UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

———————————————————————

NRP HOLDINGS LLC and NRP PROPERTIES LLC

                Plaintiffs,

v.

CITY OF BUFFALO, BYRON W. BROWN,
STEVEN M. CASEY, DEMONE A. SMITH,
RICHARD A. STENHOUSE, and BUFFALO
JEREMIAH PARTNERSHIP FOR COMMUNITY
DEVELOPMENT, INC., JOHN DOE 1 – 10, and
JOHN DOE COMPANIES 1 – 5.


                Defendants.

———————————————————————

AMENDED
RICO CASE
STATEMENT
PURSUANT TO
LOCAL RULE 9

For its Amended RICO Case Statement pursuant to Rule 9 of the Local Rules of Civil Procedure for the Western District of New York, Plaintiffs NRP Holdings LLC and NRP Properties LLC (collectively "NRP"), through their attorneys Webster Szanyi LLP, state as follows:

**1.** **State whether the alleged unlawful conduct is in violation of 18 U.S.C. §§ 1962 (a), (b), (c) and/or (d).**

Response:   18 U.S.C. §§1962(c) and 1962(d).

**2.** **List each defendant and state the alleged misconduct and basis of liability of each defendant.**

Response:    Defendant Byron W. Brown ("Brown") was and is the Mayor of the City of Buffalo ("Buffalo"). Defendant Steven M. Casey was and is the First Deputy Mayor of Buffalo. Defendant Demone A. Smith ("Smith") was and is a member of the Buffalo Common Council. Defendant Richard A. Stenhouse ("Stenhouse") was and is

the president of the Jeremiah Partnership for Community Development, Inc. ("Jeremiah Partnership").

NRP are affiliates of the NRP Group LLC, an Ohio limited liability company that develops, builds and manages apartments and housing across the United States. Among other honors, the National Association of Home Builders named the NRP Group LLC as the 2009 multifamily development firm of the year.

In November 2007, NRP was invited by representatives of the City of Buffalo ("Buffalo") to participate in a meeting to discuss affordable housing initiatives within the City of Buffalo. During this meeting, these representatives expressed their desire to work with NRP and associated companies to build single family homes within the City of Buffalo.

Effective February 21, 2008, NRP entered into agreements with associated companies to develop, construct and manage fifty (50) homes in the Masten Park and Cold Springs neighborhoods of Buffalo (the "Project"). (NRP and its associated companies are hereafter collectively referred to as the "Development Team.")

By letter dated February 25, 2008, Buffalo agreed and committed itself to participate in the Project by, among other things, extending to the Project its usual Low Income Housing PILOT agreement, providing $1,600,000 of its HOME funds to assist in the construction and, in addition, providing fifty-one (51) buildable vacant lots at a price no greater than $2,000 per buildable lot, and not to exceed a total price of $100,000.

Buffalo's agreement and commitment to the Project was subject to one condition -- the Development Team's success in securing 2008 Low Income Housing Tax Credits ("LIHTC") to complete the Project.

In the February 25, 2008 agreement and commitment letter, Buffalo stated, among other things, that "[w]e are also supportive of the feature of the development, which allows for homeownership conversion at the end of the tax required compliance period. The lease to own component provides future homeownership opportunities to residents who are not currently prepared to become homeowners, while providing them with clean, state-of-the-art housing today."

As of February 25, 2008, Buffalo, Brown and Smith knew that under applicable law, the tax compliance period referenced in the February 25, 2008 agreement and commitment was thirty (30) years.

By letter dated August 20, 2008, the Development Team received a commitment from the New York State Division of Housing and Community Renewal ("DHCR") for the necessary LIHTC. The DHCR commitment required "closing on construction financing sufficient to complete the Project" on or before March 15, 2010.

By letter dated November 5, 2008, the DHCR notified the Development Team that the amount of the LIHTC was increased from $794,363 to $922,954.

By letter dated November 8, 2008, the New York State Housing Trust Fund Corporation ("HTFC") notified the Development Team that the HTFC approved a low interest loan in the amount of $2,200,000 in support of the Project. (By letter dated March 19, 2009, the HTFC issued its agreement and commitment for the loan.)

