UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

NRP Holdings LLC and NRP Properties LLC,

        Plaintiffs,

   vs.

City of Buffalo, Byron W. Brown, Steven M. Casey,
Demone A. Smith, Rev. Richard A. Stenhouse,
Jeremiah Partnership for Community
Development, Inc., John Doe 1 – 10 and John Doe
Companies 1 – 5,
        Defendants.

**AFFIDAVIT**

Docket No. 11-CV-472-WMS

STATE OF NEW YORK  )
COUNTY OF ERIE      ) SS.:
CITY OF BUFFALO    )

        Terrence M. Connors, Esq., being duly sworn, deposes and says:

        1.    I am an attorney admitted to practice law in New York State and a partner in the firm of Connors & Vilardo, LLP, attorneys for defendants City of Buffalo, Byron W. Brown, and Steven M. Casey in this action.

        2.    I make this affidavit in support of the motion to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Attached hereto as Exhibit A is a copy of the amended complaint, which was filed on December 23, 2011. (Docket # 22).

        3.    I recognize that on a Rule 12(6)(b) motion to dismiss, the Court accepts the plausible allegations in the complaint as true for purposes of deciding the motion. Moreover, the defendants recognize their duty to the

taxpayers to obtain a dismissal as early in the process as possible so that attorney fees are kept to a minimum; in fact, that is why they have made this motion.

4. Nevertheless, in light of the scurrilous and defamatory statements made about respected public officials in the complaint, a few matters should be addressed on the record even if they do not bear directly on the legal arguments in the motion to dismiss.

### Pay to Play Scheme

5. The allegation of a "pay-to-play" scheme make absolutely no sense. As public records document, Reverend Stenhouse did not contribute one penny to any of Mayor Brown's mayoral campaigns.

6. Ironically, however, the "lobbyists" who NRP retained to intervene with the mayor on its behalf indeed contributed to his campaign. In fact, upon information and belief, they were well known political supporters and allies of the mayor who contributed a total of more than $15,000 to his campaigns.

7. In other words, the "pay-to-play" allegations suggest that the mayor chose to illegally assist someone who contributed nothing to his mayoral campaign at the expense of several others who contributed thousands of dollars is preposterous to say the least.

8. Even worse, the amended complaint suggests that the mayor did this to obtain an endorsement he did not need -- and likely would

have received anyway. In fact, upon information and belief, no opponent even applied for the endorsement of the Jeremiah Project.

## HOME Funds

9. Moreover, the amended complaint seems utterly ignorant of the government program upon which it necessarily is based. Like dozens of other American cities, the City of Buffalo has shared in the federal government's generosity, using HOME funds to revitalize poverty-stricken areas in the City. This effort has been fueled largely by local community development organizations, eager to improve the neighborhoods in which their members reside.

10. Reverend Stenhouse has been at the forefront of this effort for nearly a decade now – long before Mayor Brown assumed his current position – and has long been a leader in urban redevelopment efforts on Buffalo's East Side.

11. When the Cleveland-based developer NRP first approached the City about a potential project, it received the support of officials in the City's Office of Strategic Planning. But when the project was fully explained to the Mayor, he expressed his dissatisfaction with the project's terms that were unfavorable to the purported beneficiaries of the project – the local residents – and with NRP's refusal to include those very residents in the project. That, and not some far-fetched scheme to benefit his supporters, was one of the reasons for the mayor's decision.

12. The amended complaint alleges that the mayor and his colleagues said things they never said and did things they never did. It falsely puts racist words in the mouth of the mayor using quotations that anyone who has ever spoken with the mayor can see are simply made up.

13. There are too many false statements to try to deal with each one, and this is not the vehicle for that exercise. Suffice it to say that the mayor, the deputy mayor and the City vehemently deny the conduct, ulterior motives, and far-fetched conspiracy attributed to them.

## NRP

14. Furthermore, NRP's characterization of itself deserves some attention. NRP's amended complaint touts its development of housing "across the United States" and its having being named the National Association of Home Builders "2009 Multi-Family Development Firm of the Year." (Amended Complaint, ¶18). But there is clearly another side to NRP's national reputation and its development experience elsewhere in the country.

15. According to news reports, NRP has been criticized for using out-of-state contractors on projects in St. Louis and Michigan in order to avoid paying prevailing wage. The reports state that government officials and union leaders contend that NRP used the savings in labor costs to underbid local contractors on the projects.

