COVER SHEET (REV. 07-12-05)



# ERIE COUNTY CLERKS OFFICE
## County Clerk's Recording Page

Return To:
BOX 104

**Book: 149**      **Page: 3724**

Page Count: **67**

Doc Type: **BUILDING LOAN**

Rec Date: **10/07/2005**

Rec Time: **04:07:40 PM**

Control #: **2005052679**

User ID: **bev**

Trans Num: **27422**

DEED SEQ:

MTG SEQ:

UCC:

SCAR:

INDEX:

Party 1:

**EAST SIDE HOUSING LP**

Party 2:

**BUFFALO URBAN RENEWAL AGENCY**

| Recording Fees: | | Consideration Amount: | **$1,000,000.00** |
|---|---|---|---|
| RECORDING13 | $25.00 | BASIC | **$0.00** |
| | | SONYMA | **$0.00** |
| | | ADDL | **$0.00** |
| | | NFTA MT | **$0.00** |
| | | TRANSFER | **$0.00** |
| | | NFTA TT | **$0.00** |

**Total:**      **$25.00**

STATE OF NEW YORK
ERIE COUNTY CLERK'S OFFICE

**WARNING - THIS SHEET CONSTITUTES THE CLERK'S ENDORSEMENT, REQUIRED BY SECTIONS 319&316-a (5) OF THE REAL PROPERTY LAW OF THE STATE OF NEW YORK. DO NOT DETACH. THIS IS NOT A BILL.**

David J. Swarts
County Clerk



STATE OF NEW YORK, COUNTY OF ERIE, SS.

I, Christopher L. Jacobs, Clerk of said County, and also Clerk of Supreme and County Courts of said County, do hereby Certify that I have compared the annexed copy with the original
*Building Loan*
Filed in my office and that the same is a correct transcript therefrom and of the whole of said original.
WITNESS my hand and seal of said County and Courts on
_____ day of _____ JAN 10 2012 20_____

/s/

County Clerk

# AGREEMENT BETWEEN
## THE CITY OF BUFFALO URBAN RENEWAL AGENCY

### AND

East Side Housing, L.P.,
and
Belmont Shelter Corporation

## EAST SIDE HOUSING OPPORTUNITIES
## RENTAL HOUSING PROJECT

October 3, 2005

**HOME Investment Partnerships Program**

**CFDA 14.239**

541 - 46

Book149/Page3725

## HOME Program Agreement - Table of Contents

**General Provisions**

I.      Definitions

II.     Term –

        Schedule

        Compliance period

III.    Scope of Work

        Obligations prior to construction

        Conditions of performance

IV.     Project Requirements

V.      Reimbursement of Expenses and Redevelopers Fees – Disbursement of Funds

        Disbursement of funds

        Use of the HOME funds

        Disbursement schedule

        Program income

VI.     Repayment of note and security for funds

VII.    CHDO Provisions / Reserved

VIII.   Procurement Standards

IX.     Conflict of Interest Provisions

X.      BURA responsibilities

XI.     Equal employment opportunity, labor, training and business opportunites

        Nondiscrimination

        MWBE outreach

        Section 3

XII.    Reserved / Guarantee

XIII.   Compliance with Federal, state and local laws

        Federal Covenants

XIV.    Suspension and Termination

        Events of defaults and remedies

XV.     Termination or Suspension of Award for non-compliance by BURA

XVI.    Default / Loss of Grant Funds

XVII.   Reporting Responsibilities

XVIII.  Inspection, monitoring, access to records

XIX.    General Conditions

        Affirmative Covenants

        Negative Covenants

        Owner Certifications

        Closing Expenses

        Miscellaneous Provisions

XX.     Signage

Book149/Page3726

## Exhibits and Appendices

**Exhibit A** – Scope of Services

Project Description

Accessibility Requirements

Compliance Period

Program income

Marketing and Sales

Management Plan

Tenant Selection

Over Income Tenants

Relocation

Tenant Protections

Project Schedule

**Exhibit B** – Project Budget

**Exhibit C** – HOME resale and recapture provisions

**Exhibit D** – 24 CFR 92.350 –

Nondiscrimination, equal opportunity, disclosure, debarment, drug free workplace

**Exhibit E** – Affirmative Marketing Policies and Procedures

**Exhibit F** – Lien Law Affidavit

**Exhibit G** – Conflict of Interest Disclosure

**Exhibit H** – Certification Form – Section 3 compliance

**Appendix A** –

Income limits, maximum subsidy limits, maximum sales price / property values or High/Low HOME rents

**Appendix B** - Affordability restrictions and covenants running with the land – rental projects

**Appendix C** – Signage Requirements

Book149/Page3727

## AGREEMENT BETWEEN THE CITY OF BUFFALO URBAN RENEWAL AGENCY

### AND

East Side Housing, L.P.
and
Belmont Shelter Corporation

## EAST SIDE HOUSING OPPORTUNITIES
## RENTAL HOUSING PROJECT

### CFDA 14.239

THIS AGREEMENT MADE this 3ʳᵈ day October, 2005 by and between the City of Buffalo Urban Renewal Agency (hereinafter referred to as "**BURA**"), a public body corporate established pursuant to Article 15-A of the General Municipal Law of the State of New York, and the designated administrator of the HOME Program on behalf of the City of Buffalo, having offices at 920 City Hall, Buffalo, New York, 14202, and East Side Housing, L.P. (owner), a New York limited partnership, and Belmont Shelter Corporation (guarantor), a New York not-for-profit corporation, both with an address at 1195 Main Street, Buffalo, New York, 14209, hereinafter referred to as the "Redeveloper(s)".

### WITNESSETH

WHEREAS, the United States Government, in accordance with the HOME Investment Partnerships Program, authorized by Title II of the Cranston-Gonzales National Affordable Housing Act of 1990 (42 U.S.C. 12701-12839) (hereinafter referred to as the "Act") recognized the need to supplement private and public spending for housing in the nation's metropolitan centers and to expand the supply of decent and affordable housing, particularly rental housing, for low and very low income Americans (the "Program") and;

WHEREAS, the City of Buffalo has received certain funds under the Act and Regulations promulgated pursuant thereto (hereinafter referred to as the "Regulations"), in the form of a grant; supporting various community level programs, intended to strengthen its ability to design and implement strategies for achieving an adequate supplies of decent, affordable housing; and

WHEREAS, the CITY is the recipient of HOME Investment Partnerships Program Funds from the U.S. Department of Housing and Urban Development (HUD) under Catalogue of Federal Domestic Assistance No. 14.239, including funds that are available for construction of new affordable rental housing; and

WHEREAS, BURA has been designated by the Chief Executive Officer of the City of Buffalo (The Mayor) to administer said grant funds; and

WHEREAS, the proposed Project Allocation has been approved by BURA at its meeting on September 15, 2005, Item 9(a) (Approved); and

WHEREAS, the Redevelopers desire to participate and receive HOME funds either directly or indirectly for the purpose of implementing an eligible Project (as hereinafter described); and

WHEREAS, the parties intend this Agreement to serve as a building loan agreement, as well as to set forth the terms of the allocation of Home Investment Partnership funds from BURA to the Redeveloper(s); and

Book149/Page3728

WHEREAS, it is the mutual intent of the parties and a primary objective of the Project to provide eligible low to moderate income persons with quality rental housing opportunities for an initial period of tenancy and with the opportunity to convert to home ownership under the most affordable terms available to the maximum extent possible while in compliance with all Federal, state and local laws and regulations;

NOW, THEREFORE in consideration of the mutual covenants and obligations herein contained, including the Attachments, and subject to the terms and conditions hereinafter stated, the parties hereto understand and agree as follows:

**Section I - Definitions**

A.   **BURA** - is hereby defined as the City of Buffalo Urban Renewal Agency, the designated administrator of the HOME Program on behalf of the City of Buffalo.  For the purpose of this Agreement and all administration of HOME funds, BURA, through its Vice-Chairman, shall act on behalf of the City of Buffalo in the execution and fiscal and programmatic control of this agreement. The term "Approval by the City" or "Approval by BURA" or like term used in this Agreement shall in no way relieve the Redevelopers from any duties or responsibilities under the terms of this Agreement, or obligation State or local law or regulation.

B.   **DIRECTOR** - is hereby defined as the Executive Director of the City of Buffalo Office of Strategic Planning and who acts as the Vice-Chairman of the City of Buffalo Urban Renewal Agency.

C.   REDEVELOPERS CONTRACT ALLOCATION PER THIS AGREEMENT - is hereby defined as the amount of money BURA agrees to pay and the Redevelopers agree to accept as payment in full for all the professional, technical and construction services rendered pursuant to this Agreement to complete the WORK as further defined in Section III SCOPE OF WORK, and **"EXHIBIT A"** (Project Description) and **"EXHIBIT B"** (Project Budget).

D.   WORK - is hereby defined as all the professional, technical and construction services to be rendered or provided by the Redevelopers as described here.

E.   PROJECT - is defined in Section III (below) and in EXHIBITS A and B.

F.   HOME - is hereby defined as the HOME Investment Partnerships Program as described in 24 CFR Part 92, under the authority of 42 U.S.C. 3535 (d) and 12701 - 12839.

**Section II - Term**

The Redeveloper(s) expressly agree to complete all work required by this agreement in accordance with the timetable set forth.

| Milestone | Deadline |
| --- | --- |
| Project **Start Date** | May 2005 |
| Land acquisition completed | October 4, 2005 |
| Construction start date | October 2005 |
| Submission of interim status report | November 1,  2005 |
| Construction completion date – Certificate of Occupancy Issued | November 1, 2006 |
| Project Rent-up / Occupancy completed | December 31, 2006 |
| Closing of permanent finance sources<br>Submission of preliminary initial occupancy / rentup report | January 2007<br>60 days after issuance of Certificate of Occupancy |
| Deadline for return of Program Income, if any | Ongoing during period of affordability |

| Final Project Completion Date (including including submission of all cost certifications, audits, closeout documents and final initial occupancy reports) | September 30, 2006 |
|---|---|

In addition, this project is subject to ongoing compliance requirements, as specified in the HOME regulations, for **twenty years** (the "compliance period") from the date of the Certificate of Occupancy. During this compliance period, the Redevelopers will assure continued compliance with HOME requirements. For homebuyer units this includes monitoring units for principal residency and recapture of funds at time of resale.  For rental units, this includes ongoing property standards, occupancy and rent limits compliance.

<u>Compliance Period</u>.  The minimum period for compliance with HOME regulations at 24 CFR 92.252(e), based on total HOME funds allocated per unit, is **twenty years** from the date of completion as stated on the Certificate of Occupancy.   To the extent that the Note term specified above or the regulatory period specified in the HOME Project Affordability Covenants Running with the Land are longer, the Redevelopers will continue to comply with all of the requirements stated in this section. The affordability requirements apply without regard to the term of any Note or mortgage or the transfer of ownership. The affordability restrictions may terminate upon foreclosure or transfer in lieu of foreclosure. BURA may use purchase options, rights of first refusal or other preemptive rights to purchase the property before foreclosure or deed in lieu of foreclosure to preserve affordability.  The affordability restrictions shall be revived according to the original terms if, during the affordability period, the owner of record before the foreclosure, or deed in lieu of foreclosure, or any entity that includes the former owner or those with whom the former owner has or had family or business ties, obtains an ownership interest in the project or property.

The minimum Affordability Period as required by the HOME regulations at 24 CFR 92.252 is based on the level of HOME funds provided per unit as follows –

**New Construction - Assistance per unit -- Minimum Periods of Affordability -**
        Over $40,000 -                        20 years

Timely completion of the work specified in this agreement is an integral and essential part of performance; the expenditure of HOME funds is subject to Federal deadlines and could result in the loss of the allocation of HOME Program funds and required repayment. By the acceptance and execution of this agreement, it is understood and agreed by the Redevelopers that the PROJECT will be completed as expeditiously as possible and that the Redevelopers will make every effort to ensure that the project will proceed and will not be delayed. Failure to meet these deadlines can result in cancellation of this contract and the revocation of HOME funds.

Since it is mutually agreed that time is of the essence as regards this agreement, the Redevelopers shall cause appropriate provisions to be inserted in all contracts or subcontracts relative to the work tasks required by this agreement, in order to ensure that the PROJECT will be completed according to the timetable set forth. It is intended that such provisions inserted in any subcontracts be, to the fullest extent permitted by law and equity, binding for the benefit of BURA and enforceable by BURA against the Redevelopers and their successors and assigns to the project or any part thereof or any interest therein.

In the event the Redevelopers are unable to meet the above schedule or complete the above services because of delays resulting from Acts of God, untimely review and approval by BURA and other governmental authorities having jurisdiction over the PROJECT, or other delays that are not caused by the Redevelopers, BURA shall grant a reasonable extension of time for completion of the WORK.  It shall be the responsibility of the Redevelopers to notify BURA promptly in writing whenever a delay is anticipated or experienced, and to inform BURA of all facts and details related to the delay.

**Section III - Scope of Work**

The Redevelopers, in close coordination with BURA, shall perform all professional services (the "WORK") necessary to complete the development and occupancy of the following project in full compliance with the terms of this Agreement.

The project shall consist of land acquisition, demolition (as needed), construction, marketing and rental of five three-bedroom homes and two four-bedroom homes within the East Side Opportunities neighborhood as further detailed in the Scope of Services.

The Scope of Work shall be that set forth in the Scope of Services contained within the program description attached hereto as "**EXHIBIT A**". The project budget shall be that set forth in the Project Budget and attached hereto as "**EXHIBIT B**". The project will comply with the income targeting, maximum per unit subsidy requirements, maximum rent limits, income certification and recertification requirements, and tenant protections of the HOME program as set forth at 24 CFR92.203, 92.252, and 92.253, and as further defined in **Appendix A**.

It is understood that the Redevelopers will provide a specific working budget and realistic timetable as relates to: acquisition, construction/rehabilitation, soft costs, development fees and other allowable costs/activities prior to any fund usage. Said budget shall identify all sources and uses of funds, and allocate HOME and non-HOME funds to activities or line items.

The aforementioned Work tasks will be performed in essentially the manner proposed in the Redevelopers' proposal. The aforementioned proposal will be considered to be a part and portion of this agreement for reference.

BURA shall provide the Redeveloper(s), as the maximum allowable contract allocation, that is, the REDEVELOPERS' CONTRACT ALLOCATION PER THIS AGREEMENT for the work required pursuant to the Scope of Services thereof, and as provided in Section V of this Agreement, the sum of **One million dollars ($1,000,000.00)** of HOME Funds, according to the terms and conditions stated herein.

A.  **THE REDEVELOPER(S)' OBLIGATIONS PRIOR TO THE RELEASE OF HOME FUNDS**

Prior to the release of any of the HOME FUNDS committed to the Project by BURA, the Redevelopers shall provide to BURA the following:

a.  Proof of formation of all entities participating in the Project, including Redevelopers' certifications, certificates of incorporation, secretary of state filing receipts, and/or any other documents BURA may reasonably require showing proper formation of the entities and proper authorization of the transactions;

b.  Copies of all final loan commitments and grant approvals for funding for all aspects of the Project.

c.  Signed statements from each applicant that that each party has adopted the approved Procurement Policy and Conflict of Interest Policy submitted as part of the application. .

d.  Proof of availability of all equity to be contributed to the Project. Such proof may be in the form of unencumbered bank deposits or other proof showing the availability of funds, together with letters from the equity partners committing such funds to the Project;

e.  Copy of notes and mortgages for all lenders taking mortgages on the Premises prior to, or during the construction period.

f.  Execution by East Side Housing, L.P. of a **BURA Note and Mortgage** securing the amount of **$1,000,000.00** (hereinafter the "HOME Note and Mortgage"), and, if applicable, subordinate to other financing as heretofore agreed, and other security instruments as may be required to enforce the requirements of the HOME program. The HOME Note and Mortgage shall provide for and secure repayment of HOME funds as further detailed in this agreement.

Book149/Page3731

g.  Delivery by Redeveloper(s) of HOME Project Affordability Covenants Running with the Land as required by 24 CFR 92.252;

h.  Evidence of title insurance; and

i.  Evidence of property insurance listing City of Buffalo Urban Renewal Agency as an additional insured Loss Payee.

j.  A fully detailed Property Maintenance Plan

k.  A revised Lease that complies with HUD requirements at 24 CFR 92.253 and that includes language that clearly notifies the tenant of the income certification requirements and rent restrictions and guidelines, and does not require the tenant to purchase renter's insurance.

l.  Submission of a signed Completion Guaranty by Belmont Shelter Corp.

BURA may, at its option, waive or grant extensions for the submission requirements of this Section. A Notice to Proceed will be issued upon compliance with the requirements of this section.

## B.  Conditions of Performance

Prior to the Redevelopers borrowing from BURA, the Redevelopers shall, in a manner satisfactory to BURA:

a)  Documentation.  Furnish documentation of a type and in such form as BURA may reasonably request including, without limitation, evidence of the Redevelopers' proper organization, authority to do business and Redevelopers' certification.

b)  Real Property Documents.  As applicable, provide proof of site control evidenced by a Contract of Sale, or other documentation satisfactory to BURA; a Commitment for Title Insurance issued by an abstract and title company satisfactory to BURA; a survey of the Property either certified to BURA or an existing survey with an affidavit of no change, showing the monuments, courses, and distances of the Property, and any structures thereon, easements, rights of-way and any other customary and relevant information.

c)  Performance Bond.  If applicable, as directed by a BURA project manager, allow BURA to hold all money due under this Agreement in escrow until Project completion is certified by BURA, or furnish an unconditional, irrevocable letter of credit from a financial institution acceptable to BURA, or a Performance bond running to BURA in the penal amount of BURA contract price, to be executed by the Redevelopers and the Contractor as principals and by a duly incorporated company authorized to guarantee the performance of contracts and to do business in the State of New York, as surety, conditioned for the faithful and complete performance of such contract in strict compliance with the drawings and specifications, and also for the payment of all materials and services rendered in the execution of the contract, and that any person or corporation furnishing such materials or rendering such services may maintain an action to recover for the same against the obligors in the bond, as though such person or corporation were named therein, provided the action is brought within one (1) year after the time of the cause of action accrued. The right of a person rendering services or furnishing materials to maintain an action on such bond shall be subject, however, to the prior rights of BURA against the obligors in said bond.

d)  Taxes Paid and Current.  the Redevelopers certifies that it has filed all required federal, state, city and other tax returns and similar returns and has paid or provided for the payment of all taxes and assessments, if any, due thereunder through the date of this Agreement including all real estate taxes on all properties owned by the Redevelopers, and all withholding, FICA and franchise, and other taxes as may be due and payable.

