UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------

NRP Holdings LLC and NRP Properties LLC,

Plaintiffs,

vs.

City of Buffalo, Byron W. Brown, Steven M. Casey,
Demone A. Smith, Rev. Richard A. Stenhouse,
Jeremiah Partnership for community Development, Inc.
John Doe 1 – 10 and John Doe Companies 1 – 5.

Defendants.

---------------------------------------------------------------------

MEMORANDUM OF LAW
11-CV-472-WMS

Terrence M. Connors, Esq.
Randall D. White, Esq.
CONNORS & VILARDO, LLP
Attorneys for Defendants
City of Buffalo, Byron W. Brown,
and Steven M. Casey
1000 Liberty Building
424 Main Street
Buffalo, New York 14202
(716) 852-5533

David Rodriguez
Acting Corporation Counsel
By: Timothy A. Ball, Esq.
CITY OF BUFFALO DEPARTMENT
OF LAW
Attorneys for Defendant
  Demone A. Smith
65 Niagara Square
Buffalo, New York 14202
(716) 851-4318

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

THE AMENDED COMPLAINT .............................................................................. 3

ARGUMENT ............................................................................................................ 4

    I.    NRP's Breach of Contract Claim Must Be Dismissed Because the City Never Entered into a Binding Contract with NRP. ............................... 4

        A.    The 2/25/08 Wanamaker Letter is not a binding contract because Wanamaker did not have authority to enter into a contract on behalf of the City.......................................................................... 4

        B.    The 2/25/08 Wanamaker Letter is not a contract because the Letter itself demonstrates that, as a matter of law, there was no mutual intent to be bound. ......................................................... 6

    II.    NRP's Promissory Estoppel Claim Also Fails as a Matter of Law. ...... 10

    III.    NRP Fails to State a Claim for Tortious Interference Against the City Defendants. ............................................................................................. 12

        A.    The Wanamaker Letter ................................................................ 12

        B.    NRP's contracts with third parties to perform the Project. ....... 13

        C.    NRP's prospective contractual and business relationships........ 14

    IV.    NRP'S RICO Claims Fail to Allege that Defendants Have Engaged in Any Racketeering Activity, Let Alone a Pattern of Racketeering Activity. .................................................................................................. 15

        A.    NRP has failed to identify any racketeering activity. ................ 16

        B.    NRP has failed to allege a pattern of racketeering. ................... 19

    V.    NRP's 42 U.S.C. § 1983 Claims Also Fail as a Matter of Law ............. 21

        A.    NRP's due process claims fail because is no protected property interest. ...................................................................................... 21

        B.    NRP's equal protection claims fail because NRP has not alleged selective treatment. ................................................................... 22

    VI.    NRP's Claims Against the Individual City Defendants and its Claims for Punitive Damages Must be Dismissed............................................. 24

CONCLUSION........................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*A.A. Tube Testing Co. v. Sohne*, 20 A.D.2d 639, 246 N.Y.S.2d 247
(2d Dep't 1964)..................................................................................14

*Adjustrite Systems, Inc. v. GAB Business Services, Inc.*, 145 F.3d 543
(2d Cir. 1998) .................................................................................6, 7

*Advance Relocation & Storage Co. v. Local 814*, 2005 WL 665119
(E.D.N.Y. 2005)................................................................................17

*Am. Bldg. Maint. Co. of N.Y. v. Acme Property Services, Inc.*,
515 F.Supp.2d 298 (N.D.N.Y. 2007)................................................15

*Arcadian Phosphates Inc. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir. 1989) ..................7

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010)........................................20

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009)......................................passim

*Bankers Trust Co. v. Bernstein*, 169 A.D.2d 400, 563 N.Y.S.2d 821
(1st Dep't 1991).................................................................................14

*Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 127 S.Ct. 1955 (2007) ........................16, 19

*Catskill Development, L.L.C. v. Park Place Entertainment Corp.*,
547 F.3d 115 (2d Cir. 2008), *cert. denied*, 129 S.Ct. 1908 (2009) ...................12

*Christian v. Town of Riga*, 649 F.Supp.2d 84 (W.D.N.Y. 2009) ................................23

*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S. Ct. 2748 (1981)...........25

*City of Syracuse v. S&S Environmental*, 35 A.D.3d 1193, 826 N.Y.S.2d 541
(4th Dep't 2006) ..................................................................................5

*City of Zanesville, Ohio v. Mohawk Data Sciences Corp.*, 97 A.D.2d 64,
468 N.Y.S.2d 271 (4th Dep't 1983.............................................................5, 11

*Curtis & Associates, P.C. v. Law Offices of David M. Bushman*, 758 F.Supp.2d 153
(E.D.N.Y. 2010), *aff'd*, 2011 WL 4839089 (2d Cir. 2011) .................................16

*D'Andrea v. Rafla-Demetrious*, 3 F.Supp.2d 239 (E.D.N.Y. 1996), *aff'd*, 146 F.3d 63
(2d Cir. 1998) .....................................................................................15

*Figueroa Ruiz v. Alegria*, 896 F.2d 645 (1st Cir. 1990) ..............................................15

*First Capital Asset Mgt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004)...19, 20

*G-I Holdings, Inc. v. Baron & Budd*, 179 F.Supp.2d 233 (S.D.N.Y. 2001)................12

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183,
    428 N.Y.S.2d 628 (1980)...................................................................14

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989) ...................19, 20

*Haddock v. City of New York*, 75 N.Y.2d 478, 554 N.Y.S.2d 439 (1990) ..................25

*Hi Pockets, Inc. v. Music Conservatory of Westchester, Inc.*, 192 F.Supp.2d 143
    (S.D.N.Y. 2002) ..........................................................................24

*Kamholtz v. Yates County*, 350 Fed. Appx. 589 (2d Cir. 2009)..................................23

*Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649 (S.D.N.Y. 1996) ...............15

*Kerlikowske v. City of Buffalo*, 305 A.D.2d 997, 758 N.Y.S.2d 739
    (4th Dep't 2003) ........................................................................5, 10

