UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

**NRP HOLDINGS LLC and**
**NRP PROPERTIES LLC,**

        Plaintiffs,

V.

**CITY OF BUFFALO, BYRON W. BROWN,**
**STEVEN M. CASEY, DEMONE A. SMITH,**
**RICHARD A. STENHOUSE, and BUFFALO**
**JEREMIAH PARTNEERSHIP FOR COMMUNITY**
**DEVELOPMENT, INC., JOHN DOES 1-10, and**
**JOHN DOE COMPANIES 1-5,**

        Defendants.

Civil No.: 11-CV-0472

---

## **DECLARATION OF THOMAS S. LANE**

**Thomas S. Lane**, makes this Declaration under penalties of perjury, pursuant to 28 U.S.C. § 1746:

    1.    I am an attorney admitted to practice law in New York State and before this Court and a partner in the law firm Webster Szanyi LLP, attorneys for plaintiffs, NRP Holdings LLC and NRP Properties LLC ("NRP"). I submit this declaration in opposition to the defendants' Rule 12(b)(6) motion to dismiss and, specifically, to designate the pleadings and documents that should be considered in connection with this motion and to provide the Court with a summary of the relevant facts.

    2.    For the reasons stated in the accompanying Memorandum of Law, defendants' motion should be denied because, among other things, (1) defendant City of Buffalo ("Buffalo") entered into a binding agreement with NRP; (2) the individual defendants then tortiously

interfered with that agreement and others; and (3) defendants' conduct in killing the Project was the result of an illegal RICO scheme that violated NRP's constitutionally protected rights.

**Documents / Information Supporting Plaintiffs' Opposition**

3. The following documents are incorporated herein and offered in support of Plaintiffs' opposition to defendants' motion:[1]

- Plaintiffs' Amended Complaint and Attachments (Dckts 22; 22-1 – 22-5);

- Plaintiffs' Amended RICO Case Statement (Dckt 22-7);

- Buffalo City Council Resolution No. 264, dated September 27, 1966 (Exhibit A);

- Buffalo City Charter § 168-7 (Exhibit B);

- BURA by-laws (Exhibit C);

- Buffalo Website Page identifying BURA's role with respect to Buffalo (Exhibit D);

- BURA Board Item dated March 5, 2009 (Exhibit E);

- BURA minutes dated March 12, 2009 (Exhibit F);[2]

- City of Buffalo, City Planning Board, correspondence dated April 2, 2009 providing site plan approval (Exhibit G);

- City of Buffalo, Dept. of Economic Development, Permit, & Inspection Services, Correspondence dated April 29, 2009 – permit ready letter (Exhibit H);

- City of Buffalo Sign in sheet for Facilitation Meeting with NRP, dated August 12, 2008 (Exhibit I);

---

[1] The Court may consider this factual information as it is a matter of public record or integral to the allegations in the complaint. See Memorandum of Law. These items are by no means exhaustive, provided as example only, and constitute only a small percentage of the documentary evidence supporting Plaintiffs' claims in this case.
[2] Plaintiffs submitted a FOIL demand for the audio tape from this meeting as all such meetings are recorded, but Buffalo has not provided a timely response to plaintiffs' demand.

- City of Buffalo Planning Board, Notice of Public Hearing dated February 24, 2009 (Exhibit J);

- *Buffalo Poverty Reduction Plan* identifying the project as part of defendant Brown's "record of achievement" (excerpts attached as Exhibit K);

- Defendant Brown's press release identifying the project in a 2009 request for Federal Stimulus Funds (despite the fact that Federal Funding was already allocated through HUD)(Exhibit L).

## Facts

4. After it was invited to Buffalo and issued a commitment letter on February 25, 2008, NRP entered into agreements with associated companies to develop, construct and manage fifty (50) homes in the Masten Park and Cold Springs neighborhoods of the City of Buffalo (the "Project"). (NRP and its associated companies are hereafter referred to as the "Development Team"). (Am. Compl. ¶¶ 19 – 20; Dckt 22-1). ·The Project provided a much needed affordable housing development on the City's beleaguered East Side intended to benefit the citizens and residents of Buffalo.

