UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

───────────────────────────────────────

NRP HOLDINGS LLC and NRP PROPERTIES LLC

                              Plaintiffs,

v.                                                         Civil No.:  11-CV-00472(WMS)

CITY OF BUFFALO, BYRON W. BROWN,
STEVEN M. CASEY, DEMONE A. SMITH,
RICHARD A. STENHOUSE, BUFFALO
JEREMIAH PARTNERSHIP FOR COMMUNITY
DEVELOPMENT, INC., JOHN DOE 1 – 10, and
JOHN DOE COMPANIES 1 – 5.

                              Defendants.

───────────────────────────────────────

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**WEBSTER SZANYI LLP**
Attorneys for Plaintiffs
Thomas S. Lane, Esq.
Nelson Perel, Esq.
1400 Liberty Building
Buffalo, New York 14202
(716) 842-2800

# TABLE OF CONTENTS

Preliminary Statement.................................................................................................1

Statement of Facts....................................................................................................2

Rule 12(b)(6) Standard .............................................................................................2

Argument ...............................................................................................................3

    I.    NRP Has Pled A Breach of Contract ...................................................................3

        A.    The February 25, 2008 Letter Is A Binding Preliminary Agreement .....................3

            1.    The February 25, 2008 Agreement – Parties' Intent..................................5

            2.    Context of Transaction...............................................................7

            3.    Open Terms...........................................................................7

            4.    Partial Performance by NRP and Buffalo ..............................................8

            5.    Is Formalized Contract Customary Form of Such Transactions.............................8

        B.    Mr. Wanamaker Was Authorized To Execute The Commitment Letter ................8

        C.    Mutual Intent to be Bound ...................................................................12

    II.    NRP Has Pled Promissory Estoppel ..................................................................13

    III.    NRP Has Pled State Law Tort Claims ................................................................13

    IV.    NRP Has Stated A Claim Pursuant To The RICO.....................................................14

        A.    NRP Has Adequately Alleged Racketeering Activity ...........................................15

        B.    NRP Has Adequately Alleged A Pattern Of Racketeering....................................18

            1.    Closed-Ended Continuity...............................................................18

            2.    Open-Ended Continuity .................................................................21

    V.    NRP has Stated A Valid Claim Pursuant to 42 U.S.C §1983 .........................................22

        A.    Due Process...............................................................................22

   B.  Equal Protection.............................................................................................................24

VI.    Punitive Damages ............................................................................................................25

Conclusion .................................................................................................................................25

## TABLE OF AUTHORITIES

CASES...................................................................................................................... PAGE


*3947 Austin Blvd. Assocs., LLC v. M.K.D. Capital Corp.,*
    2007 WL 1575265 (S.D.N.Y. 2007).................................................................. 6, 12

*Agress v. Clarkstown Centr. Sch. Dist.,*
    69 A.D.3d 769 (2d Dep't 2010) ....................................................................... 13

*Air Italy, S.P.A. v. Aviation Technologies, Inc.,*
    2010 WL 2925949 (E.D.N.Y. 2010).................................................................. 13

*Arcadian Phosphates v. Arcadian Corp.,*
    884 F.2d 69 (2d Cir. 1989)................................................................................ 7

*Ally Gargano/MCA Advertising Ltd. v. Cooke Props., Inc.,*
    1989 WL 126066 (S.D.N.Y. 1989).................................................................... 7

*Bed Bath & Beyond, Inc. v. Ibex Constr., LLC.,*
    52 A.D.3d 413 (1st Dep't 2008) ...................................................................... 12

*Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir. 1986) .....................................................18

*Brady v. Town of Colchester*, 863 F.2d 205 (2d Cir. 1988).............................................24

*Brown v. Cara*, 420 F.3d 148 (2d Cir. 2005)................................................4, 5, 6, 7, 8

*Bullock v. Gerould*, 338 F. Supp. 2d 446 (W.D.N.Y. 2004)...........................................24

*Columbus McKinnon Corp. v. HealthNow New York, Inc.*
    2006 WL 2827675 (W.D.N.Y. 2006) .............................................................18

*DeFalco et. al. v. Bernas et al,* 244 F.3d 286 (2d Cir.) .........................................14, 15, 16, 18. 21

*East Hampton Union Free School Dist. v. Sandpebble Builders, Inc.,*
    90 A.D. 3d 815 (2nd Dept 2011).......................................................................9

*Emigrant Bank v. UBS Real Estate Securities, Inc.,*
    49 A.D.3d 382 (1st Dep't 2008) ....................................................................7 13

*Frank Sloup and Crabs Unlimited, LLC v. Loeffler,*
    745 F. Supp. 2d 115 (E.D.N.Y. 2010) ............................................................24

*Fresh Meadow Food Servs., Inc. v. RB 175 Corp.*,
    282 Fed. Appx. 94 (2d Cir. 2008)..................................................................18

*Goodstein Constr. Corp. v. City of New York*,
    67 N.Y.2d 990 (1986). .......................................................... 3-4, 6, 7

*JRP Old Riverhead Ltd. v. Town of Southhampton*,
    44 A.D.3d 905 (2nd Dept 2007)..................................................................9

*Kenmore Mercy Hosp. v. Daines*, 2011 WL 4368564 (W.D.N.Y. 2011).....................................24

*L-7 Designs, Inc. v. Old Navy, LLC*,
    647 F.3d 419 (2d Cir. 2011)..................................................................5

*Leadsinger, Inc. v. Cole,* 2006 WL 2320544 at *13 (S.D.N.Y. 2006) ...........................................14

*Liberty Environmental Systems, Inc. v. County of Westchester*,
    1998 WL 799158 (S.D.N.Y. 1998)..................................................................4, 7

*Liberty Environmental Systems, Inc. v. County of Westchester*,
    2000 WL 1752927 (S.D.N.Y. 2000)..................................................................11

*Mendez v. Bank of Amer. Home Loans Serv., LP.*,
    2012 WL 112506 (E.D.N.Y. 2012)..................................................................13

*Nelson v. City of Rochester*, 492 F. Supp. 2d 282 (W.D.N.Y. 2007) .............................................9

*Network Enters, Inc. v. APBA Offshores Prods, Inc.*,
    427 F. Supp.2d 463 (S.D.N.Y. 2006)..................................................................6

*Network Enters, Inc. v. APBA Offshores Prods, Inc.*,
    264 Fed. Appx. 36 (2d Cir. 2008)..................................................................6, 8

*Notaro v. Power Auth. Of State of New York*,
    41 A.D 3d 1318 (4th Dep't 2007)..................................................................13

*Odom v. Matteo*, 772 F. Supp. 2d 377 (D. Conn. 2011)..............................................................25

*P.M. v. Evans-Brant Central School Dist.*,
    2012 WL 42248 (W.D.N.Y. 2012) ..................................................................2

*Purgess v. Sharrock*, 33 F.3d 134 (2nd Cir. 1994)..................................................................13

*Raedle v. Credit Agricole Indosuez*,
    10-2565-cv (2nd Cir. Feb. 28, 2012 ..................................................................13

*Sullivan v. Town of Salem*, 805 F.2d 81 (2d Cir. 1986) ................................................................23

*Smith v. Wade*, 461 U.S. 30 (1983) ................................................................................................25

*Tasso v. Platinum Guild Int'l*, 1997 WL 16066 (S.D.N.Y. 1997) ................................................14

*Teacher's Ins. & Annuity Assoc. v. Tribune Co.*,
  670 F. Supp. 491 (S.D.N.Y. 1987). ............................................................4, 6, 7, 8, 12

