UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

NRP HOLDINGS LLC and
NRP PROPERTIES LLC,

                    Plaintiffs,

          v.                                          **DECISION AND ORDER**
                                                      11-CV-472S
CITY OF BUFFALO, *et al.*,

                    Defendants.

# I.  INTRODUCTION

This lawsuit arises from  a stalled housing project on the City of Buffalo's East Side.

From 2007 to 2009, Plaintiffs NRP Holdings LLC and NRP Properties LLC (collectively

"NRP"),[1] two intertwined housing development corporations, were working with the City of

Buffalo on a project to build and manage 50 subsidized homes in the Masten and Cold

Springs neighborhoods in the City of Buffalo. After each side had taken significant steps

towards the project's completion, the City backed discontinued its involvement, allegedly

because NRP rebuked Mayor Byron Brown's attempts to involve his political ally Richard

Stenhouse, and Stenhouse's company, Jeremiah Partnership for Community

Development, Inc. ("Jeremiah Partnership"), in the project.

NRP now brings claims against the City and several of its ranking employees under

state contract and tort law, the Racketeer Influenced and Corrupt Organizations Act

---

[1]NRP is the alleged assignee of Belmont Shelter Corporation ("Belmont"), a separate entity that was also involved in the project. NRP "stands in the shoes" of Belmont for the purposes of this motion. Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 101 (2d Cir. 2007).

("RICO"), and the United States Constitution. The City has moved to dismiss those claims in their entirety.[2] (Docket No. 26.) After briefing on the City's motion to dismiss concluded, NRP moved for leave to file a second amended complaint, refining their claims and seeking to add the City of Buffalo Urban Renewal Agency ("BURA") as a defendant. That motion also seeks to strike Defendants' reply thereto. For the following reasons, Defendants' motion to dismiss is granted in part and denied in part; and NRP's motion to amend is granted; its motion to strike the City's reply, however, is denied as moot.

As an initial matter, this Court must first address NRP's motion to further amend its complaint. Leave to amend is freely granted when justice so requires. See Fed. R. Civ. P. 15(a)(2). "This mandate is to be heeded." Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962). But "there is a difference between freedom and license," Abram v. City of Buffalo, 2008 WL 5191675, at *5 (W.D.N.Y. Dec. 10, 2008) (quoting CL-Alexanders Laing & Cruickshank v. Goldfeld, 739 F. Supp. 158, 167 (S.D.N.Y.1990)), and the decision whether to grant leave to amend remains within the court's discretion, id. (citing John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp., 22 F.3d 458, 462 (2d Cir. 1994).

Employing that discretion, this Court finds that NRP should be permitted to amend its complaint. Although the motion is opposed by Defendants, the proposed amendments affect them only slightly. Moreover, Defendants have had an opportunity – which they seized – to respond to the allegations contained in the proposed second amended

---

[2]Defendant Demone Smith filed his own motion to dismiss (Docket No. 27), but did not submit a memorandum in support of that motion; instead he incorporates the arguments made in the memorandum of law filed by the City, Mayor Brown, and Deputy Mayor Casey. Those motions will therefore be treated as one.

complaint. Thus, they will not be unduly prejudiced by the amendment. Although this Court finds that several of the proposed additions are simply legal conclusions, and therefore futile,[3] the proposed complaint does contain sufficient material to warrant the granting of NRP's motion. Accordingly, Defendants' motion to dismiss will be construed as against the second amended complaint.[4]

As for NRP's desire to add BURA, having made their motion before discovery has commenced, this Court finds no undue delay or bad faith on NRP's part. To the extent that BURA may contend that this Court's present findings apply equally to it, it is free to bring a future motion citing this Court's present Decision and Order in support of that prospective motion.

## II.  BACKGROUND

### A.    Facts

Facts alleged in NRP's second amended complaint – but not labels or legal conclusions – must be accepted as true for the purposes of resolving this motion. See Ashcroft v. Iqbal, 556 U.S. 662, 668, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

The events leading to this litigation began in November of 2007 when the City expressed its desire to work with NRP in constructing affordable single-family homes within

---

[3]Even NRP recognizes that the proposed amendment adds a "few 'magic' words." (Pl.'s Reply Br. in Supp. of its Mot. for Leave to Amend, at 2; Docket No. 42.)

[4]Although the motion will be construed as against the second amended complaint, documents attached to the first amended complaint will be considered at this time, and NRP must still file its second amended complaint, with any attachments it deems necessary, with this Court.

the City limits.[5] (Second Am. Compl., ¶ 21; Docket No. 37-2.) NRP contends that an agreement to this end was formalized through a February 25, 2008 letter composed by Timothy Wanamaker, the Executive Director of Buffalo's Office of Strategic Planning. (Id., ¶ 23.) In that letter, Wanamaker wrote to NRP:

> This letter is to confirm that the Buffalo Urban Renewal Agency has earmarked $1,600,000 of the City's HOME funds for the [] project that consists of construction of fifty (50) units of single-family homes in the Masten Park and Cold Springs neighborhoods of the City of Buffalo.

(Wanamaker Letter, attached as "Ex. A" to Am. Compl.; Docket No. 22-1.) After describing the details of the plan – including the "lease-to-own" component, the City's promise to offer its "usual Low-Income Housing Pilot Agreement," and the City's commitment to provide 51 vacant lots at a price of $2,000 per lot – Wanamaker noted, "This commitment letter is only valid if the developer is successful in securing a 2008 Low-Income Housing Tax Credit allocation to complete the project." (Id.) He concluded, "Of course, BURA is required to meet all applicable Federal, State, and local rules and regulations before issuance of HOME funds to eligible recipients."[6] (Id.)

It appears from the complaint that this letter prompted NRP to begin taking the project's requisite preliminary steps. On August 20, 2008, NRP obtained the crucial low-income-housing tax credits from the New York State Division of Housing and Community Renewal. (Second Am. Compl., ¶¶ 28, 29; Tax Credit letter, attached as "Ex. B" to Am.

---

[5]NRP was not involved in the first phase of this project, entitled "East Side Housing Opportunities Phase 1."