After receiving the agreements and commitments from Buffalo and the DHCR, Buffalo moved forward with its participation in the Project in accordance with its February 25, 2008 commitment and agreement.

For example, Buffalo issued letters in support of the Project and the application to the DHCR. Buffalo also selected the sites to be used for the single-family homes. In addition, the City of Buffalo Planning Board "approved as presented", the site plan, design and elevations submitted by the Development Team.

In early 2009, however, Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership demanded that the Development Team contract with Stenhouse and/or organizations connected to Stenhouse (including the Jeremiah Partnership) to participate in the Project.

The Development Team was told that the participation of Stenhouse was required in order to assure adequate minority involvement in the Project.

The Development Team was specifically instructed that it was necessary to "find a role for Stenhouse" and "make Stenhouse happy" in order for the Project to proceed.

Initially, Stenhouse simply indicated an interest to make sure that there was adequate minority involvement in the Project. Thereafter, Stenhouse communicated a series of escalating demands. Instead of unofficial input, Stenhouse then demanded a series of tasks involving ever increasing payments to him and later the Jeremiah Partnership. Eventually, Stenhouse asked whether he could be a partner on the Project similar to the arrangement he had on the Packard project, a prior project within the City of

Buffalo, where he was paid a "developer's" fee. Stenhouse then demanded that the Development Team accept his response to a Request for Proposal, discussed below, even though it was inferior to the bid selected by the Development Team.

The Development Team was told that, because Stenhouse did not have an acceptable contract on the Project, several items promised by Buffalo were being held up in Brown's office.

Despite these threats and demands, the Development Team believed that they should issue a Request For Proposal ("RFP") to satisfy the purported need for an independent contractor on the Project devoted to minority involvement issues even though members of the Development Team were already providing such services.

In April 2009, the Development Team issued the RFP for a provider to assist it in maximizing participation in the Project by local minority business enterprises, women-owned business enterprises and individuals. The RFP was mailed to over thirty (30) organizations and an advertisement was placed in the Buffalo News. Stenhouse and the Jeremiah Partnership were advised of the RFP and invited to respond. The Development Team received three (3) proposals including one from Stenhouse and the Jeremiah Partnership. After a thorough review of the proposals, the Development Team selected the proposal submitted by the University of Buffalo – Center for Urban Studies in conjunction with J.W. Pitts Planning (collectively referred to as the "UB Team"). The proposal by the UB Team ranked far superior to the others and was more reasonably priced.

In April 2009, Buffalo issued site plan approval and a permit ready letter for the Project. In the same month, the DHCR issued environmental and plan approvals for the Project. By this time, the Development Team had incurred considerable expense and performed all tasks necessary to move forward with the Project.

After selecting the UB Team and rejecting the proposal submitted by Stenhouse and the Jeremiah Partnership, the Project was stalled and ultimately killed by Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership.

Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership used their positions and influence to cause Buffalo to breach its February 25, 2008 agreement and commitment to the Project because the Development Team refused to comply with the illegal demand that they pay monies to Stenhouse and/or affiliated organizations in order for the Project to proceed.

In making the illegal demand, Brown said: "If you do not hire the right company [i.e. Stenhouse and/or the Jeremiah Partnership], you do not have my support for the Project." He also said: "Make Stenhouse happy or the deal will not go through" and further stated that he was "sick of seeing those fucking white developers on the East Side with no black faces represented." After the Development Team selected the UB Team instead of Stenhouse, Brown said: "I told you what you had to do and you hired the wrong company." Smith made similar statements. Upon information and belief, Stenhouse and the Jeremiah Partnership demanded a role on the Project because of their past endorsement of Brown as Mayor and in consideration for their future endorsement of Brown. 2009 was an election year. Upon information and belief, Brown

and Smith intended to reward Stenhouse and the Jeremiah Partnership for their past endorsement and support and viewed the continuing endorsement by Stenhouse and the Jeremiah Partnership as integral to Brown's re-election efforts in 2009.