16. Attached hereto as Exhibit A are a series of articles from the St. Louis Post-Dispatch. The articles are dated February 16, 2006, February

17, 2006, February 22, 2006, February 28, 2006, March 18, 2006, April 21, 2006, June 15, 2006, June 28, 2006, October 4, 2007, December 27, 2007, and June 6, 2008, and were obtained by your deponent's office from Westlaw.

17. This series of articles contains reports concerning NRP's performance and termination from a St. Louis area project in 2006.

18. According to those St. Louis Post-Dispatch articles:

- NRP was the construction contractor on a lower-income housing project in the St. Louis area that was backed by state and federal tax credits and tax exempt bonds;

- NRP employed out-of-state contractors who, in turn, employed illegal immigrants on the project;

- The illegal immigrants were paid $8.00 per hour, well below the prevailing union wage of about $26.00;

- NRP's winning construction bid on the project was $4 million less than any bids by local union contractors;

- According to an April 21, 2006 St. Louis Post-Dispatch article, a member of the Missouri Housing Development Commission, Bill Luetkenhaus, and others "said the figure hinged on NRP's use of inexpensive subcontractors, which, in turn, used cheap, illegal labor. 'The bids that were submitted in the package that was given to the state was not priced at a rate in which you could use Missouri workers and local tradesmen,' he said";

- After the illegal workers were discovered, work on the project came to a standstill;

- The St. Louis project eventually had to be restructured and additional public money provided to allow the project to continue without illegal immigrant labor and at the prevailing wage;

- NRP was terminated from the project;

- The termination of NRP was a condition imposed in connection with the restructuring of the project. As the April

21, 2006 St. Louis Post-Dispatch article states, "'I made it very clear if I was going to spearhead this [restructuring] effort and pull our parties together, NRP has to go,' Luetkenhaus said. 'NRP came and talked to us in February; they were not repentful for their actions.'";

- The incident involved local officials, unions, the Missouri Housing Development Commission and Missouri State Treasurer Sarah Steelman.

19. NRP also was the subject of similar charges in connection with building a lower-income housing development in Brownstown, Michigan. A June 29, 2005 Detroit News article obtained by your deponent's office from Westlaw is also included in Exhibit A. The article describes the picketing of the project by union carpenters because the workers were not paid prevailing wages and the jobs were not going to local workers. According to the article, the project was funded, in part, by a loan from the Michigan State Housing Development Authority. As a result, contractors such as NRP were not required to pay union wages.

20. According to the article, NRP did not deny that it failed to pay prevailing wages and actually defended its practice. According to the article, "developers like Rick Bailey, whose Cleveland-based NRP Contractors is building the Preston Pointe Development, said he's not sure he could build moderate – and low-income housing if he had to pay prevailing wages and benefits. 'But if we could, the product would not be near as nice as what we're building,' Bailey said. 'One union contractor's bid (for carpentry) was five times more than what we got it for.'"

21. For the legal reasons in the attached memorandum of law, this action should be dismissed. But as a matter of fairness and to set the record straight, what is stated above needed to be said.

22. Finally, there is evidence that NRP knew that its claim based on the one-and-a-half page February 25, 2008 letter from Timothy Wanamaker was legally insufficient.

23. Attached hereto as Exhibit B is a true and correct copy of a document obtained by our office from the Erie County Clerk's Office. The document is titled "Agreement between the City of Buffalo Urban Renewal Agency and East Side Housing, L.P., and Belmont Shelter Corporation," dated October 3, 2005, and it was filed in the Erie County Clerk's Office on October 7, 2005. The agreement concerns the first phase of the Project that is the subject of NRP's amended complaint. The project referred to in this agreement, East Side Housing Opportunities Phase I, is expressly referenced and relied upon in the amended complaint. (*See, e.g.,* Amended Complaint, ¶86). Accordingly, the Court may take judicial notice of this agreement, which is referred to herein and in the memorandum of law as the "East Side I HOME Agreement," and it is properly considered by the Court in connection with the City Defendants' motion to dismiss.

24. For the convenience of the Court, attached hereto as Exhibit C are excerpts from the Buffalo City Charter that are cited in the accompanying memorandum of law.

25. Also for the convenience of the Court, attached hereto as Exhibit D are cited excerpts from 24 Code of Federal Regulations §92.500 et. seq.

_____<br>Terrence M. Connors, Esq.

Sworn to before me this
13th day of January, 2012.
_____
Notary Public

RANDALL D. WHITE
Notary Public, State of New York
Qualified in Erie County
My Commission Expires on July 22, 2015