## Section IV - Project Requirements

Book149/Page3732

The Redevelopers agree to strictly comply with all requirements of the HOME Program as stated in 24 CFR Part 92, and all federal, state and local laws regarding implementation of the Project, including but not limited to the following:

A.  No HOME project funds will be advanced, and no costs can be incurred, until the City or BURA has conducted an environmental review of the proposed project site as required under 24 CFR Part 58. The environmental review may result in a decision to proceed with, modify or cancel the project.

Notwithstanding any provision of this Agreement, the parties hereto agree and acknowledge that this Agreement does not constitute a commitment of funds or site approval, and that such commitment of funds or approval may occur only upon satisfactory completion of the environmental review and receipt by BURA of a release of funds from the U.S. Department of Housing and Urban Development under 24 CFR Part §58.

Further, the Redevelopers will not undertake or commit any funds to physical or choice-limiting actions, including property acquisition, demolition, movement rehabilitation, conversion, repair or construction prior to the environmental clearance, and must indicate that the violation of this provision may result in the denial of any funds, under the agreement.

B.  The HOME funds advanced to the PROJECT will be secured by a Note and mortgage, and an Affordability Covenant Running with the Land as required by 24 CFR Part 92.

C.  The Redevelopers will ensure that any expenditure of HOME funds will be in compliance with the requirements at 92.206, and acknowledge that HOME funds will only be provided as reimbursement for eligible costs incurred for the construction of HOME-eligible units based upon and  including actual expenditures or invoices for work completed.  No payment for the Redevelopers' Fee shall be made from the HOME allocation unless approved by BURA.

D.  If the project is to be owner-occupied, the Redevelopers will ensure that all HOME assisted units will be in compliance with 24 CFR 92.254, including documenting that the property is eligible under 92.254, and will maintain compliance during the minimum compliance period. If the property also contains rental units assisted with HOME funds, the Redevelopers will ensure that occupancy complies with the requirements of 92.252.

E.  If the project is to be rental, the Redevelopers will ensure that occupancy of the HOME-assisted units complies with the requirements of 92.252 the Redevelopers will ensure that that project is eligible under 92.214, and that it will meet the applicable standards of 24 CFR 92.252 - 253 at occupancy and for the minimum compliance period.

F.  The designated HOME-assisted units of this PROJECT will meet the affordability requirements as found in 24 CFR 92.252 (rental) or 92.254 (owner-occupied) as applicable. The Redevelopers shall collect and maintain Project beneficiary information pertaining to household size, income levels, racial characteristics, and the presence of Female Headed Households in order to determine low and moderate-income benefits in a cumulative and individual manner. Income documentation shall be in a form consistent with HOME requirements as stated in the **HUD Technical Guide for Determining Income and Allowances under the HOME Program** and as further described in the City of Buffalo Housing Programs Policies and Procedures Guidebook.

G.  The Redevelopers will ensure that any sale of this Project shall comply with the Resale and Recapture provisions as detailed in the Note and Mortgage in accordance with the HOME regulations at 24 CFR 92.252 and as stated in "**EXHIBIT C**".

H.  In the selection of occupants for PROJECT units, the Redevelopers shall comply with all non-discrimination requirements of 24 CFR 92.350 as presented in "**EXHIBIT D**". If the project

Book149/Page3733

consists of 5 or more units, the Redevelopers will implement affirmative marketing procedures as required by 24 CFR 92.351. The proposed Affirmative Marketing Plan is as presented in "**EXHIBIT E**".

I.  If the PROJECT is occupied at the time of this commitment, the Redevelopers will comply with the relocation requirements of 24 CFR 92.353.

J.  Completion Date

The Redevelopers must complete the Project by November 1, 2006. However one or more time extensions of sixty (60) days each or less may be granted by BURA, provided that:

A.  the Redevelopers shall request a time extension in writing at least ten (10) days before the original completion date; and

B.  BURA has authorized such extensions in writing.

If the project is not substantially completed as per the terms of this agreement and within the term established by this agreement in Section II, BURA may recapture any and all funds advanced under this agreement as provided in Sections XIV, XV and XVI.

K.  The Redevelopers shall assure compliance with 24 CFR 92.251 as relates to Property Standards and Housing Quality Standards (HQS), Accessibility Standards under 24 CFR 92.251(a)(3) as applicable, and Lead Based Paint Requirements as found in 24 CFR 92.355 and 24 CFR Part 35 during the construction period and throughout the duration of this agreement and the period of affordability.

a).  Lead-Based Paint.   If the property was originally placed into service prior to 1978, no work shall be undertaken until a risk assessment has been conducted, or if assuming the presence of lead paint, an acceptable abatement and property maintenance plan must be submitted and approved prior to release of funds.   the Redevelopers will comply with the requirements of 24 CFR 92.355, and will incorporate any lead hazard controls into the scope of work, will hire the appropriate interim control or abatement workers to address the identified or presumed hazards, and cooperate with BURA to obtain timely clearances of any hazard reduction work.

b).  Local codes.   the Redevelopers will ensure that any construction, rehabilitation or repairs to the property shall be in compliance with all local codes, and will provide documentation and access to BURA to verify code compliance prior to occupancy.

L.  If the PROJECT is to be owner-occupied, the Redevelopers shall assure that any NOTES and MORTGAGES recorded for homebuyers shall be in compliance with 24 CFR 92.254 and that the Redevelopers will monitor each unit for principal residency (under 92.254(a)(3)) and resale/recapture (under 92.254 (a)(4) – (5)).

M.  The Redevelopers will provide any documentation required by BURA regarding matching funds as may be required to document matching funds for purposes of the HOME program.

N.  Procurement.   the Redevelopers agree to procure any contracts awarded subsequent to this agreement in a manner that ensures open and free competition and in compliance with all applicable federal and local regulations and as provided in Section VIII. Prior to the expenditure of HOME funds to be provided under this agreement, the Redevelopers will submit a procurement plan and guidelines to BURA for review.  The Redevelopers will attempt to secure at least three bids, and shall select the lowest responsible and responsive bidder.  the Redevelopers will maintain documentation of all procurements for inspection by BURA.

O.  Relocation.  If any temporary or permanent relocation is approved by BURA as part of this project, relocation notices and assistance will be provided as required by 92.353.

P.  If any project under this agreement involves the construction or rehabilitation of 12 or more HOME-assisted units, the Redevelopers shall comply with the provisions of the Davis-Bacon Act (40 U.S.C. 276 a to a - 7) as supplemented by Department of Labor regulations (29 CFR, Part 5), as amended.

Q.  **Converting rental units to homeownership units for existing tenants (24 CFR 92.255) –**

BURA may permit the Redevelopers of the HOME-assisted rental units to convert the rental units to homeownership units by selling, donating, or otherwise conveying the units to the existing tenants to enable the tenants to become homeowners in accordance with the requirements of Sec. 92.254. If no additional HOME funds are used to enable the tenants to become homeowners, the homeownership units are subject to a minimum period of affordability equal to the remaining affordable period if the units continued as rental units. If additional HOME funds are used to directly assist the tenants to become homeowners, the minimum period of affordability is the affordability period under Sec. 92.254(a)(4), based on the amount of direct homeownership assistance provided.

R.  The Redevelopers will be monitored by BURA for compliance with the regulations of 24 CFR 92 for the compliance period specified above. The Redevelopers will provide reports and access to project files as requested by BURA during the PROJECT and for Five (5) years after completion and closeout of the AGREEMENT.

**Section V - Reimbursement of Expenses & Redevelopers Fees – Disbursement of Funds**

Project expenses (excluding Redevelopers' fee) shall be paid based on vouchers for actual expenses incurred or paid. Requests for payment must be submitted by the Redevelopers on forms specified by BURA with adequate and proper documentation of eligible costs incurred in compliance with 92.206 and necessary for HUD IDIS disbursement requirements.  All such expenses shall be in conformance to the approved project budget. Budget revision and approval shall be required prior to payment of any expenses not conforming to the approved project budget. All expenditures shall be made in strict compliance with Federal Acquisition Regulations as found in the United States Code of Federal Regulations.

A.  **Disbursement of Funds**

a)  HOME funds are issued only as advances for, or reimbursement of, eligible project expenses incurred by the Redevelopers according to the approved project budget.  The HOME-assisted and non-assisted units have been determined to be comparable.  The proportion of HOME costs to the total HOME-eligible development costs may not exceed the proportion of HOME assisted units to the total number of units in the project. Funds will initially be released sequentially by BURA and from East Side Housing, L.P.'s partnership equity with BURA releasing an amount for reimbursement of eligible costs in the aggregate amount of $750,000, followed by partnership equity in the aggregate amount of $750,000.  Funds under this Agreement, up to the aggregate amount of $150,000, thereafter will be released on a pro rata share with partnership equity and advances under the senior building loan from Bank of America, N.A. The remainder of the funds, in the amount of $100,000, will be released in accordance with paragraph V(A)(f) hereof. on a pro-rata basis for costs incurred.. In no case will the aggregate funds provided exceed the maximum HOME subsidy allowed under 24 CFR 92.  If any funds are due the Redevelopers based on this Agreement, BURA agrees to issue such funds within a reasonable time after inspection and approval, if any, by BURA. the Redevelopers may not request funds under this agreement until the funds are needed for payment of eligible costs. The amount of each request must be limited to the amount needed.

Book149/Page3735

b) The Redevelopers will receive HOME funds and will establish separate bank accounts sufficient to provide for the tracking of all advances of HOME funds, related expenditures, and the return and possible reallocation of Program Income in compliance with all appropriate OMB and BURA requirements. Co-mingling of funds will not be permitted.

c) As applicable, participating contractors / the general contractor shall provide an itemized bill setting forth all work performed and the release of funds shall be subject to the Redevelopers' and BURA's approval. the Redevelopers shall cause to be submitted to BURA receipts or paid invoices for all expenditures, stating the Property's address, the Redevelopers's name(s), products purchased, place and date of purchase of labor and related services, and total summary of expenditures on the Contractor's bill heading. All such statements and request for payment must be approved by the Redevelopers, and both the contractor and the Redevelopers must affix their signatures to all requests for payment. Such signatures must be notarized, or witnessed by a Commissioner of Deeds of the City of Buffalo. For each payment to be issued, the contractor shall submit to the Redevelopers releases of all mechanics and material liens, and the releases shall be submitted by the Redevelopers to BURA.

d) the Redevelopers may submit a final invoice upon completion. Final payment shall be made after BURA has determined that all services have been rendered, files and documentation delivered, and units have been placed in service in full compliance with HOME regulations, including submission of a completion report and documentation of eligible occupancy, property standards and long-term use restrictions.

e) The CITY and/or BURA shall have the right to review and audit all records of the Redevelopers pertaining to any payment by BURA. Said records shall be maintained for a period of five years after completion and final payment.

f) **CONDITIONS FOR FINAL PAYMENT** (10% of Grant Allocation) – Prior to the release of the 10% retainage, the following conditions must be met:
    1. Final Section 3 report in a format to be provided by BURA
    2. Completion of a Cost Certification Audit showing total project costs and providing detail of all costs
    3. Submission of final signed partnership documents
    4. Receipt of initial occupancy report

## B. Use of the HOME Funds

a) The Redevelopers shall use such funds solely for the eligible Project as agreed to and as more particularly described in the attached and incorporated "**EXHIBIT A**" ("Project Description"), and "**EXHIBIT B**" ("Project Budget") which sets forth the use of the HOME funds, the tasks to be performed, a schedule for completing the tasks, including the return of Program Income, and the Project Budget; and (if applicable) after submission of a true statement under oath, verified by the Redevelopers, as required by Section 22 of the New York State Lien Law of a Lien Law Affdavit in the form attached hereto as "**EXHIBIT F**".

b) The Redevelopers agree that the Project Description, as set forth in "**EXHIBIT A**", and the Project Budget, as set forth in "**EXHIBIT B**" shall not be changed or modified in any manner without the prior written consent of BURA. Requests for amendment or modification of this Agreement shall be made in writing specifying the changes sought and the reasons therefore. All requests for amendments or modifications relative to the Project shall be submitted in writing to the Vice-Chairman of BURA or his designee. Should the parties consent to modification of the Agreement, then an amendment or modification will be drawn, approved and executed in the same manner as the original contract.

Book149/Page3736

c) BURA shall not be obligated to provide any funds for work or service performed prior to the date of this Agreement, but such work or services may be counted as part of the Redevelopers' private financing if previously approved by BURA in writing.

d) The Redevelopers shall receive and hold all funds provided pursuant to this Agreement subject to the trust fund provisions of Section 13 of the New York Lien Law. the Redevelopers shall establish separate bank accounts as appropriate to ensure tracking of expenditures and receipt of Program Income in compliance with HOME and OMB requirements. The use of HOME funds must be documented sufficiently to track all the Redevelopers expenses, and the receipt of Program Income. the Redevelopers agrees to provide BURA with a budget for the use of a possible reallocation of Program Income prior to the start of construction.

e) The Redevelopers shall not incur any costs, nor shall HOME funds be advanced, until BURA has conducted an environmental review of the project as required under 24 CFR Part 58, and has notified the Redevelopers that it may proceed. The environmental review may result in a decision to proceed with, modify or cancel the project. Nothing in this paragraph or Agreemnt shall be construes as a warranty or representation of environmental conditions to the Redevelopers or any other persons.  Notwithstanding any provision of this Agreement, the parties hereto agree and acknowledge that this Agreement does not constitute a commitment of funds or site approval, and that such commitment of funds or approval may only occur upon satisfactory completion of environmental review and receipt by BURA of a release of funds from the U.S. Department of Housing and Urban Development under 24 CFR Part 58.  Further , the Redevelopers will not undertake or commit any funds to physical or choice limiting actions, including property acquisition, demolition, movement, rehabilitation, conversion, repair or construction prior to the environmental clearance and acknowledges that a violation of this provision may result in the denial of any funds under this Agreement.

f) The Redevelopers must use any Program Income that may be reallocated to the Project to benefit low-income families, as required by 24 CFR 92, and within the deadlines established by this agreement as set forth in Section II and **EXHIBIT A.**

C. BURA shall provide the Redevelopers as the maximum allowable contract allocation, that is, the REDEVELOPERS' CONTRACT ALLOCATION PER THIS AGREEMENT for the work required pursuant to the Scope of Services thereof, and as provided in Section V of this Agreement, the sum of **One million dollars ($1,000,000.00)** of HOME Funds, according to the terms and conditions stated herein.  Progress payments of the Redevelopers Contract Allocation per this Agreement (if applicable) **will not exceed** the following cumulative maximum percentages of the total the Redevelopers Contract Allocation per this Agreement at the following stages of project completion:

| Milestone | Max Cumulative Redevelopers Contract Allocation per this Agreement |
|---|---|
| Acquisition closing | 5% |
| Construction closing / start of construction or rehab | 75% |
| 50% construction completion | 90% |
| Construction completion (certificate of occupancy) | 90% |
| Sustaining occupancy (or sale) & completion audit | 100% |

If multiple projects or buildings are involved, the release of funds may be pro-rated to each building or project, and the applicable percentage may be applied to each.

D. **Program Income**

---

Program income means gross income received by the Redevelopers directly generated from the use of HOME funds or matching contributions.  When program income is generated by housing that is only partially assisted with HOME funds or matching funds, the income shall be pro-rated to reflect the percentage of HOME funds used.  Program income includes proceeds from the disposition by sale of real property constructed with HOME funds or matching contributions.  Proceeds from the sale of this Project during the Period of Affordability shall be considered to be program income and must be returned to BURA or otherwise reinvested in the Project, such as in connection with the conversion of a rental unit to a home ownership opportunity to an eligible person pursuant to 24 CFR 92.255, or in another HOME eligible project approved by BURA.  Program income attributable to the Project may be reallocated to the Redevelopers for eligible Project expenses, including lender provided construction financing, as allowed under 24 CFR 92.206, following review of Project costs and approval by BURA.

The Redevelopers is not permitted to retain program income under the terms and provisions of this Agreement and must return all program income to the Agency through its Office of Financial Control of Agencies, consistent with HOME Regulations Section 92.503.  The Redevelopers agree that any program income on hand when the Agreement expires or received after such expiration shall be paid to the Agency as required by Section 92.503.

E.   BURA reserves the right to inspect records and project sites to determine that reimbursement and compensation requests are reasonable. BURA also reserves the right to hold payment until adequate documentation has been provided and reviewed.

F.   The Redevelopers may submit a final invoice upon completion.  Final payment shall be made after BURA has determined that all services have been rendered, files and documentation delivered, and units have been placed in service in full compliance with HOME regulations, including submission of a completion report and documentation of eligible occupancy, property standards and long-term use restrictions.

G.   BURA shall have the right to review and audit all records of the Redevelopers pertaining to any payment by BURA. Said records shall be maintained for a period of five years after completion.

## Section VI - Repayment of Note and Security for Funds

A.   All HOME funds are subject to repayment by East Side Housing, L.P. as outlined herein. The premises shall be secured by a HOME Note and Mortgage representing the HOME funds investment in the property.