*Kirch v. Liberty Media Corp.*, 449 F.3d 388 (2d Cir. 2006) ........................................13

*Kreiss v. McCown DeLeeuw & Co.*, 37 F.Supp.2d 294 (S.D.N.Y. 1999) ...............6, 10

*Laidlaw Energy and Envtl., Inc. v. Town of Ellicottville*, 2011 WL 4954881
    (W.D.N.Y. 2011) ........................................................................23

*Leadsinger v. Cole*, 2006 WL 2320544 (S.D.N.Y. 2006) ...........................................12

*LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980), *cert. denied*, 101 S.Ct. 1418 (1981)
    ...........................................................................................23

*Lieberman v. Good Stuff Corp.*, 1995 WL 600864 (S.D.N.Y. 1995)............................10

*Lindlots Realty Corp. v. Suffolk County*, 278 N.Y. 45, 15 N.E.2d 393 (1938) .............4

*LinkCo v. Fijitsu Ltd.*, 230 F.Supp.2d 492 (S.D.N.Y. 2002) .......................................14

*Lutzken v. City of Rochester*, 7 A.D.2d 498, 184 N.Y.S.2d 483 (4th Dep't 1959).......11

*Martz v. Inc. Village of Valley Stream*, 22 F.3d 26 (2d Cir. 1994) ............................22

*Medtech Products Inc. v. Ranir, LLC*, 596 F.Supp.2d 778 (S.D.N.Y. 2008) ..............14

*Miranda v. Ponce Fed. Bank*, 948 F.2d 41 (1st Cir. 1991)...........................................15

*NBT Bancorp. Inc. v. Fleet/Norstar Financial Group, Inc.,* 87 N.Y.2d 614, 641
    N.Y.S.2d 581 (1996) ............................................................................12

*Optivision, Inc. v. Syracuse Shopping Center Associates*, 472 F.Supp. 665
    (N.D.N.Y. 1979) ..............................................................................14

*Parsa v. State,* 64 N.Y.2d 143, 485 N.Y.S.2d 27 (1984) ..............................11

*Prudential Ins. Co. of America v. Hilton Hotels Corp.*, 1996 WL 340002
    (S.D.N.Y. 1996) ..............................................................................10

*Purchase Real Estate Group Inc. v. Jones*, 2010 WL 1837809 (S.D.N.Y. 2010) ........16

*ReproSystem, B.V. v. SCM Corp.*, 727 F.2d 257 (2d Ci), *cert. denied,*
    105 S.Ct. 110 (1984) ..........................................................................7

*Seif v. City of Long Beach,* 286 N.Y. 382, 36 N.E.2d 630 (1941) ................................11

*Shann v. Dunk,* 84 F.3d 73 (2d Cir. 1996) ....................................................................7

*Skilling v. United States*, 130 S. Ct. 2896 (2010) ......................................................17

*Skyline Travel, Inc. v. Emirates,* 2011 WL 1239783 (S.D.N.Y. 2011) .................12, 13

*Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625 (1983) ....................................................25

*Syracuse Orthopedic Associates v. City of Syracuse,* 136 A.D.2d 923,
    524 N.Y.S.2d 916 (4th Dep't 1988) ..............................................................5, 10

*United States v. Ganim,* 510 F.3d 134 (2d Cir. 2007) ..................................................17

*Walentas v. Lipper,* 862 F.2d 414 (2d Cir. 1988) , *cert. denied,*
    109 S.Ct. 1747 (1989) ..........................................................................22

*Winner Int'l v. Kryptonite Corp.,* 1996 WL 84476  (S.D.N.Y. 1996) ..........................15

*Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78 (2d Cir. 1986) ....................6

**Charter and Statutes**

Charter of the City of Buffalo · Section 6-5 ................................................................5

Charter of the City of Buffalo · Section 22-1................................................................5

18 U.S.C. § 1961 ................................................................19

42 U.S.C. § 12722(6)................................................................21

42 U.S.C. §1983 ................................................................4

**Rules & Regulations**

Fed.R.Civ.P. 12(6)(b) ................................................................1, 4, 14

24 CFR §92.504 ................................................................8, 9

24 CFR §92.504(b) ................................................................8, 9

24 CFR §92.504(c) ................................................................8, 9

Defendants, City of Buffalo, Byron W. Brown, Steven M. Casey, and Demone Smith (hereinafter "the City Defendants"), submit this memorandum of law in support of their motion to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6).

## PRELIMINARY STATEMENT

NRP seeks recovery for a breach of a contract that, as a matter of state and federal law, never existed or was never binding, especially as to the City of Buffalo. Perhaps for that reason, NRP has decided to forgo the straightforward, thumbs-up/thumbs-down breach of contract complaint that one might expect from a self-proclaimed sophisticated developer -- at least one that really believed that it had a valid breach of contract claim. Instead, NRP has cobbled together a ridiculous theory of a conspiracy that never occurred, involving numerous City officials, a community leader, and unidentified "John Does" and "John Doe Companies;" raising false allegations of "pay to play," "pay for votes," defaming the Mayor by calling him foul-mouthed and racist -- adjectives that anyone who knows the Mayor knows are preposterous; and including RICO violations and a gratuitous reference to an unrelated FBI investigation.[1]

Those false allegations, transparently designed to generate media soundbites, fail to state claims upon which relief can be granted. Under long-established rules

---

[1]     NRP consistently avoids identifying the source of its allegations, the sender or recipient of e-mails or the parties to an alleged statement. NRP even avoids identifying the members of its own "Development Team" whom it cites. One reason may be that, upon information and belief, one of those individuals relied upon by NRP in the amended complaint was previously convicted of felony armed robbery and a firearms felony.

designed to protect the public fisc, the one-and-a-half page letter from Timothy Wanamaker was never a binding contract for the City of Buffalo's expenditure of $1.6 million in federal HOME funds.  As a legal matter, NRP is charged with knowledge of those state and federal rules; as an experienced developer, NRP was presumably aware of them.  If there were any doubt, Belmont Shelter Corporation, NRP's predecessor-in-interest on the alleged contract, had actual knowledge of those state and federal rules through its receipt of HOME funds, and its involvement in related contracts, on the first phase of the very project at issue.