5. In the February 25, 2008 commitment letter, Buffalo expressly committed itself to the Project subject to one condition – that the Development Team secure 2008 Low Income Housing Tax Credits ("LIHTC") from the New York State Division of Housing and Community Renewal ("DHCR"). (Dckt 22-1). Both before and following the commitment letter, the Development Team and Buffalo worked together to satisfy this condition. (Am. Compl. ¶ 28). The Development Team assembled a detailed application to DHCR that was heavily supported by work performed and carried out by Buffalo, through its departments, agencies, and employees, both in the application process and following the submission. (Am. Compl. ¶¶ 28 –

31, 60 – 61, 97, 100; Exhibits E – J). For all practical purposes, the application could only be submitted with the approval of Buffalo and with a copy of the commitment letter to evidence Buffalo's support. This support included Buffalo's direct endorsements to the DHCR in an effort to assist the Development Team in securing the LIHTC. (Am. Compl. ¶¶ 29, 100). Notably, defendant Brown was involved in the process and provided his endorsement of the Project to DHCR. (*Id.*). These efforts were successful as DHCR issued an award of LIHTC on August 20, 2008. (Dckt 22-2). Thus, the one condition of the commitment letter was satisfied.

6. The Development Team and Buffalo were elated with the award and immediately went to work to move the Project forward. (See Exhibit I). The Development Team and Buffalo met on countless occasions and were in constant contact by email and telephone. (See e.g. Exhibit I). In fact, hundreds of email communications confirm Buffalo's significant involvement and support during this process. By way of example only, Buffalo selected the lots where the housing would be constructed. (Am. Compl. ¶ 30). Buffalo provided guidance, advice, and direct input to the Development team for obtaining environmental clearance and eventually provided the necessary clearance. (Am. Compl. ¶ 61). In conjunction with this, Buffalo signed an "Access Agreement" so that the Development Team's environmental contractor could enter the lots and carry out its review. Buffalo reviewed building plans and the Planning Board held public meetings. (See e.g. Exhibit J). Eventually, Buffalo's Planning Board approved the project as a whole and formally "approved as presented" the site plan, design, and elevations submitted by the Development Team. (Am. Compl. ¶ 60; Exhibit G). Buffalo issued a permit ready letter for the Project and subsequently accepted and cashed the Development Team's check in the amount of $3,939.00. (Am. Compl. ¶ 60; Exhibit H). Substantive meetings were held with Buffalo employees including members of the Buffalo Urban Renewal Agency

4

("BURA"), the Director of Administration and Finance, the Director of Real Estate, Building Inspectors, the Assistant Environmental Program Coordinator, Director of Special Projects, members of the Office of Strategic Planning, Senior Planners, and, of course, the Mayor. (See e.g. Am. Compl. ¶¶ 28, 36, 97, 100; Exhibit I). Project Managers from Buffalo reviewed documents submitted by the Development Team and returned them with suggested revisions when necessary. Buffalo drafted and provided numerous documents for execution and accepted them back from the Development Team. In fact, Buffalo even demolished dilapidated structures on certain lots designated for the Project. (Am. Compl. ¶ 28).

7. Buffalo was entrenched in efforts to move the Project forward and identified the project in *The Buffalo Poverty Reduction Blueprint* dated April 29, 2009 as one that would help revive the downtrodden East Side. (Exhibit K). Likewise, when applying for Federal Stimulus funds in 2009, defendant Brown expressly identified the project as a "ready to go project" and a "critically important project[]" that would "create jobs for our residents."[3] (Exhibit L).

8. By March 2009, Buffalo and its lead agency for the project, BURA, concluded that all elements of the Project necessary to execute the HOME funding agreement were in place. (Exhibits E and F). Documents from Buffalo confirm that BURA's Board was presented with a detailed project description consisting of a checklist signed by appropriate BURA personnel showing that all items for the release of the HOME funds had been completed. (*Id.*). A motion to approve was made by Buffalo's corporation counsel and the forms were "approved as to form" by BURA's counsel, Scott Billman. (*Id.*). The BURA Board minutes dated March 12, 2009 identify Mayor Brown, Council President Franczyk and other council members as members and further reports that the Project received unanimous approval. (*Id.*). These unambiguous public

---

[3] It appears that defendant Brown fraudulently included this project in Buffalo's application for 2009 Stimulus Funds since the project was already being supported with $1.3 million of HOME Funds.