*Tinnell v. Invacare Corp.*, 2010 WL 4616633 (W.D.N.Y. 2010) ....................................................2

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) ..................................................................16

*United States v. Vigil*, 523 F.3d 1258 (10th Cir. 2008) ..............................................................16

*Walentas v. Lipper*, 862 F.2d 414 (2d Cir. 1988) ........................................................................23

*Ward v. Pricellular Corp.*, 1991 WL 64043 (S.D.N.Y. 1991) ........................................................7

**STATUTES........................................................................................................ PAGE**

18 U.S.C. § 1341 ............................................................................................................................15

18 U.S.C. § 1343 ............................................................................................................................15

18 U.S.C. § 1951 ............................................................................................................................15

18 U.S.C. §1961 ............................................................................................................................15

18 U.S.C. §1962 ......................................................................................................................14, 15

27 N.Y. Jur. 2d Counties, etc. §1406 ..............................................................................................9

City Charter § 22-1 ........................................................................................................................11

City Charter § 168-7 ..................................................................................................................9, 10

City Charter available at http://www.ecode360.com/BU1237 ........................................................9

Common Council Resolution No. 264 ........................................................................................9, 10

Fed. R. Evid. 201(b)(2) ....................................................................................................................9

Rule 8 ............................................................................................................................................19

Rule 12(b)(6) ....................................................................................................................................2

## **Preliminary Statement**

Plaintiffs NRP Holdings LLC and NRP Properties LLC (collectively "NRP") file this brief in opposition to defendants' motion to dismiss.

Consistent with the conduct underlying this case, defendants' motion reflects the arrogance of persons who view themselves as untouchable and above the law.  In an effort to deny NRP its day in court, or even basic discovery, defendants expect this Court to believe that (a) their executive level employee had no authority to bind Buffalo to an agreement entered with full knowledge of all defendants and largely performed and fully ratified by defendants' departments, agencies, and employees;  (b) Buffalo can entice a developer into expending hundreds of thousands of dollars and thousands of man hours on a project but that its written express agreement is a meaningless document; and (c) the Mayor can meet with NRP following execution of the agreement, voice his support for the project, endorse the project to the relevant State funding agency, trigger the involvement of all relevant City departments and agencies, but later pretend that he never liked the project and was against it.

Defendants expect that their illegal pay-to-play demands should be overlooked as nothing more than an innocent attempt to involve the "community" in the project even though the community was already heavily represented.  Defendants hope that this Court will buy into their claims that there is nothing illegal about killing a development project after brazenly demanding a "role" on the project for their good friend, supporter, and co-conspirator and then stating "I told you what you had to do and you hired the wrong company."  Indeed, defendants believe that it is perfectly acceptable to kill a low income housing project supported by State and Federal funds unless the developer agrees to "grease the palm" of their biggest political

backers.[1]  Defendants also expect that when their unlawful demands and conditions are not met,

they can simply fabricate transparent excuses for killing the project with impunity.

Unfortunately for defendants, their expectations, hopes, and beliefs are factually and

legally incorrect and contrary to well settled rules of law that hold contracting parties to their

word and punish those who engage in illegal, wrongful, and criminal conduct.

### Statement of Facts

The facts relevant to this motion are set forth in the declaration of Thomas S. Lane dated

February 29, 2011, the Amended Complaint and attachments (Dckt 22), and the Amended

RICO Case Statement (Dckt 22-7) and will not be repeated herein except for the purposes of

discussion.  As recognized by the defendants, the Court is required to accept the facts alleged by

NRP as true in considering the motion to dismiss.[2]

### Rule 12(b)(6) Standard

This Court has stated that "Federal pleading standards are generally not stringent:  Rule

8 requires only a short and plain statement of a claim."[3]  Each of the Counts in the Amended

Complaint satisfies this Court's standard for surviving a Rule 12(b)(6) motion.  NRP's

complaint consists of 109 detailed fact allegations followed by five Counts incorporating those

allegations and satisfying the elements of each of the asserted claims.  As shown below, NRP

relies on settled legal authority for each of their claims.

---

[1] Defendants naively claim that no "pay to play" scheme occurred because Stenhouse and the Jeremiah Partnership did not contribute financially to Brown's campaign.  Not only is there no evidence to support this fact, but Stenhouse provided something much more valuable than money; he provided and delivered a block of votes.

[2] This Court may consider additional documents on this motion to dismiss, such as those offered by NRP, because they are integral to the complaint, even though they were not specifically attached to it, materials in Defendants' possession, and/or "public disclosure documents required by law to be, and that have been, filed with [Buffalo]." *See, e.g.,* <u>Tinnell v. Invacare Corp</u>., 2010 WL 4616633 at *2 (W.D.N.Y. 2010).

[3] <u>P.M. v. Evans-Brant Central School Dist</u>., 2012 WL 42248 at *2 (W.D.N.Y. 2012).

**Argument**

**I.     NRP Has Pled A Breach of Contract**

By their very nature, development projects involving the use of municipal property require extensive preliminary efforts.  Developers rely on preliminary agreements as protection against arbitrary action after they have incurred significant costs during the process.  Both the New York Court of Appeals and the Second Circuit Court of Appeals recognize that preliminary agreements, like the one in this case, are routine and enforceable.

**A.     The February 25, 2008 Letter Is A Binding Preliminary Agreement**

The February 25, 2008 letter is a binding preliminary agreement.  At the very least, it obligated Buffalo to make good faith efforts to honor its stated commitments.  In Goodstein Constr. Corp. v. City of New York, the New York Court of Appeals held that New York City designated a developer ("Goodstein") to exclusively negotiate a Land Disposition Agreement ("LDA") concerning a certain parcel owned by the City.[4]  Goodstein alleged that the City "de-designated" it for improper motives in violation of the implied covenant of good faith and fair dealing.[5]  The court agreed, holding that the developer "did not assume the risk of bad faith by [the city] or of its unexcused breach of its contract obligation."[6]  The City agreed to "cooperate with [the developer] in the extensive and expensive preparations and negotiations leading to submission and approval of the LDA."[7]  Goodstein held that this duty was not undermined by the City's ability to terminate the designation agreement or that the developer agreed to undertake "the planning at its 'sole risk, cost and expense.'"[8]  The court thus held Goodstein pled a sufficient contractual obligation.  Goodstein controls here and NRP is entitled to pursue

---

[4] 67 N.Y.2d 990, 991-92 (1986).
[5] Id. at 991-92.
[6] Id. at 992.
[7] Id.
[8] Id.