[6]As noted, BURA is an acronym for the Buffalo Urban Renewal Agency. Its role in the project is discussed further below. It is sufficient to note here that BURA is an arm of the City that deals with housing projects such as this one.

Compl.) NRP also secured a low-interest loan for the project. (Second Am. Compl., ¶ 30.) The City, itself, took preliminary steps: It selected location sites for the planned homes. (Id., ¶ 33.) And the Buffalo Planning Board approved NRP's site plan, design, and elevations for the project. (Id., ¶ 34.)

According to NRP, however, progress was interrupted beginning in early 2009 when Mayor Brown imposed "significant stipulations" on the project, including that NRP "'find a role for . . . the Jeremiah Partnership from the East Side.'" (Id., ¶ 36) (ellipses in original). Shortly thereafter, on March 30, 2009, the Mayor's Office contacted NRP and "demanded that it let them know within 'the next 1 and ½ hours' whether the Jeremiah Partnership would be provided a service contract on the project" and that it "'needed to make [Richard] Stenhouse happy' for the project to proceed." (Id., ¶¶ 37, 39.) Later that day, Richard Stenhouse, President of the Jeremiah Partnership, sent NRP an e-mail requiring a "'contract to provide mwbe and section 3 [sic][7] subcontractors for the fifty houses. Cost $30,000 and an agreement with [NRP] to do management training for a year for the Jeremiah Partnership. These items would need to be formally signed before we will sign off.'" (As reproduced in the Second Am. Compl., ¶ 40; emphasis removed).

NRP did not agree to this condition. On April 15, 2009, it learned through an e-mail from an unidentified third party that "Stenhouse is ready to place his call to the Mayor endorsing [NRP's] approach, provided I can show him an executed agreement with [NRP]." (Second Am. Compl., ¶ 45.) NRP also learned that the "cost" had risen from $30,000 to

---

[7]Although not explained in the complaint, "MWBE" likely refers to the minority and women business enterprise. "Section 3" likely refers to a U.S. Department of Housing and Urban Development ("HUD") requirement designed to ensure that HUD funds invested in housing and community development provide employment opportunities for low-income individuals.

$60,000. (Id.)  According to NRP, Mayor Brown also threw his weight behind Stenhouse's involvement. One unidentified NRP representative reported that the Mayor admonished NRP: "'If you do not hire the right company, you do not have my support for the project.'" (Id., ¶ 72.)

Later in April of that year, NRP issued a "Request for Proposal" for certain, again unidentified, project services. (Id., ¶ 52.) The relationship between this request and Stenhouse's demands, if any, is unclear at this time. Stenhouse and the Jeremiah Partnership, however, were invited to apply. (Id., ¶ 55.) NRP received three proposals, one of which was from Stenhouse.

Stenhouse's proposal entailed a total budget of $80,000 and included what NRP calls "numerous and suspect budget items," such as a $3,600 allotment for refreshments at twelve planned meetings, and a "$35,000 'administrative fee' for postage, telephone, and 'Jeremiah involvement.'" (Id., ¶ 58.) The proposal was rejected in favor of a bid prepared by the University at Buffalo ("UB"). It proposed a $40,524,00 total budget – nearly half that of Stenhouse's proposal. (Id., ¶ 59.)

With that, NRP alleges that the City killed the project. In May of 2009, an individual retained by NRP to intervene on its behalf reported that Deputy Mayor Steven Casey said, "The deal is dead without Stenhouse." (Id., ¶ 69.) NRP also received an e-mail from "city officials" explaining that "'everything was ready to go on Tuesday until Stenhouse called and said he was unhappy.'" (Id., ¶ 70.) Mayor Brown also expressed this sentiment: in the course of a meeting after NRP selected the UB proposal, the Mayor was reported as saying, "'I told you what you had to do and you hired the wrong company.'" (Id., ¶  74.)

This litigation followed.

6

**B.    Procedural History**

NRP filed a complaint in this Court on June 6, 2011. (Docket No. 1.) After the parties' unsuccessful attempt to resolve the dispute through mediation (Docket No. 19), NRP filed an amended complaint on December 23, 2011, which, *inter alia*, added Defendant Casey as a party. (Docket No. 22.) Thereafter, on January 13, 2012, NRP voluntarily dismissed Jeremiah Partnership and Richard Stenhouse as defendants.[8] The same day, the remaining defendants moved to dismiss the amended complaint. (Docket Nos. 26, 27.) Briefing on those motions concluded on March 16, 2012.

On April 4, 2012, NRP moved for leave to file a second amended complaint. (Docket No. 37.) Defendants opposed that motion, and briefing concluded on May 21, 2012, at which time this Court took the motions under consideration without oral argument.

### III.  DISCUSSION

**A.  Motion to Dismiss Standard – Rule 12(b)(6)**

Rule 12(b)(6) allows dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  Federal pleading standards are generally not stringent; Rule 8 requires only a short and plain statement of a claim. Fed. R. Civ. P. 8(a)(2).  But the plain statement must "possess enough heft to show that the pleader is entitled to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1966, 167 L. Ed. 2d 929 (2007).

When determining whether a complaint states a claim, the court must construe it liberally, accept all factual allegations as true, and draw all reasonable inferences in the

---

[8]NRP's voluntary dismissal of claims (Docket No. 25) dismisses "Richard A. Shenhouse." This Court assumes this to be simply a typographical error.

plaintiff's favor. ATSI Commc'ns, 493 F.3d at 98. Legal conclusions, however, are not afforded the same presumption of truthfulness. See Iqbal, 556 U.S. at 678 ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). Labels, conclusions, or a "formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Facial plausibility exists when the facts alleged allow for a reasonable inference that the defendant is liable for the misconduct charged. Iqbal, 556 U.S. at 678. The plausibility standard is not, however, a probability requirement: the pleading must show, not merely allege, that the pleader is entitled to relief. Id. at 678; Fed. R. Civ. P. 8 (a)(2). Well-pleaded allegations must nudge the claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

Courts therefore use a two-pronged approach to examine the sufficiency of a complaint, which includes "any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits." Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). This examination is context specific and requires that the court draw on its judicial experience and common sense. Iqbal, 556 U.S. at 679. First, statements that are not entitled to the presumption of truth – such as conclusory allegations, labels, and legal conclusions – are identified and stripped away. See Id. Second, well-pleaded, non-conclusory factual allegations are presumed true and examined to determine whether they "plausibly give rise to an entitlement to relief." Id.