The illegal schemes implemented by Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership against NRP continued until March 15, 2010, when NRP was unable to meet the deadline for closing on construction financing sufficient to complete the Project and, as a result, the Project could no longer be completed.

Buffalo, Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership have failed to offer any good faith or legitimate reason for causing Buffalo to breach its agreement and commitment to the Project.

In statements to the media, Brown claims that he refused to support the Project when he learned of the thirty year rental time period before the homes would be made available for home ownership. Brown's purported reason is patently false. Brown was aware that the thirty year durational requirement was mandatory under applicable law prior to Buffalo's February 25, 2008 agreement and commitment for the Project.

Stenhouse is quoted by the media as stating that he never thought the Project was worthwhile. Stenhouse's statement is both incredible and false as reflected by his ongoing and persistent efforts in 2009 to have a role on the Project including the submission of a proposal in response to the RFP.

**3.      List the alleged wrongdoers, other than the defendants listed above, and state the alleged misconduct of each wrongdoer.**

Response:     Other than the defendants listed above, NRP is presently unaware of any other entities or persons that participated in the alleged wrongdoing described in the previous response.   NRP believes others may have been involved and, for this reason, has named John Doe individuals and John Doe Companies as defendants in the complaint.

**4.      List the alleged victims and state how each victim was allegedly injured.**

Response:     NRP and the Development Team were the victims.   As a direct and proximate result of the illegal conduct of Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership, NRP was no longer able to claim the benefits of their agreements with members of the Development Team, the DHCR, the HTFC and others who issued loan commitments and, in turn, Buffalo.   As a result, the Development Team incurred injury to its business and property in excess of $1,000,000.00.

**5.      Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim.**

      **(A)      List the alleged predicate acts and the specific statutes which were allegedly violated;**

      **(B)      Provide the dates of the predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate acts;**

      **(C)      If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities the "circumstances constituting fraud or mistake shall be**

**stated with particularity." Fed. R. Civ. P. 9(b), Identify the time, place and contents of the alleged misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations were made;**

(D)    **State whether there has been a criminal conviction for violation of each predicate set;**

(E)    **State whether civil litigation has resulted in a judgment in regard to each predicate act;**

(F)    **State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe in detail.**

Response:    The illegal schemes developed and implemented by Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership are commonly known as a "pay to play" and "pay for votes" scheme.

Over the period November 2007 to March 2010, Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership developed and implemented a conspiracy which included inviting NRP to Buffalo to develop the Project and then failing to complete actions required by Buffalo and withholding Buffalo's final approval unless NRP and the Development Team complied with their illegal demands to pay money to Stenhouse and/or the Jeremiah Partnership.  When the Development Team refused to comply with those illegal demands, Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership conspired to cause Buffalo to breach its agreement and commitment by, among other things, failing to provide funds and lots within the deadlines necessary for the Project to proceed.

Through telephonic communications, U.S. Mail, electronic communications, e-mails, and direct statements, Brown, Casey, Smith, Stenhouse and the Jeremiah

Partnership made clear that the Project would not proceed unless the Development Team paid money to Stenhouse and the Jeremiah Partnership.

Upon information and belief, Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership conditioned Buffalo's support for *other* development projects that proceeded within Buffalo on those projects finding a role for and/or the payment of monies to Stenhouse and/or the Jeremiah Partnership. Upon information and belief, in situations where development projects found a role for Stenhouse and/or the Jeremiah Partnership on their teams, Buffalo honored its agreements and commitments on those projects. Upon information and belief, the role of Stenhouse and/or the Jeremiah Partnership in certain *other* development projects was essentially a "no show" job where Stenhouse and/or the Jeremiah Partnership added little or no value to the projects.

Upon information and belief, Stenhouse did not have development experience. As a result, the Mayor's office often directed City employees to work directly with Stenhouse at City expense to provide services and the expertise that he lacked even though Stenhouse was being paid to provide such services.