B.   Note and Mortgage Amount and Terms

   a.   Amount.  Pursuant to the Regulations of the Program and the terms of this Agreement, BURA shall provide East Side Housing, L.P. with an amount not to exceed the sum of **One million dollars ($1,000,000.00)** hereinafter referred to as the "Note Amount" for the eligible costs and activities described herein.

   b.   Adjustment of the Note Amount.  If any sources or uses in the Budget attached as "**EXHIBIT B**" are changed prior to completion of the project, BURA must be notified of the changes, and may adjust the Note amount based upon its review of changes.   BURA also reserves the right to conduct a final underwriting and layering analysis of the project prior to closing.

   c.   Note Term.  All terms, covenants and conditions of this Agreement shall remain in effect for a period of twenty years from the date of the Certificate of Occupancy.

Book149/Page3738

d.   Interest Rate.   The interest rate of the HOME Note Amount will be **4.52%** per annum for so long as the Redeveloper(s) remain in compliance with the terms of this Agreement. In the event that the Redeveloper(s) are in default under the terms of this Agreement, and remain so for Thirty days after Notice as set forth in the terms of this Agreement then during such time said interest will accrue at the rate of 9% per annum payable annually on November 1 of each year.

e.   Payment.  East Side Housing, L.P. will pay interest only in the amount of Forty-Five Thousand Two Hundred dollars ($45,200.00) each year for twenty (20) years beginning November 1, 2006.   Notwithstanding anything set forth hereinabove, the obligation to make payments of interest shall be limited to the amount of Excess Income of East Side Housing, L.P.  "Excess Income" means project operating income for the year remaining after payment of all project expenses, including required payments of debt service on any indebtedness having a lien priority over the Note and Mortgage and payment of any deferred developer fee to the extent contemplated by East Side Housing, L.P.'s Amended and Restated Limited Partnership Agreement, as from time to time amended, and as permitted by Bank of America, N.A., prior to distribution of any Return on Equity. "Return on Equity" means distributions to general or limited partners of East Side Housing, L.P. in their capacities as such. If Redeveloper(s) can demonstrate to BURA's satisfaction that there is insufficient Excess Income to pay accrued interest, then, so long as there shall be no default under the Note and Mortgage, that amount of interest which exceeds Excess Income shall be deferred, shall only be due and payable on the next payment date at which the Excess Income is sufficient to allow payment thereof and shall be aggregated with any other such amounts (collectively, the "Deferred Payment"). The Deferred Payment shall neither bear interest nor be subject to penalty.  The Deferred Payment shall be due and payable in full on the maturity date of the Note and Mortgage. All payments made from Excess Income hereunder shall be applied first to the Deferred Payment and then to current payments of interest.

f.   Repayment.  The principal amount of the Note will be due and payable on November 1, 2026. In addition, the Note shall be due and payable, in full, at the option of BURA, upon the occurrence of any of the following events: (i) If the Redevelopers in any manner sells or otherwise transfers their interest, in whole or in part, in the subject properties without prior written authorization from BURA; (ii) Upon any default, as defined in Sections XIV, XV and XVI of this Agreement.

C.  It is understood that upon the completion of the PROJECT, any HOME funds reserved but not expended under this agreement will revert to BURA.

D.  If the project is rental, the DEVELOPER will create and follow a tenant participation plan as required in 24 CFR 92.303.

E.  **If the project is rental, the affordability restrictions remain in force regardless of the transfer of ownership.  If the project does not remain affordable through the affordability period, the total DEVELOPER Contract Allocation per this Agreement must be repaid in full to BURA.**

F.  **If the PROJECT is rental, sale of the property to another party may occur only with the approval of BURA, and the purchaser shall assume all obligations of the Redevelopers under this agreement, including the note and mortgage and the deed covenants. Provisions in those documents may provide for the extinguishment of the requirements only in the event of a third-party foreclosure or deed in lieu of foreclosure.**

G.  If the PROJECT is for owner-occupancy, the Redevelopers shall lend the HOME funds to the individual buyers in an amount sufficient to make the purchase affordable. Development Subsidy and any HOME funds that reduce the price of the property below the fair market value of the property shall be secured by a HOME note and mortgage as required in 92.254(a)(5)(ii), using the Note and

Mortgage and Affordability Covenants Running with the Land as prescribed or approved by BURA (and consistent with the method of recapture identified in the City's Consolidated Plan).

a)  All net sales proceeds from the sale of units are considered to be either:

   <u>XXX</u>      Program Income and must be returned to BURA as repayment of the HOME funds; or

   _____    CHDO Proceeds that may be retained by the Redevelopers as allowed by the terms of this Agreement and used in conformance with 24 CFR 92.300(a)(2), or as specified in EXHIBIT A.

b)  Prior to each closing, the Redevelopers will provide to BURA the estimated settlement statement, along with reconciliation statement and the draft note and mortgage. The reconciliation statement shall account for the pro-ration of HOME project funds to the individual unit, and identify those funds that are to be lent to the buyer as "Buyer subsidies" secured by the HOME note and mortgage, the pro-rated HOME development funds that are to be considered as "Development subsidies", and the amount of Redevelopers fee, and/or the Redevelopers program income to be returned to BURA from settlement funds.

c)  All resale proceeds that are received from buyers if they resell the properties during the compliance period to non-low income buyers shall be considered "Recaptured Funds" under 24 CFR 92.254(a)(5)(ii)(A)(5) and must be repaid to BURA for use in eligible HOME projects as required by 24 CFR 92.503. The Redevelopers shall promptly notify BURA of such transactions and will promptly convey any Recaptured Funds to BURA.

**Section VIII - Procurement Standards**

The Redevelopers shall establish written procurement guidelines and procedures to ensure that materials and services are obtained in a cost-effective manner as referenced in Section IV (M). When procuring for services to be provided under this agreement, the Redevelopers shall comply at a minimum with the requirements of the Procurement Policy approved by BURA as part of the application for funds received under this Agreement.

The following additional requirements are imposed on any procurement under this PROJECT,

Small purchases definition is set at $10,000 for goods and services under this Agreement

Minimum of three (3) bids required on purchases for goods and services

**Section IX - Conflict of Interest Provisions**

The Redevelopers warrant and covenant that they presently have no interest and shall not acquire any interest, directly or indirectly, which could conflict in any manner or degree with the performance of its services hereunder. The Redevelopers further warrant and covenant that in the performance of this contract, no person having such interest shall be employed.

HOME conflict of interest provisions, as stated in 92.356, apply to the award of any contracts under the agreement and the selection of tenant households to occupy HOME-assisted units.

No employee, agent, consultant, elected official, or appointed official of the Redevelopers may obtain a financial interest or unit benefits from a HOME-assisted activity, either for themselves or those with whom they have family or business ties, during their tenure or for one year thereafter. This prohibition includes the following:

A.  Any interest in any contract, subcontract or agreement with respect to a HOME-assisted project or program administered by the Redevelopers, or the proceeds thereunder; or

B.  Any unit benefits or financial assistance associated with HOME projects or programs administered by the Redevelopers, including:

>   * Occupancy of a rental-housing unit in a HOME-assisted rental project;

>   * Receipt of HOME tenant-based rental assistance;

>   * Purchase or occupancy of a homebuyer unit in a HOME-assisted project;

>   * Receipt of HOME homebuyer acquisition assistance; or

>   * Receipt of HOME owner-occupied rehabilitation assistance.

In addition, no member of Congress of the United States, official or employee of HUD, or official or employee of the City of Buffalo or BURA shall be permitted to receive or share any financial or unit benefits arising from the HOME-assisted project or program.

The Redevelopers shall affirmatively represent that there are no conflicts of interest as of the date of this Agreement by completing the Conflict of Interest Disclosure at **"EXHIBIT G"**.

Prior to the implementation of the HOME-assisted activity, exceptions to these provisions may be requested by the Redevelopers in writing to BURA and the City of Buffalo Office of Strategic Planning. The Redevelopers must demonstrate and certify that the policies and procedures adopted for the activity will ensure fair treatment of all parties, and that the covered persons referenced in this policy will have no inside information or undue influence regarding the award of contacts or benefits of the HOME assistance. BURA or the City of Buffalo Office of Strategic Planning may grant exceptions or forward the requests to HUD as permitted by 24 CFR 92.356, 85.36 and 84.42, as they apply.

## Section X - BURA Responsibilities

BURA shall furnish the Redevelopers with the following services and information from existing BURA records and BURA files:

A.  BURA shall provide to the Redevelopers Information regarding its requirements for the PROJECT.

B.  BURA will provide the Redevelopers with any changes in HOME regulations or program limits that affect the project, including but not limited to income limits, maximum subsidy or property value limits, and rent limits.

C.  BURA will conduct progress inspections of work completed to protect its interests as lender and regulatory authority for the project, and will provide information to the Redevelopers regarding any progress inspections or monitoring to assist it in ensuring Compliance.

BURA's review and approval of the WORK will relate only to overall compliance with the general requirements of this Agreement and HOME regulations, and all City regulations and ordinances.

Nothing contained herein shall relieve the Redevelopers of any responsibility as provided under this Agreement.

## Section XI - Equal Employment Opportunity, Labor, Training & Business Opportunities

The Redevelopers agree to comply with the federal regulations governing equal employment opportunity, training, employment, and business opportunities as follows, including, but not limited to, those regulations at 24 CFR 92.350 and as further described in "**EXHIBIT D**":

## A.  NONDISCRIMINATION –

a)  The Redevelopers will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin.  The Redevelopers shall take affirmative action to ensure that applicants for employment are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.  The Redevelopers agree to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the Redevelopers setting forth the provisions of this nondiscrimination clause.

b)  The Redevelopers will, in all solicitations or advertisements for employees placed by or on behalf of the Redevelopers, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

c)  The Redevelopers shall send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the Redevelopers contracting officer, advising the labor union or worker's representative of the Redevelopers commitments under Section 202 of Executive Order 11246 of September 24, 1965 and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

d)  The Redevelopers shall comply with all provisions of Executive Order 11246 of September 24, 1965 and of the rules, regulations and relevant orders of the Secretary of Labor.

e)  The Redevelopers shall furnish all information and reports required by Executive Order 11246 of September 24, 1965 and by the rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and shall permit access to the Redevelopers's books, records and accounts by

Book149/Page3742

the Department and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations and orders.

f)  In the event of the Redevelopers' noncompliance with nondiscrimination clauses of this Agreement or with any of such rules, regulations or orders, this Agreement may be canceled, terminated or suspended in whole or in part and the Redevelopers may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965 and such other sanctions may be imposed and remedies Invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation or order of the Secretary of Labor or as otherwise provided by law.

g)  The Redevelopers will include the provisions of Paragraphs (a) through (g) in every subcontract, purchase order or loan agreement unless exempted by rules, regulations or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965 so that such provisions will be binding upon each subcontractor, vendor or borrower. the Redevelopers will take such action with respect to any subcontract, purchase order, vendor or borrower as BURA may direct as a means of enforcing such provisions, including sanctions for non-compliance; provided however that in the event that the Redevelopers becomes involved in, or is threatened with litigation with a subcontractor or vendor or borrower as a result of such direction by BURA, the Redevelopers may request the United States to enter into such litigation to protect the interest of the United States.

## B.  MWBE Outreach

If any subcontracts are let, the prime contractor shall make affirmative efforts to encourage the use of minority and women's business enterprises (MWBEs) in connection with activities funded under this Agreement.  The Redevelopers shall keep records of the extent (number and dollar amount) of participation by minority- and women-owned businesses, and shall forward such records to BURA. Such efforts should include the following elements or others appropriate to the rehabilitation activities funded.

Including qualified minority and women's businesses on bid solicitation lists and assuring that minority and women's businesses are solicited whenever they are potential sources of material or services.

When economically feasible, the Redevelopers will divide total contract requirements into small tasks or quantities, or extending delivery schedules, so as to permit maximum minority and women's business participation.

The Redevelopers will use the services and assistance of the Minority Business Development Agency of the Department of Commerce and the interagency Committee on Women's Business Enterprise, as needed.

## C.  SECTION 3

The Redevelopers agree to comply with the federal regulations governing Section 3 of the Housing and Urban Development Act of 1968, including, but not limited to, those regulations set forth below and as further described in the Certification at "**EXHIBIT H**":

a)  It is agreed that, prior to the release of funds, the Redevelopers will meet with staff members of the City of Buffalo Office of Strategic Planning to review policies and procedures that provide for compliance with Section 3 requirements and City of Buffalo guidelines.

b)  It is agreed that the WORK to be performed under this agreement is on a project assisted under a program providing direct Federal financial assistance from the U.S. Department of Housing and Urban Development and is subject to the requirements of Section 3 of the Housing and Urban

Development Act of 1968, as amended, 12 U.S.C. 1701 u, as well as any and all applicable amendments thereto.  Section 3 requires that, to the greatest extent feasible, opportunities for training and employment be given low- and moderate-income residents of the project area, and that contracts for work in connection with the project are awarded to business concerns which are located in, or owned in substantial part by persons residing in the project area.

c)  The Redevelopers shall comply with the provisions of said Section 3 and the regulations issued pursuant thereto by the Secretary of Housing and Urban Development set forth in 24 Code of Federal Regulations, and all applicable rules and orders of the Department of Housing and Urban Development issued there under, as well as any and all applicable amendments thereto prior to the execution of this contract as well as during the term of this contract.  The Redevelopers certify and agree that it is under no contractual or other disability, which would prevent it from complying with these requirements as well as any and all applicable amendments thereto.

d)  The Redevelopers will include this Section 3 clause in every subcontract for work in connection with the project and will, at the direction of BURA, take appropriate action pursuant to the subcontractor upon a finding that the subcontractor is in violation of regulations issued by the Secretary of Housing and Urban Development, in 24 Code of Federal Regulations.  The Redevelopers will not subcontract with any subcontractor where it has notice or knowledge that the letter has been found in violation of regulations under 24 code of Federal Regulations and will not let any subcontract unless the subcontractor has first provided it with a preliminary statement of ability to comply with these requirements as well as with any and all applicable amendments thereto.

e)  Compliance with the provisions of Section 3, the regulations set forth in 24 Code of Federal Regulations and all applicable rules and orders of the Department of Housing and Urban Development issued there under prior to the execution of the contract shall be a condition precedent to federal financial assistance being provided to the PROJECT as well as a continuing conditions, binding upon the applicant or recipient for such assistance, its successors, and assigns.  Failure to fulfill these requirements shall subject the Redevelopers or recipient, its contractors and subcontractors, its successors, and assigns to those sanctions specified by 24 Code of Federal Regulations as well as with any and all applicable amendments thereto.

**Section XII –  Reserved**

**Section XIII - Compliance with Federal, State & Local Laws**

The Redevelopers covenant and warrant that they will comply with all applicable laws, ordinances, codes, rules and regulations of the state local and federal governments, and all amendments thereto, including, but not limited to: Title 8 of the Civil Rights Act of 1968 PL90-284; Executive Order 11063 on Equal Opportunity and Housing; Section 3 of the Housing and Urban Development Act of 968; Housing and Community Development Act of 1974, as well as all requirements set forth in 24 CFR 92 of the HOME INVESTMENT PARTNERSHIP PROGRAM. The Redevelopers covenants and warrants that it will, indemnify and hold the City of Buffalo and BURA forever free and harmless with respect to any and all damages whether directly or indirectly arising out of the provisions and maintenance of this contract.

**Federal Covenants**.  While this Agreement is in effect, the Redevelopers hereby agrees to follow:

A.  HOME Regulations.   the Redevelopers will comply with all federal laws, rules and regulations applicable to the receipt of funds made available under the Housing and Community Development Act of 1974, as amended, as defined in this agreement and 24 Code of Federal Regulations Part 92, as it may be amended.

B.  Affirmative Marketing.  the Redevelopers will comply with federal regulations for Affirmative Marketing of the Project as described in their Affirmative Marketing Plan included in the application for funding.

C.  The Redevelopers will comply with all Non-discrimination, Section 3 and MWBE Outreach requirements set forth in **SECTION XI** above.

D.  Environmental Certifications.  the Redevelopers certifies that no facility for which funds are received under this Agreement is listed on the List of Violating Facilities issued by the Environmental Protection Agency (EPA) pursuant to 40 CF 15.20.

> The Redevelopers will comply with all the requirements of Section 114 of the Clean Air Act, as amended (42 USC 1857C-8), and Section 308 of the Federal Water Pollution Control Act, as amended (33 USC 1318), relating to inspection, monitoring, entry, reports and information, as well as all other requirements specified in said Section 114 and Section 308, and all regulations and guidelines issued thereunder.

> The Redevelopers will be given prompt notice of any notification received by the City from the EPA, indicating that a facility utilized or to be utilized pursuant to this Agreement is under consideration for listing on the EPA List of Violating Facilities.

> the Redevelopers agree that no amount of the assistance provided under this contract will be utilized with respect to a facility which has given rise to a conviction under Section 113(c)(1) of the Clean Air Act or Section 309(c) of the Federal Water Pollution Control Act.

E.  the Redevelopers agrees that the funds provided shall not be in any way or to any extent engaged in the conduct of political activities in contravention of the Hatch Act (Chapter 15 of Title 5, United States Code).

F.  Religious Organizations - As specified in 24 CFR 92.257 HOME funds may be provided to primarily religious organizations on the same basis as any other organization.  Organizations that are directly funded under the HOME Program may not engage in inherently religious activities, such as worship, religious instruction, or proselytization, as part of the assistance funded under this part.  If an organization conducts such activities, the activites must be offered separately, in time or location, from the assistance funded under this part, and participation must be voluntary for the beneficiaries of the assistance provided.  An organization that participates in the HOME Program shall not, in providing program assistance, discriminate against a program beneficiary or propective program beneficiary on the basis of religion or religious belief.  the Redevelopers agrees that it will comply with the regulations at 24 CFR 92.257 in the administration of the project funded under this agreement.