Yet, NRP, as Belmont's alleged assignee, chose to barrel ahead with its lawsuit fabricated with that non-binding, page-and-a-half letter.  Indeed, NRP's amended complaint seems designed primarily to generate negative publicity for defendants, exert political pressure on them, and extort a settlement.

Perhaps those tactics have worked elsewhere for NRP, which has been accused of employing out-of-state subcontractors on public projects in St. Louis and Michigan to avoid paying prevailing wage to local workers.  According to news reports, it was a conscious strategy decision by NRP to instead pay lower wages to out-of-state workers (and even to illegal immigrants in St. Louis) and use the labor cost savings to underbid local contractors for the projects.[2]

NRP has already generated more than its "15 minutes" of publicity with this lawsuit.  But even after a notice of claim, a RICO statement, a complaint, and an amended RICO statement, its amended complaint fails to state a claim upon which

_____

[2]      See Exhibit A to the Affidavit of Terrence M. Connors, Esq.

relief can be granted.  For that reason, defendants are entitled to dismissal of the amended complaint now, before the taxpayers of the City of Buffalo are forced to incur the costs of further litigation.

THE AMENDED COMPLAINT

According to the amended complaint, plaintiffs, NRP Holdings LLC and NRP Properties LLC (collectively "NRP"), are affiliates of NRP Group LLC, an Ohio limited liability company that develops housing projects.  (Amended Complaint, ¶18).  NRP alleges that in late 2007 and early 2008, it became involved in a potential project for the development, construction, and management of fifty (50) homes in the Masten Park and Cold Springs neighborhoods of the City of Buffalo. (Amended Complaint, ¶¶19-20).  As the amended complaint acknowledges, the first phase of this project (also known as East Side Housing Opportunities I) had already been completed.  (*See* Amended Complaint, ¶86).

All of NRP's claims arise out of a letter, dated February 25, 2008, and attached to the amended complaint as Exhibit A, from Timothy E. Wanamaker, Executive Director of the Office of Strategic Planning for the City of Buffalo, to Michael D. Riegel, Vice President of Finance Administration for Belmont Shelter Corporation ("Belmont").  NRP alleges that by that letter, the City of Buffalo "agreed and committed" to provide $1.6 million of its federal HOME funds to the Project.  (Amended Complaint, ¶21).  NRP alleges that it "is the assignee of all rights and benefits concerning the February 25, 2008 agreement and commitment." (Amended Complaint, ¶112).  All of NRP's claims arise out of the alleged breach of that contract by the City of Buffalo.  NRP alleges that the breach was motivated by

3

a conspiracy among defendants to demand that the project involve defendants

Richard A. Stenhouse and the Jeremiah Partnership for Community Development.

The amended complaint seeks damages for breach of contract (Count I);

promissory estoppel (Count II); tortious interference with contract and prospective

business relationships (Count III); RICO violations (Count IV); and violations of 42

U.S.C. §1983 (Count V).  The amended complaint also seeks punitive damages,

treble damages, and attorney's fees and costs on some counts.  The amended

complaint is unclear as to whether NRP is asserting claims as assignee (presumably

from Belmont as assignor) or in its own capacity or some combination.  Regardless,

the amended complaint fails to state a claim upon which relief can be granted and

should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

ARGUMENT

I.   NRP's Breach of Contract Claim Must Be Dismissed Because the City Never
     Entered into a Binding Contract with NRP.

    A.   The 2/25/08 Wanamaker Letter is not a binding contract because
          Wanamaker did not have authority to enter into a contract on behalf of
          the City.

It is well-established that a New York municipality is not bound by a contract

entered into by an officer or employee who lacks authority to enter into such a

contract.  More than seventy years ago, the New York Court of Appeals noted that

"it is undisputed that a municipality cannot be made liable for breach of contract, or

services rendered, or sales price, or even for use and occupation of property

acquired, when an official of the municipality has exceeded his power or authority."

*Lindlots Realty Corp. v. Suffolk County*, 278 N.Y. 45, 52, 15 N.E.2d 393, 395 (1938);

*accord City of Syracuse v. S&S Environmental*, 35 A.D.3d 1193, 826 N.Y.S.2d 541 (4th Dep't 2006) (contract invalid because it was executed by City of Syracuse's Commissioner of the Department of Community Development, who did not have the legal authority to do so); *Kerlikowske v. City of Buffalo*, 305 A.D.2d 997, 997, 758 N.Y.S.2d 739, 740 (4th Dep't 2003) (contract invalid because neither Director of Operations nor President of the Common Council were authorized by City Charter to enter into a binding and enforceable contract on behalf of the City); *Syracuse Orthopedic Associates v. City of Syracuse,* 136 A.D.2d 923, 923, 524 N.Y.S.2d 916, 917 (4th Dep't 1988) (contract invalid and unenforceable because it was not executed as provided by Charter of the City of Syracuse).

The rationale for such a rule is clear.  The authority of municipal officers and agents is a matter of public record and "there is a conclusive presumption that persons dealing with them know the extent of their authority."  *City of Zanesville, Ohio v. Mohawk Data Sciences Corp.*, 97 A.D.2d 64, 66, 468 N.Y.S.2d 271, 273 (4th Dep't 1983.  "Common sense dictates this course of action since statutory requirements could otherwise be nullified at the will of public officials to the detriment of the taxpaying public, and funds derived from public taxation could be subjected to waste and dissipation."  *Id.*

In this case, Article 22 of the City of Buffalo Charter governs contracts entered into by the City.  Section 22-1 states:  "Every contract to which the City is a party shall be made and executed in the name of the City and approved as to form by the Corporation Counsel, and signed and acknowledged by the head of the

department charged with the execution of the matter therein provided for." Article 6 of the Charter explicitly states that the Office of Strategic Planning is within the Executive Department and that the Mayor is the head of the Executive Department. Accordingly, any contract entered into by the Office of Strategic Planning must be signed and acknowledged by the Mayor. In addition, section 6-5 of the Charter, which enumerates the powers and duties of the Executive Director of Strategic Planning, makes no mention of his or her authority to enter into contracts on behalf of the City.