5

records belie defendants' argument that material issues remained open before execution of the HOME funding agreement. Irrespective, the conduct of the parties shows that they were operating under the terms of the commitment letter to move the Project forward.

9. However, immediately after BURA approval, with the project "shovel ready," defendants demanded that the Development Team pay Stenhouse and the Jeremiah Partnership money or else they would kill the Project. (Am. Compl. ¶¶ 32 – 37, 42, 45, 65, 68 – 71).[4] During an in person meeting, defendant Smith and other Buffalo employees told the Development Team that it needed to "make Stenhouse happy" by providing him a paid role on the Project. (Am. Compl. ¶ 36). Stenhouse then sent an email demanding a contract before he would "sign off" on the Project. (Am. Compl. ¶ 37). Emails consistent with this demand followed and in one case the Development Team was told the Mayor needed to know "in the next one and ½ hours" whether Stenhouse would be extended a contract on the Project. (Am. Compl. ¶¶ 34 – 35). When the Development Team balked at this request, defendants slowed and then stopped their efforts to move the Project forward.

10. To avoid the appearance of impropriety, the Development Team issued an RFP for the role defendants requested for Stenhouse. (Am. Compl. ¶ 49). Although Stenhouse responded to the RFP, his proposal was unsatisfactory and appeared as nothing more than a *pro forma* effort for Stenhouse's not so subtle money grab on the Project. (Am. Compl. ¶¶ 54 – 55). During the RFP process, defendant Brown informed a certain member of the Development Team that it needed to hire the "right company" for the deal to go through and that it needed to "make Stenhouse happy." (Am. Compl. ¶¶ 69 – 70). When defendant Brown learned Stenhouse was not selected for the Project, he said "I told you what you had to do and you hired the wrong

---

[4] Stenhouse and the Jeremiah Partnership are no longer active defendants in this case as a result of NRP's execution of a voluntary dismissal that was so ordered by this Court. See Dckt 28.

company." (Am. Compl. ¶ 71). Multiple similar statements were relayed by the defendants to members of the Development Team – "the deal is dead without Stenhouse;" "everything was ready to go . . . until Stenhouse called and said he was not happy;" and "if Stenhouse is not happy, [the Project] is not going anywhere." (Am. Compl. ¶¶ 66 – 68).

11. Defendants killed the Project for one reason only -- because the Development Team would not pay or find a role for Stenhouse and the Jeremiah Partnership. Defendants then concocted an identical story to explain why they killed the project claiming that they did not support the scattered sites for the homes or the rent to own nature mandated by the Tax Credits. (Am. Compl. ¶¶ 93 – 98). Apparently, the defendants had forgotten that Buffalo (not the Development Team) selected the sites for the homes and that Buffalo endorsed the rent to own nature of the project advising the Development Team "The Development will help meet objectives identified in the City of Buffalo's Comprehensive Plan . . . We are also supportive of the feature of the development, which allows for home ownership conversion at the end of the tax required compliance period."[5] (Am. Compl. ¶¶ 94 – 96).

12. This is not the first time defendants have engaged in a pay to play scheme to benefit Stenhouse. NRP has identified at least two other projects where similar demands were made and where Stenhouse was indeed provided a paid role on projects to perform work he was unquestionably unqualified to perform. (Am. Compl. ¶¶ 81 – 86). Thus, on these other projects, Stenhouse ended up receiving payments for work Buffalo employees ultimately completed. (Am. Compl. ¶ 84).

13. NRP submitted FOIL demands seeking information on these other projects but Buffalo first delayed and then refused to provide NRP with responsive information. (Am.

---

[5] Buffalo has supported and endorsed rent to own projects funded with LIHTC both before and since the time defendants killed the subject project. (Am. Compl. ¶ 99).

Compl. ¶ 87).  Nonetheless, NRP has sufficiently provided factual information forming the foundation for a pattern of racketeering activity that persisted both before and throughout the subject Project.  These facts also establish that it was treated differently than other developers based solely on its refusal to pay moneys to Stenhouse.