3

its breach of contract claim against Buffalo for breaching the implied covenant of good faith and fair dealing.[9] Notably, the February 25, 2008 letter contained none of the limitations present in Goodstein's agreement.[10]

In Brown v. Cara, the Second Circuit Court of Appeals analyzed preliminary agreements as either Type I or Type II agreements under Judge Leval's seminal decision in Teacher's Ins. & Annuity Assoc. v. Tribune Co..[11] Brown construed a two-page Memorandum of Understanding ("MOU") between a developer and a property owner.[12] Although the MOU did "not bind the parties to complete the project," Brown held that Type II agreements "bind the parties to negotiate . . . open issues in good faith in an attempt to reach the . . . objective within the agreed framework."[13] The purpose of Type II agreements is to preserve "agreements that were intended as binding, despite a need for further documentation or further negotiation." [14] These agreements serve "a valuable function in the marketplace . . . permitting parties to make plans in reliance upon their preliminary agreements and present market conditions without expending enormous sums negotiating every detail of final contract documentation before knowing whether they have an agreement, and if so, on what terms."[15]

In Brown, the Second Circuit applied five factors to determine whether the parties agreed to a Type II agreement: (1) whether the language used reveals an intent to be bound; (2)

---

[9] Liberty Environmental Systems, Inc. v. County of Westchester, 1998 WL 799158, at *4 (S.D.N.Y. 1998) (applying Goodstein and holding that plaintiff's "claim of breach of the implied covenant of good faith [arising from MOU] raises issues of fact which preclude summary judgment").
[10] Id. (noting that the Court of Appeals rejected these arguments in Goodstein).
[11] 420 F.3d 148, 153 (2d Cir. 2005) (citing 670 F. Supp. 491, 498 (S.D.N.Y. 1987)).
[12] Id. at 151-153.
[13] Id.
[14] Id. at 157.
[15] Id.

the context of the transaction; (3) open terms; (4) partial performance; and (5) the necessity of

putting the agreement in final form, as indicated by the customary form of such transactions.[16]

The February 25, 2008 letter is a binding agreement because, like the <u>Brown</u> MOU, it

shows that the parties agreed "to work toward the goal" of fulfilling all conditions necessary for

the execution of the HOME funding agreement.  Buffalo's obligation to proceed in good faith

barred it from "renouncing the deal, abandoning the negotiations, or insisting on conditions that

do not conform to the preliminary agreement"[17] – such as making Stenhouse happy by paying

him money.[18]

1. <u>**The February 25, 2008 Agreement – Parties' Intent**</u>

The February 25, 2008 commitment letter and agreement provides that it was sent "to

<u>confirm</u>" that BURA "<u>has earmarked</u> $1,600,000 of Buffalo's HOME funds for the above-

referenced project," that "HOME <u>funds will be issued</u> . . .," and stated further that the:

City of Buffalo's <u>commitment</u> to this project is in the form of the following:

1. The <u>City will extend</u> to the development <u>its usual</u> Low-Income Housing <u>PILOT agreement</u> and
2. The <u>City will provide $1,600,000 of its HOME funds</u> to assist in the construction of the East Side Housing Opportunities II project.
3. The <u>City will provide 51 buildable vacant lots</u> in the Cold Springs and Masten Districts to facilitate accomplishment of this project at a price no greater than $2,000 per buildable lot, and not to exceed a total price of $100,000.

<u>(Dkt 22-1)</u> (emphasis added).  The letter provided that "[t]his commitment letter is only valid if

the developer is successful in securing a 2008 [LIHTC] allocation to complete the project."

---

[16] <u>Id.</u> at 157.

[17] <u>L-7 Designs, Inc. v. Old Navy, LLC</u>, 647 F.3d 419, 430 (2d Cir. 2011) (citation omitted).

[18] NRP's complaint alleges that Buffalo "breached the February 25, 2008 agreement by . . . failing to perform tasks required of it to move the project forward. . .."  See Am. Compl. at ¶ 115.  One of the tasks was necessarily to negotiate in good faith and comply with the implied duty of fair dealing.

The terms of the February 25, 2008 letter are more binding than the terms in <u>Brown</u>

("work together to develop, build, market, and manage [the Jay Street Property]" and to "work

together in accordance with the terms and conditions outlined [in the MOU]") -- which

prompted the Second Circuit to remark that it "cannot imagine more clear evidence of an

intention to be bound to the MOU as a general framework."[19]  If Buffalo wished minimize its

commitment to the Project, then it could have issued a different letter.  As the issuing party,

Buffalo cannot complain that its obligations were too firm.[20]

Courts find that "earmarking" funds indicates an intent to create a preliminary

agreement.  For example, in <u>Teacher's Ins.</u>, Judge Leval found that the lender's earmarking of

funds indicated an intent to be bound.[21]

The fact that steps needed to occur before the execution of the PILOT and HOME

Agreements is irrelevant.  <u>Teacher's Ins.</u> noted that the letter in that case was "contingent upon

the preparation, execution, and delivery of" final contract documents.[22]  Nonetheless, Judge

Leval held that this "does not mean that the language of reservation authorized one party to kill

the deal simply by refusing to negotiate or to sign the contract documents [because] [s]uch an

interpretation would render language like . . . 'firm commitment' meaningless."[23]

Likewise, courts reject the argument that a preliminary agreement is not binding because

the ultimate agreement must be approved by a board of directors or a legislative body.  In

<u>Teacher's Ins.</u>, Judge Leval held "the reservation of Board approval and the expressed

---

[19] 420 F.3d at 157-58; *see also* <u>3947 Austin Blvd. Assocs., LLC v. M.K.D. Capital Corp.</u>, 2007 WL 1575265, at *1 (S.D.N.Y. 2007) (finding commitment letter to be binding for purposes of awarding default judgment for reliance costs to developer who received commitment letter from investor who agreed to provide developer with $5.9 million credit facility for acquisition and development of self-storage facility).

[20] <u>Network Enters., Inc. v. APBA Offshores Prods., Inc.</u>, 427 F. Supp.2d 463 (S.D.N.Y. 2006), aff'd, 264 Fed. Appx. 36 (2nd Cir. 2008).

[21] 670 F. Supp. at 502; <u>Network Enters, Inc. v. APBA Offshores Prods, Inc.</u>, 264 Fed. Appx. 36, 38 (2d Cir. 2008) (noting that party partially performed by "reserving air time" for use by the purchaser).

[22] 670 F. Supp. at 505; *see also* <u>Goodstein,</u> *supra.*

[23] <u>Id.</u> at 505-06.

'contingency upon the preparation, execution and delivery of documents' did not override and nullify the acknowledgment that a 'binding agreement' had been made on the stated terms."[24]

Ultimately, "the critical issue is the parties' intent at the time the alleged agreement was reached, a determination which is a factual one, not a legal one, and, except in the clearest case, the question is for the finder of fact to resolve."[25]  Any questions concerning Buffalo's intention to be bound by the February 25, 2008 letter may not be resolved at this stage.

### 2.    **Context of Transaction**

Like the development project in <u>Brown</u>, the Project was "subject to numerous steps"[26] including the need for cooperative efforts to identify and approve the lots and satisfy the conditions for execution of the HOME funding agreement (which occurred).

### 3.    **Open Terms**

The existence of open terms does not render the February 25, 2008 letter unenforceable and "may actually support finding a binding Type II agreement."[27]  Judge Leval stated that the "fact that countless pages of relatively conventional minor clauses remained to be negotiated does not render the agreement unenforceable."[28]  Likewise, the existence of a well-understood process to satisfy conditions necessary to execute the HOME Agreement favors NRP's position in this case.

---

[24] 670 F. Supp. at 500; *see also* <u>Liberty Environmental Systems</u>, 1998 WL 799158, at *4 (rejecting County's argument that MOU was not binding because it had not been approved by the Legislature); <u>Goodstein</u>, 67 N.Y.2d at 991-92 (rejecting argument that preliminary agreement was not binding because ultimate Land Disposition Agreement required approval of the municipal Board of Estimate).