8

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts generally may consider facts stated in the complaint or "[d]ocuments that are attached to the complaint or incorporated in it by reference." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).

## B.    The City of Buffalo's Motion to Dismiss

As noted, the City of Buffalo seeks dismissal of each claim brought by NRP. This Court will discuss those claims, and the City's arguments for dismissal, below.

### 1.    Breach of Contract[9]

The City of Buffalo argues that NRP cannot state a claim for breach of contract because (1) Wanamaker did not have the authority to bind the City and (2) no legal contract existed. Because this Court agrees with the City's latter contention, it need not discuss, at this time, Wanamaker's authority to enter into contracts on the City's behalf.[10]

NRP's breach-of-contract claim is premised exclusively on Wanamaker's February 25, 2008 letter. NRP argues that this letter bound the City to negotiate in good faith and that the City breached this agreement when it abruptly cancelled the deal. Specifically, NRP argues that the Wanamaker letter constitutes a "Type II" agreement.

The division of agreements into types finds its provenance in Judge Pierre Leval's

---

[9]It is undisputed that New York law governs NRP's breach of contract, promissory estoppel, and tort causes of action.

[10]This Court will, however, take up that discussion below when considering NRP's promissory estoppel claim.

9

seminal decision, <u>Teachers Insurance and Annuity Association v. Tribune Co.</u>, 670 F. Supp. 491 (S.D.N.Y. 1987). After collecting relevant New York law, Judge Leval found that one type of agreement, later dubbed a "Type I" agreement, reflects a meeting of the minds on "all the issues perceived to require negotiation." <u>Id.</u> at 498. Such an agreement "binds both sides to their ultimate contractual objective." <u>Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.</u>, 145 F.3d 543, 548 (2d Cir. 1998) (citing <u>Tribune</u>, 670 F. Supp at 498). NRP does not argue that the Wanamaker letter constitutes a Type I agreement.

By contrast, "Type II" agreements are more preliminary in nature, and "binding only to a certain degree"; they reflect an agreement "on certain major terms, but leave other terms open for further negotiation." <u>Id.</u> This type of agreement "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the objective within the agreed framework." <u>Id.</u>

Although the New York Court of Appeals has recently expressed misgivings about the "rigid" classification of agreements into types, it did "not disagree with the reasoning in federal cases." <u>IDT Corp. v Tyco Group, S.A.R.L.</u>, 13 N.Y.3d 209, 213 n. 2, 890 N.Y.S.2d 401, 918 N.E.2d 913 (2009).[11] Since <u>Tribune</u>, the Second Circuit and other courts applying New York law have examined purported agreements like this under the <u>Tribune</u> framework; and thus, with the imprimatur of New York's highest court, the reasoning employed in those cases – regardless of the label assigned to it – will guide this Court.

****

---

[11] In <u>IDT</u>, the court found that a preliminary settlement agreement did not bind the parties to their ultimate contractual goal because, based on the written terms of the agreement, it contemplated the negotiation of later agreements, the consummation of which was a precondition to a party's performance. 13 N.Y.3d at 214. While the court further found that the agreement bound the parties to negotiate in good faith, the parties, according to the court, did not breach this obligation. <u>Id.</u> at 214-15.

NRP draws comparisons from, and relies heavily on, <u>Brown v. Cara</u>, 420 F.3d 148 (2d Cir. 2005). There, the Second Circuit, reversing the district court's grant of summary judgment for the defendant, found that the parties' "memorandum of understanding" ("MOU") was a binding "Type II" preliminary agreement. <u>Id.</u> at 156. The court placed considerable emphasis on the language of the MOU itself, which "clearly state[d] the parties' agreement to 'work together to develop, build, market, and manage the Jay Street Property' and to 'work together in accordance with the terms and conditions outlined in the MOU.'" <u>Id.</u> at 158 (quoting the MOU; alterations omitted). Recognizing the import of this language, the court could not "imagine more clear evidence of an intention to be bound to the MOU as a general framework in which the parties will proceed in good faith toward the goal of developing the Property." <u>Id.</u>

Like the MOU in <u>Brown</u>, the letter here is short, leaves certain terms open, and is contingent on other events. As the <u>Brown</u> court recognized, this does not, necessarily, render the letter unenforceable. <u>See</u> <u>Tribune</u>, 670 F. Supp. at 499 ("To consider the existence of open terms as fatal would be to rule, in effect, that preliminary binding commitments cannot be enforced. That is not the law."). The letter also expresses the City of Buffalo's commitment to the project. Indeed, Wanamaker, himself, even defines it as a "commitment letter." The letter further outlines the steps that the City has undertaken, and will undertake, to move the project forward: It indicates that $1,600,000 of the City's funds were earmarked for the project; it promises that the City will set aside a number of lots; and it details the price per lot. What is more, the complaint asserts that NRP also took several steps in furtherance of the project. Each of these factors both demonstrates a similarity with the facts of <u>Brown</u> and weigh in favor of a finding that the parties agreed to negotiate in

11

good faith. See Brown, 420 F.3d at 148 (explaining the factors relevant to determining whether a preliminary agreement is a binding Type II agreement).

But two crucial aspects of the letter distinguish it from the MOU in Brown. And those differences prove fatal to NRP's claim. First, the "four corners" of the letter demonstrate that the City harbored no intent to be bound. Second, the Brown MOU, and other agreements that courts have held to be binding, were executed with mutual consent, while the Wanamaker letter is demonstrably one-sided.

### i.   Language of the Letter

"The most important" factor in deciding whether a document can constitute a Type II agreement is the language of the relevant contractual document. Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 549 (2d Cir.1998); SSP Capital Partners, LLP v. Mandala, LLC, 402 Fed. Appx. 572, 574 (2d Cir. 2010) (summary order). "Indeed, if the language of the agreement is clear that the parties did not intend to be bound, the Court need look no further." Cohen v. Lehman Bros. Bank, FSB, 273 F. Supp. 2d 524, 528 (S.D.N.Y.2003); see also Tribune, 670 F. Supp. at 499 ("[F]irst and most important factor looks to the language of the preliminary agreement for indication whether the parties considered it binding . . . ."). It bears repeating that NRP does not claim that NRP and the City executed a Type I agreement – one that binds the parties to actually complete the project. Instead, NRP claims that it and the City entered into a Type II agreement, contracting only to "negotiate in good faith." Adjustrite, 145 F.3d at 548.