Upon information and belief, the Packard project, which commenced in or about 2006, is another example where the individual defendants conspired to find a role for Stenhouse as a condition for approving a development project in Buffalo. In that project, Stenhouse became a "partner" on the development project and earned a developer's fee. Indeed, upon information and belief, Stenhouse provided no services of value to the Packard project.

Upon information and belief, East Side Housing Opportunities, Phase I is another example of where the individual defendants conspired to demand a role for Stenhouse and/or his affiliated companies as a condition for approving a development project in Buffalo. NRP was not involved in this Phase I project but has learned that Stenhouse's participation in the project added little to no value. Despite the lack of any meaningful contribution to this project, Stenhouse was paid a significant fee at the insistence of the defendants.

Prior to filing this case, NRP submitted a Freedom of Information Law request to Buffalo requesting, among other things, all documents in Buffalo's possession concerning Stenhouse and the Jeremiah Partnership. The request was intended to determine the precise involvement of Stenhouse and the Jeremiah Partnership concerning other development projects in Buffalo. In response, Buffalo first delayed and then refused to produce documents in Buffalo's possession concerning Stenhouse and the Jeremiah Partnership. Discovery is necessary to determine the full extent of the role of Stenhouse and the Jeremiah Partnership in the Packard project, the East Side Housing Opportunities, Phase I project, and other development projects in Buffalo.

The foregoing predicate acts are violations of the Hobbs Act, 18 U.S.C. § 1951 and New York Penal Law § 200 *et seq.*, 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

Based on the predicate acts committed against NRP and the Development Team and, upon information and belief, other developers in Buffalo, the RICO pattern in this case involves closed-ended and open-ended continuity. Even assuming, *arguendo*, the "pay to play" practice has ended, Brown, Casey, Smith, Stenhouse and the Jeremiah

11

Partnership developed and implemented this practice against NRP and others through numerous threats and demands over a time period of more than two years. The scheme also included repeated misrepresentations concerning the purported role of Stenhouse and the Jeremiah Partnership in connection with development projects in Buffalo.

By its nature, a "pay to play" scheme involving high ranking political officials satisfies the test for open-ended continuity. It is reasonable to infer that such predicate acts were the regular way in which such persons exercised their authority within the enterprise and implied a threat of continuing criminal activity. In the case of NRP and the Development Team, for example, Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership would have allowed the Project to proceed if NRP and the Development Team agreed to pay Stenhouse and the Jeremiah Partnership. NRP and the Development Team, however, were stalled and suffered significant economic losses because they would not comply with or participate in the illegal schemes.

The RICO claim includes but is not limited to predicate offenses of mail and wire fraud. In turn, the offenses of mail and wire fraud include but are not limited to the following specific events. Upon information and belief, Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership developed and implemented the "pay to play" conspiracy when NRP was invited to develop the Project in November 2007, and thereafter. By letter dated February 25, 2008, Buffalo's agreement and commitment to the Project was subject to one condition – the Development Team's success in securing LIHTC to complete the Project. This letter was false because Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership conspired to impose the additional condition requiring the

Development Team to hire Stenhouse and the Jeremiah Partnership. The Development Team relied on the February 25, 2008 letter and successfully obtained the LIHTC. Starting in early 2009, Stenhouse made a series of escalating demands concerning the need for his involvement in the Project. These demands included mailings and e-mails to the Development Team stating terms for the involvement of himself and the Jeremiah Partnership on the Project. In April-May 2009, Stenhouse and the Jeremiah Partnership responded to the RFP by U.S. Mail, again stating terms for the involvement of Stenhouse and the Jeremiah Partnership. Each of these "proposals" was false and misleading because they were not offers subject to fair and open competition with other potential vendors of similar services. Rather, they were threats and demands that the Development Team was obligated to accept. As the Development Team learned, if it refused to accept the proposals, then Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership would make sure that the Project died. In 2010, Brown and Stenhouse made repeated statements that were intended for publication (and in fact were published over the air waves) falsely stating the reasons why they killed the Project. Throughout, all defendants also engaged in related communications by telephone, mail, and electronic transmission.