G.  Labor Provisions.  Where applicable, as set forth in 24 CFR 92.354, all laborers and mechanics employed in the rehabilitation of the Property shall be paid wages at the appropriate rate as determined by the Secretary of Labor in accordance with the Davis-Bacon Act (40 U.S.C. 276a-276a-5), and contracts involving their employment shall be subject to the provisions, as applicable, of the Contract Work Hours and Safety Standards Act (40 U.S.C 327-333).  All rules and regulations promulgated by the Davis-Bacon Act shall be applicable, except as permitted under the Act.  the Redevelopers, and the Redevelopers's contractors and subcontractors, shall comply with regulations issued under these acts and with other federal laws and regulations pertaining to labor standards, as applicable.

H.  Architectural Barriers.  the Redevelopers will comply with the requirements of the Architectural Barriers Act of 1968 (42 U.S.C. 4151-4157) the accessibility requirements at 24 CFR 92.350 (Appendix D).

I.  Lead-Based Paint.  the Redevelopers will comply with the requirements of the Lead-Based Paint Poisoning Prevention Act (42 U.S.C. 4821-4846) and implementing regulations at 24 CF Part 35.

---

J.  the Redevelopers will comply with the provisions of 24 CF Part 24 relating to the employment, engagement of services, awarding of contracts, or funding of any contractors or subcontractors during any period of debarment, suspension, or placement in ineligibility status.

K.  The Redevelopers agrees to comply with all applicable standards, orders, or requirements issued under section 306 of the Clean Air Act (42 U.S.C. 1857(h)), section 508 of the Clean Water Act (33 U.S.C. 1368), Executive Order 11738, and Environmental Protection Agency regulations (40 CFR part 15).

L.  The Redevelopers further warrants and agrees to include or cause to be included the criteria and requirements of this section in every non-exempt subcontract in excess of $100,000, the Redevelopers also agrees to take such action as the federal, state or local government may direct to enforce aforesaid provisions.

## Section XIV - Suspension & Termination

In accordance with 24 CFR 85.43, suspension or termination may occur if the Redevelopers materially fails to comply with any term of the award, and that the award may be terminated for convenience in accordance with 24 CFR 85.44.

### Events of Default and Remedies

A.  <u>Failure to Complete</u>.  In the event that BURA determines that the Project has not been substanitally completed, that any money received under this Program has been received through misrepresentations, that any performance was not rendered in a timely, good and workmanlike manner, that inferior materials or products were used, that any provisions of this Agreement have been violated, or that ineligible improvements have been made, then BURA may, at its option:

a)  Withhold any amount of the Redevelopers Contract Allocation per this Agreement until specified work and/or services are completed;

b)  Adjust the Redevelopers Contract Allocation per this Agreement due to the Redevelopers based on the percentage of actual eligible activities that have been completed or approved services that have been performed, without further obligation by BURA;

c)  Deny any monies that would have been available to the Redevelopers because of incorrect eligibility statements set forth inSection XIV; or

d)  Any or all monies advanced shall be immediately due and payable to BURA by the Redevelopers, together with costs of collection of that money and any interest that may be due.

BURA, in the administration of funds which may be due under this Agreement, shall determine what monies are due to the Redevelopers in accordance with HOME Regulations. the Redevelopers agrees to accept the final decision of BURA as to any monies that the REDEVELOPERS may be entitled to receive under the Program.  However, BURA agrees not to unreasonably withhold any funds that may be payable to the Redevelopers relative to this Agreement and its Exhibits.

B.  <u>Failure to Comply with HOME Regulations</u>. For failure to comply with HOME regulations as specified in this agreement, BURA may take such legal action as is necessary to enforce compliance with this agreement, the Note and Mortgage and the Affordability Covenant Running with the Land.

C.  <u>Other Defaults</u>.  In addition to the foregoing events of default and remedies, all BURA obligations to the Redevelopers may be immediately terminated, the Redevelopers may be barred from further participation in programs subsidized by the City of Buffalo and or any Agency or Corporation thereto, and the entire the Redevelopers Contract Allocation per This Agreement disbursed to the

Book149/Page3746

Redevelopers under this Agreement by BURA may be declared to be immediately due and payable at BURA's sole election, upon the happening of any one of the following specified events of default by the Redevelopers or by the Redevelopers's manager, employee, or agent:

a) Nonpayment of any principal of, or interest on, any indebtedness created hereunder when due, or the Redevelopers's failure to materially perform any of the other terms or conditions of this Agreement, the Note and Mortgage, or materially perform any other agreement with BURA.

b) The filing by or against the Redevelopers of a request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as a bankrupt, relief as a debtor or other relief under the bankruptcy, insolvency or similar laws of the United States or any state or territory thereof or any foreign jurisdiction now or hereinafter in effect; the making of any general assignment by the Redevelopers for the benefit of creditors; the appointment of a receiver or trustee for the Redevelopers or for the Redevelopers's assets including, without limitation, the appointment of or taking possession by a "custodian" as defined in the Federal Bankruptcy Code; the institution by or against the Redevelopers of any other type of insolvency proceeding (under bankruptcy laws of the United States or any subdivision thereof or of any foreign jurisdiction, or otherwise) or of any formal or informal proceedings for the dissolution or liquidation of, or settlement of claims against the Redevelopers; or the cessation by the Redevelopers as a going business concern., loss of the Redevelopers certification

c) If any certificate, statement, representation, warranty, covenant or audit furnished by or on behalf of the Redevelopers in connection with this Agreement (including those contained herein) or as an inducement to BURA to enter into this Agreement shall prove to have been false in any material respect at the time as of which the facts therein set forth were certified or stated, or to have omitted any substantial contingent or unliquidated liability or claim against the Redevelopers, or if, on the date of the execution of this Agreement, there shall have been any materially adverse change in any of the facts disclosed by any such certificate, statement, representation, warranty, covenant or audit, which change shall not have been disclosed by the Redevelopers to BURA at or prior to the time of such execution.

d) Nonpayment by East Side Housing, L.P. of any other indebtedness to BURA or others when due.

e) Transfer of any part of the Redevelopers's interest in the Property without BURA's prior written consent; in no case will transfer be permitted unless the Redevelopers shows to BURA's satisfaction that the transferee assumes the Redevelopers's obligations hereunder in writing, and that the transferee is eligible and willing and able to adequately perform said obligations.

D. If the Redevelopers shall fail to fulfill in timely and proper manner Its obligations under this contract, or if the Redevelopers shall materially violate any of the covenants, agreements or stipulations of this contract, BURA shall thereupon have the right to terminate this contract by giving written notice to the Redevelopers of such termination and specifying the effective date thereof, at least five (5) days before the effective date of such termination.  In such event, the Redevelopers shall be entitled to receive just and equitable compensation for any work satisfactorily completed hereunder to the date of said termination. Notwithstanding the above, the Redevelopers shall not be relieved of liability to BURA for damages sustained by BURA by virtue of any breach of the contract by the Redevelopers, and BURA may withhold any payments to the Redevelopers for the purpose of setoff until such time as the exact amount of damages due BURA from the Redevelopers is determined, whether by court of competent jurisdiction or otherwise.

## Section XV - Termination or Suspension of Award for Noncompliance by BURA

BURA may terminate this contract at any time for noncompliance in whole or in part or withhold payments by giving the grantee and/or sub-grantee reasonable notice of the failure and (7) days to respond, and a hearing set thereafter by the Vice Chairman of BURA, and to be conducted by the Vice Chairman of BURA or his designee.  Upon Notification to the grantee for noncompliance the grantee will not incur any

further costs pursuant to this allocation agreement. BURA further reserves all other rights to terminate as prescribed in 24 CFR Sections 85.43 and 85.44. If the contract is terminated by BURA as provided herein, BURA will reimburse for any actual and approved expenses incurred prior to the notification of noncompliance, and pre-approved costs involved in terminating the contracts and shutting down the work as of the date of notice, in addition the Redevelopers will be paid as fee an amount which bears the same ratio to the total the Redevelopers' Contract Allocation per this Agreement as the services actually performed bear to the total service of the Redevelopers covered by this contract, less payments of compensation previously made.

## Section XVI – Default - Loss of Grant Funds

If the Redevelopers materially fail to fully perform and carry out any of the terms, covenants, and conditions of the agreement, and more particularly if the Redevelopers refuse or fail to proceed with the work with such diligence as will insure its completion within the time fixed by the schedule set forth in **"EXHIBIT A"** of this agreement, the Redevelopers shall be in default and notice in writing shall be given to the Redevelopers of such default by BURA or an agent of BURA. If the Redevelopers fail to cure such default within such time as may be required by such notice, the City of Buffalo acting by and through BURA, may at its option terminate and cancel the contract.

In the event of such termination all grant funds awarded to the Redevelopers pursuant to this agreement shall be immediately revoked and any approvals related to the PROJECT shall immediately be deemed revoked and canceled. In such event, the Redevelopers will no longer be entitled to receive any compensation for work undertaken after the date of the termination of this agreement, as the grant funds will no longer be available for this project.

Such termination shall not effect or terminate any of the rights of BURA as against the Redevelopers then existing, or which may thereafter accrue because of such default, and the foregoing provision shall be in addition to all other rights and remedies available to BURA under the law and Note and mortgage (if in effect), including but not limited to compelling the Redevelopers to complete the project in accordance with the terms of this agreement, in a court of equity.

The waiver of a breach of any term, covenant or condition hereof shall not operate as a waiver of any subsequent breach of the same or any other term, covenant, or condition hereof.

## Section XVII - Reporting Responsibilities

The Redevelopers agree to submit any and all quarterly reports required by HUD or the City to BURA on the following due dates: October 15, January 15, April 15, and July 15, next following the date of this agreement and as required in Section II.

The Redevelopers will provide, at a minimum, annual reports regarding occupancy of the HOME assisted units by eligible households throughout the period of affordability, including, at a minimum, information regarding tenant household characteristics and income, rent levels (including rent rolls), and proposed rent increases.

The Redevelopers will provide annual audited financial statements (including, at a minimum, balance sheet, income statement and cash flow statements) not later than 120 days following the end of the Redevelopers' fiscal year each year during the period of affordability, as well as other reports as demanded by BURA.

Any delinquency in the submission of a quarterly report may in BURA's sole discretion result in the suspension of any payment otherwise due under this Agreement. BURA will send the Redevelopers a notice to cure the default if the quarterly report has not been received ten (10) days after the due date. If the Redevelopers have not submitted a report ten (10) days after the date of the notice to cure, BURA in its sole discretion will have the option to terminate the contract as described in this agreement. In addition, the Redevelopers agree to provide BURA information as required to determine program

Book149/Page3748

eligibility, in meeting nation objectives, and financial records pertinent to the project. **Additional reporting requirements may be imposed at the discretion of BURA and will be provided to the Redevelopers by BURA under separate cover.**

### Section XVIII - Inspection, Monitoring & Access to Records

BURA reserves the right to inspect, monitor, and observe work and services performed by the Redevelopers at any and all reasonable times.

A. <u>Inspection</u>

   a)  The Redevelopers agree to allow BURA or the City of Buffalo to conduct inspections of the Property to ensure compliance with all applicable codes and ordinances, and all documents and information concerning the project, in all forms, including electronic records, during all stages of construction, including but not limited to inspections necessary to determine the reasonableness of invoices or requests for funding.

   b)  The Redevelopers agree to allow BURA or the City to conduct inspections prior to approval of project completion and final payment.

   c)  The Redevelopers will grant BURA access during the term of this Agreement, to verify that improvements have been completed, that the work meets the specifications set forth as **"EXHIBIT A"**, that the Redevelopers remains in compliance with the terms of this Agreement, and that all applicable Regulations have been met, and to insure that the project meets the HUD Section 8 housing quality standards and local codes. If the property contains rental units, the Redevelopers also agree to allow BURA and/or the City of Buffalo and/or its designated representatives, to conduct an inspection of the subject property after receipt of the Completion Notice to insure that it meets the HUD Section 8 housing quality standards and local codes, and annually thereafter for as long as the Property retains rental occupancy.

B. BURA reserves the right to audit the records of the Redevelopers any time during the performance of this Agreement and for a period of five years after final payment is made under this Agreement.

C. If required, the Redevelopers will provide BURA with a certified audit of the Redevelopers' records representing the Fiscal Year during which the PROJECT becomes complete whenever the amount listed in SECTION III is at or exceeds $300,000, pursuant to the requirements of OMB Circular A - 133.

D. Upon request access shall be granted to BURA, HUD, the Comptroller General of the United States, or any of their duly authorized representatives to any and all books, documents, papers, and records of the Redevelopers or its contractors which are deemed by BURA, HUD, or the Comptroller General of the United States to be directly pertinent to this Agreement for the purpose of making audit, examination, excerpts, and transcriptions.

### Section XIX – General Conditions

A. The Redevelopers agree to strictly comply with all Federal State and local laws and regulations in the execution of their duties under this Agreement. Said laws and regulations shall include but not be limited to the requirements of the HOME Program as stated in 24 CFR Part 92. Failure to so comply shall result, at the discretion of BURA, in the suspension or termination of entitlement to any monies otherwise due under this Agreement.

B. All notices or other communication which shall or may be given pursuant to this Agreement shall be in writing and shall be delivered by personal service, or by registered mail addressed to the other party at the address indicated herein or as the same may be changed from time to time. Such notice shall

Book149/Page3749

be deemed given on the day on which personally served; or, if by mail, on the fifth day after being posted or the date of actual receipt, whichever is earlier.

**BURA address:** Timothy E. Wanamaker
Vice Chairman
Buffalo Urban Renewal Agency
920 City Hall
Buffalo, New York 14202

A copy should also be forwarded to the BURA Project Coordinator at the same address.

**The Redevelopers address:**
**East Side Housing, L.P.,**
1195 Main Street
Buffalo, New York, 14209
Attention: Michael Riegel

**Belmont Shelter Corp.**
1195 Main Street
Buffalo, New York 14209
Attention: Michael Riegel

C. Title and paragraph headings are for convenient reference and are not a part of this Agreement.

D. In the event of conflict between the terms of this Agreement and any terms or conditions contained in any attached documents, the terms in this Agreement shall rule.

E. No waiver or breach of any provision of this Agreement shall constitute a waiver of a subsequent breach of the same or any other provision hereof and no waiver shall be effective unless made in writing.

F. The parties hereto agree that this Agreement shall be construed and enforced according to the laws of the State of New York, and the laws of the United States where pertaining to the use of Federal HOME funds.

G. Should any provisions, paragraphs, sentences, words or phases contained in this Agreement be determined by a court of competent jurisdiction to be invalid, illegal, or otherwise unenforceable under the laws of the State of New York, or the City of Buffalo, such provisions paragraphs, sentences, words or phrases shall be deemed modified to the extent necessary in order to conform with such laws, or if not modifiable to conform with such laws, then same shall be deemed severable, and in either event the remaining terms and provisions of this Agreement shall remain unmodified and in full force and effect.

H. The Redevelopers shall comply with the provisions of the Copeland Anti-Kick-Back Act (18 U.S.C. 874) as supplemented in the Department of Labor Regulations (29 CFR Part 3), as amended.

I. The Redevelopers shall comply with the provisions of sections 103 and 107 of the Contract Work Hours and Safety Standard Act (40 U.S.C. 327-330) as supplemented by Department of Labor regulations (29 CFR, Part 5), as amended.

J. The Redevelopers further warrant and agree to include or cause to be included the criteria and requirements of paragraphs (H) through (I) of this section in every subcontract funded in whole or in part by this Agreement. The Redevelopers also agree to take such action as the federal, state or local government may direct to enforce aforesaid provisions.

K. The obligations undertaken by the Redevelopers pursuant to this Agreement shall not be delegated or assigned to any other person or agency unless BURA shall first consent to the performance or assignment of such service or any part thereof by another person or agency.

Book149/Page3751

L.  The Agreement shall be binding upon the parties hereto, their heirs, executors, legal representative, successors and assigns.

M.  The Redevelopers shall indemnify and save BURA harmless from and against any negligent claims, liabilities, losses and causes of action which may arise out of the Redevelopers' activities under this Agreement, including all other acts or omissions to act on the part of the Redevelopers, including any person acting for, or on its behalf, and from and against any orders, judgments, or decrees which may be entered, and from and against all costs, attorneys fees, expenses and liabilities incurred in the defense of any such claims, or in the investigation thereof.

N.  The Redevelopers and its employees and agents shall be deemed to be independent contractors, and not agents or employees of BURA, and shall not attain any rights or benefits under the civil service or pension ordinances of the City of Buffalo or BURA, or any rights generally afforded classified or unclassified employees; further they shall not be deemed entitled to state Compensation benefits as an employee of BURA.

O.  Funding for this Agreement: is contingent on the availability of funds and continued authorization for program activities and is subject to amendment or termination due to lack of funds, or authorization, reduction of funds, and/or change in regulations.

P.  **Affirmative Covenants.** From the time of the execution of this Agreement and throughout the compliance period, the Redevelopers shall:

a)  Records Inspection. Keep proper books of account in manner satisfactory to BURA, and permit, at the Redevelopers' expense, inspections and audits by BURA, of all books, records and papers in the custody or control of the Redevelopers or of others, relating to the Redevelopers' financial or business condition, including the making of copies thereof and abstracts therefrom, and inspection and appraisal of any of the Redevelopers's assets.

b)  Financial Information. Deliver to BURA financial information in such form and detail and at such times as are satisfactory to BURA.

c)  Taxes. Promptly pay all taxes, assessments and other governmental charges due from the Redevelopers, if any, provided, however, that nothing herein contained shall be interpreted to require the payment of any such tax so long as its validity is being contested in good faith.

d)  Insurance.