The amended complaint repeatedly and unequivocally states that the February 25, 2008 Wanamaker Letter is the contract. (*See* Amended Complaint, ¶¶ 21, 22, 28, 74, 106, 112, 113, 114, 115 and 131). But Wanamaker did not have the authority under the Charter to enter into a binding and enforceable contract on behalf of the City. As a result, the alleged contract is simply invalid and unenforceable as a matter of law.

> **B.** **The 2/25/08 Wanamaker Letter is not a contract because the Letter itself demonstrates that, as a matter of law, there was no mutual intent to be bound.**

"It is a basic principle of contract law that absent the parties' intent to be bound, no contract can be formed." *Kreiss v. McCown DeLeeuw & Co.*, 37 F.Supp.2d 294, 299 (S.D.N.Y. 1999); *see also Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1986). "Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." *Adjustrite Systems, Inc. v. GAB Business Services, Inc.*, 145 F.3d 543, 548 (2d Cir. 1998); *accord Shann v. Dunk*, 84

F.3d 73 (2d Cir. 1996).  "The key, of course, is the intent of the parties:  whether the parties intended to be bound, and if so, to what extent."  *Adjustrite*, 145 F.3d at 548-549.

In determining the intent of the parties, the language of the agreement is "the most important" factor.  *Id.* at 549.  Indeed, for certain agreements, the court "need look no further than" the language of the agreement in determining that it is not binding.  *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989); *accord Adjustrite*, 145 F.3d at 549-550; *ReproSystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir.), *cert. denied,* 105 S.Ct. 110 (1984).

In this case, the express language of the purported contract – the Wanamaker Letter – demonstrates not only that the parties did not intend to be bound, but that they could not, as a matter of law, be bound.  For example, the Wanamaker Letter states only that "the Buffalo Urban Renewal Agency has *earmarked* $1,600,000 of the City's HOME funds" for the project.  It refers to itself as a "commitment letter," not a contract.  It states that it is valid only if the developer obtains a certain tax credit.  Finally, and most importantly, the Wanamaker Letter states that "BURA is required to meet all applicable Federal, State and local rules and regulations before issuance of HOME funds to eligible recipients."

Not surprisingly, those "rules and regulations" include extensive federal regulations that govern HOME funds and that impose certain responsibilities on "participating jurisdictions" such as the City of Buffalo.  The regulations provide

7

that "[b]efore disbursing any HOME funds to any entity, the participating jurisdiction must enter into a written agreement with that entity." 24 CFR §92.504(b). Any entity administering all or part of the HOME program on behalf of the participating jurisdiction must also enter into a written agreement with any other entity before disbursing any HOME funds to that entity. *Id.* The regulations provide that "[t]he contents of the agreement may vary depending upon the role the entity is asked to assume the type of project undertaken," but there are "basic requirements by role and. . . minimum provisions that *must be included in a written agreement.*" 24 CFR §92.504(c) (emphasis added).

The Wanamaker Letter was addressed to Belmont, which is subject to 24 C.F.R. §92.504(c)(3) as a non-profit housing owner, sponsor or developer of the Project. Those regulations set forth detailed requirements for the agreement in a variety of areas such as the use of HOME funds, including a schedule and budget; affordability and repayment; resale and recapture; property standards (*e.g.,* lead paint); marketing; displacement, relocation and reacquisition; labor; and record-keeping. *See* 24 CFR §92.504(c)(3). The Wanamaker Letter contains none of these provisions and satisfies none of the regulations.

The City of Buffalo could not, as a matter of federal law, bind itself to disburse any HOME funds with respect to this Project until the execution of an agreement satisfying those regulations. *See* 24 CFR §92.504. Because the Wanamaker Letter fails to satisfy those requirements, it is insufficient as a matter of federal law to constitute a binding enforceable contract to disburse the HOME

funds.  Likewise, because the Wanamaker Letter expressly references federal regulations that it does not satisfy, the Letter itself clearly indicates the parties' intent not to be bound.

Moreover, Belmont knows exactly what type of agreement the federal regulations required because it entered into such an agreement with respect to the East Side Housing Opportunities, Phase I project.  A copy of that agreement, dated October 3, 2005, and referred to herein as the "East Side I HOME Agreement," is attached to the Affidavit of Terrence M. Connors, Esq., as Exhibit B.  The East Side I HOME Agreement was signed on behalf of Belmont by Michael Riegel, to whom the Wanamaker Letter is addressed, and was filed in the Erie County Clerk's Office on October 7, 2005.  The East Side I HOME Agreement entails 62 pages, with Exhibits A through H and Appendices A through C.  The East Side I HOME Agreement was clearly intended to satisfy the federal regulations and it is filled with references and citations to the federal statutes and regulations governing the HOME Investment Partnership Program.

A simple side-by-side comparison of the East Side I HOME Agreement, executed by Belmont, with the Wanamaker Letter, addressed to Belmont, graphically confirms both that (1) the Wanamaker Letter does not satisfy the federal HOME regulations; and (2) that the Letter indicates the parties' intent not to be bound until the execution of a document comparable to the East Side I Home Agreement.

Accordingly, NRP's breach of contract claim should be dismissed.  *See, e.g.*,

*Kreiss*, 37 F.Supp.2d at 300 (dismissing where language of alleged contract

"demonstrates the parties clear intent to be bound only by forthcoming final

agreements"); *Prudential Ins. Co. of America v. Hilton Hotels Corp.*, 1996 WL

340002 (S.D.N.Y. 1996) (language of alleged contract was "dispositive" and required

dismissal where although it states that it "is binding on the parties," "other portions

of the agreement indicate a clear intention not to be bound to substantive portions

of the document absent the execution of future binding agreements"); *Lieberman v.

Good Stuff Corp.*, 1995 WL 600864 (S.D.N.Y. 1995) (dismissal where language of

agreement "unmistakably indicates" parties did not intend to be bound).