14. NRP's complaint states five counts for breach of contract, promissory estoppel, state law torts, RICO and Section 1983 violations.  Each has been thoroughly investigated by NRP and will be supported by extensive documentary and testimonial evidence.  NRP has obtained an assignment of claims from members of the Development Team and is pursuing these claims individually and by assignment. (Am. Compl. ¶ 112)

## Defendants' Motion Papers

15. Defendants' motion papers are replete with factual information and attorney opinions that are not properly before this Court and not part of the record to be considered by the Court on the motion.

16. Defendants' affidavit includes information that is provided in a transparent attempt to relay information to media outlets meant to defame NRP based solely on hearsay newspaper articles from out of state sources.

17. Certainly, defendants know that attaching these articles to a motion to dismiss is patently improper.  This Court is, of course, empowered to strike the entire motion, *sua sponte*, as containing information defendants know cannot be considered for any legitimate purpose. Indeed, defendants do not tie any of the baseless claims from the hearsay news articles to any of their legal arguments revealing that their efforts are simply designed to distract the Court from the issues at hand.  Plaintiffs will not assist the defendants in their obvious ploys by addressing

the substance of their collateral attacks. Suffice it to say, NRP disputes the contents of the news articles defendants have chosen to file in this Federal court proceeding.

18. Of course, Plaintiffs certainly do find it curious that defendants employ this tactic given that a similar approach by Plaintiffs would include *Buffalo News* articles accusing Brown and/or the other defendants of serious governmental misconduct including, (1) the misuse of more than eight million dollars in federal block grant funds, (2) the misapplication of federal block grant programs, rendering them ineffective; (3) providing more than $110,000 in city loans and grants to a futile business venture run by a political ally who quickly defaulted on this obligation to the City; (4) hiring and supervising an unqualified human resources commissioner who paid millions in City funds for health insurance premiums for 152 deceased City employees; and (5) engaging in politically motivated recruiting and hiring procedures resulting in the hiring of at least two unqualified individuals for top city commissioner positions.[6] Moreover, the *Buffalo News* has reported that several key members of the mayor's administration, including the Mayor himself, appear to be the target of a Federal investigation for fostering an environment of corruption that includes seven past and present City employees who have been indicted, arrested and/or convicted of federal crimes, including theft, misuse of anti-poverty funds, embezzlement and providing assistance to known drug dealers.[7]

19. Finally, defendants' motion papers are significant for what they do not include. Defendants chose to selectively quote City Charter provisions while omitting other controlling

---

[6] See "Fine Dining, City Hall Style," *The Buffalo News*, May 24, 2009; "Stokes Charged in Confrontation," *The Buffalo News*, September 11, 2009; "HUD Blasts City Over Misuse of Anti-Poverty Funds," *The Buffalo News*, March 28, 2009; "Brown Skirted Rules in Hiring of Thomas," *The Buffalo News,* August 16, 2010; "Did Connections Trump Credentials?" *The Buffalo News*, July 11, 2010; "Thomas Attacks Mayor, Comptroller, *The Buffalo News*, October 13, 2010; "Political Link Seen in Repeat Hiring of Indicted Contractors," *The Buffalo News*, August 21, 2011; "Wanamaker's Plea Deal Could By Trouble for City Hall," *The Buffalo News*, December 10, 2011; "FBI's City Hall Probe Raises Questions," *The Buffalo News*, January 21, 2012.
[7] *Id.*

provisions. They also overlook Mr. Wanamaker's authority as Vice Chairman of BURA and BURA's delegated role to act on Buffalo's behalf in connection with the Project, pretending that the February 25, 2008 letter was not issued pursuant to that authority. Defendants also choose to overlook controlling legal authority, including authority that had been raised with their counsel pre-suit and other authority that was set forth in Plaintiffs' Amended RICO case statement.

## **Conclusion**

20. For these reasons, and those set forth in the accompanying Memorandum of Law, defendants' motion to dismiss should be denied in its entirety.

DATED: February 29, 2012

s/ *Thomas S. Lane*
Thomas S. Lane