[25] <u>Ally Gargano/MCA Advertising Ltd. v. Cooke Props., Inc.</u>, 1989 WL 126066 at *13-14 (S.D.N.Y. 1989) (construing <u>Goodstein</u> and <u>Teacher's Ins.</u> and denying summary judgment); <u>Ward v. Pricellular Corp.</u>, 1991 WL 64043, at *5-7 (S.D.N.Y. 1991) (same); <u>Emigrant Bank v. UBS Real Estate Securities, Inc.</u>, 49 A.D.3d 382, 384 (1st Dep't 2008) (proper to deny motion to dismiss because "[w]hether defendant breached [duty to negotiate] presented a question of fact") (citing <u>Goodstein</u> and <u>Arcadian Phosphates v. Arcadian Corp.</u>, 884 F.2d 69, 72 (2d Cir. 1989)).

[26] 420 F.3d at 158.

[27] 420 F.3d at 158.

[28] 670 F. Supp. at 501.

### 4.      Partial Performance by NRP and Buffalo

This factor "cuts strongly in favor of" NRP.[29]  The Development Team and Buffalo's

Departments and Agencies worked extensively to satisfy all requirements and had achieved that

objective – that is until the demand for a pay-off to Stenhouse and the Jeremiah Partnership.

### 5.      Is Formalized Contract Customary Form of Such Transactions

 "Type II agreements, by definition, comprehend the necessity of future negotiations and

contracts."[30]  Although the February 25, 2008 letter contemplated later execution of the HOME

agreement, this supports the finding of a Type II agreement.  Teacher's Ins. described this factor

as "whether in the relevant business community, it is customary to accord binding force to the

type of . . . preliminary agreement at issue."[31]  The answer is self-evidently yes, or at a

minimum requires a determination that cannot be resolved at this stage.

### B.      Mr. Wanamaker Was Authorized To Execute The Commitment Letter

Defendants argue that Mr. Wanamaker lacked authority to execute the February 25,

2008 letter based solely on the premise that the Office of Strategic Planning lacks such

authority.  Although the letter was printed on Mr. Wanamaker's Office of Strategic Planning

letterhead, it appears to have been sent in his capacity as Vice Chairman of BURA.  The letter

stated that it was sent "to confirm that the Buffalo Urban Renewal Agency has earmarked"

certain HOME funds for the Project.  Overlooking the elephant in the room, defendants fail to

address Mr. Wannamaker's role and authority as the Vice Chairman of BURA.  Based on the

letter and BURA's role in implementing the Project, there is no doubt that BURA, and not the

Office of Strategic Planning, was the party binding Buffalo to the commitments in the letter.

Thus, defendants' premise is incorrect (and at the very least creates an issue of fact not properly

---

[29] 420 F.3d at 158.

[30] 420 F.3d at 158; see also 264 Fed. Appx. at 38 (construing Brown).

[31] 670 F. Supp. at 503.

resolved on this motion).  Indeed, defendants mislead the Court as they overlook key facts including that (A) BURA was the lead agency authorized by the City via Charter § 168-7[32] to bind Buffalo; and (B) Buffalo ratified the February 25, 2008 letter through its conduct.[33]

BURA is authorized to enter into contracts on behalf of Buffalo such as the February 25, 2008 letter.[34]  Pursuant to its by-laws, BURA "shall have such powers as are conferred upon it by law, and in particular, Article XV-A of the General Municipal Law, and . . . Common Council [resolution No. 264 dated September 27, 1966]."[35]  Article III, § 2 provides that the Vice-Chairman is the "Executive Director of the Office of Strategic Planning" (i.e., Tim Wannamaker) and his powers "include the negotiation, preparation, execution and implementation of all contracts and Land Disposition Agreements dealing with the acquisition and disposition of neighborhood property for and on behalf of BURA, which are intended to be utilized for publicly supported residential rehabilitation of [sic] housing construction purposes." Thus, Mr. Wanamaker and BURA had authority to issue the February 25, 2008 commitment letter at the behest and on behalf of Buffalo.

Defendants' failure to address BURA's role in the project reflects an inability to do so. § 168-7(a)(7) of the City Charter designates BURA as the "lead agency" for actions involving funding from HUD such as the HOME funds at issue here.  Thus, City Charter § 6-5, relied on

---

[32] City Charter available at http://www.ecode360.com/BU1237.

[33] 27 N.Y. Jur. 2d Counties, etc., §1406 ("Ratification may be by express assent, or by acts or conduct of the principal inconsistent with any other supposition than that it intended to own the act done in its name."); East Hampton Union Free School Dist. v. Sandpebble Builders, Inc., 90 A.D. 3d 815, 817-18 (2nd Dept 2011); ("A contract that is not approved by a relevant municipal or governmental body, as required by law, rule or regulation, may be ratified by the municipality or government body by subsequent conduct . . . . "); JRP Old Riverhead Ltd. v. Town of Southhampton, 44 A.D.3d 905 (2nd Dept 2007) (same).

[34] Pursuant to City Council resolution No. 264, Buffalo delegated its authority to BURA to carry out urban renewal projects at the behest and on behalf of the City of Buffalo.

[35] BURA's By-laws are attached as Exhibit "C" to the Lane Dec. and are also available at http://www.ci.buffalo.ny.us/files/1_2_1/BURA/BURA_BY_LAWS.pdf.  This Court may take judicial notice of BURA's by-laws, which are published in the City's official webpage.  Fed. R. Evid. 201(b)(2); Nelson v. City of Rochester, 492 F. Supp. 2d 282, 284 f.1 (W.D.N.Y. 2007) (taking judicial notice of the Rochester municipal code).

by defendants, is completely irrelevant.  Mr. Wanamaker, in his capacity as Vice-Chairman of

BURA, was authorized to negotiate and execute the February 25, 2008 letter via Common

Council Resolution No. 264, City Charter § 168-7 and BURA's by-laws.

The issue of authority, at the very least, creates an issue of fact.  For example,

defendants point to the East Side I HOME Agreement ("ES-I HOME Agreement") as an

example of a binding contract involving HOME funds.[36]  This document actually supports

NRP's position.  The ES-I HOME Agreement followed the same path that NRP's HOME

Agreement would have followed if defendants had not breached the February 25, 2008 letter.

In other words, the ES-I HOME Agreement was the final step of a lengthy cooperative process.

Buffalo, through its lead agency BURA, executed the ES-I HOME Agreement.  As shown

therein, BURA approved the project on September 15, 2005 and the agreement was executed on

October 5, 2005.[37]  Likewise, in March 2009, BURA approved execution of the HOME

agreement for the Project subject only to HUD's release of the funds.  As in ES-I, NRP had

every reason to expect Buffalo to satisfy each of the commitments in the February 25, 2008

letter within a short period of time.

The ES-I HOME Agreement further shows that BURA was authorized to represent

Buffalo's interests in connection with the Project:

- BURA has been designated by the Chief Executive Officer of the City of Buffalo (The Mayor) to administer said grant funds.[38]

- **BURA** is . . . the designated administrator of the HOME Program on behalf of the City of Buffalo.  For the purpose of this Agreement and all administration of HOME funds, **BURA, through its Vice-Chairman, shall**

---

[36] Defs.' Mem. of Law, at 9 (citing Connors Aff., Ex. B).
[37] Compare Connors Aff., Ex. B, at 5 of 67 ("the proposed Project Allocation has been approved by BURA at its meeting on September 15, 2005, Item 9(a) (Approved)") with Lane Dec, Ex. F (BURA minutes)(unanimously approving the Project).
[38] Connors Aff., Ex. B, at 5 of 67.

**act on behalf of the City of Buffalo** in the execution and fiscal and
programmatic control of this agreement.[39]

These excerpts show that BURA, through its Vice-Chairman, was very clearly authorized by

Buffalo concerning projects involving the allocation of the HOME funds.  Like the February 25,

2008 letter, the ES-I Home Agreement was signed by Mr. Wanamaker.