The Wanamaker letter, however, demonstrates no such agreement. It is evident that the City's intent was not to "agree to agree," but rather to assist the developer in securing tax credits. This is borne out by the language of the letter itself. From the outset,

Wanamaker's intent is clear: the reference line, meant to convey the main focus of the letter, reads, "re: Belmont *Tax Credit Project*" (emphasis added).[12] Wanamaker is equally unequivocal in the first line of the letter, writing that "[t]his letter is to confirm that the Buffalo Urban Renewal Agency has earmarked $1,600,000 of the City's HOME funds . . . ." The only rational reading of this language demonstrates that the letter was sent to NRP to support its application to the N.Y.S. Division of Housing and Community Renewal for low-income housing tax credits. More importantly, the remainder of the letter reveals absolutely no language evincing the City's purported intent to negotiate with NRP in good faith; instead it simply outlines the City's dedication to the project. It thus stands in stark contrast to the MOU in <u>Brown</u>, in which both parties, each a signatory to the contract, agreed to "work together to develop, build, market, and manage the project." 420 F.3d at 144-45. It stands in equally stark contrast to other agreements where courts have found a binding preliminary agreement. For example, in <u>FCOF UB Securities LLC v. MorEquity, Inc.</u>, 663 F. Supp. 2d 224, 229-30 (S.D.N.Y. 2009), the court found that a commitment document constituted a valid Type II agreement where it was "Accepted and Agreed" by both parties and contained a provision prohibiting the seller from assigning the letter without the express written consent of the buyer. Likewise, in <u>EQT Infrastructure Ltd. v. Smith</u>, No. 11-CV-0462 (CS), 2012 WL 933087, at *5 (E.D.N.Y. Mar. 20, 2012), the agreement stated that "defendants will work with Plaintiff in good faith with respect to the Possible Transaction," and provided that the assent to good faith "will be binding." (alterations omitted). But such language is absent here. Rather, in Wanamaker's own words, the letter demonstrates only the "City of

---

[12]See footnote "1," explaining that NRP is the assignee of Belmont.

Buffalo's commitment *to this project*," not to NRP. (See Wanamaker letter at 2; emphasis added.)

Because the letter indicates no intent on the part of the City to work in good faith with NRP, its breach-of-contract claim must fail. See, e.g., Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC, --- F. Supp. 2d ----, No.10-CV-4145 (KMK), 2012 WL 1852409, at *9 (S.D.N.Y. May 17, 2012) (noting that on Rule 12(b)(6) motion or its equivalent, while courts must be cautious in making determinations on the issue of intent, such a ruling is appropriate where the language of the agreement makes clear that the defendants did not intend to be bound).

### ii.   Mutuality

By their very nature, agreements require two parties. See Tribune, 670 F. Supp. at 498 ("Preliminary binding agreement is one that expresses *mutual commitment to a contract on agreed major terms"*) (emphasis added). The Wanamaker letter, however, relates only to the City and contains no "major terms" regarding NRP. In fact, the body of the letter does not even mention NRP; it is not signed by NRP; nor is there a signature line where NRP could have signed.

By way of comparison, the first case to authoritatively recognize the existence of Type II agreements is instructive. Just as in this case, Tribune concerned a "commitment letter" that was sent by the defendant to the plaintiff. Id. at 491-94. But in Tribune, the defendant "*executed and returned the letter* on behalf of [the defendant]." Id. at 494 (emphasis added). No such assent and acceptance occurred here. This is likely because the obligations spelled out in the letter were overwhelmingly, if not exclusively, the City's. The letter commits the City to "extend to the development its usual Low-Income Housing

14

PILOT agreement," to "provide $1,600,000 of its HOME funds to assist in the construction" and to "provide 51 buildable vacant lots." (Wanamaker Letter, at 2.)

By contrast, the letter imposes only one conceivable duty on NRP: it conditions the City's commitment to the project on the developer's acquisition of tax credits. But this does not appear to be a genuine obligation or duty requiring NRP's consent; it is simply a condition precedent to the City's commitment to the project. And, as noted above, it does not necessarily implicate NRP, as it refers only to a generic "developer." Even assuming, however, that this is a genuine duty of NRP, this lone term, by itself, is not "sufficiently specific" as to NRP's obligations under the purported agreement "to make the commitment letter agreement meaningful and enforceable." See Tribune, 670 F. Supp. at 502; Brown, 420 F.3d at 150 (agreement set forth *specific responsibilities of each party*); FCOF, 663 F. Supp. 2d at 226 (parties executed a purchase agreement, which "included a detailed description of the assets to be sold and a detailed pricing mechanism, and specified that the closing was subject to the negotiation"). Here, the letter is conspicuously devoid of any other rights or obligations of NRP – details that are incumbent to a Type II agreement, especially considering the scale of the project at issue.

Because the letter evinces no mutual commitment, nor details sufficiently specific responsibilities or rights of NRP, it cannot form the basis of a Type II agreement. See Tribune, 670 F. Supp at 499, 502; see also Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004) ("To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound.").

****

Although it is important that courts enforce and preserve agreements that were

intended as binding, it is equally important that courts "avoid trapping parties in surprise contractual obligations that they never intended." Tribune, 670 F. Supp. at 497. Here, NRP's breach-of-contract claim, based on an one-and-one-half-page letter, would constitute such a surprise obligation. Because NRP's claim is based on a letter that cannot plausibly be deemed a binding contract, it must be dismissed.

### 2. Promissory Estoppel

"Under New York law, a claim for promissory estoppel requires 'a clear and unambiguous promise, reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained in reliance on that promise.'" Kaye v. Grossman, 202 F. 3d 611, 615 (2d Cir. 2000); Ripple's of Clearview, Inc. v. Le Havre Assocs., 452 N.Y.S.2d 447, 449, 88 A.D.2d 120 (1982).