NRP is unaware of any criminal conviction or other civil litigation resulting in a judgment in relation to any of the alleged predicate acts.

> **6.     Describe in detail the alleged enterprise for each RICO claim.**
>
>   **(A)     State the names of the individuals, partnerships, corporations, associations, or other legal entities, which allegedly constitute the enterprise;**

13

> **(B)** Describe the structure, purpose, function and course of conduct of the enterprise;
>
> **(C)** State whether any defendants are employees, officers or directors of the alleged enterprise;
>
> **(D)** State whether any defendants are associated with the alleged enterprise;
>
> **(E)** State whether you are alleging that the defendants are individuals or entities separate, from the alleged enterprise, or that the defendants are the enterprise itself, or members of the enterprise; and
>
> **(F)** If any defendants are alleged to be the enterprise itself, or members of the enterprise, explain whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.

Response: The enterprise is Buffalo. At all relevant times, Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership used Buffalo as a passive instrument for their personal benefit, *i.e.* by developing and implementing a "pay to play" and "pay for votes" scheme to further political careers and/or for their personal benefit. Brown and Smith are public officials of Buffalo.

**7.     State and describe in detail whether you are alleging that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.**

Response: The enterprise, Buffalo, existed prior to the pattern of racketeering activity, and exists as a legitimate entity. Accordingly, the pattern of racketeering conducted by Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership through their association with Buffalo is separate from the enterprise and has not merged into a single entity.

**8.    Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity.  Discuss how that racketeering activity differs from the usual and daily activities of the enterprise, if at all.**

Response:    The enterprise, Buffalo, issued the February 25, 2008 agreement and commitment letter.  This letter included one condition, namely the Development Team was obligated to secure the LIHTC.   Despite the Development Team's compliance with this condition, Buffalo did not perform under the agreement and commitment letter because Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership required another condition, namely the Development Team's obligation to pay money to Stenhouse and/or the Jeremiah Partnership.  Such a "pay to play" or "pay for votes" scheme is contrary to the usual and daily lawful activities of Buffalo.

**9.    Describe what benefits, if any, the alleged enterprise receives from the alleged pattern of racketeering.**

Response:    In this case, the enterprise, Buffalo, is a passive instrument through which Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership wielded power for their personal political and economic benefit.

**10.    Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

Response:    NRP and its affiliate the NRP Group, LLC are Ohio entities that develop, build and manage apartments and housing across the United States.  As such, the predicate acts described above affected efforts by these Ohio entities to

conduct business in the State of New York and, therefore, has a direct impact on interstate commerce.

**11.     If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:**

        **(A)     State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and**

        **(B)     Describe the use or investment of such income.**

Response:     Not applicable because there is no allegation of a violation of 18 U.S.C. § 1962(a).

**12.     If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.**

Response:     Not applicable because there is no allegation of a violation of 18 U.S.C. § 1962(b).

**13.     If the complaint alleges a violation of 18 U.S.C. 1962(c), provide the following information:**

        **(A)     State who is employed by or associated with the enterprise; and**

        **(B)     State whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).**

Response:     As described above, Brown was and is the Mayor of Buffalo. Smith was and is a member of the Buffalo Common Council. Casey was and is the First Deputy Mayor of Buffalo. Stenhouse and the Jeremiah Partnership were and are associated with Buffalo based on their relationship with Brown and Smith. Buffalo is a

passive instrument through which Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership wielded power for their personal political and economic benefit.

**14.    If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe in detail the alleged conspiracy.**

Response:    The members of the conspiracy are Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership.  These persons conspired to develop and implement "pay to play" or "pay for votes" schemes described in detail above.

**15.    Describe the alleged injury to business or property.**

Response:    NRP suffered injury to its business and property.  As a result of the defendants' illegal schemes, NRP was no longer able to claim the benefits of their agreements with members of the Development Team, the DHCR, the HTFC and others who issued loan commitments and, in turn, Buffalo.  As a result, NRP incurred injury to its business and property consisting of out of pocket expenses, lost profits including rental revenues and anticipated sales of units, lost business opportunities, and other damages to be determined.  For example, the lost out of pocket expenses exceed $450,000.00.  Other compensatory damages are expected to exceed $1,000,000.00.