   1.  Keep the Property insured at all times with responsible insurance carriers against fire and other hazards in such manner and to the extent that like properties are usually being insured by others owning property, operating businesses, plants and properties of similar character in the same general locality;

   2.  Keep the Property adequately insured at all times with responsible insurance carriers against liability on account of damage to persons or property, and under all applicable workers' compensation laws; and

   3.  Furnish BURA with certificates of insurance during the term of this Note evidencing compliance with paragraphs (i) and (ii), and naming BURA as an additional named insured.

e)  Ensure that purchasers of property developed under this Agreement maintain certificates of insurance during the period of affordability evidencing compliance with paragraphs (i) and (ii), and naming BURA as an additional named insured

---

f) <u>Litigation.</u> Promptly inform BURA of the commencement of any action, suit, proceeding or investigation against the Redevelopers, or the making of any counterclaim against the Redevelopers in any action, suit or proceeding, and of all liens against any of the Property.

g) <u>Project Completion.</u> Complete the Project within the time specified in Section III of this agreement, or within such additional time extension(s) as BURA may approve in writing, such completion to be evidenced by any final reports, lien waivers and such other documents and inspections as BURA may require.

h) <u>Federal Requirements.</u> Submit evidence satisfactory to BURA that the work done on the Project meets all applicable Federal requirements for the Project and the Program. the Redevelopers also agrees to comply with all requirements set forth in 24 CFR Part 5, Subpart A, including nondiscrimination and equal opportunity; disclosure requirements, debarred, suspended or ineligible contractors and maintenance of a drug free workplace.

i) <u>Access.</u> Provide any BURA representative access to the Property, at all reasonable times, to inspect for cost, quality, compliance with the property standards of 24 CFR 92.251 and to verify the information submitted by the Redevelopers in accordance with 24 CFR 92.252 or any other lawful purpose.

j) <u>Tenant Displacement.</u> Tenants who may be displaced will be relocated on a temporary basis and fully apprised of their rights (if any) to relocation assistance pursuant 24 CFR 92.353. Unless specified in **"EXHIBIT A"** attached hereto, no tenant relocation is necessary for the Project, and no further cost for such activity shall be considered after the closing of this Agreement.

**Q. <u>Negative Covenants</u>**

From the time of the execution of this Agreement and throughout the compliance period, the Redevelopers:

a) <u>Encumbrances.</u> Shall not create incur, assume or suffer to exist any security interest, mortgage, pledge, lien or other encumbrance upon the subject property, except as approved by BURA.

b) <u>Transfer Assets.</u> Shall not sell, convey, lease or transfer any of the Redevelopers's assets other than in the ordinary course of business, or merge or consolidate with or into any other company or corporation.

c) <u>Guaranties.</u> As to the Property, shall not become a guarantor, surety or otherwise liable for the debts or other obligations of any other person, firm or corporation except as an endorser of instruments for the payment of money deposited to the Redevelopers's bank account for collection in the ordinary course of business; provided, however, that Belmont Shelter Corp. shall be permitted to guaranty certain obligations of East Side Housing, L.P. to Bank of America, N.A. and of Woodland General, Inc. to NEF Assignment Corporation.

d) <u>Change Business or Location.</u> Shall not change the form in which the Redevelopers conduct the Redevelopers' businesses or the location of such businesses or the nature of the businesses as conducted by the Redevelopers on the date of this Agreement or fail to maintain the Redevelopers' business operation as a going concern.

R. <u>The Owner Certifications.</u> From the time of the execution of this Agreement and throughout the compliance period, the Redevelopers shall certify that:

a) <u>Units.</u> The Property is, or shall be owned by East Side Housing, L.P. and shall, at the completion of the project, contain a minimum of seven affordable rental units that shall be rented to low and

very low income households as defined under 24 CFR 92 and as further defined in Exhibit A – Scope of Services.

b) <u>Commercial Space</u>. No funds advanced pursuant to this Agreement will be spent on commercial space. If the Property contains commercial space, the commercial space will be brought up to City code standards through the use of private funds, and the cost cannot be factored into the ratio of Equity Injection to HOME funds. BURA will consider and determine the treatment of expenses common to both commercial and residential components of the Project (e.g., roof repair, boiler replacement).

c) <u>Prohibited Uses</u>. the Redevelopers's indebtedness to BURA will not be used to refinance existing debts, for development of commercial space, for residential space provided for any manager, employee, or agent of the Redevelopers, or for costs incurred for improvements prior to the date of this Agreement.

d) <u>Conversion</u>. the Redevelopers will not convert the units in the Project to condominium ownership or any form of cooperative ownership not eligible to receive HOME funds.

S. **Closing Expenses**. All costs incidental to the Note and any related closing or recording, including title examination fees, mortgage title Insurance surveyor's fees, mortgage tax and recording fees are to be paid by the Redevelopers, and are eligible expenses to the extent allowed by this Agreement under applicable federal laws, rules and regulations. BURA shall not be required to pay any brokerage or other fee or commission arising from this Note. the Redevelopers shall be required to pay any reasonable costs and expenses including actual counsel fees incident to the enforcement of any provision of this Agreement or the Mortgage.

T. **Miscellaneous Provisions**

a) No delay or omission by BURA in exercising any right or remedy hereunder or with respect to any indebtedness created hereunder shall operate as a waiver thereof or of any other right or remedy, and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any right or remedy.

b) This Agreement shall be construed and interpreted in accordance with the laws of the State of New York.

c) No provision of this Agreement, including but not limited to the scope, size or any other aspect of the Project may be modified, amended, terminated or transferred without your prior written consent.

d) Reference is hereby made to the Federal "HOME" Program. Regulations are at 24 CFR Part 92. Said regulations are hereby incorporated by reference into this Agreement. In the event that any provision of this Agreement are inconsistent with any provision of the HOME Investment Partnership Act Regulations, located at 24 CFR 92, the provisions of the regulations shall be controlling.

e) In the event any provision of this Agreement is inconsistent with any provision of any other document required or executed pursuant to this Agreement, the provisions of this Agreement shall be controlling.

## Section XX – Signage Requirements

The REDEVELOPERS shall erect a Project Sign meeting the BURA requirements as shown in **Appendix C**. The sign shall be 4' x 8' – ¾" exterior grade plywood painted both sides and edges 2 coats, supported by two 2" x 4" posts braced with a 2" x 4" angled back for each post. The back of the sign shall be blue.

Book149/Page3754

The bottom of the sign shall be 4' from the ground.
The top 15" section of the sign shall be painted red with the **Name of the Project** in 5" white letters.
The middle 15" section shall be painted white with the names of City Officials and their Titles in 3" blue letters.
The bottom 18" section shall be painted blue with the funding source listed in 2" white letters.
All lettering shall be centered within their respective sections. The sign shall be placed in a suitable location on the entrance side of the project.

Book149/Page3755

IN WITNESS WHEREOF,

The Parties hereto have executed this Agreement the date first written above.

**East Side Housing, L.P.**

BY: _MICHAEL RIEGER_

TITLE: _V. PRESIDENT_

**Belmont Shelter Corporation**

BY: _MICHAEL RIEGEL_

TITLE: _V. PRESIDENT_

**CITY OF BUFFALO URBAN RENEWAL AGENCY**

Timothy E. Wanamaker

Vice-Chairman of BURA

Approved as to Content only
Office of Strategic Planning

BY:

Dated: _10-3-05_

Approved as to Form only
Agency General Counsel

BY: _APPROVED AS TO FORM ONLY_

_OCT 3 2005_

Dated: _RICHARD E. STANTON_
_GENERAL COUNSEL_

STATE OF NEW YORK )
COUNTY OF ERIE ) SS.

On the _3rd_ day of _October_, in the Year _2005_, before me, the undersigned, personally appeared Timothy E. Wanamaker, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

**RICHARD E. STANTON**
**NOTARY PUBLIC, STATE OF NEW YORK**
**QUALIFIED IN ERIE COUNTY**
**My Commission Expires** _11-30-05_

Book149/Page3756

Commissioner of Deeds/Notary Public

STATE OF NEW YORK )
COUNTY OF ERIE                    ) SS.

On the ___3rd___ day of October in the Year 2005, before me, the undersigned, personally appeared Michael Riegel, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Commissioner of Deeds/Notary Public

TIMOTHY C. CASHMORE
Notary Public, State of New York
Qualified in Erie County
My Commission Expires 05/31/20 07

STATE OF NEW YORK )
COUNTY OF ERIE                    ) SS.

On the ___3rd___ day of October in the Year 2005, before me, the undersigned, personally appeared Michael Riegel, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Commissioner of Deeds/Notary Public

TIMOTHY C. CASHMORE
Notary Public, State of New York
Qualified in Erie County
My Commission Expires 05/31/20 07

Book149/Page3757

**EXHIBIT A**
**SCOPE OF SERVICES**

**East Side Housing Opportunities Single Family Rental Housing**
**Project Description**

The **East Side Housing Opportunities Single Family Rental Housing Project** will provide a total of thirty (30) units of low income rental housing, including seven (7) HOME assisted units. The Redevelopers will construct twenty-five(25) three-bedroom homes and five (5) four-bedroom homes for low income families. Twenty-nine units will be new construction, including twenty-five (25) three-bedroom structures and four (4) four-bedroom homes. The final unit unit will be a complete renovation of an existing structure to provide an additional four-bedroom home. All HOME-assisted units will be new construction. The Project homes will be constructed in the Ellicott Council District, census tract 32.02, primarily on Southampton, Northampton, Michigan, Masten and Dodge Streets, Buffalo, New York. The Redevelopers will use $1,000,000.00 in HOME funds, in addition to New York State Low Income Housing Tax Credits, and private financing., for a proposed total project cost of more than $5.3 million dollars. The project must comply with

**HOME-assisted Units** - At initial occupancy, four (4) three-bedroom units and one (1) four-bedroom unit will be available to households with incomes of 60% of the median or less (the High HOME rent units). Following initial occupancy, these units may be made available to households with incomes of 80% of the median or less. In addition, one (1) three-bedroom unit and one (1) four-bedroom unit will be set aside for households with incomes of 50% of the median or less at initial occupancy and for the duration of the twenty year affordability period (the Low HOME rent units). The HOME assisted units will each feature a living room, kitchen, dining area, bath and bedrooms as noted above. All assisted and non-assisted units will be comparable and the HOME-assisted units will be sited at fixed locations.

Notwithstanding these HOME requirements, it is expected that, in order to ensure compliance with both HOME and Low Income Housing Tax Credit regulations, all Project units will be initially occupied by households with incomes of 50% of the median or less, with rents as allowed, but no greater than the High or Low HOME rents, as applicable. Following the Tax Credit rental period, the HOME assisted units may be occupied by households meeting the HOME criteria referenced above, or may converted to homeownership units by selling, donating, or otherwise conveying the units to the existing tenants to enable the tenants to become homeowners in accordance with the requirements of 24 CFR 92.254.

Preliminary addresses for the seven HOME-assisted units are –

1200 Michigan Avenue – Site Map Lot 2  /  160 Dodge Street – Site Map Lot 6
134 Masten Avenue – Site Map Lot 7  /    228 Dodge Street – Site Map Lot 9
88 Southampton Street – Site Map Lot 27  /  174 Southampton Street – Site Map Lot 30
261 Northampton Street – Site Map Lot 35

Rents for the HOME assisted units, including utilites, will not exceed the High (five units) or Low (two units) HOME rent limits for three- or four-bedroom apartments as noted above (see Appendix A). Rents for the HOME-assisted units will be reviewed and approved by BURA subject to the maximum rent limitations of 92.252 and BURA will ensure that the rents do not exceed the maximum allowable rent minus the monthly allowances for utilities and services. BURA may also approve rents that are less than the maximum allowable rents. All proposed rent increases for the HOME-assisted units must be approved by BURA . BURA wil annually provide information on updated HOME rent limits and utility allowances. Any increase in rents for HOME-assisted units is subject to the provisions of outstanding leases and, in any event, the REDEVELOPERS must provide tenants of those units not less than 30 days prior written notice before implementing any increase in rents.

Book149/Page3758

In addition, the project will comply with Section 504 of the Rehabiliation Act of 1973, the Fair Housing Act and HUD's implementing Regulations (24 CFR Parts 8 and 100, respectively). Two (2) units in the project will be accessible to individuals with mobility impairments and an additional one (1) unit will be available to individuals with sensory impairments.

*Accessibility Requirements*

- For **new construction of multi-family projects**, a minimum of 5 percent of the units in the project (but not less than one unit) must be accessible to individuals with mobility impairments, and an additional 2%, at a minimum, of the units (but not less than one unit) must be accessible to individuals with sensory impairments. The total number of units in a HOME-assisted project, regardless of whether they are all HOME-assisted, is used as the basis for determining the minimum number of accessible units. Also, in a project where not all the units are HOME-assisted, the accessible units may be either HOME-assisted or non-HOME-assisted.
- Accessible units must be, to the maximum extent feasible, distributed throughout the projects and sites and must be available in a sufficient range of sizes and amenities so as not to limit choice. Owners and managers of projects with accessible units must adopt suitable means to assure that information regarding the availability of accessible units reaches eligible individuals with handicaps. They must also take reasonable non-discriminatory steps to maximize use of such units by eligible individuals. When an accessible unit becomes vacant, before offering the unit to a non-handicapped individual, the owner/manager should offer the unit: first, to a current occupant of the project requiring the accessibility feature; and second, to an eligible qualified applicant on the waiting list requiring the accessibility features.
- The standards for ensuring compliance with Section 504 are the Uniform Federal Accessibility Standards, although deviations are permitted in specific circumstances.

  Individuals with handicaps must be able to find out about, apply for, and participate in federally-assisted programs or activities.

  Special communication systems may be needed for outreach and ongoing communication (e.g., Telecommunications Devices for the Deaf (TDD), materials on tape or in Braille, accessible locations for activities and meetings.)
- Policies and procedures must be non-discriminatory (e.g., housing providers may not ask people with handicaps questions not asked of all applicants, screen individuals with handicaps differently or assess an individual's ability to live independently).

*Compliance Period:*

The compliance period for this project will be twenty years from the date of the Certificate of Occupancy. of the final Project unit constructed. Affordability covenants running with the land will ensure that affordability is maintained throughout the compliance period. HOME Program Resale and Recapture requirements during the compliance period will be detailed in the Affordability Covenants Running with the Land and in the Note and Mortgage to be executed with the Redevelopers. The minimum period of affordability for new construction of rental units is twenty years.

The projected completion date of construction is November 1, 2006. If the Redevelopers are unable to meet this deadline as established by this agreement, the Redevelopers must submit a written request for an extension detailing the reason(s) for the delay, and a plan for completing the project, including, as appropriate, a modification of this Scope of Services.

*Program Income:*

Program income means gross income received by the Redevelopers directly generated from the use of HOME funds or matching contributions. When program income is generated by housing that is only partially assisted with HOME funds or matching funds, the income shall be pro-rated to reflect the percentage of HOME funds used. Program income includes proceeds from the disposition by sale of real property constructed with HOME funds or matching contributions. Proceeds from the sale of this Project

Book149/Page3759

before the expiration of the affordability period shall be considered to be program income and must be returned to BURA.  Program income attributable to the Project may be reallocated to the Redevelopers for eligible Project expenses, including lender provided construction financing, as allowed under 24 CFR 92.206, following review of Project costs.

The Redevelopers are not permitted to retain program income under the terms and provisions of this Agreement and must return all program income to the Agency through its Office of Financial Control of Agencies, consistent with HOME Regulations Section 92.503.  The Redevelopers agree that any program income on hand when the Agreement expires or received after such expiration shall be paid to the Agency as required by Section 92.503.

### *Marketing & Sales:*

The Redevelopers will market the HOME assisted units as per the Affirmative Market Plan submitted in the Redevelopers' application and as further detailed in **Exhibit E.**

### *Management Plan:*

The Redevelopers will abide by the **Property Management Plan** submitted and approved as part of the application process for funds provided under this agreement.

*Tenant Selection:*

The Redevelopers will not discriminate against a person or family holding a Section 8 certificate or voucher, or on the basis of race, color, religion, sex, age, handicap, national origin, family composition, receipt of public assistance, or on the basis that the tenants have a minor child or children who will be residing with them. The Redevelopers will abide by the **Tenant Selection Plan** submitted and approved as part of the application process for funds provided under this agreement.

The REDEVELOPERS will ensure that the HOME assisted units are occupied only by households that are eligible as low or very low income families and will provide for certification of eligibility using the definition of income as defined in 24 CFR 5.609 ("Part 5 annual income").

For families who are tenants in HOME-assisted units, the Redevelopers must initially determine tenant household income and compliance using the following method -

Examine the source documents evidencing annual income (e.g., wage statement, interest statement, unemployment compensation statement, etc.) for the family.

Calculate the annual income of the family by projecting the prevailing rate of income of the family at the time the Redevelopers determines that the family is income eligible.

**Annual income shall include income from all family or household members.** Income or asset enhancement derived from the HOME-assisted project shall not be considered in calculating annual income.

Tenant income must be recertified annually on the anniversary date of the initial certification, which should coincide with the date of the lease. Households must qualify as low income at the time of occupancy.

*Over-income tenants [ 24 CFR92.252(i) ]*

(1) HOME-assisted units continue to qualify as affordable housing despite a temporary noncompliance caused by increases in the incomes of existing tenants if actions satisfactory to HUD are being taken to ensure that all vacancies are filled in accordance with this section until the noncompliance is corrected.
(2) Tenants who no longer qualify as low-income families must pay as rent the lesser of the amount payable by the tenant under State or local law or 30 percent of the family's adjusted income, except that tenants of HOME-assisted units that have been allocated low-income housing tax credits by a housing credit agency pursuant to section 42 of the Internal Revenue Code of 1986 (26 U.S.C. 42) must pay rent governed by section 42.

*Relocation:*

No relocation will occur during this project.