II.    NRP's Promissory Estoppel Claim Also Fails as a Matter of Law.

NRP's amended complaint adds a promissory estoppel claim to circumvent

the insufficiency of its purported contract.  But NRP's promissory estoppel claim

fails for precisely that reason:  the courts have repeatedly rejected efforts to use

equitable theories such as estoppel to circumvent the fact that a municipal contract

is unenforceable.

For example, in *Syracuse Orthopedic Associates*, *supra*, the court found the

alleged contract with the City of Syracuse to be invalid and unenforceable because it

was not signed by an authorized City officer in compliance with the City Charter.

524 N.Y.S.2d at 924.  The court also found that the City was not "estopped from

challenging the validity of the contract.  Estoppel is unavailable against a public

agency in these circumstances."  *Id.*  Likewise, in *Kerlikowske*, *supra*, the court

rejected the plaintiff's attempts to "rely on the doctrine of estoppel to enforce the

10

alleged contract," which had not been executed by an authorized officer of the City

in accordance with the City Charter.  758 N.Y.S.2d at 741.  As the New York Court

of Appeals has recognized, a contrary result would allow the parties to completely

circumvent the statutory requirements:

> Even though a promise to pay may be spelled out from the
> parties' conduct, a contract between them may not be implied
> to provide 'rough justice' and fasten liability on the
> [municipality] when applicable statutes expressly prohibit it.
> The result may seem unjust but any other rule would
> completely frustrate statutes designed to protect the public
> from governmental misconduct or improvidence.  The
> contractor's option is to withhold his services unless an
> agreement is executed and approved as the statutes require.

*Parsa v. State,* 64 N.Y.2d 143, 147, 485 N.Y.S.2d 27, 29 (1984); *accord Seif v. City of*

*Long Beach,* 286 N.Y. 382, 387-388, 36 N.E.2d 630, 632 (1941) (noting its previous

"emphatic warning that equitable powers of the courts may not be invoked to

sanction disregard of statutory safeguards and restrictions" on who can create an

obligation or liability of a municipality); *Lutzken v. City of Rochester,* 7 A.D.2d 498,

499, 184 N.Y.S.2d 483, 486 (4th Dep't 1959).

Indeed, the New York Court of Appeals has held that even the "acceptance of

benefits by the city under a contract made without authority does not estop a

municipal corporation from challenging the validity of the contract and from

denying liability for materials furnished or services rendered under a contract not

made or ratified by a board or officer acting under authority conferred by law and in

the manner as prescribed by law." *Seif,* 36 N.E.2d at 632; *accord Parsa, supra;*

*Zanesville, supra.*

11

III.   NRP Fails to State a Claim for Tortious Interference Against the City
       Defendants.

NRP attempts to allege three tortious interference claims: (1) that

defendants Brown, Casey, and Smith tortiously interfered with the alleged contract

between NRP and the City, *i.e.*, the Wanamaker Letter; (2) that the City

Defendants tortiously interfered with contracts between NRP and third parties

expressly related to the Project; and (3) that the defendants tortiously interfered

with NRP's prospective contractual and business relations with the City and with

unidentified third-parties on unidentified contracts. Each of these three

interference claims fails as a matter of law and should be dismissed.

A.   The Wanamaker Letter

NRP alleges that the City Defendants intentionally procured the City's

breach of the Wanamaker Letter. (Amended Complaint, ¶126). An essential

element of a claim for tortious interference with a contract, however, is the

existence of a valid contract between the plaintiff and a third party. *See Catskill*

*Development, L.L.C. v. Park Place Entertainment Corp.*, 547 F.3d 115, 124 (2d Cir.

2008), *cert. denied*, 129 S.Ct. 1908 (2009); *NBT Bancorp. Inc. v. Fleet/Norstar*

*Financial Group, Inc.*, 87 N.Y.2d 614, 622, 641 N.Y.S.2d 581, 585 (1996). Thus,

where a plaintiff fails to allege the existence of a valid contract, courts will dismiss

a tortious interference claim under Fed.R.Civ.P. 12(6)(b). *See, e.g., Skyline Travel,*

*Inc. v. Emirates,* 2011 WL 1239783, *5 (S.D.N.Y. 2011); *Leadsinger v.* Cole, 2006

WL 2320544, *12 (S.D.N.Y. 2006); *G-I Holdings, Inc. v. Baron & Budd*, 179

F.Supp.2d 233, 253 (S.D.N.Y. 2001). In this case, NRP attempts to base its tortious

interference claim on the Wanamaker Letter.  But, as set forth above, NRP has failed to allege that the Wanamaker Letter is a valid contract.  As a result, NRP has failed to state a claim for tortious interference with contract as to the Wanamaker Letter.

B.   NRP's contracts with third parties to perform the Project.

NRP also has alleged that the defendants tortiously interfered with NRP's contracts with other third parties to "develop, construct and manage" the Project. (Amended Complaint ¶¶20, 26-28, 122-125).  NRP alleges that it secured those agreements "in order to perform the Project."  (Amended Complaint, ¶124).  These tortious interference claims fail for at least three reasons.

First, these contracts obviously were contingent upon a valid contract between NRP and the City for the Project itself.  Indeed, the alleged agreements state that each is "conditioned upon [NRP's] agreement to deliver the housing project described in your application."  (Amended Complaint, Exhibits B, D). Because there was no valid contract between NRP and the City for the Project, the related contracts between NRP and third-parties to help NRP perform the Project are also invalid and unenforceable.  As a result, NRP cannot allege a valid existing contract with these third parties or tortious interference with it.

Second, and likewise, because the third-party contracts were contingent upon a project that never materialized, there was no breach of any third-party contract. Therefore, NRP cannot allege the essential element that the third-parties actually breached the contracts with NRP.  *See, e.g., Kirch v. Liberty Media Corp.*, 449 F.3d 388 (2d Cir. 2006); *Skyline Travel,* 2011 WL 1239753, *5 (S.D.N.Y. 2011).