Defendants claim that the authority of municipal officials is a matter of public record

and those who deal with them should know the extent of their authority.  Here, Buffalo's

website, consistent with provisions noted above, unambiguously advises the public "Funding

for the various programs conducted by BURA is obtained from the Federal government,

through the City of Buffalo.  In effect, BURA acts as an agent of the City in carrying out its

urban renewal activities. . .."[40]  Thus, the public is expressly advised that BURA is the agent for

Buffalo for the exact type of project at issue in this case.

Buffalo's Departments and Agencies treated the February 25, 2008 letter as binding.  In

fact, all relevant Departments and Agencies acted to move the Project forward.  Indeed, during

the early stages of the Project, Brown communicated his support to the DHCR and requested

State funding.  Such actions show that Buffalo believed that it was bound by the terms of the

February 25, 2008 letter or, at a minimum, ratified those commitments through its conduct.

To the extent Buffalo argues certain "formalities" were not met under § 22-1 of the City

Charter, they ignore the other provisions noted above that provide a means of authority.

Moreover, these alleged formalities are not a pre-requisite for a Type II preliminary agreement

as recognized by the Court in Liberty Env. Systems, Inc. v. Westchester.[41]  In any event, the

---

[39] Connors Aff., Ex. B, at 6 of 67 (emphasis added).
[40] Lane Declaration, at Exhibit D (emphasis added).
[41] 2000 WL 1752927, *3 - 4 (SDNY 2000)(a post trial decision finding similar Charter provisions not controlling
where they applied only to contracts authorizing the expenditure of public funds and the agreement at issue was
binding the County to "future negotiations" to reach a final agreement.  In so finding, the Court interpreted "the

issue is one that cannot be resolved at the motion stage, especially in light of the fact that the BURA Board minutes here reflect that Buffalo's Corporation Counsel made a motion to approve the Project and the allocation of the HOME funds, the motion carried "unanimously," and the "Board Item" dated March 5, 2009 was approved for submittal to the Board by the Vice Chairman and "approved to form" by the BURA counsel.  In other words, Buffalo, through its lead agency, did exactly what was contemplated by the February 28, 2008 letter subject to the execution of the final agreement, and presumably what it has done on all other similar projects, such as ES-I, evincing an unquestionable agreement recognized by all parties to "work toward the goal of developing the [subject properties] within a defined framework."

  C.  **Mutual Intent to be Bound**

   Defendants' discussion of <u>Adjustrite</u> and <u>Arcadian Phosphates</u>, as opposed to the more analogous <u>Brown,</u> <u>Teacher's Ins.</u>, and <u>Goodstein</u> cases, undermines their analysis.[42]  As discussed above, the February 25, 2008 letter is a binding agreement because it made an offer that invited acceptance by performance, which in fact occurred when NRP expended substantial time and money towards completing the Project.[43]  In <u>Bed Bath & Beyond</u>, the First Department held that a Letter of Intent was binding because the developer moved forward with the project, which "manifested its intent to be bound."[44]

---

Charter as drawing a logical and bright line between preliminary agreements that do not commit public funds and agreements that do commit public funds."  Here, the same distinction can be made when reviewing Buffalo City Charter §§ 22-2 through 22-6 as only those that commit such funds are deemed unenforceable in the absence of certain formalities).

[42] As a result, the cases cited by the Defendants at Point I(B) of their Memorandum are distinguishable.  Moreover, unlike the February 25, 2008 letter, the term sheet in <u>Kreiss</u> (37 F. Supp. 2d at 300) included language expressly reserving the parties' right not to be bound until execution of final agreements.

[43] <u>3947 Austin Blvd. Assocs.</u>, 2007 WL 1575265, at *1 (finding commitment letter to be binding because investor agreed to provide developer with $5.9 million credit facility for acquisition and development of self-storage facility, which prompted action by developer in expending time and money towards completing the project); <u>Teacher's Ins.</u>, 670 F. Supp. at 499-500.

[44] <u>Bed Bath & Beyond, Inc. v. Ibex Constr., LLC.</u>, 52 A.D.3d 413, 414 (1st Dep't 2008) (holding that LOI was binding, even though it was "subject to . . . execution of a Construction Agreement," because the LOI did "not contain an express reservation . . . of the right not to be bound").

## II.     NRP Has Pled Promissory Estoppel

A "detailed showing of the elements of promissory estoppel need not be shown to survive a pre-answer motion to dismiss."[45]   NRP has "done enough at the pleadings stage to allege a clear and unambiguous undertaking to pay" or perform and that it "relied on the promise to its detriment by continuing to perform under the" February 25, 2008 letter.[46]   For the reasons set forth in Point I, NRP states a claim for promissory estoppel.[47]   Defendants' cases are distinguishable because Wannamaker was authorized to bind Defendants.   Promissory estoppel is available against a municipality "where a governmental subdivision acts or comports itself wrongly or negligently [as alleged by NRP here], inducing reliance by a party who is entitled to rely and who changes his position to his detriment or prejudice."[48]   Plainly, defendants' decision to kill the project based on NRP's refusal to pay off Stenhouse is the type of misconduct that estops them from avoiding their commitments to the Project.

## III.     NRP Has Pled State Law Tort Claims

NRP has pled the elements of a tortious interference with contract and tortious interference with prospective economic advantage claims.[49]   The main distinction between these claims is the additional required element for the latter claim that "defendant acted with the sole purpose of harming plaintiffs or used dishonest, unfair or improper means."[50]   For the reasons stated in Point I, the February 25, 2008 letter is enforceable thus defeating Defendants' main

---

[45] Mendez v. Bank of Amer. Home Loans Serv., LP., 2012 WL 112506, at *13 (E.D.N.Y. 2012) (denying motion to dismiss because existence of contract was disputed).

[46] Air Italy, S.P.A. v. Aviation Technologies, Inc., 2010 WL 2925949, at *5 (E.D.N.Y. 2010).

[47] Emigrant Bank, 49 A.D.3d at 384 (denying motion to dismiss promissory estoppel claim where duty to negotiate in good faith claim was viable).

[48] Notaro v. Power Auth. Of State of New York, 41 A.D 3d 1318, 1319 (4th Dep't), appeal dismissed, 9 N.Y.3d 935 (2007); Agress v. Clarkstown Centr. Sch. Dist., 69 A.D.3d 769, 771 (2d Dep't 2010).

[49] Defendants' authorities in Point III(A) are thus inapplicable.

[50] Raedle v. Credit Agricole Indosuez, 10-2565-cv at 10 (2nd Cir. Feb. 28, 2012), citing, Purgess v. Sharrock, 33 F.3d 134, 141 (2nd Cir. 1994).

argument why NRP failed to state a valid tortious interference claim. [51]   Otherwise, defendants

pretend that the Amended Complaint fails to place them on notice of the contracts/prospective

economic advantage that were violated.  The violation primarily concerns the Project, not

simply future projects.  The contracts/economic advantage concerns the February 25, 2008

agreement, the Development Team's agreement with the NYS DHCR, the allocation of Federal

HOME funds, etc.  Defendants were plainly aware of all of these things.  Significantly,

defendants do not deny that a decision to kill the Project unless the Development Team made

improper payments to Stenhouse satisfies the something more required to establish the tortious

interference with prospective economic advantage claim.