At this point, there is no dispute that NRP has plead the elements of this claim.[13] Rather, the City argues that Wanamaker did not have the authority to bind the City of Buffalo, and as such, as a matter of settled New York law, an equitable claim like promissory estoppel cannot be asserted against it. NRP does not dispute that point of law, but argues that Wanamaker did have the necessary authority to bind the City. Indeed, it alleges as much in its second amended complaint.

The City argues that this allegation is insufficient, characterizing it as a legal conclusion. But even assuming, without deciding, that the allegation alone is insufficient, this Court, relying on documents outside the complaint that were brought to this Court's

---

[13]See *infra,* at 17, for further discussion on this point.

attention by both parties, finds that the claim can proceed.[14]

The City initially notes that Article 22, Section 1 of the City of Buffalo Charter states that:

> Every contract to which the city is a party shall be made and executed in the name of the City and approved as to form by the Corporation Counsel, and signed and acknowledged by the head of the department charged with the execution of the matter therein provided for.

(Attached as Ex. C to Defs.' Mot. to Dismiss; Docket No. 26-4.) Because Article 6 of the Charter specifies that the Office of Strategic Planning, of which Wanamaker was the Executive Director, is within the Executive Department, of which the Mayor is the "head," the City contends that any contract deriving from the Office of Strategic Planning must be signed by the Mayor if it is to be valid.

But as NRP points out, Wanamaker was also the Vice Chairman of the Buffalo Urban Renewal Agency, and in this capacity, according to NRP, Wanamaker did have the requisite authority.

Although the import of the following language is disputed by Defendants, City of Buffalo Resolution No. 264 is clear: "the City of Buffalo Urban Renewal Agency is hereby designated to carry out all urban renewal functions authorized by law." (Attached as "Ex. A" to Pl.'s Response; Docket No. 33-1.)  Article III, Section 2 of the Agency's by-laws further explains that:

> [t]he Vice-Chairman shall be the Executive Director of the

_____

[14]This Court is permitted to consider documents incorporated by reference in the complaint and facts of which this Court can take judicial notice. Roth, 489 F.3d at 509 (quoting Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir.1991)) (emphasis in the original). Further, it is "clear on the record that no dispute exists regarding the authenticity or accuracy of th[ose] document[s].'" DiFolco, 622 F.3d 104, 111 (quoting Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006)).

Office of Strategic Planning[,] whose powers and duties as the BURA Vice-Chairman shall be the same as those conferred upon the Executive Director of the Office of Strategic Planning under the Charter of the City of Buffalo; such duties and powers to *also include the negotiation, preparation[,] execution and implementation of all contracts* and Land Disposition Agreements dealing with the acquisition and disposition of neighborhood property for and on behalf of BURA, which are intended to be utilized for publicly supported residential rehabilitation of [sic] housing construction purposes.

(Attached as "Ex. C" to Pl.'s Response; Docket No. 33-3.)

Read in unison, Resolution 264 and BURA's by-laws render the conclusion that Wanamaker had the necessary authority to engage in contract negotiations plausible. And if further proof were necessary, this conclusion is supported by looking to Phase 1 of the housing project, which was executed in 2005. There, BURA, presumably acting under the very authority defined by Resolution 264 and its own by-laws, was the main governmental party to the agreement, which, tellingly, was signed by Wanamaker in his role as BURA Vice Chairman. (See Phase 1 Agreement, at 32, attached as "Ex. B" to Connors Aff.; Docket No. 26-3.)

The fact that the BURA Board did not actually approve the allocation of project funds until the next year, does not, as the City argues, preclude Wanamaker, as the Agency's Vice Chairman, from exercising his authority to enter into preliminary agreements, or make preliminary promises, that could potentially affect the City of Buffalo. According to BURA by-laws, he was the designated agent for the project, and at this point there is no serious dispute that, just as in Phase 1, he would have likely been the eventual signatory to the final agreement if one was reached.

This fact also distinguishes the City's proposed authority to the contrary. See, e.g.,

18

Kerlikowske v. City of Buffalo, 758 N.Y.S.2d 739, 740,  305 A.D.2d 997 (4th Dep't 2003)
(letter written by president of common council could not be regarded as a binding contract
because he did not have authority to enter into a contract on behalf of the city). In fact, one
New York court, holding likewise, described the rationale for this rule in the following
manner: "those dealing with officers or agents of municipal corporations must at their peril
see to it that such officers or agents are acting within their authority . . . [and] . . . the loss
should be ascribed to the negligence of the person who failed to ascertain the authority
vested in the public agency with whom he dealt." City of Zanesville, Ohio v. Mohawk Data
Scis., Corp., 97 A.D.2d 64, 66-67, 468 N.Y.S.2d 271 (4th Dep't 1983). But here, while the
final contract may have been subject to further hurdles and approvals, Wanamaker
appears, at least at this early stage of the proceedings, to have been the appropriate,
authorized agent with whom NRP was to negotiate. And therefore, NRP exhibited no
"negligence" in dealing with him.  Accordingly, Defendants' motion on this claim, arguing
that Wanamaker lacked the authority to enter into contracts on behalf of the City, is denied.

It should also be noted that it remains unclear at this point in what capacity
Wanamaker was acting when he sent the February 25 letter. As noted by Defendants, the
letter conspicuously contains the "Office of Strategic Planning" letterhead, but it appears
that BURA was the central entity involved in the planning and development of the housing
project. Further, Wanamaker, himself, indicates that BURA, not the Office of Strategic
Planning, earmarked $1,600,000 in funds. But, as evidenced by this discussion, this issue
requires a factual inquiry, and thus this Court will not rule on it at this time.

Finally, this Court notes that in its reply brief, the City, for the first time, argues that
NRP has not made the necessary allegation of a "clear and unambiguous promise"

because the Wanamaker letter was subject to further negotiations. But, as it was raised in their reply brief, NRP has not had an opportunity to respond thereto. As such, that argument will not be considered at this time. See Ernst Haas Studio Inc. v. Palm Press, Inc., 164. F.3d 110, 111 (2d Cir. 1999).