**16.    Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.**

Response:    By refusing to comply with the "pay to play" threats and demands, NRP and the Development Team were unable to claim the benefits of the agreements described in the previous paragraph and suffered injury and damages as a result.

**17.    List the damages sustained for which each defendant is allegedly liable.**

Response:    Brown, Casey, Smith, Stenhouse and the Jeremiah Partnership are jointly and severally liable for the damages suffered by NRP and the Development Team.  Such damages include the out of pocket expenses, lost profits including lost rental revenues and anticipated sales of units, lost business opportunities and other damages to be determined.

**18.    List all other federal causes of action, if any, and provide the relevant statute numbers.**

Response:    Count I of the Amended Complaint asserts a breach of contract claim against Buffalo.  Count II of the Amended Complaint asserts a promissory estoppel claim against Buffalo, Brown, Casey, and Smith.  Count III of the Amended Complaint asserts claims under common law theories of tortious interference with contract and/or prospective contractual relations, tortious interference with prospective economic advantage and/or economic relations and concerted action theory and/or civil conspiracy.  These Counts are federal claims because the Court's subject matter jurisdiction over these Counts is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.  Count V of the Complaint asserts a federal law claim pursuant to 42 U.S.C. §1983.

**19.    List all pendent state claims, if any.**

Response:    Count I of the Amended Complaint asserts a breach of contract claim against Buffalo.  Count II of the Amended Complaint asserts a promissory estoppel claim against Buffalo, Brown, Casey, and Smith.  Count III of the Amended

Complaint asserts state law claims under the common law theories of tortious interference with contract and/or prospective contractual relations, tortious interference with prospective economic advantage and/or economic relations and concerted action theory and/or civil conspiracy.  As stated in the previous response, these claims fall under the federal court's diversity jurisdiction even though state law provides the applicable substantive law.

**20.     Provide any additional information that you feel would be helpful to the Court in processing your RICO claim.**

Response:    The following provides a succinct summary of the case including additional information, stated upon information and belief, that NRP believes would be helpful to the Court in processing the claim.

**What is the Lawsuit About:**

NRP filed litigation in the United States Federal Court for the Western District of New York against the City of Buffalo and others (the "defendants") as a result of the defendants' intentional and ultimately successful efforts to kill an affordable housing project.  In 2007, the defendants invited NRP to assist the City of Buffalo in expanding the affordable housing options available to its residents.   After two initial meetings, the City selected NRP and affiliated companies (the "Development Team") to develop, construct, and manage 50 homes in the Masten Park and Cold Springs neighborhoods of Buffalo (the "project").  The City issued a firm commitment letter to the project and contractually obligated itself to take the actions necessary to assist NRP and the Development Team to complete the project.  In consideration of this, and specifically at the request of the City, NRP undertook great efforts and incurred significant expenses to move the project forward to completion.  In addition to its expenditures, NRP devoted thousands of man hours to the project.  In the late stages of the project, the defendants demanded that NRP hire Reverend Richard Stenhouse and the Buffalo Jeremiah Partnership For Community

Development, Inc. as a sub-contractor for the project to perform certain services to assist NRP in maximizing participation in the project by local minority business enterprises, women-owned business enterprises and individuals.  After considering the demand, NRP determined that it should place the services out for public bid and issued a Request for Proposal (RFP) to the public.  Rev. Stenhouse and the Jeremiah Partnership were invited to respond, and were among three entities to respond to the RFP.  At the end of the RFP process, Rev. Stenhouse was not selected to provide any services for the project.  Upset that Rev. Stenhouse was not selected and that NRP did not comply with their prior demand to hire Rev. Stenhouse, the defendants, including Mayor Brown, First Deputy Mayor Casey, and Council Member Demone Smith, intentionally killed the project and, through their direct actions, ensured that it would not proceed to completion.