*Tenant Protections and Participant Protections*

**Sec. 92.253 - Tenant and participant protections:**

a.  **Lease.** The lease between a tenant and an owner of rental housing assisted with HOME funds must be for not less than one year, unless by mutual agreement between the tenant and the owner.
b.  **Prohibited lease terms.** The lease may not contain any of the following provisions:
    1.  Agreement to be sued. Agreement by the tenant to be sued, to admit guilt, or to a judgment in favor of the owner in a lawsuit brought in connection with the lease;
    2.  Treatment of property. Agreement by the tenant that the owner may take, hold, or sell personal property of household members without notice to the tenant and a court decision on the rights of the parties. This prohibition, however, does not apply to an agreement by the

---

tenant concerning disposition of personal property remaining in the housing unit after the tenant has moved out of the unit. The owner may dispose of this personal property in accordance with State law;

3. Excusing owner from responsibility. Agreement by the tenant not to hold the owner or the owner's agents legally responsible for any action or failure to act, whether intentional or negligent;

4. Waiver of notice. Agreement of the tenant that the owner may institute a lawsuit without notice to the tenant;

5. Waiver of legal proceedings. Agreement by the tenant that the owner may evict the tenant or household members without instituting a civil court proceeding in which the tenant has the opportunity to present a defense, or before a court decision on the rights of the parties;

6. Waiver of a jury trial. Agreement by the tenant to waive any right to a trial by jury;

7. Waiver of right to appeal court decision. Agreement by the tenant to waive the tenant's right to appeal, or to otherwise challenge in court, a court decision in connection with the lease; and

8. Tenant chargeable with cost of legal actions regardless of outcome. Agreement by the tenant to pay attorney's fees or other legal costs even if the tenant wins in a court proceeding by the owner against the tenant. The tenant, however, may be obligated to pay costs if the tenant loses.

c. **Termination of tenancy**. An owner may not terminate the tenancy or refuse to renew the lease of a tenant of rental housing assisted with HOME funds except for serious or repeated violation of the terms and conditions of the lease; for violation of applicable Federal, State, or local law; for completion of the tenancy period for transitional housing; or for other good cause. To terminate or refuse to renew tenancy, the owner must serve written notice upon the tenant specifying the grounds for the action at least 30 days before the termination of tenancy.

d. **Tenant selection**. An owner of rental housing assisted with HOME funds must adopt written tenant selection policies and criteria that:

1. Are consistent with the purpose of providing housing for very low-income and low-income families;

2. Are reasonably related to program eligibility and the applicants' ability to perform the obligations of the lease;

3. Provide for the selection of tenants from a written waiting list in the chronological order of their application, insofar as is practicable; and

4. Give prompt written notification to any rejected applicant of the grounds for any rejection.

Book149/Page3762

*Project Schedule* –

The Redevelopers expressly agree to complete all work required by this agreement in accordance with the timetable set forth below –

| Milestone | Deadline |
|---|---|
| Project **Start Date** | May 2005 |
| Land acquisition completed | October 4, 2005 |
| Construction start date | October 2005 |
| Submission of interim status report | November 1,  2005 |
| Construction completion date – Certificate of Occupancy Issued | November 1, 2006 |
| Project Rent-up / Occupancy completed | December 31, 2006 |
| Closing of permanent finance sources<br>Submission of preliminary initial occupancy / rentup report | January 2007<br>60 days after issuance of<br>Certificate of Occupancy |
| Deadline for return of Program Income, if any | Ongoing during period of affordability |
| **Final Project Completion Date (including including submission of all cost certifications, audits, closeout documents and final initial occupancy reports)** | September 30, 2006 |

Book149/Page3763

**EXHIBIT B**
**Project Budget –**

**Final Sources and Uses To be Provided Prior to Closing**

|  | HOME | Other Funds | Total |
|---|---|---|---|
| **Sources -** | | | |
| Low Income Housing Credit Equity | $0 | $4,176,387 | $4,176,387 |
| NYS Homeless Housing Assistance Program | $0 | $0 | $0 |
| AHP/Redevelopers's Equity | $0 | $0 | $0 |
| **HOME Funds – construction financing –** | **$1,000,000** | **$0** | **$1,000,00** |
| Conventional Mortgage | $0 | $375,000 | $375,000 |
| the Redevelopers | $0 | $44,421 | $44,421 |
| **Total Sources** | **$1,000,000** | **$4,595808** | **$5,595,808** |
| | | | |
| **Uses -** | | | |
| Acquisition | $55,000 | $0 | $55,000 |
| Soft Costs | $470,183 | $0 | $470,183 |
| Construction | $474,817 | $3,688,434 | $4,163,251 |
| Construction Contingency | $0 | $229,464 | $229,464 |
| Redevelopers Fee | $0 | $468,185 | $468,185 |
| Working Capital | $0 | $67,000 | $67,000 |
| Project Reserves | $0 | $142,725 | $142,725 |
| Administrative Costs / Partnership Expense | $0 | $0 | $0 |
| **Total Uses** | **$1,000,000** | **$4,595808** | **$5,595,808** |

Book149/Page3764

## EXHIBIT C.
## HOME Resale and Recapture Provisions

**The Recapture Provision**

This provision authorizes BURA to take back all or a portion of the HOME funds provided if the Redevelopers sells or otherwise transfers title to the property within the affordability period without the permission of BURA., or otherwise fails to comply with the provisions of 24 CFR 92.

**The Resale Provision**  This provision ensures that a HOME-assisted property remains affordable during the entire  period of affordability. the Redevelopers may sell the property after the period of affordability without any restrictions. The affordability period may be terminated should any of the  following events occur: foreclosure, transfer in lieu of foreclosure or assignment of a FHA  insured mortgage to HUD. The original housing Redevelopers, or BURA may use purchase options, rights of  first refusal, or other preemptive rights to purchase the housing before foreclosure to preserve  affordability.

All of the requirements are described in the Affordability Covenant Running with the Land (deed restriction) that is recorded with the Erie County Clerk's Office by the Redevelopers.

The specific requirements of the resale and recapture provisions under this Agreement –

____ are set forth in EXHIBIT XXX in the Affordability Covenants Running with the Land and the Note and Mortgage to the Purchaser.

<u>XXX</u>  **shall be provided to the Redevelopers under separate cover.**

Book149/Page3765

**EXHIBIT D – 24 CFR 92.350**
24 CFR Part 5, Subpart A, Section 5.105  - [Revised as of April 1, 2003]

**Nondiscrimination, Equal Opportunity, Disclosure, Debarred or Ineligible Contractors, Drug Free Workplace**

The following Federal requirements apply as noted in the respective program regulations:

(a)   **Nondiscrimination and equal opportunity.**

1.   The Fair Housing Act (42 U.S.C. 3601-19) and implementing regulations at 24 CFR part 100 et seq.;

2.   Executive Order 11063, as amended by Executive Order 12259 (3 CFR, 1959-1963 Comp., p. 652 and 3 CFR, 1980 Comp., p. 307) (Equal Opportunity in Housing Programs) and implementing regulations at 24 CFR part 107;

3.   Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d-2000d-4) (Nondiscrimination in Federally Assisted Programs) and implementing regulations at 24 CFR part 1;

4.   The Age Discrimination Act of 1975 (42 U.S.C. 6101-6107) and implementing regulations at 24 CFR part 146;

5.   Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) and implementing regulations at part 8 of this Title (see below);

6.   Title II of the Americans with Disabilities Act, 42 U.S.C. 12101 et seq.;

7.   24 CFR part 8;

8.   Section 3 of the Housing and Urban Development Act of 1968 (12 U.S.C. 1701u) and implementing regulations at 24 CFR part 135;

9.   Executive Order 11246, as amended by Executive Orders 11375, 11478, 12086, and 12107 (3 CFR, 1964-1965 Comp., p. 339; 3 CFR, 1966-1970 Comp., p. 684; 3 CFR, 1966-1970 Comp., p. 803; 3 CFR, 1978 Comp., p. 230; and 3 CFR, 1978 Comp., p. 264, respectively) (Equal Employment Opportunity Programs) and implementing regulations at 41 CFR chapter 60;

10.  Executive Order 11625, as amended by Executive Order 12007 (3 CFR, 1971-1975 Comp., p. 616 and 3 CFR, 1977 Comp., p. 139) (Minority Business Enterprises);

11.  Executive Order 12432 (3 CFR, 1983 Comp., p. 198) (Minority Business Enterprise Development); and

12.  Executive Order 12138, as amended by Executive Order 12608 (3 CFR, 1977 Comp., p. 393 and 3 CFR, 1987 Comp., p. 245) (Women's Business Enterprise).

(b)   **Disclosure requirements**. The disclosure requirements and prohibitions of 31 U.S.C. 1352 and implementing regulations at 24 CFR part 87; and the requirements for funding competitions established by the Department of Housing and Urban Development Reform Act of 1989 (42 U.S.C. 3531 et seq.).

(c)   **Debarred, suspended or ineligible contractors**. The prohibitions at 24 CFR part 24 on the use of debarred, suspended or ineligible contractors.

(d)   **Drug-Free Workplace**. The Drug-Free Workplace Act of 1988 (41 U.S.C. 701 et seq.) and HUD's implementing regulations at 24 CFR part 24. [61 FR 5202, Feb. 9, 1996, as amended at 65 FR 16715, Mar. 29, 2000]

The key accessibility laws that apply to the HOME Program include the following:

• **Section 504 of the Rehabilitation Act of 1973** (24 CFR Part 8) Known as "Section 504," this Act prohibits discrimination against persons with disabilities in any program receiving Federal monies, such as the HOME Program. It governs the design and construction of housing to ensure that Federal programs are operated to be accessible to persons with disabilities, and to ensure that a

Book149/Page3766

portion of housing developed with Federal funds is accessible to those with mobility, visual, and hearing impairments. See Section 504 Notices, Regulations and Supportive Documents for more information.

- **Americans with Disabilities Act** (42 U.S.C. 12131; 47 U.S.C. 155, 201, 218, and 225)
  The ADA prohibits discrimination against persons with disabilities in all programs and activities sponsored by state and local governments. The Act specifically gives HUD jurisdiction over discrimination against people with disabilities as it pertains to housing programs or activities on the state or local government level.

- **Fair Housing Act, as amended** (24 CFR Part 100 et seq)
  This Act was amended in 1988 to include persons with disabilities as a protected class, and apply design and construction requirements to housing developed with private or public funds. This law requires property owners to make reasonable modifications to units and/or public areas in order to provide "full enjoyment" of that unit to a disabled tenant(s) or potential tenant. Further, it requires property owners to make reasonable accommodations to its rules or procedures that may be necessary to afford a disabled tenant with full use and enjoyment of the premises (e.g. allowing a visually impaired tenant to keep a guide dog, even if the building has a "no pets" policy).

Notice PIH 99-52 describes Section 504 of the Rehabilitation Act of 1973; the Americans with Disabilities Act of 1990; the Architectural Barriers Act of 1968 and the Fair Housing Act of 1988. This notice provides information, examples, and resources on key elements of these regulations.

Both Section 504 and the Fair Housing Act are applicable to the HOME Program. Each has different requirements of applicability by project type. In general, when triggered, the Fair Housing Act requires a greater number of accessible units than Section 504. However, the technical specifications required by Section 504 apply a higher standard of accessibility than the Fair Housing Act.
- The Fair Housing Act applies to all newly constructed multifamily housing (rental and homeownership) with four or more units.
  - Entrances, common spaces, and all ground floor dwelling units of non-elevator buildings, and all units of elevator buildings must be made accessible, in accordance with the Fair Housing Act standard.
- Section 504 requires full accessibility in accordance with the Uniform Federal Accessibility Standards, or "UFAS." Section 504 applies to all Federally-assisted newly constructed housing of five or more units, and substantially rehabilitated housing of fifteen or more units.
  - Under Section 504, HOME-assisted rental housing developments must provide full accessibility for persons with mobility impairments in at least five percent (but no fewer than one) of the units.
  - In addition, at least two percent (but no fewer than one) of the units must be made fully accessible to persons with sensory (hearing or vision) impairments.
  - Entrances and common areas must also be fully accessible.
  - Furthermore, 24 CFR Part 8.29 requires that single family housing units receiving Federal assistance for construction and rehabilitation activities must be made accessible upon the request of the prospective buyer if the nature of that buyer's handicap requires such modifications.

In addition to the design and construction standards, Section 504 requires that the owner or Redevelopers, must do the following:
- Distribute accessible units throughout projects and sites, and make them available in a range of sizes and amenities to maximize choice.
- Adopt suitable means to ensure that information about the availability of accessible units is made available to disabled persons.

Book149/Page3767

- Disseminate program information and unit availability information in a manner that is accessible to persons with disabilities, such as using telecommunication devices, materials in Braille, or American Sign Language interpreters, as needed.

## Section 504 - Removal of Physical Barriers

- For **new construction of multi-family projects**, a minimum of 5 percent of the units in the project (but not less than one unit) must be accessible to individuals with mobility impairments, and an additional 2%, at a minimum, of the units (but not less than one unit) must be accessible to individuals with sensory impairments. The total number of units in a HOME-assisted project, regardless of whether they are all HOME-assisted, is used as the basis for determining the minimum number of accessible units. Also, in a project where not all the units are HOME-assisted, the accessible units may be either HOME-assisted or non-HOME-assisted.
- The Section 504 definition of **substantial rehabilitation for multifamily projects** includes construction in a project with 15 or more units for which the rehabilitation costs will be 75 percent or more of the replacement cost. In such developments, **a minimum of 5 percent of the units in the project (but not less than one unit) must be accessible to individuals with mobility impairments, and an additional 2 percent, at a minimum, (but not less than one unit) must be accessible to individuals with sensory impairments.** As in the case of new construction, the total number of units in a HOME-assisted project, regardless of whether they are all HOME-assisted, is used as the basis for determining the minimum number of accessible units, and, in a project where not all the units are HOME-assisted, the accessible units may be either HOME-assisted or non-HOME-assisted.
- Accessible units must be, to the maximum extent feasible, distributed throughout the projects and sites and must be available in a sufficient range of sizes and amenities so as not to limit choice. Owners and managers of projects with accessible units must adopt suitable means to assure that information regarding the availability of accessible units reaches eligible individuals with handicaps. They must also take reasonable non-discriminatory steps to maximize use of such units by eligible individuals. When an accessible unit becomes vacant, before offering the unit to a non-handicapped individual, the owner/manager should offer the unit: first, to a current occupant of the project requiring the accessibility feature; and second, to an eligible qualified applicant on the waiting list requiring the accessibility features.
- The standards for ensuring compliance with Section 504 are the Uniform Federal Accessibility Standards, although deviations are permitted in specific circumstances.

## Provide Program Accessibility

Individuals with handicaps must be able to find out about, apply for, and participate in federally-assisted programs or activities.

Special communication systems may be needed for outreach and ongoing communication (e.g., Telecommunications Devices for the Deaf (TDD), materials on tape or in Braille, accessible locations for activities and meetings.)

- Policies and procedures must be non-discriminatory (e.g., housing providers may not ask people with handicaps questions not asked of all applicants, screen individuals with handicaps differently or assess an individual's ability to live independently).

Refer to 24 CFR Part 8 for the regulations effectuating 504 of the Rehabilitation Act of 1973, as amended.

Book149/Page3768



**EXHIBIT E**

### Affirmative Marketing Policies and Procedures

Statement of Policy - In accordance with regulations of the HOME Investment Partnership Program, HOME 24 CFR 92.351 (a), and in furtherance of the City of Buffalo's commitment to non-discrimination and equal opportunity in housing, the Redevelopers have established procedures to affirmatively market the rental units to special populations in need of supportive housing . These procedures are intended to further the objectives of Title VIII of the Civil Rights Act of 1968, Executive Order 1563 and New York State's Human Rights Law.

The Redevelopers believe that individuals of similar economic levels in the same housing market area should have available to them a like range of housing choices regardless of their race, creed, color, national origin, sex, disability, religion, age, familial status or marital status.

The Redevelopers are committed to the goals of affirmatively marketing, which will be implemented in the HOME Program through specific steps that it will follow. These goals will be reached through the following procedures:

Informing the public, potential tenants, and owners about Federal fair housing laws and affirmative marketing policies. The Redevelopers will inform the public and owners about Federal fair housing laws and their affirmative marketing policies. Methods to inform the public and owners will include the use of the Equal Housing Opportunity logo type or slogan in press releases and solicitations for owners, and written communication to fair housing and other groups.

Requirements for federally assisted project of 5 or more units will include:

- Units must be advertised in the Buffalo News and community newspapers. The fair housing logo or slogan must be included on all advertisements.
- The unit owners must also be marketed with agency and community groups that serve low-income households.
- The fair housing logo or slogan must be displayed on posters and brochures advertising the units.

**Special Outreach** – To inform and solicit applications from persons in the housing market who are not likely to apply for housing units without special outreach, the following procedures will be required of HOME projects containing 5 or more units:

- The Redevelopers will identify which group in the housing market needs special outreach.
- The Redevelopers will notify community organizations, churches, fair housing groups, employment centers, education centers, housing counseling agencies and rental agencies that serve low-income households of the housing opportunities.

**Record Keeping** – The Redevelopers will keep the following records:

---

East Side Housing Opportunities – September 30, 2005

Page 45.

Book149/Page3769

- Individuals/families that apply for housing
- Individuals/families assisted with HOME assisted housing
- The the Redevelopers will keep records and report data to BURAon the following: racial, ethnic and gender characteristics of applicants that apply and/or receive assistance for HOME assisted units, and household income.
- Activities to inform the general public of HOME assisted units; copies of advertisements placed in local newspapers.
- How applicants heard about the HOME assisted units.
- Copies of all advertisements, brochures, posters and a list of community contacts.

**Assessment and corrective actions**:  The Redevelopers will assess the affirmative marketing performance on projects that receive HOME funds for HOME assisted units.

The Redevelopers will examine agency records to determine if a good faith effort has been made to market the units.

After reviewing the records, the the Redevelopers will determine if persons in the housing market area who were not likely to apply for the housing without special outreach did apply and were assisted, then the Redevelopers will assume the marketing procedures were effective.  If the the Redevelopers determine that this did not happen, the Redevelopers and BURA will review the affirmative marketing plan and make adjustments where necessary.