Third, the amended complaint alleges only that the City Defendants "knew *or should have known* of the agreements secured by the Development Team in order to perform the Project." (Amended Complaint, ¶124) (emphasis added). That allegation is insufficient as a matter of law. "Although a defendant need not be aware of all the details of a contract, it must have actual knowledge of the specific contract." *LinkCo. v. Fijitsu Ltd.*, 230 F.Supp.2d 492, 495 (S.D.N.Y. 2002) (internal quotation and citations omitted.) Courts have rejected allegations that a defendant "should have known of the contract." *See, e.g., Medtech Products Inc. v. Ranir, LLC*, 596 F.Supp.2d 778, 796 (S.D.N.Y. 2008) (Rule 12(b)(6) dismissal with prejudice of tortious interference claim in amended complaint because it alleged only that defendant "knew or should have known" of the contract); *A.A. Tube Testing Co. v. Sohne*, 20 A.D.2d 639, 639, 246 N.Y.S.2d 247, 248 (2d Dep't 1964).

C.   NRP's prospective contractual and business relationships

The requirements for this tort are "more demanding" than those for tortious interference with the performance of an existing contract. *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 632-633 (1980). For example, this tort requires an allegation that a contract "would have been entered into" but for the defendants' conduct. *Bankers Trust Co. v. Bernstein*, 169 A.D.2d 400, 401, 563 N.Y.S.2d 821, 822 (1st Dep't 1991) (citation omitted). "The 'would have been entered into' standard is a strict one as it is more stringent than 'being reasonably certain' or 'having a reasonable expectation.'" *Optivision, Inc. v. Syracuse Shopping Center Associates*, 472 F.Supp. 665, 685 (N.D.N.Y. 1979).

NRP's half-hearted allegations here do not come close to meeting those more demanding requirements.  As to future relationships with the City, NRP makes only a single-sentence claim "that NRP would be selected to complete future housing projects within the City of Buffalo."  (Amended Complaint, ¶128).  NRP fails to identify any of the "future housing projects," much less allege that NRP "would have entered" into a contract with the City as to it.  As to other third parties, NRP fails to even identify them, and thus does not identify the alleged contract or that NRP "would have entered" into that contract. These allegations are therefore insufficient as a matter of law.  *See, e.g., Am. Bldg. Maint. Co. of New York v. Acme Property Services, Inc.*, 515 F.Supp.2d 298, 316 (N.D.N.Y. 2007) (dismissing claim for plaintiff's "failure to identify a specific business relationship that was interfered with" by defendant); *accord D'Andrea v. Rafla-Demetrious*, 3 F.Supp.2d 239, 250 (E.D.N.Y. 1996), *aff'd*, 146 F.3d 63 (2d Cir. 1998), *aff'd*, 146 F.3d 63 (2d Cir. 1998); *Winner Int'l v. Kryptonite Corp.,* 1996 WL 84476, *4 (S.D.N.Y. 1996).

IV.    **NRP'S RICO Claims Fail to Allege that Defendants Have Engaged in Any Racketeering Activity, Let Alone a Pattern of Racketeering Activity.**

"Civil RICO is an unusually potent weapon – the litigation equivalent of a thermonuclear device." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)). "Because the 'mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'" *Katzman,* 167 F.R.D. at 655 (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990))

(alterations in original). Accordingly, courts examine RICO claims "with particular scrutiny." *Purchase Real Estate Group Inc. v. Jones*, 2010 WL 1837809, at *6 (S.D.N.Y. 2010) (quotations omitted).

In assessing a complaint, the court must determine whether it has facial plausibility after disregarding conclusory allegations and legal conclusions and considering all incorporated documentary evidence and judicially noticeable materials. *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009). Although a complaint need not establish a probability of success, the factual allegations must allow the court to "infer more than the *mere possibility* of misconduct." *Id.* at 1950 (emphasis added). It is wholly insufficient to "plead facts that are '*merely consistent* with' a defendant's liability. *Id.* at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 557, 127 S.Ct. 1955, 1966 (2007). Moreover, courts are "particularly mindful of these standards in the context of a civil RICO claim." *Curtis & Associates, P.C. v. Law Offices of David M. Bushman*, 758 F.Supp.2d 153, 166 (E.D.N.Y. 2010), *aff'd,* 2011 WL 4839089 (2d Cir. 2011).

Here, NRP's conclusory allegations of a pay-to-play scheme are, at most, "merely consistent" with its theory of civil RICO violations, and its RICO claims must be dismissed.

### A.     NRP has failed to identify any racketeering activity.

The very crux of civil RICO liability is the commission of racketeering activity. Under 18 U.S.C. § 1961, "racketeering activity" refers to any act or threat involving one of a number of enumerated predicate offenses, such as extortion. To survive a motion to dismiss, a complaint may not simply list a host of predicate acts

in conclusory fashion.  Rather, "the plaintiff must plead all of the elements of the predicate acts."  *Advance Relocation & Storage Co. v. Local 814*, 2005 WL 665119, *5 (E.D.N.Y. 2005).

NRP seeks to allege violations of the Hobbs Act (18 U.S.C. § 1951), New York's bribery statute (N.Y. Penal Law § 200, *et seq.*), and the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).  (Amended Complaint, ¶137).  Although NRP has not articulated how defendants have violated the Hobbs Act or the mail and wire fraud statutes, presumably NRP is proceeding under the theories of extortion under color of official right and honest services fraud, respectively – both of which similarly depend upon bribery.  *See generally United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007), *cert. denied*, 128 S.Ct. 1911 (2008); *Skilling v. United States*, 130 S.Ct. 2896 (2010) .

But despite its false assertions of a pay-to-play scheme, NRP has failed to adequately plead bribery.  While the amended complaint is replete with empty rhetoric, including such fabrications as "pay to play," "illegal demands," and "conspired to demand a role for Stenhouse," such legal conclusions and NRP's threadbare recitals of the elements of bribery are not entitled to deference.  *See Iqbal*, 129 S. Ct. at 1949-50.