      In <u>Leadsinger, Inc. v. Cole</u>, the court held that, "in the context of a tortious interference

with prospective economic advantage claim, plaintiff is not required at the pleading stage to

'identify with sufficient specificity the prospective contractual relationships in questions

[because it] would be unreasonable to require more specific pleadings prior to discovery."[52]

      Defendants have failed to address NRP's concerted action theory claim.  As a result, this

claim is not part of their motion to dismiss and must continue past the pleading stage.

## IV.   <u>NRP Has Stated A Claim Pursuant To The RICO</u>

      NRP has stated a valid claim pursuant to the Racketeer Influenced and Corrupt

Organizations Act ("RICO").  "To establish a RICO claim, a plaintiff must show '(1) a violation

of the RICO statute, 18 U.S.C. §1962; (2) an injury to business or property; and (3) that the

injury was caused by the violation of Section 1962.'"[53]

---

[51] Consequently, Defendants' authorities in Point III(B) need not be addressed.

[52] 2006 WL 2320544 at *13 (S.D.N.Y. 2006) (denying motion to dismiss where defendant had "knowledge of all of" plaintiffs' contracts and prospective contracts); <u>Tasso v. Platinum Guild Int'l</u>, 1997 WL 16066, at *4-5 (S.D.N.Y. 1997) (denying motion to dismiss where defendant made statements to induce third-party not to become a customer of plaintiff).

[53] <u>DeFalco et. al. v. Bernas et al</u>, 244 F.3d 286, 305 (2d Cir.), cert. denied, 534 U.S. 891 (2001).

NRP alleges a violation of 18 U.S.C. §1962(c)[54] and §1962(d).[55] (Dkt 22-7 at 1). To

state a claim, NRP must allege "'(1) conduct (2) of an enterprise (3) through a pattern (4) of

racketeering activity.'"[56] Defendants claim that NRP's RICO claim is deficient for two reasons:

(1) "NRP has failed to identify any Racketeering Activity"; and (2) "NRP has failed to allege a

pattern of racketeering." (Def.s' Mem. at 16-21).[57]

### A. **NRP Has Adequately Alleged Racketeering Activity**

"Racketeering activity" is defined in 18 U.S.C. §1961. NRP is relying on section 1341

(mail fraud), section 1343 (wire fraud) and 1951 (interference with commerce, robbery or

extortion). NRP is also relying on New York State bribery statutes.

18 U.S.C. §1951 (the "Hobbs Act") provides in relevant part:

§1951.  Interference with Commerce By Threats or Violence.

(a) Whoever in any way or degree obstructs, delays or affects commerce . . . by
    robbery or extortion or attempts or conspires so to do . . .
(b) As used in this section . . .
    (2) The term 'extortion' means the obtaining of property from another, with
    his consent induced by wrongful use of actual or threatened force, violence, or
    fear or under color of official right.

In <u>Defalco</u>, a case overlooked by defendants, the Hobbs Act allegations were identical to

those here. There, plaintiffs argued their development project was conditioned on compliance

---

[54] "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."
[55] "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."
[56] <u>DeFalco</u>, 244 F.3d at 306.
[57] Presumably defendants limit their arguments recognizing Plaintiffs' sufficient allegations that they were unable to claim the benefits of their agreements with members of the Development Team, the DHCR and others who issued loan commitments. As a result, NRP incurred injury to its business and property consisting of out-of-pocket expenses, lost profits including rental revenues and anticipated sales of units, lost business opportunities and other damages. The lost out of pocket expenses exceed $450,000. Other compensatory damages exceed $1,000,000. (Dkt. 22-7 at 7). NRP also alleged that the enterprise is Buffalo and that Defendants used Buffalo as a passive instrument for their personal benefit, *i.e.* by developing and implementing a "pay to play" and "pay for votes" scheme to further political careers and/or for their personal benefit and that such actions affected interstate commerce. (Dkt. 22-7 at 14, 15-16). NRP's allegations of enterprise and interstate commerce are sufficient under established Second Circuit authority. <u>DeFalco</u>, 244 F.3d at 306-09.

with a Town Supervisor's demands to find roles for various residents.  The Second Circuit concluded that threats of economic loss in the form of payoffs to designated persons in order to secure project approvals constituted Hobbs Act extortion:

> In this Circuit, '[t]he cases interpreting the Hobbs Act have repeatedly stressed that the element of 'fear' required by the Act can be satisfied by putting the victim in fear of economic loss.'  The absence or presence of fear of economic loss 'must be considered from the perspective of the victim, not the extortionist; the proof need establish that the victim reasonably believed:  first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment. . . . . This Circuit's case law on extortion by wrongful use of fear of economic loss 'is comprised of cases in which the evidence was plain that nonpayment would result in preclusion from or diminished opportunity for some existing or potential economic benefit.[58]

In <u>DeFalco</u>, the Second Circuit sustained the RICO claims <u>after trial</u> based on payoffs that benefitted "certain members of the Town government and favored local residents."[59]  A Hobbs Act violation simply requires "that a particular payment is made in exchange for a commitment to perform official acts to benefit the payor in the future."[60]

As in <u>DeFalco</u>, NRP has alleged a Hobbs Act conspiracy whereby Defendants made clear that the Project would not proceed unless payments were made to Stenhouse and the Jeremiah Partnership.  Defendants had the power over the Project and used that power to kill it when the Development Team refused to pay the demanded extortion.  NRP alleges an even more plausible case of Hobbs Act extortion as it alleges specific instances where developers paid off Stenhouse and/or the Jeremiah Partnership (*e.g.* Packard and East Side I), and as a result the defendants permitted Buffalo to honor its commitments on those projects.

---

[58] <u>DeFalco</u>, 244 F.3d at 313.  *See also* <u>United States v. Vigil</u>, 523 F.3d 1258 (10th Cir. 2008)(affirming conviction of public official who conditioned award of public contract on the contractor's hiring of designated persons favored by the public official), cert. denied, 555 U.S. 886 (2008).
[59] 244 F.3d at 315.
[60] <u>United States v. Ganim</u>, 510 F.3d 134, 147 (2d Cir. 2007), cert. denied, 522 U.S. 1313 (2008).

Defendants make the absurd argument that there is nothing inherently unlawful about killing the Project based on the refusal of the Development Team to comply with a demand to pay off Stenhouse.  (Def.'s Mem. at 18).  Defendants' conspiracy to kill the Project after all steps have occurred based on a last minute demand that the developer pay off the Mayor's supporters is indefensible.  There was no legitimate role for Stenhouse and the Jeremiah Partnership, particularly after the Development Team hired the UB Team.  This argument is also belied by the defendants' stated reasons for killing the Project.[61]  Regardless, whether defendants had a legitimate reason to demand a payoff to Stenhouse is not an issue that can be resolved on this motion.

As DeFalco demonstrates, a pay to play scheme may be a Hobbs Act violation where the payoffs are directed to a person other than the official who demanded the payoff as a condition for municipal approval.  Even assuming *arguendo*, that a direct payment to the official is required, Stenhouse and the Jeremiah Partnership offered defendants something much more important than "money, gifts or improper benefits."  Defendants were willing to conspire with Stenhouse and the Jeremiah Partnership (and essentially give them the power to approve or disapprove a Buffalo housing project) because they deliver votes and other intangible benefits.

Under DeFalco and Vigil, NRP has sufficiently pled a Hobbs Act conspiracy by the defendants to extort the payment of money to Stenhouse and the Jeremiah Partnership for no legitimate reason as a condition for final approval of the Project.