### 3.    Tortious Interference with Contract

To state a claim in New York for tortious interference with contract, a plaintiff must allege: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." Kirch v. Liberty Media Corp., 449 F.3d 388, 401–02 (2d Cir. 2006) (internal quotations omitted).

NRP alleges that Defendants Brown, Casey, and Smith tortiously interfered with NRP's contract (i.e., the Wanamaker letter) with the City of Buffalo and that all the Defendants, the City included, interfered with two contracts that NRP had with third parties.

Initially, NRP's claim against the individual defendants must fail because it is premised on the Wanamaker letter, which, as previously concluded, is not a valid contract. As such, NRP has failed to meet the first prong its claim. See, e.g., Kirch, 449 F.3d at 401.

Secondly, NRP's claim concerning its contracts with third parties fails because NRP cannot meet the fourth prong of its claim. In an effort to satisfy this prong, NRP alleges that "[t]he defendants intended to and did in fact cause an actual breach of the contracts and/or non-performance thereof." (Second Am. Compl., ¶ 134.) It also attaches the purported agreements. But even a cursory review of the agreements, pertaining to the low-income tax credits and the low-interest loan for the project, both of which were procured from New

York State, reveals that the "agreements" contain identical, limiting language; specifically, they explain that the offers are "conditioned upon your agreement to deliver the project described in your application." (<u>See</u> Low-Income Tax Credit Award Letter; attached as "Ex. B" to Am. Compl.; Docket No. 22-2; Housing Trust Fund Commitment Letter, attached as "Ex. D" to Am. Compl.; Docket No. 22-4.) This is fatal to NRP's claim: because NRP did not deliver the project, it did not meet the shared condition precedent to the two contracts – there was, therefore, no breach. <u>See, e.g.</u>, <u>Ginett v. Computer Task Group, Inc.</u>, 962 F.2d 1085, 1099 (2d Cir. 1992); 13 Williston on Contracts § 38:6 (4th ed. 2000) ("The condition is part of the promise qualifying and limiting it, and the promise, as a matter of plain fact, is not broken until the condition has happened or has been performed."). Without an "actual breach," NRP cannot state a claim for tortious interference. <u>See, e.g.</u>, <u>Kirch</u>, 449 F.3d at 401. The City Defendants motion on this ground is therefore granted.

### 4.    Tortious Interference with Prospective Economic Advantage[15]

"To state a claim for tortious interference with prospective economic advantage under New York law, a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) that defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." <u>Raedle v. Credit Agricole Indosuez</u>, 670 F.3d 411, 417 (2d Cir. 2012). "The defendant's interference must be direct: the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." <u>Kolchinsky v. Moody's Corp.</u>, No. 10 Civ. 6840(PAC), 2012

---

[15] Tortious interference with business relations and tortious interference with prospective economic advantage are different titles for the same cause of action. <u>Catskill Dev., L.L.C. v. Park Place Entm't Corp.</u>, 547 F.3d 115, 132 (2d Cir. 2008).

WL 639162, at *6 (S.D.N.Y. Feb. 28, 2012) (quoting <u>B & M Linen, Corp. v. Kannegeisser,</u> <u>USA, Corp.</u>, 679 F. Supp. 2d 474, 485 (S.D.N.Y. 2010)).  "Moreover, '[a]s a general rule, the defendant's conduct must amount to a crime or an independent tort' to constitute tortious interference with prospective economic advantage." <u>Id.</u> (quoting <u>Carvel Corp. v.</u> <u>Noonan</u>, 3 N.Y.3d 182, 190, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (2004)).

NRP's complaint falls short of alleging sufficient facts to state such claim because NRP does not allege that Defendants directed any activities toward a third party. <u>See</u> <u>Carvel</u>, 3 N.Y.3d at 192 ("[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship."). Although the City's refusal to enter into a contract with NRP may have had repercussions regarding possible future relationships with third parties or even future deals with the City itself, the amended complaint is devoid of factual allegations that any Defendants directed any activities toward a third party in an effort to "convince [that] party not to enter into a business relationship" with NRP. This cause of action, which NRP simply lumps together with its more feasible – yet ultimately insufficient – claim for tortious interference with contract, is ill-fitting and inapplicable to the facts alleged. It is therefore dismissed.

## 5.     RICO

"To establish a RICO claim, a plaintiff must show (1) a violation of the RICO statute, 18 U.S.C. §1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." <u>DeFalco v. Berns</u>, 244 F.3d 286, 305 (2d Cir. 2001) (internal quotation marks omitted). NRP alleges violations of 18 U.S.C. §§ 1962(c) and (d), the latter of which simply makes it unlawful to conspire to violate subsections (a), (b), or

(c).  <u>See</u> 18 U.S.C. § 1962(d).

Considering 18 U.S.C. § 1962(c) then, a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed.2d 346 (1985). The last three terms are defined by the RICO statute itself:

- An "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. " 18 U.S.C. § 1961(4).

- "'Racketeering activity' is broadly defined to encompass a variety of state and federal offenses" including, *inter alia*, murder, kidnapping, gambling, arson. <u>See</u> <u>DeFalco</u>, 244 F.3d at 306. As it relates to this action, NRP alleges that Defendants committed the racketeering activities of bribery, mail fraud, wire fraud, interference with commerce, robbery, and extortion.18 U.S.C. § 1961(1); 18 U.S.C. § 1951.

- A "'pattern of racketeering activity' requires at least two acts of racketeering activity," one occurring after the effective date of the RICO statute, and the last occurring within ten years after the commission of a prior act of racketeering activity. 18 U.S.C. § 1961(5).

Defendants argue that NRP has failed to allege the final two elements of a § 1962(c) claim: racketeering activity and a pattern of racketeering activity.

### i.    Racketeering Activity

As alluded to above, NRP contends, *inter alia*, that Defendants violated the Hobbs Act, 18 U.S.C. § 1951, which makes it unlawful to conspire to "obstruct[], delay[] or affect commerce . . . by robbery or extortion." The Act defines extortion as "the obtaining of property from another, with his consent induced by wrongful use of actual or threatened force, violence, or fear or under color of official right. 18 U.S.C. § 1951(b).