**Why was the Lawsuit Filed:**

The lawsuit was filed because NRP believes that the defendants' conduct in killing the project was wrongful and illegal.  In the course of demanding that NRP hire Rev. Stenhouse to participate in the project, the defendants made certain statements that caused NRP to believe it was the target of a "pay to play" scheme.  For example, Mayor Byron Brown said:  "If you do not hire the right company [i.e., defendant Stenhouse and/or the Jeremiah Partnership], you do not have my support for the Project."  He also said:  "Make Stenhouse happy or the deal will not go through" and that he was "sick of seeing those f***ing white developers on the East Side with no black faces represented." After the Development Team selected an alternative bidder instead of Rev. Stenhouse, Brown said:  "I told you what you had to do and you hired the wrong company."  Council Member Demone Smith made similar statements.  Rev. Stenhouse also contacted NRP. His initial contact appeared benign until he, through the course of events, made escalating demands for a role in the project all of which required the payment of significant sums of money to Rev. Stenhouse and his affiliated companies.  NRP's refusal to comply with the defendants' demands was the sole reason for the defendants killing the project.  Although the defendants would later claim they knew little about the project or never supported the concept of the project, the facts alleged in the complaint

demonstrate that these are sham excuses contrived in an effort to conceal the alleged illegal conduct of the defendants.  Unfortunately, this is not the first time that the defendants have demanded that an entity intending to do business in the City of Buffalo hire Rev. Stenhouse as a condition for City support.  NRP's investigation has revealed that other business entities have been subjected to similar demands that they hire Rev. Stenhouse and his affiliated companies in order to complete other development projects within the City of Buffalo.

**What Legal Claims Are Alleged in the Lawsuit:**

NRP has alleged several claims in the complaint including breach of contract, promissory estoppel, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), violations of NRP's constitutionally protected right to conduct business within the City of Buffalo without being subjected to illegal demands by City employees, and several claims related to applicable business torts.

**What are the Goals of the Lawsuit:**

There are three goals of the lawsuit: deterrence, increased awareness, and recovery of damages.  First and foremost, NRP believes that the defendants' conduct should not be repeated.  No developer or business should be subjected to a "pay to play" scheme in order to carry out business with and in the City of Buffalo.  Both the filing of this lawsuit and the expected successful resolution of the lawsuit should serve as a deterrent to the defendants and others who may hold public office in the City of Buffalo from engaging in similar conduct in the future.  Second, NRP hopes to raise awareness of the alleged wrongful conduct and to encourage others who have been treated in a similar manner to come forward.  Third, NRP is entitled to be compensated for the damages it incurred as a result of the alleged wrongful conduct by the defendants.  The law provides very clear remedies for a party who has been harmed by the actions of another.  NRP is pursuing only those legal remedies which are available to it under the law.  In this case, NRP is seeking to recover for its lost out of pocket expenses, compensatory and consequential

damages, punitive or treble damages, and the attorney's fees it has and will incur in prosecuting this action and enforcing its legal rights and remedies.

**Conclusion:**

Parties such as NRP should not have their development projects in Buffalo conditioned on illegal demands and threats to pay money to Stenhouse and the Jeremiah Partnership (or any other person or entity) in order to have those projects approved by publicly elected officials.  In such circumstances, the federal courts routinely recognize the availability of RICO to provide a federal claim in favor of such parties against persons attempting to extort compliance with such a "pay to play" scheme.  *See, e.g., DeFalco v. Bernas*, 244 F.3d 286 (2nd Cir. 2001).

NRP reserves its right to supplement this case statement, to the extent necessary and/or required by Court rules, following the receipt of discovery information from the defendants.

Dated:        December 23, 2011

WEBSTER SZANYI LLP
Attorneys for Plaintiffs

By:     s/*Thomas S. Lane*
            Thomas S. Lane
            Nelson Perel
1400 Liberty Building
Buffalo, New York 14202
Telephone:  (716) 842-2800
tlane@websterszanyi.com
nperel@websterszanyi.com