**Corrective action**.  The Redevelopers will take the following action if BURA determines that they have failed to carry out the affirmative marketing plan or fails to maintain the records on applicants.

- The Redevelopers will first discuss the problem and the ways the agency can improve its affirmative marketing performance.

**Assessment**.  The Redevelopers will assess the affirmative marketing activities for HOME assisted units of ten or more and prepare a written report as part of its monitoring procedures for the HOME Program.

**Outreach standards**.  The Redevelopers's Minority/Women Owned Businesses Outreach Policy for HOME funded projects will include minority and women-owned businesses in all contracting activities entered into for HOME assisted activities as stated under the terms of this agreement.  The Redevelopers' outreach efforts to minority and women-owned businesses will be based on the following criteria:

- Outreach efforts will include a good faith, comprehensive and continuing endeavor to recruit and include MBE/WBE in HOME funded activities.

- The Outreach effort will be designed to utilize all available and appropriate public and private sector local resources.

Book149/Page3770

## MINORITY - FOCUS NEWSPAPERS

The Challenger
1303 Fillmore Avenue
Buffalo, New York 14211
Al-Nisa Banks
(716) 897-0442

La Ultima Hora
804 West Avenue
Buffalo, NY 14213
(716) 882-3869
(Hispanic Newspaper)

Criterion
409 East Utica Street
Buffalo, New York 14208
Frank Gist
(716) 882-9570

## LOCAL NEWSPAPERS

Riverside Review
215 Military Rd.
Buffalo, NY 14207
Richard Mack
877-8400

Buffalo Rocket/West Side Times
2507 Delaware Ave
Buffalo, NY 14216
873-2594

## COMMUNITY AGENCIES

Community Action Organization
70 Harvard Place
Buffalo, New York 14209
881-5150

Native American Community Services
2495 Main Street
Suite # 524
Buffalo, New York 14214-253
(716) 832-2302

West Side Community Services
161 Vermont Street
Buffalo, New York 14213
884-6616

Seneca Nation of Indians
1490 Route 438
Irving, New York 14081
Dean Seneca/Gerri Memmo
532-4900

Every Women Opportunity Center
237 Main Street, Suite 330
Buffalo, New York 14203
Myrna F. Young, Executive Director
847-1120

Community Voice Organization
118 East Utica Street
Buffalo, New York 14209
(716) 882-0606

Erie Regional
54-130 Maryland Street
Buffalo, New York 14201-1891
847-2070

Friends To The Elderly
Youth and Family Center Inc.
118 East Utica Street
Buffalo, New York 14209
Dorothy Collier, Exec. Director
(716) 882-0602

Hispanos Unidos de Buffalo
254 Virginia Street
Buffalo, New York 14201
856-7110

Book149/Page3771

## COMMUNITY BASED HOUSING ORGANIZATIONS

EAST-SOUTH DISTRICT

BROADWAY FILLMORE NHS
780 Fillmore Avenue
Buffalo, NY 14212-1342
Contact:  Bruce Williams, Executive Director

Phone: 852-3130
Fax: 852-3552
E-mail:
bwilliams@bfnhs.org

CENTRAL DISTRICT

ELLICOTT DISTRICT CD
644 William Street
Buffalo, NY 14206-1626
Contact:  Erma Brown, Executive Director

Phone: 856-3262
Fax: 856-7034
E-mail:
ellicottcdc644@aol.com

HISPANICS UNITED OF BUFFALO (HUB)
254 Virginia Street
Buffalo, NY 14201-1938
Contact: Gloria Soto, Housing Director

Phone: 856-715
Fax: 856-9617
E-mail:
hispanicsunitedofbuffalo
@hotmail.com

EAST-NORTH DISTRICT

FILLMORE LEROY AREA RESIDENTS (FLARE)/CAO
307 Leroy Avenue
Buffalo, NY 14214-2520
Contact:  Yvonne McCray, Executive Director

Phone: 838-6740
Fax:    838-6919
E-mail:
yvend95@yahoo.com

NORTH DISTRICT;

UNIVERSITY HEIGHTS
3242 Main Street
Buffalo, NY 14214-1324
Contact:  Alyce Cuddy, Housing Director

Phone: 832-55
Fax:    832-5099
E-mail: uhcda@aol.com

KENSINGTON BAILEY NHS
995 Kensington Avenue
Buffalo, NY 14215-2736
Contact:  Jerome Nagy, Executive Director

Phone:  836-3600
Fax:    836-3686
E-mail:
jeromekbnhs@yahoo.com

North Buffalo CDC
203 Sanders Road
Buffalo, NY 14216-135
Contact:  Deborah A. Cielencki, Executive Director

Phone:  874-6133
Fax:    874-1647
E-mail: -----

SOUTH DISTRICT:

NHS OF SOUTH BUFFALO
1937 South Park Ave.
Buffalo, NY 14220-1852
Contact:  Shyrl Duderwick, Executive Director

Phone: 823-3630
Fax:    823-2967
E-mail: sbnhs@pcom.net

LOVEJOY DISTRICT NRS
615 Walden Ave.
Buffalo, NY 14206-513
Contact: Lynnette Gospodarski,

Phone: 896-505
Fax:    896-5247
E-mail:
dhldnrs@yahoo.com

---

East Side Housing Opportunities – September 30, 2005

Book149/Page3772

OLD FIRST WARD COMMUNITY ASSOCIATION
62 Republic Street
Buffalo, NY  14204-2703
Contact:  Laura Kelly, Housing Director

Phone: 856-8613
Fax:    856-8273
E-mail: -----

WEST-NORTH DISTRICT

BLACKROCK RIVERSIDE NHS
203 Military  Road
Buffalo, NY  14207-2631
Contact:  Paul Brunner, Executive Director

Phone:877-395
Fax:    877-3912
E-mail:
riverrocknhs1@choiceonemail.com

WEST SIDE NHS
359 Connecticut Street
Buffalo, NY  14213-2547
Contact:  Linda Chiarenza, Executive Director

Phone: 885-2344
Phone: 885-2346
E-mail: info@wsnhs.org
lchiarenza@wsnhs.org

HOUSING AGENCIES

Belmont Shelter Corporation
1195 Main St.
Buffalo NY 14209
884-7791

Rental Assistance Corporation of Buffalo
470 Franklin St.
Buffalo, NY 14202
882-0063

Housing Opportunities Made Equal
700 Main St.
Buffalo, NY 14202
854-1400

City of Buffalo Fair Housing Officer
Frank Perez
Room 218 City Hall
Buffalo, NY 14202
851-4212

**See also HUD form 935.2 ( Affirmative Fair Housing Marketing Plan )as executed by the
Redevelopers and contained in the Proposal for HOME funds and hereto made a part of this
Agreement.**

Book149/Page3773

EXHIBIT F

LIEN LAW AFFIDAVIT

SECTION 22 AFFIDVIT

**Michael Riegel**, being duly sworn, does depose and say that he/ is the Vice President of Woodland General, Inc., the general partner of East Side Housing, L.P., one of the Redevelopers named in the foregoing Agreement between the City of Buffalo Urban Renewal Agency and the Redevelopers, that no consideration was paid, or is to be paid for the loan therein; that all expenses, except as therein noted and for commitment fees and other fees paid to the Lender; that all of the expenses incurred in connection with the funds to be provided against the premises are as follows:

The amount of the Building Loan is: $1,000,000

(1)   The consideration for the Building Loan to be paid and the other expenses heretofore incurred or to be incurred in connection with and paid out of the Building Loan are (or are estimated to be) as follows:

| | |
|---|---|
| Surveys: | $19,500.00 |
| Site Acquisition: | $55,000.00 |
| Examination of title and recording fees: | $22,000.00 |
| Architect's Fee: | $75,000.00 |
| Cost Certification: | $7,500.00 |
| Fees of Banks's Construction Consultant: | $12,000.00 |
| Fees of Bank's Counsel: | $20,000.00 |
| Bank Commitment Fee: | $20,818.00 |
| Insurance: | $14,000.00 |
| Legal Fees: | $118,000.00 |
| Tac Credit Application Fee: | $5,000.00 |
| Environmental: | $35,000.00 |
| Appraisal: | $6,000.00 |
| Bank Construction Loan Interest: | $115,365.00 |
| Total: | $525,183.00 |

(2)   The amount, if any, to be advanced from the Building Loan to repay amounts previously advanced to Borrower pursuant to Notices of Lending for costs of the Improvements is: $0.00

Book149/Page3774

(3)    The amount, if any, to be advanced from the Building Loan to reimburse Borrower for costs of the Improvements expended by Borrower after the commencement of the Improvements but prior to the date hereof:          $0.00

(4)    The estimated amount to be advanced from the Building Loan for indirect costs of the Improvements which may become due and payable after the date hereof and during the construction of the Improvements (such as bond and insurance premiums, fees of architects, engineers and surveyors, ground rents, taxes, assessments and water and sewer rents and interest on the Building Loan) is:          $0.00

(5)    The net sum available to Borrower from the Building Loan to pay contractors, subcontractors, laborers and materialmen for the Improvements is:          $474,817

(6)    This affidavit is made pursuant to and in compliance with Section 22 of the Lien Law of the State of New York.

(7)    If Borrower is a corporation or partnership, this statement is verified by deponent and not by Borrower because Borrower is a corporation or partnership of which the deponent is an officer of the general partner.

(8)    The facts stated above and any costs itemized on this statement are true, to the best knowledge of the undersigned.

That after the payment of the cost and expenses as set forth above, the total sum available to the Redevelopers for the Project will be the amount hereinabove indicated as the Total Sum.

EAST SIDE HOUSING, L.P,

By:    Woodland General, Inc., general partner

By: _____

Michael Riegel, Vice President

---

STATE OF NEW YORK )
COUNTY OF ERIE )  ) SS.

*Sworn to before me this*

On the _3rd_ day of October, in the Year 2005, ~~before me, the undersigned, personally~~ appeared Michael Riegel, personally known to me ~~or proved to me on the basis~~ of satisfactory evidence to be the individual(s) whose name(s) is ~~(are)~~ subscribed to the within instrument and acknowledged to me that he/she/they ~~executed the same~~ in his/her/their capacity(ies), and that by his/her/their signature(s) on the ~~instrument,~~ the individual(s), or the person upon behalf of which the individual(s) acted, executed ~~the instrument.~~

_____
Commissioner of Deeds/Notary Public

TIMOTHY C. CASHMORE
Notary Public, State of New York
Qualified in Erie County
My Commission Expires 05/31/20_07_

Book149/Page3776

**EXHIBIT G.1**

**Conflict of Interest Disclosure**

**East Side Housing, L.P.**

The **Redeveloper** represents that none of its **employees, officers, compensated members, contractors or consultants** are, or for the duration of this agreement will be, employees of the City of Buffalo Urban Renewal Agency (BURA) or City of Buffalo nor are their family members or business relationships employees of BURA or the City of Buffalo nor will their employees, officers, compensated members, contractors or consultants obtain a financial interest either for themselves or those whom they have immediate family or business ties, during their tenure or for one year thereafter.

The **Redeveloper** must formally disclose all potential Conflicts of Interest to the Buffalo Urban Renewal Agency.

Disclosure:  Are you, or are you related to (by blood, marriage, act of law, or business relationship) any person who is an employee of the City of Buffalo, the Buffalo Urban Renewal Agency (BURA), the Municipal Housing Authority (BMHA), Board of Education, Sewer Authority or any other entity funded by Community Development Block Grant (CDBG), or the HOME Investment Partnership Program?

☐   YES          ☑   NO

If yes, a full disclosure must be forwarded on **official letterhead** to the Buffalo Urban Renewal Agency (BURA).  The notice must include:

Name:_____

Job Title or Position:_____

Disclosure must include:

1.   Name of Relation
2.   Department
3.   Position
4.   Relationship

The **Redeveloper** acknowledges receipt of this policy and verifies that all appropriate parties have been apprised of their obligation to disclose all potential conflicts of interest.

_____          10-3-05
Signature                                              Date
East Side Housing, L.P.

Book149/Page3777

**EXHIBIT G.1**

**Conflict of Interest Disclosure**

**Belmont Shelter Corporation**

The **Redeveloper** represents that none of its **employees, officers, compensated members, contractors or consultants** are, or for the duration of this agreement will be, employees of the City of Buffalo Urban Renewal Agency (BURA) or City of Buffalo nor are their family members or business relationships employees of BURA or the City of Buffalo nor will their employees, officers, compensated members, contractors or consultants obtain a financial interest either for themselves or those whom they have immediate family or business ties, during their tenure or for one year thereafter.

The **Redeveloper** must formally disclose all potential Conflicts of Interest to the Buffalo Urban Renewal Agency.

Disclosure: Are you, or are you related to (by blood, marriage, act of law, or business relationship) any person who is an employee of the City of Buffalo, the Buffalo Urban Renewal Agency (BURA), the Municipal Housing Authority (BMHA), Board of Education, Sewer Authority or any other entity funded by Community Development Block Grant (CDBG), or the HOME Investment Partnership Program?

☐   YES                 ☒   NO

If yes, a full disclosure must be forwarded on **official letterhead** to the Buffalo Urban Renewal Agency (BURA).  The notice must include:

Name:_____

Job Title or Position:_____

Disclosure must include:

5.   Name of Relation
6.   Department
7.   Position
8.   Relationship

The **Redeveloper** acknowledges receipt of this policy and verifies that all appropriate parties have been apprised of their obligation to disclose all potential conflicts of interest.

_____          10·3·05
Signature                                                          Date
Belmont Shelter Corporation

Book149/Page3778

**EXHIBIT H.**
**Certification Form for Section 3 Compliance**

SECTION 3 COMPLIANCE IN THE PROVISION OF TRAINING, EMPLOYMENT AND
BUSINESS OPPORTUNITIES

This Contract is subject to the requirements of Section 3 of the Housing and Urban Development Act of 1968 (12 USC 1701u) as amended, the HUD regulations issued pursuant thereto at 14 CFR, Part 135, and any applicable rules and orders of HUD issued thereunder prior to the execution of this contract. The Section 3 clause, set forth in 24 CFR, 135.20(b) provides:

The work to be performed under this contract is subject to the requirements of section 3 of the Housing and Urban Development Act of 1968, as amended, 12 U.S.C. 1701u (section 3). The purpose of section 3 is to ensure that employment and other economic opportunities generated by HUD assistance or HUD-assisted projects covered by Section 3, shall, to the greatest extent feasible, be directed to low- and very low-income persons, particularly persons who are recipients of HUD assistance for housing.

The parties to this contract agree to comply with HUD's regulations in 24 CFR part 135, which implement Section 3. As evidenced by their execution of this contract, the parties to this contract certify that they are under no contractual or other impediment that would prevent them from complying with the part 135 regulations.

The contractor agrees to send to each labor organization or representative of workers with which the contractor has a collective bargaining agreement or other understanding if any, a notice advising the labor organization or workers' representative of the contractor's commitments under this section 3 clause, and will post copies of the notice in conspicuous places at the work site where both employees and applicants for training and employment positions can see the notice. The notice shall describe the section 3 preference, shall set forth minimum number and job titles subject to hire, availability of apprenticeship and training positions, the qualifications for each; and the name and location of the person(s) taking applications for each of the positions; and the anticipated date the work shall begin.

The contractor agrees to include this section 3 clause in every subcontract subject to compliance with regulations in 24 CFR part 135, and agrees to take appropriate action, as provided in an applicable provision of the subcontract or in this section 3 clause, upon a finding that the subcontractor is in violation of the regulations in 24 CFR part 135. The contractor will not subcontract with any subcontractor where the contractor has notice or knowledge that the subcontractor has been found in violation of the regulations in 24 CFR part 135.

The contractor will certify that any vacant employment positions, including training positions, that are filled (1) after the contractor is selected but before the contract is executed, and (2) with persons other than those to whom the regulations of 24 CFR part 135 require employment opportunities to be directed, were not filled to circumvent the contractor's obligations under 24 CFR part 135.

Noncompliance with HUD's regulations in 24 CFR part 135 may result in sanctions, termination of this contract for default, and debarment or suspension from future HUD assisted contracts.

With respect to work performed in connection with section 3 covered Indian housing assistance, section 7(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450e) also applies to the work to be performed under this contract. Section 7(b) requires that to the greatest extend feasible (1) preference and opportunities for training and employment shall be given to Indians, and (ii) preference in the award of contracts and subcontracts shall be given to Indian organizations and Indian-owned Economic Enterprises. Parties to this contract that are subject to the provisions of section 3 and section 7(b) agree to comply with section 3 to the maximum extent feasible, but not in derogation of compliance with section 7(b).

The Contractor agrees to abide by the Section 3 clause set forth above and will also cause this Section 3 clause to be inserted in any subcontracts entered into with third parties for work covered by this Contract.

The Redevelopers:

By: _____
Signature
East Side Housing, L.P.

Date: _____10 · 3 · 05_____

By: _____
Signature
Woodland General, Inc.