Instead, the Court must look to the actual substantive allegations of the amended complaint.  *See id.*  Even assuming, *arguendo*, the truth of NRP's assertions that defendants first demanded that Reverend Stenhouse be given a position on the project and then withdrew their support for the project when their

request was not honored, there is *nothing* inherently unlawful about this.  In fact,

seeking the involvement of local participation – such as Reverend Stenhouse and

the other members of the Jeremiah Partnership, who have been at the very

forefront of the redevelopment movement on the East Side for nearly a decade – is

completely *consistent* with Congress's purpose in creating the HOME program.[3]

Defendants' alleged actions support NRP's bribery theory only if they were in

exchange for money, gifts, or improper benefits from Reverend Stenhouse and the

Jeremiah Partnership – an illegal *quid pro quo*.

Not surprisingly, however, the amended complaint is remarkably silent on

this point.  NRP's only assertion regarding an alleged *quid pro quo* is that

defendants' actions were in return for "past endorsement and support" and the

"continuing endorsement" of Mayor "Brown's re-election efforts in 2009." (*See*

Amended Complaint, ¶¶ 77-78).  Those "factual" allegations, which are made only

"upon information and belief," are completely conclusory.  In essence, NRP

improperly attempts to manufacture an utterly false and preposterous RICO claim

by tacking allegations of unspecified political support and endorsement onto an

already insufficient "formulaic recitation of the elements" of bribery.  *See Iqbal*, 129

S. Ct. at 1949.  NRP's allegations are, at most, "merely consistent" with NRP's

theory of racketeering and therefore insufficient as a matter of law.  *See id.* at 1949

---

[3]     Congress designed the HOME program, in part, "to expand the capacity of
nonprofit community housing development organizations to develop and
manage decent, safe, sanitary, and affordable housing."  42 U.S.C. § 12722(6).

NRP's amended complaint resembles the complaint rejected by the Supreme Court in *Twombly*. The *Twombly* plaintiffs alleged a conspiracy in violation of the Sherman Act, 15 U.S.C. § 1, *et seq.* *See Twombly*, 550 U.S. at 553. The Court held that the complaint's "allegation of parallel conduct" and "bare assertion of conspiracy" were insufficient to withstand a motion to dismiss: "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* at 556-57.

B.     NRP has failed to allege a pattern of racketeering.

The pattern element of a RICO claim requires, at the very least, two related predicate acts that "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900 (1989). The pattern requires either open-ended continuity – where there is racketeering activity with a threat of continued activity in the future – or closed-ended continuity – where there was a continuous series of racketeering activity "extending over a substantial period of time." *Id.* at 241-42.

First, there is no closed-ended continuity here. The Second Circuit has never found a pattern of closed-ended continuity where the alleged predicate acts occurred within a two-year period. *First Capital Asset Mgt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004). The amended complaint here alleges that all of the specific instances of purported racketeering activity occurred between "early 2009" and "March 15, 2010." (*See* Amended Complaint, ¶¶32, 115). Thus, even if true, these alleged statements and acts are insufficient to constitute a pattern of racketeering

activity.  *See H.J. Inc.*, 492 U.S. at 241-42; *First Capital Asset Mgt., Inc.*, 385 F.3d
at 181.

Apparently recognizing that fatal flaw, NRP attempts to comply with Second
Circuit precedent by baldly (and falsely) asserting that defendants "developed and
implemented this practice against NRP and, upon information and belief, others
through numerous threats and demands over a period of more than two years."
(*See* Amended Complaint, ¶ 139).  But NRP is unable to identify any other specific
instances of alleged racketeering activity occurring outside of the period between
"early 2009" and "March 15, 2010." (*See* Amended Complaint, ¶¶ 32, 115).  In
conclusory form, NRP merely points to two other projects, the Packard Project and
the East Side Housing Opportunity Phase I Project, and suggests that defendants
"conspired to demand a role for Stenhouse" on those two projects.  (*See* Amended
Complaint, ¶¶ 85-86).  This Court need not accept as true such a "legal conclusion
couched as a factual allegation."  *See Iqbal*, 129 S.Ct. at 1950.

Moreover, these allegations, offered "upon information and belief" are legally
insufficient because facts may be pled "upon information and belief" only when "the
facts are peculiarly within the possession and control of the defendant." *See Arista
Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).  The developers in the
Packard and East Side I projects should have knowledge of any facts supporting
NRP's claim.  As the publicly filed East Side I HOME Agreement reveals, Belmont –
whose rights NRP asserts in this action – was a party to the East Side I project and
would presumably have knowledge of any such facts.  Yet, NRP has failed to provide

any specific factual allegations suggesting that defendants engaged in racketeering activity in connection with the East Side I Project or the Packard Project.  In short, NRP has failed to plead closed-ended continuity.

Finally, in an effort to plead an open-ended pattern of racketeering activity, NRP makes two allegations:  first, it suggests that "left unchecked, it is reasonable to expect that such acts were the regular manner in which such persons exercised their authority within the enterprise and implied a threat of continuing improper activity."  (*See* Amended Complaint, ¶ 140).  Second, it contends that the "escalating demands concerning the role of Stenhouse and the Jeremiah Partnership . . . implied a threat of continuing criminal activity."  (Amended Complaint, ¶ 141).  But NRP presents no facts in support of these vague, conclusory claims of open-ended continuity.  Indeed, NRP actually pleads facts that belie the open-ended suggestion.  NRP alleges that defendants' actions were in return for "past endorsement and support" and "the continuing endorsement" of Mayor Brown's "re-election efforts in 2009."  (Amended Complaint, ¶ 78).  NRP's amended complaint thus alleges that the pattern of racketeering activity necessarily terminated after the Mayor's re-election in 2009.  NRP not only has failed to plead open-ended continuity, but it has actually pleaded itself out of court on that theory.

V.   NRP's 42 U.S.C. § 1983 Claims Also Fail as a Matter of Law

    A.   NRP's due process claims fail because there is no protected property interest.

According to the amended complaint, the Wanamaker Letter constituted " a federally protected property right" and defendants denied NRP due process because

21

the City did not fulfill the alleged agreement.  But this analysis is flawed for two reasons.