NRP has alleged violations of New York Penal Law §200.10 titled "Bribe Receiving in the Third Degree" that states "[a] public servant is guilty of bribe receiving in the third degree when he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that his vote, opinion, judgment, action decision or exercise of discretion as

---

[61] Am. Compl. ¶¶ 93-97.

public servant will thereby be influenced."  NRP's allegations of a "pay to play" or "pay for votes" scheme plainly fits within the State law provision.

NRP has sufficiently alleged the offenses of mail and wire fraud.  In <u>Columbus McKinnon Corp. v. HealthNow New York, Inc.</u>, this Court held that allegations of misconduct and the cover up of that misconduct could be combined to constitute mail and wire fraud and a pattern of misconduct.[62]  Likewise, NRP has alleged mail and wire fraud by reference to specific events from the time it was invited to participate in the Project in November 2007 through 2010.  As in <u>Columbus McKinnon</u>, NRP has alleged that defendants conspired to lure it into their pay to play scheme and then covered up their scheme by falsely stating the reasons why they killed the Project.  Throughout, defendants engaged in communications by telephone, mail and electronic transmission.[63]

## B.  NRP Has Adequately Alleged A Pattern Of Racketeering

"RICO defines a 'pattern of racketeering activity' as requiring 'at least two acts of racketeering activity' committed in a 10-year period. . . . To establish a pattern, a plaintiff must also make a showing that the predicate acts of racketeering activity by a defendant are 'related, and they amount to or pose a threat of continued criminal activity.' . . . The continuity necessary to prove a pattern can be either 'closed-ended continuity,' or 'open-ended continuity.'"[64]

### 1.  Closed-Ended Continuity

"To satisfy closed-ended continuity, the plaintiff must prove a 'series of related predicates extending over a substantial period of time. . . . Although closed-ended continuity is

---

[62] 2006 WL 2827675 at * 8-11 (W.D.N.Y. 2006).

[63] <i>See also</i> <u>Fresh Meadow Food Servs., Inc. v. RB 175 Corp.</u>, 282 Fed. Appx. 94 (2d Cir. 2008) (reversing and holding that plaintiff adequately pled mail and wire fraud and pattern based on one communication in 1997 and two in 2001); <u>Beauford v. Helmsley</u>, 865 F.2d 1386 (2d Cir. 1986)(reversing and holding that plaintiff adequately pled mail and wire fraud and pattern based on mailing of false offering plans), remanded, 492 U.S. 914 (1989), affirmed, 893 F.2d 1433 (2nd Cir. 1989), cert. denied, 493 U.S. 992 (1989).

[64] <u>DeFalco</u>, 244 F.3d at 320.

primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists."[65]

NRP alleges two types of closed-ended continuity.  Concerning the claims of mail and wire fraud, NRP alleges acts over a more than two year time period from November 2007 through March 2010.  As a result, defendants' claim that NRP alleges that "all" of the racketeering activity occurred between early 2009 and March 15, 2010 is incorrect.

Concerning the violations of the Hobbs Act and New York State bribery statutes, NRP alleges three instances where Defendants conspired to develop and implemented the same pay to play scheme on this Project, Packard and East Side I over multiple years.

Defendants recognize, as they must, that the development, implementation and cover up of the pay to play scheme on the Project, Packard and East Side I satisfies the requirement of closed-ended continuity.  Therefore, defendants argue only that NRP has failed to plead sufficient facts, rather than legal conclusions, that such a scheme was employed in Packard and East Side I.  This argument should be rejected for several reasons.

Under Rule 8, NRP has alleged that payoffs to Stenhouse were demanded and made in Packard and East Site I and, unlike the Project, Defendants permitted those projects to proceed. NRP further alleged that Stenhouse was unqualified, added little or no value on Packard and East Side I especially in comparison to the amount of the payments.[66]  These fact allegations are more than sufficient. [67]

---

[65] DeFalco, 244 F.3d at 321.

[66] Am. Compl. ¶ 83.

[67] Defendants do not deny the allegation that NRP was not involved in East Side I (Am.Compl. ¶ 86) yet appear to argue that because NRP's partner on the Project, Belmont Shelter, was also involved in East Side I, NRP should be charged with knowledge of the specific arrangement between Stenhouse and Belmont Shelter on that project. However,  NRP and Belmont Shelter are separate entities.  As a result of their partnership on the Project, NRP was entitled to receive an assignment to pursue this action.  That assignment did not create a partnership for all Belmont

Given the scope of Defendants' pay to play scheme, including Stenhouse's request that his "contract" include "management training for a year for the Jeremiah Partnership" and the spurious nature of the services he would perform for his later $80,000 demand (Compl. ¶ 37, 55), what developer would have a need to use Stenhouse and the Jeremiah Partnership on its project?  These allegations provide further support that Stenhouse and the Jeremiah Partnership lacked the necessary qualifications (and expected to be paid to learn them) and, in addition, the spurious nature of the services offered in return for the demanded payment.

The only plausible answer concerning Packard and East Side I, as in this case, is that paying off Stenhouse was a cost of doing business in the City of Buffalo.  Defendants' contrary claim that developers would be happy to pay Stenhouse and the Jeremiah Partnership because they "have been at the very forefront of the redevelopment movement on the East Side" is nonsense especially given the fact that Buffalo employees ended up performing the work Stenhouse was supposed to carry out on those other projects.[68]

Finally, Buffalo has refused to comply with Freedom of Information Law requests to produce documents concerning Stenhouse's and the Jeremiah Partnership's role in other development projects including Packard and East Side I.  Surely, if Stenhouse and the Jeremiah Partnership earned their money on such other projects, documents evidencing that performance would have been produced.  Indeed, as alleged, the FBI and U.S. Attorneys' office is investigating Defendants' conduct on the Project and others.[69]

---

Shelter projects or provide open access to Belmont Shelter's records and information.  Regardless, NRP stands by the allegations in the amended complaint that Stenhouse's participation in East Side I produced little or no value and that he was paid a significant fee at the insistence of the Defendants.
[68] See Am. Compl., at ¶ 84.
[69] Am. Compl. ¶¶ 87-91.

## 2.  **Open-Ended Continuity**

"To establish open-ended continuity, 'the plaintiff need not show that the predicates extended over a substantial period of time, but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed. . . In assessing whether or not the plaintiff has shown open-ended continuity, the nature of the RICO enterprise and of the predicate acts are relevant. . . . . '[W]here the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business or that the nature of the predicate acts themselves implies a threat of continued criminal activity.'"[70]  As in DeFalco, NRP has alleged that the demands of Stenhouse escalated over time thus establishing an open-ended continuity.  In March 2009, Stenhouse demanded "$30,000 and an agreement with [the Development Team] to do management training for a year . . . before we will sign off."  By April 15, 2009, the demand was raised to $60,000.  In May 2009, Stenhouse upped the demand to $80,000.[71]

As occurred in this case, Packard and East Side I, it may be inferred that the scheme is the regular manner in which defendants determine their support for Federally supported Buffalo development projects.  Indeed, defendants' claim that "Stenhouse and the other members of the Jeremiah Partnership . . . have been at the very forefront of the redevelopment movement on the East Side for nearly a decade."  This admission underscores the extensive involvement of such unqualified persons on projects and the power they hold to extort payoffs.  It suggests that defendants are proud of their actions and have no intention to curtail them.

---

[70] Defalco, 244 F.3d. at 323.
[71] Am. Compl. ¶¶ 37, 42, 55-57.