In support of its claim, NRP relies almost exclusively on <u>DeFalco</u>. There, the Second Circuit found that "[t]his Circuit's case law on extortion by wrongful use of fear of economic loss 'is comprised of cases in which the evidence was plain that nonpayment would result in preclusion from or diminished opportunity for some existing or potential economic benefit.'" 244 F.3d at 313 (quoting <u>United States v. Capo</u>, 817 F.2d 947, 951 (2d Cir. 1987)). Drawing a parallel to this case, NRP argues that it has stated a claim for extortion because the City made it clear that non-payment to Stenhouse would result in preclusion from the project.

This Court agrees. And it need only look to the similar facts in <u>DeFalco</u> to reach this conclusion. There, the defendant, William Dirie, a town supervisor, suggested that  the plaintiff, Joseph DeFalco, a developer, hire several local contractors, including one of his friends, and buy materials from local shops for a proposed development on vacant land. Dirie told DeFalco, "Around here in Sullivan County, you *got* to deal with the local people." <u>Id.</u> (emphasis in original). DeFalco complied with many of Dirie's demands, but eventually fired Dirie's friend, Harry Fisher, prompting Dirie to threaten to "scrap the project," and later take steps to that end. <u>Id.</u>

The court, ruling on a post-trial appeal, found that based on the implication of those

24

statements and actions, "[a] reasonable jury [] could have concluded that these were credible threats rather than mere suggestions" and that "[a] reasonable jury could also have found that DeFalco reasonably believed that Dirie had the power to harm him, and that Dirie would exploit that power to the [sic] his detriment." Id. There was, accordingly, "sufficient evidence for a reasonable jury to find that Dirie extorted the value of the services of Harry Fisher." Id.

Of course, that case and this one are not identical, and Defendants point out those factual differences in an effort to distinguish it. Defendants note, for example, that Dirie and the other defendants in DeFalco were not involved in the planning of the project; indeed, the plaintiffs in DeFalco sought approval for a private development on private land. Further, their demands were more numerous and facially unrelated to the project. Here, Defendants argue, the City was permitted to impose conditions on the project because it was a party thereto, and its condition, that Stenhouse be involved, was related to a legitimate goal of involving minority contractors in the project.

Those differences certainly make it a closer case, particularly because this Court is leery of a holding that would convert every condition imposed by a municipality in public-works project into a RICO violation. But in the end, this Court is satisfied that the allegations here, which this Court must accept as true,  go beyond a mere condition.

NRP claims that Defendants not only required Stenhouse's involvement, but that Stenhouse demanded a $30,000 fee despite offering no description of what services he would perform for that fee. (Second Am. Compl., ¶ 37.) Then, NRP alleges, the fee was raised to $60,000. (Id., ¶ 45. ) This, despite the fact that, according to NRP, Stenhouse had no experience as a developer. Further, in other projects, NRP alleges that a similar

demand was made (and paid), but that his was "essentially a no show job," where he added "little to no value" to the project. (Id., ¶¶ 86-89.) Thereafter, when NRP did not agree to hire Stenhouse, the fee was increased to $80,000, inclusive of an unexplained $35,000 "administrative fee." (Id., ¶ 55.) Finally, NRP alleges that Defendants killed the project despite the fact that it hired another minority-owned developer at half the price, thus fulfilling the proffered reason for Stenhouse's involvement. (Id., ¶ 56.) The sum of the allegations therefore demonstrates that NRP has not simply alleged that Defendants placed a condition on a public-works project, but that Defendants impermissibly used their power to "extort the value of the services of" Richard Stenhouse. See DeFalco, 244 F.3d at 313. NRP has thus adequately stated a claim alleging the existence of racketeering activity.

### ii.    Pattern of Racketeering Activity

The pattern, or "so-called 'continuity' requirement[,] can be satisfied either by showing a 'closed-ended' pattern – a series of related predicate acts extending over a substantial period of time – or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 183 (2d Cir. 2008). Regarding close-ended continuity, the Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time.'" Id. Although this Circuit has "not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity." Id. (internal quotation marks omitted).

NRP argues that it has alleged both close- and open-ended continuity.

Attacking NRP's claim of close-ended continuity, Defendants argue that its allegations are limited to a time period between "early 2009" and March 15, 2010" and are therefore too transient to state a RICO claim. But, NRP alleges that the City's unlawful conduct was not limited to Phase II of the project – the part in which NRP was involved; instead it claims that the City employed the same tactics – mandating the involvement of, and payments to, Stenhouse and his company  – in two other City housing projects, namely "Phase I" of this project and the "Packard" project. Those projects, according to NRP, were commenced in or around 2005 and 2006. As such it has alleged that the City engaged in racketeering activity over a span of at least five years. Under Second Circuit precedent, there is no dispute that this constitutes a "substantial period of time."

There is a dispute, however, regarding whether NRP's allegations concerning those two other projects are sufficient.

First, Defendants argue that the allegations are simply legal conclusions. But this is not so. NRP alleges that the City conducted itself in the same manner in other projects as they did when dealing with NRP. This is plainly a factual allegation.

Second, Defendants argue that NRP cannot plead this allegation on "information and belief," as NRP has, because it should have known of the specific facts supporting NRP's claim. See IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1057 (2d Cir. 1993) (pleading on "information and belief" is allowed where information is "peculiarly within the opposing party's knowledge") (citation and quotation marks omitted). But Defendants argument here is premised on the assumption that because Belmont Shelter Corporation was involved in the other projects, NRP, who is the assignee of Belmont's rights in this case, should be privy to the specific circumstances of those projects.

27

Defendant cites no authority for this proposition, and nothing in the undeveloped record suggests that by virtue of its assignment in this action, NRP had access to all the information and facts possessed by Belmont.

Instead, this Court finds that the character of NRP's allegations concerning the City's conduct in similar projects, when coupled with the more specific factual allegations concerning the conduct in the project that it had personal knowledge of, renders NRP's claim plausible.[16] See Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"); see also Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (pleading on information and belief permitted where "the belief is based on factual information that makes the inference of culpability plausible").