Date: _____10 - 3 - 05_____

By: _____
Signature
Belmont Shelter Corporation

Date: _____10 - 3 - 05_____

Book149/Page3780

APPENDIX A
INCOME LIMITS, MAXIMUM SUBSIDY LIMITS, MAXIMUM RENT LIMITS

**2005 HUD Income Limits – City of Buffalo – effective February 11, 2005**

Individuals served under the programs covered by this agreement and funded by HOME, must meet the income limits established by HUD on an annual basis.  The maximum limits existing at the time of this agreement are --

| family size | Low/ Moderate Income ** 80% of median | 60 % of median | Very Low Income ** 50% of median | Extremely Low Income ** 30% of median |
|---|---|---|---|---|
| 1 | $31,900 | $23,940 | $19,950 | $11,950 |
| 2 | $36,500 | $27,360 | $22,800 | $13,700 |
| 3 | $41,050 | $30,780 | $25,650 | $15,400 |
| 4 | $45,600 | $34,200 | $28,500 | $17,100 |
| 5 | $49,250 | $36,900 | $30,750 | $18,450 |
| 6 | $52,900 | $39,660 | $33,050 | $19,850 |
| 7 | $56,550 | $42,360 | $35,300 | $21,200 |
| 8 | $60,200 | $45,120 | $37,600 | $22,550 |

**MAXIMUM per UNIT SUBSIDY LIMITS**

HOME per unit subsidy limits may not exceed 100 % of the dollar limits for a Section 221(d)(3) Non-profit sponsor, elevator type development.  The current limits established by the HUD Buffalo Office and effective January 1, 2005 are:

| | | |
|---|---|---|
| 0 BR | $ | 108,265 |
| **1 BR** | **$** | **124,104** |
| 2 BR | $ | 150,911 |
| 3 BR | $ | 195,226 |
| 4 BR | $ | 214,300 |

**The maximum per unit HOME subsidy available for the development of the five three-bedroom rental units at the Project will be $195,226 and the maximum per unit HOME subsidy available for the development of the two four-bedroom rental units at the Project will be $214,300** which is within the allowable limit.  In no event shall the funds provided exceed the actual per unit development cost of each HOME-assisted unit.

Book149/Page3781

Limits will be updated annually as released by HUD.

**2005 HOME Rents – includes all eligible utilities – effective – March 31, 2005**

| Number of Bedrooms | High HOME Rents | Low HOME Rents** |
|---|---|---|
| 0 | $ 538 | $ 498 |
| 1 | $ 542 | $ 534 |
| 2 | $ 648 | $ 641 |
| 3 | $ 806 | $ 740 |
| 4 | $ 899 | $ 826 |
| 5 | $ 1,034 | $ 911 |
| 6 | $ 1,169 | $ 997 |

** Low HOME Rents are the rent levels applicable to the units set aside as 50% of Median Income Units

At initial occupancy, all HOME assisted units in this project must be occupied by households with incomes at or below 60% of the area median based on household size. In HOME projects with five or more assisted units, at least 20% of the rental units must be occupied by families who have an annual median income of 50% or less. These tenants must occupy units with rents set at or below the Low HOME Rent level.

Book149/Page3782

APPENDIX B
**HOME Assisted Rental Housing**
AFFORDABILITY RESTRICTIONS and COVENANTS RUNNING WITH THE LAND

THIS AGREEMENT made this _____*3ᵈ*_____ day of S̶e̶p̶t̶e̶m̶b̶e̶r̶, *October* 2005 by and between the CITY OF BUFFALO URBAN RENEWAL AGENCY (BURA), having its offices at 920 City Hall, Buffalo, and East Side Housing, L.P., a New York limited partnership, with an address at 1195 Main Street, Buffalo, New York, 14209, hereinafter referred to as the "Mortgagor".

WHEREAS, BURA has provided **$1,000,000.00** in Federal HOME funds to MORTGAGOR through a mortgage made by the Mortgagor to be recorded at the Erie County Clerk's Office and payable to the Buffalo Urban Renewal Agency, and

WHEREAS, as a result of the use of such HOME funds to support rehabilitation of the Redevelopers multi-family rental project, including four HOME assisted rental units within the facility, the Property is subject to affordability requirements and income limitations for a period of **twenty (20)** years from the date of completion of the project; and

WHEREAS, the parties hereto wish to agree upon the terms and conditions of said affordability restrictions,

NOW, THEREFORE, in consideration of the foregoing and the covenants and conditions set forth herein, the parties hereby agree as follows:

1.       PROPERTY COVERED shall be the premises located in the City of Buffalo, New York which is more particularly described in the property description annexed hereto as Schedule A and made a part hereof.

2.       AFFORDABILITY REQUIREMENTS AND INCOME LIMITATIONS.

a.      The **seven (7) fixed-location HOME assisted rental units** in the project shall be occupied only by households that are eligible as low or very low income families and shall meet the income and affordability requirements set forth at 24 CFR § 92.216 and 24 CFR § 92.252.

b.      **Initial Occupancy** – Five (5) of the HOME assisted rental units (the High HOME rent units) must be initially occupied by low income households whose incomes do not exceed 60% of the median family income for the area, adjusted by family size; the **two (2)** additional HOME assisted rental units (the Low HOME rent units) must initially, and throughout the period of affordability, be occupied by very low income households whose incomes do not exceed 50% of the median family income for the area, adjusted by family size.

c.      **Maximum Rents** – The HOME assisted rental units in the project must be occupied only by households that are income qualified families as noted above and must meet the following rent limit requirements as set forth at 24 CFR § 92.252 to qualify as affordable housing.  Rents (including utilities) for the five High HOME rent units must not exceed the High HOME Rent Levels for the area as allowed by HUD.  Rents (including utilities) for the two Low HOME rent units must not exceed the Low HOME Rent Levels for the area as allowed by HUD.

d.      **HOME Rents** –  Following initial occupancy, the five High HOME rent units may be occupied by low income families whose incomes are less than eighty percent (80%) of the median income for the area, adjusted by family size.  Rents for those units shall not exceed the HUD established High HOME Rent guidelines for the area (see Appendix A).

e.      **Maximum Rent When Incomes Increase:**

1.      A tenant whose household income increases after initial eligibility determination and exceeds 50% of the median adjusted income will be allowed to renew his lease and remain in the HOME assisted unit, following the annual recertification of his income in accordance with paragraph (j) herein.  If the tenant's income does not exceed 80% of median adjusted income, the applicable rent ceiling shall not change from that set forth above in paragraph (d).

2.      If the tenant's income has increased to above 80% of the median adjusted income, the rent (including utilities) must be adjusted so that the tenant is paying 30% of the

Book149/Page3783

household's annual adjusted income for rent, minus the utility allowance.

h. **Term of Affordability** – HOME assisted units shall meet the affordability requirements for not less than twenty (20) years, beginning after project completion (24 CFR § 92.252 (e) as per the date of the Certificate of Occupancy.

i. **Tenant Selection** – MORTGAGORS shall adopt written tenant selection policies and criteria consistent with the purpose of providing housing for very low income families, and shall comply with the HOME regulations, including the prohibited lease terms found at 24 CFR § 92.253.

j. **Income Eligibility Certifications and Monitoring** – MORTGAGORS shall determine the income of each tenant household initially in accordance with 24 CFR § 92.203(a)(1)(I) and 24 CFR § 92.203(b)(1) and each year during the period of affordability. MORTGAGORS shall use the definition of annual income as defined at 24 CFR Part 5 Annual Income that provides for calculation of the projected gross annual income of all adult members of the household. At least annually, MORTGAGORS shall certify to BURA that the rents charged and tenant incomes are in compliance with the rent and income requirements set forth herein, and, upon request, shall make such records available to BURA. During the period of affordability, BURA may inspect the exterior of the property, the rental units and common areas to ensure compliance with federal HOME regulations

3. <u>**COVENANTS TO RUN WITH THE LAND**</u>. The covenants as to affordability contained herein shall be deemed to be covenants running with the land, and shall exist for the benefit of BURA and of any and all past and future tenants at the Project. These covenants, conditions and restrictions shall bind the parties hereto and their successors and assigns.

4. <u>REMEDIES</u>. In the event of violation of these covenants by MORTGAGOR, BURA may obtain an injunction against MORTGAGORS or any owner of the Project prohibiting rental of any units at the Project until such time as the Project is in compliance with these covenants. In addition to any injunction obtained by BURA for violation of these covenants, MORTGAGORS or any owner of the Project shall pay to BURA, for the benefit of tenants charged rents exceeding the affordability limits set forth herein, an amount equal to the rents so overcharged, which amount, when paid, shall be remitted by BURA to the tenants so overcharged. In addition to the foregoing, in the event of violation of these covenants relative to rent charged, tenant income, or any other covenant contained herein, MORTGAGORS or any owner of the Project shall pay to BURA an amount equal to BURA's compliance costs for the period such noncompliance exists. In addition to any other remedies set forth herein, in the event of violation of these covenants, any real property tax exemption granted by the City of Buffalo for the Project shall terminate, and the real property, and all improvements located thereon, shall be subject to full real property taxation at the prevailing rate for similar non-exempt property. The rights and remedies under this clause are cumulative and shall be in addition to any and all other rights and remedies available to BURA by federal regulation, including 24 CFR §92.252, at law or in equity, including the rights of specific performance, the right to sue for the recovery of the HOME funds and the right to sue for the recovery of damages suffered as a result of any violation of these covenants. Any rights to be asserted by BURA hereunder shall be exercised after thirty (30) days written notice of default to MORTGAGORS and a reasonable period for Mortgagors to cure such default.

5. <u>FORECLOSURE</u>. The affordability restrictions may terminate upon foreclosure or transfer in lieu of foreclosure. The affordability restrictions shall be revived according to the original terms if, during the original affordability period, the owner of record before the foreclosure, or deed in lieu of foreclosure, or any entity that includes the former owner or those with whom the former owner has or had family or business ties, obtains an ownership interest in the project or property.

6. <u>REPAYMENT</u>. The affordability restrictions remain in force regardless of the transfer of ownership. If the rental unit(s) does not remain affordable through the affordability period, then the funds

Book149/Page3784

provided for the renovation of property, as attributable to the rental unit(s) and as calculated by BURA, must be repaid in full to BURA.

IN WITNESS WHEREOF, the parties hereto have executed these covenants the day and year first above written.

**East Side Housing, L.P.**

By: Woodland General, Inc.

By: _____

    Michael Riegel, Vice President

STATE OF NEW YORK )
County of Erie           )ss:

On the ___3rd___ day of __October, 2005__ before me, the undersigned, personally appeared Michael Riegel, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
                                           Notary Public

TIMOTHY C. CASHMORE
Notary Public, State of New York
Qualified in Erie County
My Commission Expires 05/31/20__07__

Book149/Page3785

**Schedule A - PROPERTY DESCRIPTION**

The Property Mortgaged is:

## Page 1 of 4

1200 Michigan Avenue, formerly
**1200 & 1202 Michigan Avenue and Part of No. 122 Dodge Street**
**(Site Map Lot 2)**
**ALL THAT TRACT OR PARCEL OF LAND** situate in the City of Buffalo, County of Erie, and State of New York, being part of Lot No. 32, Township 11, Range 8 of the Holland Land Company's Survey, more particularly bounded and described as follows:

**BEGINNING** at the intersection of the west line of Michigan Avenue (66' wide) and the north line of Dodge Street (60' wide); thence westerly along the north line of Dodge Street, a distance of 135.13 feet to a point; thence northerly at an interior angle of 89° 58' 09" and parallel with Michigan Avenue, a distance of 53.50 feet to a point; thence easterly at an interior angle of 90° 01' 51" and parallel with Dodge Street, a distance of 135.13 feet to the west line of Michigan Avenue; thence southerly at an interior angle of 89° 58' 09" along the west line of Michigan Avenue, a distance of 53.50 feet to the point or place of beginning.

And Also Including 160 Dodge Street, formerly
**160 & 164 Dodge Street**
**(Site Map Lot 6)**
**ALL THAT TRACT OR PARCEL OF LAND** situate in the City of Buffalo, County of Erie, and State of New York, being part of Lot No. 32, Township 11, Range 8 of the Holland Land Company's Survey, more particularly bounded and described as follows:

**COMMENCING** at the intersection of the east line of Michigan Avenue (66' wide) and the north line of Dodge Street (60' wide); thence easterly along the north line of Dodge Street, a distance of 177.00 feet to the **POINT OF BEGINNING**; thence northerly at an interior angle of 89° 58' 09" and parallel with Michigan Avenue, a distance of 139.30 feet to a point; thence easterly at an interior angle of 90° 18' 37", a distance of 58.00 feet to a point; thence southerly at an interior angle of 89° 41' 23" and parallel with Michigan Avenue, a distance of 139.58 feet to the north line of Dodge Street; thence westerly at an interior angle of 90° 01' 51" along the north line of Dodge Street, a distance of 58.00 feet to the point or place of beginning.

---

Book149/Page3786

**Page 2 of 4**

And Also Including  134 Masten Avenue, formerly
132 & 134 Masten Avenue
(Site Map Lot 7)

**ALL THAT TRACT OR PARCEL OF LAND** situate in the City of Buffalo, County of Erie, and State of New York, being part of Lot No. 32, Township 11, Range 8 of the Holland Land Company's Survey, more particularly bounded and described as follows:

**BEGINNING** at the intersection of the west line of Masten Avenue (66' wide) and the north line of Dodge Street (60' wide); thence westerly along the north line of Dodge Street, a distance of 125.00 feet to a point; thence northerly at an interior angle of 90° 03' 50" and parallel with Masten Avenue, a distance of 60.00 feet to a point; thence easterly at an interior angle of 89° 56' 10" and parallel with Dodge Street, a distance of 125.00 feet to the west line of Masten Avenue; thence southerly at an interior angle of 90° 03' 50" along the west line of Masten Avenue, a distance of 60.00 feet to the point or place of beginning.

And Also Including 228 Dodge Street, formerly
226 & 228 Dodge Street
(Site Map Lot 9)

**ALL THAT TRACT OR PARCEL OF LAND** situate in the City of Buffalo, County of Erie, and State of New York, being part of Lot No. 32, Township 11, Range 8 of the Holland Land Company's Survey, more particularly bounded and described as follows:

**COMMENCING** at the intersection of the east line of Masten Avenue (66' wide) and the north line of Dodge Street (60' wide); thence easterly along the north line of Dodge Street, a distance of 125.00 feet to the **POINT OF BEGINNING**; thence northerly at an interior angle of 90° 05' 10" and parallel with Masten Avenue, a distance of 142.10 feet to a point; thence easterly at an interior angle of 89° 54' 21", a distance of 60.00 feet to a point; thence southerly at an interior angle of 90° 05' 39" and parallel with Masten Avenue, a distance of 142.09 feet to the north line of Dodge Street; thence westerly at an interior angle of 89° 54' 50" along the north line of Dodge Street, a distance of 60.00 feet to the point or place of beginning.

**Page 3 of 4**

And Also Including 88 Southampton Street, formerly
86 & 88 Southampton Street
(Site Map Lot 27)
**ALL THAT TRACT OR PARCEL OF LAND** situate in the City of Buffalo, County of
Erie, and State of New York, being part of Lot No. 32, Township 11, Range 8 of the
Holland Land Company's Survey, more particularly bounded and described as follows:

**COMMENCING** at the intersection of the east line of Michigan Avenue (66' wide) and
the north line of Southampton Street (60' wide); thence easterly along the north line of
Southampton Street, a distance of 115.00 feet to the **POINT OF BEGINNING**; thence
northerly at an interior angle of 89° 41' 23" and parallel with Michigan Avenue, a
distance of 130.00 feet to a point; thence easterly at an interior angle of 90° 18' 37" and
parallel with Southampton Street, a distance of 60.00 feet to a point; thence southerly at
an interior angle of 89° 41' 23" and parallel with Michigan Avenue, a distance of 130.00
feet to the north line of Southampton Street; thence westerly at an interior angle of 90°
18' 47" along the north line of Southampton Street, a distance of 60.00 feet to the point
or place of beginning.

And Also Including 174 Southampton Street, formerly
172 & 176 Southampton Street
(Site Map Lot 30)
**ALL THAT TRACT OR PARCEL OF LAND** situate in the City of Buffalo, County of
Erie, and State of New York, being part of Lot No. 32, Township 11, Range 8 of the
Holland Land Company's Survey, more particularly bounded and described as follows:

**COMMENCING** at the intersection of the east line of Masten Avenue (66' wide) and
the north line of Southampton Street (60' wide); thence easterly along the north line of
Southampton Street, a distance of 215.00 feet to the **POINT OF BEGINNING**; thence
northerly at an interior angle of 90° 06' 08" and parallel with Masten Avenue, a distance
of 130.00 feet to a point; thence easterly at an interior angle of 89° 53' 52" and parallel
with Southampton Street, a distance of 65.00 feet to a point; thence southerly at an
interior angle of 90° 06' 08" and parallel with Masten Avenue, a distance of 130.00 feet
to the north line of Southampton Street; thence westerly at an interior angle of 89° 53'
52" along the north line of Southampton Street, a distance of 65.00 feet to the point or
place of beginning.

**Page 4 of 4**

And Also Including  261 Northampton Street, formerly
259 & 263 Northampton Street
(Site Map Lot 35)
**ALL THAT TRACT OR PARCEL OF LAND** situate in the City of Buffalo, County of
Erie, and State of New York, being part of Lot No. 32, Township 11, Range 8 of the
Holland Land Company's Survey, more particularly bounded and described as follows:

**COMMENCING** at the intersection of the east line of Masten Avenue (66' wide) and
the south line of Northampton Street (60' wide); thence easterly along the south line of
Northampton Street, a distance of 605.22 feet to the **POINT OF BEGINNING**; thence
southerly at an interior angle of 89° 49' 23" and parallel with Masten Avenue, a distance
of 126.32 feet to a point; thence easterly at an interior angle of 90° 06' 08", a distance of
62.90 feet to a point; thence northerly at an interior angle of 89° 02' 12" and parallel with
Jefferson Avenue, a distance of 126.26 feet to the south line of Northampton Street;
thence westerly at an interior angle of 91° 02' 17" along the south line of Northampton
Street, a distance of 61.00 feet to the point or place of beginning.

Exhibit C –
Project Sign Requirements - Sample

4" X 8' – ¾" EXTERIOR PLYWOOD
PAINT BOTH SIDES AND EDGES 2 COATS – BACK OF SIGN SHALL BE BLUE

NOT TO SCALE



HON. ANTHONY M. MASIELLO - MAYOR
TIMOTHY E. WANAMAKER, EXECUTIVE DIRECTOR
CITY OF BUFFALO OFFICE OF STRATEGIC PLANNING

2 – 2" x 4" POSTS
BRACED WITH A 2" X 4"
ANGLED BACK FOR EACH

4'0"