First, because the Wanamaker Letter did not constitute a valid binding contract with the City, it does not give rise to a federally protected property that can serve as the basis of a due process claim.  Second, even if the Wanamaker Letter could amount to a contract, NRP would still lack a protected property interest because "a contract dispute in and of itself is not sufficient to give rise to a cause of action under section 1983."  *Walentas v. Lipper*, 862 F.2d 414 (2d Cir. 1988), *cert. denied*, 109 S.Ct. 1747 (1989); *accord Martz v. Inc. Village of Valley Stream*, 22 F.3d 26, 31 (2d Cir. 1994) (right to payment on an "ordinary contract does not rise to the level of a constitutionally protected property interest").

**B.     NRP's equal protection claims fail because NRP has not alleged selective treatment.**

NRP claims that defendants have violated its constitutional right to equal protection because "NRP was treated differently than other developers of projects." (*See* Amended Complaint, ¶ 149).  Specifically, NRP contends that defendants supported projects that involved Reverend Stenhouse and opposed NRP's project because NRP refused to work with the Reverend.  *See id.*  But this selective treatment claim is inherently flawed.

A plaintiff seeking to establish selective treatment in violation of the Equal Protection Clause must make a two-part showing – "that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent

to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980), *cert. denied*, 101 S.Ct. 1418 (1981).  This Court and the Second Circuit have consistently granted motions to dismiss § 1983 claims that do not adequately plead such selective treatment.  *See, e.g., Kamholtz v. Yates County*, 350 Fed. Appx. 589 (2d Cir. 2009); *Laidlaw Energy and Envtl., Inc. v. Town of Ellicottville*, 2011 WL 4954881 (W.D.N.Y. 2011); *Christian v. Town of Riga*, 649 F.Supp.2d 84 (W.D.N.Y. 2009).

The amended complaint here alleges anything *but* selective treatment.  In fact, NRP specifically alleges in nearly identical language that defendants placed the exact same condition - - that Reverend Stenhouse be involved - - on all three putative development projects.  (*See* Amended Complaint, ¶32 (this Project); ¶85 (Packard project); ¶86 (East Side Housing Opportunities, Phase I)).  NRP has simply not alleged selective treatment.

But even if the uniform imposition of such a legitimate condition on all putative development projects could somehow be considered grounds for selective treatment, the amended complaint still fails the second prong of *LeClair*.  Here, NRP has not alleged the existence of any suspect or quasi-suspect classification.  Nor has NRP sufficiently alleged that defendants acted maliciously towards NRP.  NRP's allegations that defendants "maliciously and in bad faith intended to injure NRP" (Amended Complaint, ¶149) are merely conclusory and entitled to no deference.  *See Iqbal*, 129 S.Ct. at 1949-50.

23

Moreover, NRP's factual allegations support only the theory that defendants intended to *benefit Reverend Stenhouse* - - *not* that they acted with the *deliberate purpose of injuring NRP*.  Malice against NRP cannot be inferred from the alleged facts when the clear gist of the amended complaint is that defendants' sole purpose was to benefit Reverend Stenhouse.  *See Hi Pockets, Inc. v. Music Conservatory of Westchester, Inc.*, 192 F.Supp.2d 143, 158 (S.D.N.Y. 2002) (dismissing for lack of malice tenant's § 1983 equal protection claim against city based on "claims of political corruption in the granting of [landlord's] building permit;" complaint did not allege defendants intended to *injure* tenant, but only alleged that defendants "intended to aid [landlord] or other politicians") (emphasis in original).

VI.   **NRP's Claims Against the Individual City Defendants and its Claims for Punitive Damages Must be Dismissed**

The amended complaint fails to specify whether defendants Brown, Casey and Smith are being sued in their official or individual capacities.  To the extent that NRP alleges entitlement to any damages for tortious interference and punitive damages with respect to the defendants Brown, Casey and Smith, acting in their official capacities, all such causes of action must be dismissed.

The amended complaint alleges actions undertaken by the City Defendants only in their positions within the City of Buffalo.  (*See* Amended Complaint, ¶¶6, 8, 9; *see also* ¶¶ 40, 59, 66 and 74).  Under New York law, "when official action involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial, a municipal defendant generally is not answerable in

damages for the injurious consequences of that action." *Haddock v. City of New York*, 75 N.Y.2d 478, 484, 554 N.Y.S.2d 439, 443 (1990).

The amended complaint concedes that the exercise of discretion was utilized in not commencing the Project, and contains no allegations that the City Defendants' approval was merely ministerial and therefore no damages for tortious interference can attach. In Count V of the amended complaint, NRP alleges that the City Defendants were acting as "policymakers." Municipalities and municipal officials who are sued in their official capacities are immune from punitive damages. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S. Ct. 2748, 2762 (1981). As the amended complaint alleges that the City Defendants are being sued in their official capacities, any claim for punitive damages against the City Defendants must be dismissed.

Punitive damages may be awarded against an individual, municipal official, only if his "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640 (1983). NRP makes no such allegations and their contention that City Defendants are acting as policy makers, makes it an official capacity suit, for which punitive damages are not available.

<u>CONCLUSION</u>

For the reasons set forth above, the Court should dismiss the amended complaint as to the defendants, City of Buffalo, Byron W. Brown, Steven M. Casey and Demone A. Smith.

DATED:     Buffalo, New York
             January 13, 2012

*Terrence M. Connors*

Terrence M. Connors, Esq.
Randall D. White, Esq.
CONNORS & VILARDO, LLP
Attorneys for Defendants
  City of Buffalo, Byron W. Brown
  and Steven M. Casey
1000 Liberty Building
424 Main Street
Buffalo, New York 14202
716-852-5533
tmc@connors-vilardo.com


David Rodriguez
Acting Corporation Counsel
By: Timothy A. Ball, Esq.
CITY OF BUFFALO DEPARTMENT OF
LAW
Attorneys for Defendant
  Demone A. Smith
65 Niagara Square
Buffalo, New York 14202
(716) 851-4318

26