Defendants argue that there is no open-ended continuity because the activity was limited to the 2009 election.  The reference to 2009 in the Amended Complaint is relevant because that is when certain of the actions against NRP occurred.  The defendants public officials won election and there is no indication whatsoever that their "working" relationship with Stenhouse and the Jeremiah Partnership ended after the election.  Defendants' interest in maintaining the pay to play scheme remains and, thus, plaintiffs have alleged the scheme was carried out for "past" and "future" endorsements.

## V.   NRP has Stated A Valid Claim Pursuant to 42 U.S.C §1983

Defendants challenge the substance of NRP's claim of violations of due process and equal protection.  Defendants' argument as to each should be rejected.[72]

### A.  Due Process

Defendants argue that the due process claim fails because NRP did not have a protectable property interest.  For the reasons stated in Point I, *supra*, defendants' assertion is incorrect and should be rejected.

In addition, NRP is entitled to maintain this due process claim because its right to performance was sufficiently established at the time of defendants' extortion.  By May 2009, the Development Team had completed all of the steps to implement the Project.  When defendants insisted on payments to Stenhouse, or else they would kill the Project, there was no significant action left to be taken before formal execution of the HOME agreement and the transfer of the lots.  As a result, the Development Team's rights were violated because at the

---

[72] Defendants do not challenge the sufficiency of NRP's allegations that they were policymakers responsible for Buffalo's official custom or policy that required NRP to comply with the demand to pay monies to Stenhouse and/or affiliated organizations for the Project to proceed.  (Am. Compl. ¶¶ 146-47).

time of "'the alleged denial of due process, there [was] either a certainty or very strong likelihood that the [formal approvals] would have been granted.'"[73]

The status of the Project at the time of defendants' extortion sets this case apart from Walentas v. Lipper.  In Walentas, the Second Circuit held that the developer had not satisfied the standard "of either a certainty or a very strong likelihood that the application would have been granted."[74]  The court's decision was based on the facts that the developer's agreement could be terminated at any time at the sole discretion of the lead agencies, he had only a memorandum of understanding that might lead to a later memorandum of intent and that such a memorandum of intent might lead to negotiations of a land disposition agreement, an agreement that would be then subject to approval by a separate body.[75]

In contrast to Walentas, the Development Team had an agreement with Buffalo that did not contain a termination provision, BURA had completed all steps for execution of the HOME agreement and transfer of the lots, the BURA Board, which included defendant Brown and three council members, unanimously approved the Project and the Development Team had spent over $450,000 securing all approvals and permits.  As of May 2009, there were no outstanding issues when defendants ultimately killed the Project.  Thus, NRP's interest in the Project at the time of defendants' extortion amounted to something significantly more than "a mere unilateral expectancy not rising to the level of a property right guaranteed against deprivation by the Fourteenth Amendment."[76]  NRP was denied due process solely because it refused to comply with the illegal demand to pay monies to Stenhouse.

---

[73] Sullivan v. Town of Salem, 805 F.2d 81, 85 (2d Cir. 1986).
[74] 862 F.2d 414 (2d Cir. 1988), cert. denied, 490 U.S. 1021 (1989).
[75] 862 F.2d at 419-20.
[76] Sullivan, 805 F.2d at 85.

23

### B. __Equal Protection__

 "'[T]o succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and differences in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake."[77]

NRP has alleged that it was situated similarly to the developers on the Packard and East Side I projects.  Indeed, defendants attempt to use this allegation to suggest that the defendants treated all three developers the same by placing the "exact same condition" on each of them. Defendants overlook the critical allegation that "[w]hen other developers found a way to pay monies to Stenhouse and/or affiliated organizations, [Defendants] allowed their projects to proceed to completion.  Because NRP refused to make such payments, [Defendants] . . . actively took steps to kill the Project."  No legitimate government policy interest is served by Hobbs Act extortion or delegating project approval to Stenhouse who makes the decision based whether he is made a "partner" on the project.

Thus, NRP (and defendants) agree that the defendants "placed the exact same condition" on NRP and the comparators Packard and East Side I.  Defendants do not deny that Packard and East Side I complied with the extortionate demands whereas NRP did not and that their projects proceeded to completion whereas NRP's did not.  NRP was denied equal protection based solely on its refusal to comply with the illegal demand to pay monies to Stenhouse.[78]

Recognizing that NRP has alleged a valid class of one equal protection claim, defendants suggest that NRP is also required to allege malicious or bad faith intent to injure.

---

[77] Kenmore Mercy Hosp. v. Daines, 2011 WL 4368564 (W.D.N.Y. 2011).
[78] Brady v. Town of Colchester, 863 F.2d 205, 216-17 (2d Cir. 1988); Frank Sloup and Crabs Unlimited, LLC v. Loeffler, 745 F. Supp. 2d 115 (E.D.N.Y. 2010); Bullock v. Gerould, 338 F. Supp. 2d 446 (W.D.N.Y. 2004).

Even assuming *arguendo* this is a required element (it is not), NRP has alleged such conduct. By its nature, a Hobbs Act scheme succeeds only if developers are on notice that bad things will happen if they do not submit to extortion.  In this case, defendants made repeated statements that NRP would be punished if it did not play ball.  When NRP refused, defendants decided to teach it a lesson, even at the expense of forfeiting state and federal funds for a much-needed $12 million affordable housing project on Buffalo's East Side.

## VI.    Punitive Damages

Defendants incorrectly claim that the Amended Complaint sets forth claims against defendants in their official capacities only.  NRP's allegations include no such limitation.  The single allegation that defendants were acting as "policymakers" for Buffalo does not dictate the entire breadth of the Amended Complaint and fact issues necessarily exist to determine which actions were carried out in an official capacity and which were conducted outside the scope of their role as public officials (i.e., in their individual capacities).[79]  Nevertheless, defendants concede that punitive damages are recoverable where "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."[80]  NRP consistently alleges such conduct, including criminal conduct in violation of Federal and State bribery statutes, fraud, and intentional violations of NRP's constitutionally protected right to due process and equal protection.  Criminal conduct, by definition, involves evil or malicious intent.  Likewise, NRP alleges and sets forth bad faith and wrongful conduct surrounding defendants' tortious conduct.

## Conclusion

For these reasons, Defendants' Motion to Dismiss should be denied in its entirety.

---

[79] "Courts have held that assertion of a claim for punitive damages is an indicator that the claim was brought against an official in his personal capacity."  Odom v. Matteo, 772 F. Supp. 2d 377, 392 (D. Conn. 2011).
[80] Smith v. Wade, 461 U.S. 30, 56 (1983).

DATED:        February 29, 2012

**WEBSTER SZANYI LLP**
Attorneys for Plaintiffs

By:    s/ *Thomas S. Lane*
                 Thomas S. Lane
                 Nelson Perel
1400 Liberty Building
Buffalo, New York 14202
(716) 842-2800
tlane@websterszanyi.com
nperel@websterszanyi.com

TO:   **CONNORS & VILARDO LLP**
     Terrence M. Connors
      Attorneys for Defendant City of Buffalo,
      Byron M. Brown, and
      Steven M. Casey
     1000 Liberty Building
     Buffalo, NY 14202
     tmc@connorsvilardo.com

     Timothy Ball, Corporation Counsel
     Attorney for Defendant Demone A. Smith
     1102 City Hall
     65 Niagara Square
     Buffalo, NY 14202
     tball@ch.ci.buffalo.ny.us

26