Because this Court finds that NRP has sufficiently pled close-ended continuity, it need not discuss whether NRP has met the open-ended continuity requirement. See Spool, 520 F.3d at 183 (pattern requirement satisfied by adequately pleading either of the two types of continuity). Defendant's motion on this ground is therefore denied.

### 6.    Due Process[17]

NRP claims that the City's refusal to hire NRP constitutes a denial of its property

---

[16]There is no dispute, for example, that Stenhouse has been involved in City projects for some time. (See Connors Aff., ¶ 10; Docket No. 26-1.)

[17]This and NRP's equal protection claim, discussed *infra,* are brought under 42 U.S.C. § 1983. Civil liability is imposed under § 1983 upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983. On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution.  See Graham v. Connor, 490 U.S. 386, 393-94,109 S. Ct. 1865, 1870, 104 L. Ed.2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n. 3, 99 S. Ct. 2689, 2695, 61 L. Ed. 2d 433 (1979)).

rights in violation of the Due Process Clause. This contention, however, cannot stand.

In an action like this, where the defendants are allegedly engaged in "egregious and politically-influenced procedural irregularities, the threshold question is whether" the interest involved is "one entitled to protection and enforcement by a federal court." Yale Auto Parts, Inc. v. Johnson, 758 F.2d 54, 58 (2d Cir. 1985). "To have a property interest in a government benefit, 'a person must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead[,] have a legitimate claim of entitlement to it.'" Blankman v. County of Nassau, 819 F. Supp. 198, 204 (E.D.N.Y. 1993) (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972)).

As demonstrated by its earlier arguments, even NRP recognizes that, at most, it had a Type II agreement with the City – an agreement to negotiate in good faith. And, as demonstrated by this Court's above ruling, it did not even have this type of agreement. Yet, despite NRP's own recognition, it continues to assert that it somehow had a protectable property interest – a "claim of entitlement" – to be hired for the project. Second Circuit law, however, proves otherwise; Walentas v. Lipper, 862 F.2d 414, 418 (2d Cir. 1988), for example, is instructive:

> In Walentas, the Second Circuit dismissed a developer's § 1983 action because he did not have a cognizable property interest in developing city property even though he (i) had been conditionally designated as developer of various city owned properties; (ii) had been granted the exclusive right to negotiate and execute a memorandum of intent to be named the final developer; (iii) had obtained approval of his application for $20,000,000 in financial assistance; (iv) had submitted a draft Uniform Land Use Review Program Application; (v) had submitted an application for tax reductions totalling $12 million; (vi) had reached an agreement with

> several municipal development corporations on the budget; (vii) had applied for a low-interest loan to finance an automobile parking garage; and (viii) had obtained a conditional lease for one of the properties developed.

Blankman, 819 F. Supp at 204 (internal citation omitted).

As in Walentas, NRP's "selection as developer would have been a discretionary determination by a political body which . . . plaintiff had no right to expect." 862 F.2d at 420 (internal quotations marks and citation to district court omitted). At most, as NRP itself recognizes, it had an "agreement to agree," but "such an obligation is a contract right, not a property interest, and thus not entitled to section 1983 protection." Id. at 419 n. 1. This claim is therefore dismissed.

### 7.   Equal Protection

NRP argues that it has stated a "class-of-one" claim. Equal protection claims may be brought by a so-called "class of one" where a plaintiff alleges that it has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000).

NRP argues that it "was denied equal protection based solely on its refusal to comply with the illegal demand to pay monies to Stenhouse." (Pl.'s Br. in Opp. to Mot. to Dismiss, at 30; Docket No. 33-13.)

Initially, this Court is dubious that NRP has alleged that it was "similarly situated" to those it seeks to compare itself to, or that there was no rational basis for its alleged mistreatment. NRP alleges that it was treated differently from other developers (i.e., not hired for the project) because it acted differently (i.e., refused to involve Stenhouse) than

the other developers who allegedly complied with the City's demands. Thus, NRP and the other developers were not in the same position and, while the differential treatment may have been wrongful, it was not based on arbitrary reasons. See Olech, 528 U.S. at 564 ("The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination") (internal citation and quotation marks omitted).

But in any event, the Supreme Court, in Engquist v. Oregon Department of Agriculture, eliminated class-of-one claims for government employees, holding that such a claim is unavailable as a matter of law when the government makes discretionary decisions concerning government employment. 553 U.S. 591, 606-07, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008). This holding logically extends to the government-contractor relationship. See Heusser v. Hale, 777 F. Supp. 2d 366, 384, n. 31 (D. Conn. 2011) (citing Douglas Asphalt Co. v. Qore, Inc., 541 F.3d 1269, 1274 (11th Cir. 2008)) ("[E]ven if the Plaintiffs were characterized as 'government contractors,' rather than 'public employees,' Engquist would still apply to bar their claims."). Indeed, "federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." Engquist, 553 U.S. at 609 (quoting Bishop v. Wood, 426 U.S. 341, 349, 96 S. Ct. 2074, 48 L. Ed. 2d 684 (1976). Thus, because the City's decision not to hire NRP was a discretionary employment act, NRP's equal protection claim must fail.

## IV.  CONCLUSION

Defendants' motion to dismiss – as construed against NRP's second amended complaint, which NRP has leave to file – is granted with two exceptions: NRP's RICO

violation and promissory estoppel claims. Those claims can proceed.

## V.  ORDERS

IT HEREBY IS ORDERED, that the City of Buffalo Defendants' and Demone Smith's Motions to Dismiss (Docket Nos. 26, 27) are GRANTED with respect to NRP's first, third, and fifth causes of action and DENIED with respect to NRP's second and fourth causes of action.

FURTHER, that NRP's Motion for Leave to Amend its Amended Complaint, to Join other Parties, and to Strike the Connors Reply Declaration (Docket No.37) is GRANTED with respect to its Motion to Amend and Join BURA, and DENIED as moot with respect to its Motion to Strike the Connors Reply Declaration.

FURTHER, that NRP must file its Second Amended Complaint seven days from the date of this Decision and Order.

SO ORDERED.

Dated:       July 12, 2012
             Buffalo, New York

                                    /s/William M. Skretny
                                   William M. Skretny
                                      Chief Judge
                              United States District Court