UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

**NRP HOLDINGS LLC and
NRP PROPERTIES LLC,**

                   Plaintiffs,

    v.

**CITY OF BUFFALO, BYRON W. BROWN, STEVEN**      Civ. No 11-CV-472(WMS)
**M. CASEY, DEMONE A. SMITH, RICHARD A.
STENHOUSE, BUFFALO JEREMIAH PARTNERSHIP
FOR COMMUNITY DEVELOPMENT, INC., CITY OF
BUFFALO URBAN RENEWAL AGENCY, JOHN DOES 1-
10, and JOHN DOE COMPANIES 1-5,**

                   Defendants.

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**WEBSTER SZANYI LLP**

Attorneys for Plaintiffs
1400 Liberty Building
Buffalo, New York 14202
(716) 842-2800

## PRELIMINARY STATEMENT

NRP Holdings LLC and NRP Properties LLC ("Plaintiffs") file this Memorandum of Law in opposition to the Fed. R. Civ. P. 12(c) motions to dismiss filed by Defendants City of Buffalo, Mr. Brown, Mr. Casey, and Mr. Smith (the "City Defendants") (Dkt. 112) and the City of Buffalo Urban Renewal Agency ("BURA") (Dkt. 116) (collectively "Defendants").

This action concerns the City Defendants' and BURA's refusal to honor their promises concerning a low-income housing project on Buffalo's East Side. This project, the East Side Housing Opportunities II project (the "Project"), would have resulted in the revitalization of vacant lots and construction of fifty-one new and affordable homes. The Project would have provided a means for the tenants of these homes to transition into homeowners, following a fifteen year regulatory compliance period. This Project never happened, and many, if not all, of the lots designated by the City of Buffalo for this Project remain vacant.

Defendants unjustifiably failed to honor their promises after Plaintiffs refused a last minute demand to "contract" with the Reverend Stenhouse. Emails sent to the Plaintiffs from Reverend Stenhouse stated that such a payoff was necessary "before we will sign off." (Lane Decl., Exh. A, COB001922 at COB001924.) Likewise, in an email to Mayor Brown and Steve Casey, City of Buffalo Commissioner Brian Reilly reported that the Plaintiffs "know[ ] what to do, will do it and Rev. Stenhouse will call Mayor should contract be signed. IF that happens, presumably the file could be introduced for passage today at Council." (Lane Decl., Exh. B, COB032004.)

At his July 30, 2015 deposition, the first taken in this case, Mayor Brown testified that he was unaware of any instance when the Mayor's office requested City Council approval to issue a Payment In Lieu of Taxes ("PILOT") agreement and to transfer City lots in support of a

development project and the Council refused such a request.  (Lane Decl. Exh. C, pg. 131.)
Likewise, he was unaware of any instance when BURA approved an allocation of federal HOME
funds and the "form" HOME agreement was not effectuated.[1]  (Lane Decl. Exh. C, Brown
Deposition, pp. 128-31; 198-99.)  Perhaps more notable, Mayor Brown did not deny telling a
representative of the Development Team: "I told you what you had to do and you hired the
wrong company."  (*Id.* at pg. 267-268.)

Discovery to date is peeling away every purported objection and defense to the Project
raised prior to and in this lawsuit.  When confronted with the undeniable facts that every stated
legitimate condition for his support for the Project was satisfied, Mayor Brown clung to his
general disfavor of rent-to-own projects.  (*Id.* at 288-289.)  Yet, even this final reason defies
reality.  He admitted his past support for "pure" rental projects.  (*Id.*)  In fact, at the very time he
stopped the Project, he signed a letter dated February 9, 2009 to New York State Department of
Housing and Community Renewal ("DHCR") Commissioner Van Amerongen concerning the St.
Martin's Village project stating:  "We are also supportive of the development's feature which
allows for homeownership conversion at the end of the required tax credit compliance period.
The lease to own provision provides future homeownership opportunities to the residents who
are not currently prepared to be homeowners, while providing them with clean, state of the art
housing today."  (Lane Decl., Exh. D.)[2]

---

[1] Mayor Brown is also Chairman of BURA.  As such, his testimony is binding on the City of Buffalo and BURA.

[2] Over the weekend, the Buffalo News ran a story concerning home ownership in our community.  Concerning the
East Side, the News reported that six out of ten homeowners in the vicinity of ECMC have been in their homes since
1980.  http://www.buffalonews.com/city-region/buffalo-area-homeowners-love-their-homes-and-theyre-not-going-
anywhere-20150905.  The Project would have provided this same opportunity to fifty-one families with state of the
art housing in this economically disadvantaged community, with the prospect of other future projects constructed by
this nationally known firm based in Cleveland.

Once the publicly stated objections to the Project are peeled away, only one objection remains – the refusal to enter into a contract with Reverend Stenhouse. And, depositions are just starting. The evidence generated in discovery to date in this case support and only enhance the allegations of promissory estoppel and RICO previously sustained by this Court.

Styled as Rule 12(c) motions on the pleadings, Defendants must acknowledge that Rule 12(b)(6) motions to dismiss filed by the City Defendants and, separately, by BURA were **previously** addressed and resolved by this Court. Responsive pleadings on the claims permitted to proceed were filed years ago. Thus, this motion on the pleadings arrives three years after issue was joined, and seeks dismissal of claims attacked on their earlier motions on grounds that were or could have been previously raised.

Simply put, these are plainly improper motions to reargue motions addressed and twice rejected by this Court. They are a diversion at a time when Plaintiffs are attempting to proceed with depositions of the key players involved in Defendants' scheme to condition approval of a $12M housing project revitalizing otherwise vacant lots on the City of Buffalo's East Side on a payoff to an influential ally of Mayor Brown. It was after careful consideration that Plaintiffs decided to pursue this case and right this wrong. The easy choice would have been to simply yield to Defendants' demands and hire Rev. Stenhouse. That would not have been the right choice.

Defendants' transparent attempt to seek another "bite of the apple" can only be considered a motion to reargue. It is fundamental that motions to reargue must, at a minimum, offer new facts or some change in the law as a basis for asking this Court to reverse its earlier determinations. Here, Defendants offer only one new fact – a copy of an assignment agreement from one member of the Development Team – Belmont Shelter to Plaintiffs. Notably, the

assignment does not appear in the allegations supporting the promissory estoppel or RICO claims, and the facts concerning the assignment were generally pled in the operative complaint.

As shown below, Defendants' reliance on the assignment as the "new fact" supporting their motions is misplaced. They argue only that the timing of the assignment renders invalid the notice of claim. The notice of claim was served in order to advance the tort claims set forth in the third claim, a claim that was dismissed by this Court and is no longer part of the case. The law is clear that a notice of claim is not required to advance a contract based claim such as promissory estoppel or a claim based on a federal statute such as RICO. Defendants' legal argument based on this new fact is meritless and should be rejected.

Likewise, Defendants do not offer a single legal authority decided since this Court's earlier decision that purports to change the then existing law of promissory estoppel or RICO in their favor. Bereft of any relevant new fact that may be considered on a motion to dismiss pursuant to Rule 12(c) or new law, these motions should be rejected out of hand permitting Plaintiffs to focus on depositions. There is no reason why any of Defendants' arguments should be addressed now rather than on a motion for summary judgment after the conclusion of discovery. Moreover, Defendants' motions do not even address the substance of Plaintiffs' RICO claim. Defendants' motions are therefore, at best, partial motions to dismiss.

### Statement of Facts

The facts relevant to these motions are set forth in the prior Declaration of Thomas S. Lane, dated February 29, 2012 (Dkt. 33), submitted in opposition to the City Defendants prior motion to dismiss, the Second Amended Complaint (Dkt. 44), the Amended RICO Case Statement (Dkt. 22-7), and the accompanying Declaration of Thomas S. Lane dated September 9, 2015.

## Argument

### I.      Defendants' Motions to Reconsider Are Untimely and Should be Denied

The City Defendants' representation that the Court has "twice declined to rule on whether the second amended complaint states a claim for promissory estoppel" is incorrect.  (Dkt. 112-13, pg. 18.)  On January 13, 2012, the City Defendants previously moved to dismiss this action under Rule 12(b)(6).  (Dkts. 26 and 27.)  They argued that NRP's promissory estoppel and RICO claims should fail as a matter of law.  The Court rejected these arguments, allowing those claims to proceed by virtue of its July 12, 2012 Decision and Order.  (Dkt. 43.)

While the City Defendants' motions were pending, Plaintiffs sought leave to file a Second Amended Complaint, refining their claims and adding BURA as a defendant.[3]  (Dkt. 37.)  In granting Plaintiffs' motion, the Court stated the City Defendants should not be permitted to raise new arguments in reply papers that could have been raised in their main brief.  (Dkt. 43, pg. 2.)  Thereafter, BURA made additional arguments in support of its own motion to dismiss, a motion that was denied.  Following denial of their motions, Defendants filed answers.  Since, the parties have exchanged over 60,000 pages of documents, concluded paper discovery, and commenced depositions.

Defendants cannot overlook the inconvenient fact that their motions on the pleadings ask this Court to reconsider not one, but two orders permitting Plaintiffs to pursue claims for promissory estoppel and violations of RICO.  This is no accident as the standard for motions to reconsider cannot be met in this case.  A motion to reconsider not raised within ten days is

---

[3] Plaintiffs' decision to seek leave to add BURA was based on the City Defendants' argument that promises made by Mr. Wanamaker were made in his capacity as vice-chairman of BURA and that BURA was not acting as the City's agent concerning the Project.  Plaintiffs, therefore, sought leave to amend their complaint to plead that the promises concerning the Project were made by the City Defendants and/or BURA.  Such pleading in the alternative is appropriate at the pleadings stage.

construed as a motion under Rule 60(b) for relief from a judgment or order. *Rich Products Corp. v. Impress Industries, Inc.*, 2008 WL 203020, *1 (W.D.N.Y. Jan. 23, 2008). "The party seeking relief from judgment has an onerous standard to meet." *U.S. v. International Broth. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001). "Generally, a Rule 60(b) motion is granted only in 'extraordinary circumstances' when it is necessary to 'override the finality of judgments in the interests of justice.'" *Rich Products Corp.*, 2008 WL 203020, at *1 (citation omitted). "A motion for reconsideration is appropriate only where the movant demonstrates that the Court has overlooked controlling decisions or factual matters that were put before it on the underlying motion and which, had they been considered, might have reasonably altered the result before the court." *Gerace v. Cliffstar Corporation*, 2009 WL 2381852, at *2 (W.D.N.Y. Aug. 3, 2009) (internal quotations omitted).

"Motions for reconsideration are not to be used as a means to reargue matters already disposed of by prior rulings or to put forward additional arguments that could have been raised prior to the decision." *Id.; Rich Products Corp.*, 2008 WL 203020, at *1 (same); *Salamon v. Our Lady of Victory Hosp.*, 867 F.Supp.2d 344, 360 (W.D.N.Y. 2012) ("Reconsideration is not a proper tool to repackage and relitigate arguments and issues already considered by the court in deciding the original motion. Nor is it proper to raise new arguments and issues.") (internal citations and quotations omitted). "This is because a motion for reconsideration is not a device intended to give an unhappy litigant one additional chance to sway the judge." *Rich Products Corp.*, 2008 WL 203020, at *2 (citation omitted).

By the same principle, a party may not raise in a 12(c) motion failed or omitted arguments from an unsuccessful 12(b)(6) motion. *Estep v. City of Somerset, Ky.*, 2011 WL 845847, at *2 (E.D. Ky. Mar. 8, 2011) As the court in *Estep* reasoned: "If the defendant's 12(c)

motion simply reiterates the same arguments that he made in his 12(b)(6) motion, the court should deny it out of hand.  If the defendant raises new arguments in his 12(c) motion that he could (and should) have raised in his 12(b)(6) motion, the court should usually deny the 12(c) motion, lest its first opinion be rendered merely advisory."

As a motion to reconsider, this Court should direct its focus solely on any "new" facts or law that were unavailable at the time of the original motions to dismiss.  Defendants include eight documents in their motion to dismiss (outside of the Second Amended Complaint and their Answers thereto).  With one exception, Defendants had access to all of these documents prior to their prior motions to dismiss.  The one exception is the assignment agreement between Belmont and Plaintiffs - a document that was produced to Defendants over two years ago on February 1, 2013.

Defendants argue that this document justifies their motion to reconsider.  They point out that the effective date of the assignment is after the date Plaintiffs filed their notice of claim.  Based on this "new" fact, Defendants suggest that Plaintiffs are unable to pursue their promissory estoppel claim.  Their argument depends on a number of erroneous assumptions.  First, procedurally, Defendants' delay in bringing this issue to the Court's attention after obtaining the assignment warrants denial.  Second, a notice of claim is **not** required to pursue claims for promissory estoppel or RICO.  Third, the motion assumes that the promises supporting the promissory estoppel claim were made only to Belmont and only in the the City of Buffalo's / BURA's February 25, 2008 letter (the "Wanamaker Letter") and not to Plaintiffs.  These assumptions were flatly rejected by Mayor Brown who testified that the promises in the Wanamaker letter were made to the developer and the developer included both Plaintiffs and Belmont.  (Lane Decl., Exh. E, pg. 127.)  In Mayor Brown's mind, the developer on the Project

was always Plaintiffs (ie., NRP).   (*Id.*)   Defendants have advanced **no** new material facts warranting reconsideration and their motions should be denied.

### A.      Defendants' Delay in Filing Their Motions Warrants Denial

The assignment agreement between Plaintiffs and Belmont was produced on February 1, 2013 - more than **two years** before Defendants filed these motions.   (Lane Decl., ¶ 3.)   This delay alone warrants denial of the motions.   As, in essence, a motion for relief from judgment under Rule 60(b), Defendants were required to bring this motion no later than one year after entry of the orders denying their prior motions.   Rule 60(c)(1).   Defendants have clearly failed to do so.   *See Espaillat v. Cont'l Exp., Inc.*, 2003 WL 22384799, at *3 (W.D.N.Y. Sept. 5, 2003).

### B.      No Notice of Claim was Required for Plaintiffs' Promissory Estoppel and RICO Claims

A notice of claim is required only for tort claims.   General Municipal Law § 50-i sets forth the obligation to file a notice of claim.   Titled "Presentation of **tort** claims; commencement of actions," it requires a notice of claim only for claims concerning injuries "sustained by reason of the negligence or wrongful act" of a municipal defendant.   General Municipal Law § 50-i(1); *see also* General Municipal Law § 50-e (concerning notice of claim requirements "In any case founded upon **tort**...") (emphasis added).

A notice of claim is not a condition for contract or quasi contractual claims such as promissory estoppel.   *Matteawan on Main Inc. v. City of Beacon*, 84 A.D.3d 1183, 1185 (2d Dept. 2011) (no notice of claim required for quasi-contract claims); *RCA Trademark Management S.A.S. v. VOXX Intern. Corp.*, 2015 WL 5008762 (S.D.N.Y. Aug. 24, 2015) (promissory estoppel is a quasi-contract claim under New York law).   Nor is it a condition to pursue claims arising under federal law.   *Mroz v City of Tonawanda*, 999 F. Supp. 436, 455 (WDNY 1998); *see also Sangermano v Bd. of Co-op. Educ. Servs. of Nassau Cty.*, 290 A.D.2d

498, 499 (2d Dept. 2002) (notice of claim requirements are inapplicable to claims pursuant to 42 U.S.C. § 1983).

This Court's July 12, 2012 Decision and Order (Dkt. 43.) denied the City Defendants' motion to dismiss Plaintiffs' promissory estoppel and RICO claims. These are plainly not tort claims, and there was no requirement to serve a notice of claim in order to maintain an action against the City Defendants concerning these claims. Therefore, Defendants' entire legal argument based on the "new" facts of the assignment agreement is meritless and unworthy of reconsideration by this Court.

### C. The Assignment Agreement Is Not the Basis for Plaintiffs' Promissory Estoppel Claim.

Plaintiffs assert no claim concerning promissory estoppel as assignees. Rather, all of the promises which form the basis of this claim were made to the Development Team, including Plaintiffs. Because Plaintiffs assert a direct promissory estoppel claim, the assignment of Belmont's claims are irrelevant.

The Wanamaker Letter was marked as an Exhibit at Mayor Brown's deposition. Mayor Brown read the Wanamaker Letter. He was directed to the section of the letter stating that the promises were made to the developer. When asked to define the developer, without hesitation Mayor Brown testified that the developer was NRP and Belmont. (Lane Decl., Exh. C, pg. 127) ("Q: The developer, that was NRP and Belmont Shelter? ... A: Yeah. I would believe that in this context it was NRP and Belmont Shelter.") This testimony undercuts Defendants' representations to this Court that the promises in the letter were made only to Belmont because the letter was addressed to Belmont. (Dkt. 112-13, pg. 8.) To the contrary, Mr. Brown testified that the letter made promises to the developer and that developer was NRP and Belmont. Based on this testimony alone, the entire basis of Defendants' motions - promises were made only to

Belmont that were not properly assigned to Plaintiffs - is flatly contradicted by Mayor Brown and false.

In addition, numerous documents produced by Defendants firmly establish Defendants' awareness that the Development Team was NRP and Belmont.  In fact, Mayor Brown seemed incredulous at the very idea that NRP was not somehow the developer on the Project.  For example, Plaintiffs are clearly identified as part of the Development Team working to advance the Project.  (Lane Decl., Exh. F, April 21, 2008 City of Buffalo Office of Strategic Planning Project Briefing at COB004102 (discussing the "NRP Group/Belmont Shelter Corp Rent-to-Own" project as an example of programs planned in the City of Buffalo's HUD-approved Neighborhood Revitalization Strategy Area); Exh. G, Excerpts from City of Buffalo Mid-City NRSA Report at COB004249 (discussing the "NRP Group/Belmont Shelter Corp Rent-to-Own" project as an example of progress made by the City in leveraging public and private resources); Exh. H, City of Buffalo Stimulus Package Proposal Announcement, spreadsheet page 12 (identifying the "Affordable Rental Housing Development - NRSA with NRP Group Partnership" as a shovel-ready project)).

Further, Mayor Brown testified that the Wanamaker Letter did create affirmative obligations on the part of both Plaintiffs and the City.  He testified that such a letter required both sides to actively pursue efforts in support of the Project – as both sides did.  (Lane Decl., Exh. C, Brown Deposition, pp. 134-35; 227-30.)  Mayor Brown admitted that the Development Team could rely on the Wanamaker Letter and "feel that they were receiving support from the City, that it made sense for them to continue to move toward a project, that it made sense for them to do everything that they were supposed to do to try to complete a project." (*Id.* at 228-29.)

This Court should take notice, therefore, that the contrary arguments advanced by the City Defendants (and adopted by BURA) on the original motions to dismiss and which resulted in one of the grounds for dismissal of the first claim for breach of contract is specifically refuted by one of the individual defendants and constitutes an admission against Defendants City of Buffalo and BURA.  It is yet another example of Defendants advancing arguments to this Court that are flatly contradicted by admissions with extreme prejudicial effects to the Plaintiffs.

Finally, BURA argues that the assignment is conclusive proof that the Wanamaker Letter was from the City of Buffalo - and not BURA - because this is how the letter was described in the assignment.  (Lane Decl., Exh. E; Dkt. 116-7, pg. 5.)  How this letter may have been described in the assignment has no bearing as to whether BURA sent the letter.  Again this is an attempt to relitigate the question as to whether Mr. Wanamaker, as Vice Chairman of BURA, had authority to bind the City.  BURA, as agent of the City, sent the letter on behalf of the City - binding both to the promises set forth therein.  The description in the assignment is accurate and changes nothing.

BURA also argues that construction of the assignment is relevant to the allegation in Paragraph 115 of the Second Amended Complaint (Dkt. 44.)  This argument is inapposite: Paragraph 115 concerns Plaintiffs' breach of contract claim, which has already been dismissed.[4]

---

[4] BURA suggests that the Assignment Agreement did not assign a breach of contract claim to Plaintiffs.  While irrelevant for this motion, it should be noted that the Assignment assigned "all rights, title, interest in, to and under the following to NRP: (a) the Development Agreement, (b) the Sub-Development Agreement, (c) the Buffalo February 25, 2008 agreement and commitment letter, (d) the DHCR agreement and commitment letters, and (e) the HTFFC November 8, 2008 agreement and commitment letter."  The Assignment and Release further assigned to NRP "claims asserted by NRP in connection with any lawsuit or lawsuits concerning the Project."  The Assignment was total and all encompassing, therefore to the extent that any previously dismissed assigned claims are reinstated, there is no question that they were within the Assignment.

### D.      Summary

Defendants rely on the assignment for its "new" fact because they have no other basis to harass Plaintiffs and burden this Court with motions to dismiss on the pleadings.  However, this new fact presents no basis to dismiss the promissory estoppel claim based on the flawed legal argument that it was a necessary predicate for the filing of a notice of claim to pursue such a claim.  It does not even form a basis for the argument that promises in the Wanamaker Letter were made only to Belmont and not Plaintiffs and an assignment was necessary for Plaintiffs to allege that the promises were made to them.  Mayor Brown and every other actor at the City of Buffalo understood that the developer of the Project included Plaintiffs, as evidenced by Mayor Brown's understanding of the term developer in the Wanamaker Letter and countless other documents produced in discovery.

Defendants have failed to meet their extraordinary burden to demonstrate that new facts warrant reconsideration of the Court's prior orders.  For completeness, Plaintiffs now address "renewed" arguments that were made or could have been made on Defendants' earlier motions to dismiss.

### II.      Plaintiffs State a Claim for Promissory Estoppel

Defendants argue that the promissory estoppel claim must fail because (1) there was no clear and unambiguous promise; (2) no reasonable reliance, and (3) because Belmont did not assign its promissory estoppel claims to Plaintiffs.  The third basis is addressed in Point I.

"[A] claim for promissory estoppel requires 'a clear and unambiguous promise, reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained in reliance on that promise.'"  *Kaye v. Grossman*, 202 F.3d 311, 615 (2d Cir. 2000); *Ripple's of Clearview, Inc. v. Le Havre Assocs.*, 88 A.D.2d 120, 122 (2d Dept. 1982). Promissory estoppel is available against a municipality "where a governmental subdivision acts

or comports itself wrongly or negligently, inducing reliance by a party who is entitled to rely and who changes his position to his detriment or prejudice." *Notaro v. Power Auth. Of State of New York*, 41 A.D 3d 1318, 1319 (4th Dept.), *appeal dismissed*, 9 N.Y.3d 935 (2007); *Agress v. Clarkstown Centr. Sch. Dist.*, 69 A.D.3d 769, 771 (2d Dept. 2010). Defendants' decision to kill the Project based on the Development Team's refusal to pay off Stenhouse is the type of misconduct that estops Defendants from avoiding their commitments to the Project.

Significantly, Defendants offer **no** alleged authority concerning promissory estoppel or RICO decided since this Court's decisions on the prior motions to dismiss. Defendants do not argue, nor could they, that the law has changed or that this Court misapprehended the law concerning those claims.

### A.      Defendants Made Clear and Unambiguous Promises

Defendants argue that Plaintiffs' Second Amended Complaint fails to allege a clear and unambiguous promise. (Dkt. 112-13.) However, Plaintiffs' Second Amended Complaint alleges that the City Defendants and/or BURA "**made clear and unambiguous promises** to participate in the Project by, among other things, extending to the Project its usual Low Income Housing PILOT agreement, providing $1,600,000.00 of its HOME funds to assist in the construction and, in addition, providing fifty-one (51) buildable vacant lots..." (Dkt. 44, ¶ 125.) (emphasis added).

Defendants' contention that these promises were unclear or ambiguous is not premised on the promises themselves. They argue that the promises were not clear and unambiguous because they were conditioned on execution of a HOME funding agreement and further regulatory and Common Council approvals.[5] These arguments are without merit.

---

[5] The City Defendants' Memorandum of Law begins with the misstatement that Plaintiffs "remaining RICO and promissory estoppel claims arise out of a February 25, 2008 letter." (Dkt. 112-13, pg. 1.) The City Defendants cite the Wanamaker Letter as "the purported promise" made by the City Defendants. (Dkt. 112-13, pg. 28.) Plaintiffs' have never stated that the only evidence of the City Defendants' promises is the Wanamaker Letter. Nor have

None of the promises made by Defendants were conditioned upon execution of a formal written contract.  Only where a promise is clearly conditioned on the signing of a contract will courts find promises not to be clear and unambiguous, as the cases relied upon by Defendants demonstrate.[6]

Defendants' promises in the Wanamaker Letter and elsewhere were not contingent upon any regulatory or Common Council approvals.   The **only** contingency set forth in the Wanamaker Letter is "the developer ... securing a 2008 Low-Income Housing Tax Credit [LIHTC] allocation to complete the project."  (Lane Decl., Exh. E.)  That condition was satisfied on August 20, 2008, when the Development Team received a commitment from the DHCR for the necessary LIHTC.  (Lane Decl., Exh. I.)

Defendants confuse the issue of the ultimate obligations of the parties, to be reflected in agreements, with the promises which form the basis of Plaintiffs' promissory estoppel claim. Defendants' cases involve claims concerning the purported failure of Defendants to follow through on promises which were to be the ultimate obligations of the parties.  That is not so here.

---

Plaintiffs argued that the sole source for their RICO claim arises out of the Wanamaker Letter.  Rather, the letter is evidence of the clear and unambiguous promises made by the City.  These promises are also evidenced by numerous emails, correspondence, and representations by Defendants in which Defendants demonstrate their continued support and commitment to the Project.  Defendants' subsequent refusal to fulfill their promised support was due entirely to Plaintiffs' refusal to accept their extortionate demands, which were part of a pattern of racketeering activity.  Indeed, Mayor Brown testified that the promises were conveyed in the Wanamaker Letter and that they were clear and unambiguous.  (Lane Decl. Exh X, pp. 123-126).

[6] *Beekman Inv. Partners, L.P. v. Alene Candles, Inc.*, 2006 WL 330323, at *8 (S.D.N.Y. Feb. 14, 2006) (holding promise to reimburse expenses in a stock purchase transaction should the transaction not close not clear and unambiguous where the conditions for reimbursement were not agreed upon and the parties contemplated included them in a subsequent agreement); *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 78-79 (2d Cir. 1984) (holding that handshake deal to award franchise not clear and unambiguous where the parties contemplated a subsequent written agreement; also holding that plaintiff failed to demonstrate any reliance following date of alleged promise); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 265 (2d Cir. 1984) (holding that agreement to purchase subsidiaries did not constitute a clear and unambiguous promise, and that ultimate obligation to purchase was contingent upon execution of written agreement.); *Advanced Marine Technologies, Inc. v. Burnham Sec., Inc.*, 16 F. Supp. 2d 375, 381 (S.D.N.Y. 1998) (holding that agreement to assist in raising financing not clear and unambiguous where it was expressly conditioned on execution of an engagement letter setting forth the terms of the engagement).

Defendants promised to do three clear and unambiguous things in support for the Project, as discussed below.   None of these promises was conditioned on the parties executing written agreements.   Rather, Defendants made these promises with the expectation of inducing the Development Team to rely on them and incur the substantial expenses and investment of time and effort necessary to advance the Project.   Defendants expected the Development Team would further the Project so that the required regulatory and Common Council approvals could be obtained.   Defendants stood ready to fulfill their promises, but-for Plaintiffs' refusal to accept their extortionate demands to find a paid role for Rev. Stenhouse.   Indeed, based on Mayor Brown's testimony, there is no doubt that any required Common Council or regulatory approvals would have been forthcoming.   (Lane Decl. Exh. C, pg. 128-131; 198-199; 309.)

### 1.        The PILOT Agreement and Transfer of City Lots

The Wanamaker Letter promised that the "City **will extend** to the development its usual Low-Income Housing PILOT agreement ...   [and]   The City **will provide** 51 buildable vacant lots in the Cold Springs and Masten Districts to facilitate accomplishment of this project at a price no greater than $2,000 per buildable lot, and not to exceed a total price of $100,000." (Lane Decl. Exh. E) (emphasis added).

Mayor Brown admits that the City's promise in the Wanamaker Letter to extend to the development its usual Low-Income Housing PILOT agreement was not vague: "I don't believe that there is a lack of clarity in that sentence... I think the sentence is clear." (Lane Decl. Exh C, pp. 123-125).   Mayor Brown likewise admits that the City's promise in the Wanamaker letter to provide 51 buildable lots is clear and unambiguous.  (*Id.* at pg. 126.)

Defendants argue that the promises are unclear because a PILOT agreement and transfer of lots must be approved by the Common Council.   By its terms, these promise were not conditioned on Common Council approval.   As discussed below, however, there was never any

reason to doubt that the Common Council would approve the Project's PILOT agreement or the sale of lots. What the City may not do was to promise to extend the PILOT agreement and provide the lots, and then unilaterally refuse to seek the anticipated Common Council approval because the Development Team refused to comply with Defendants' extortionate demands.

## 2.    The HOME Funds

The Wanamaker Letter promises that the "City **will provide** $1,600,000 of its HOME funds to assist in the construction of the East Side Housing Opportunities II project." (*Id.*) (emphasis added). Mayor Brown also admits that this promise is clear and unambiguous. (Lane Decl. Exh. C., pg. 125-26.)

Defendants argue that this promise is unclear because the Wanamaker Letter fails to satisfy regulatory requirements concerning an agreement relating to HOME funds, citing 24 CFR § 92.504(c)(3). This argument misapprehends what the Wanamaker Letter was, in the context of this regulation. 24 CFR § 92.504(c)(3)provides as follows:

> The participating jurisdiction may preliminarily award HOME funds for a proposed project, contingent on conditions such as obtaining other financing for the project. This preliminary award is not a commitment to a project. The written agreement committing the HOME funds to the project must meet the requirements of "commit to a specific local project" in the definition of "commitment" in § 92.2 and contain the following...

The Wanamaker Letter awarded $1,600,000 of the City's HOME funds to the Project, consistent with this regulation. Mr. Wanamaker correctly stated that BURA was required to meet all applicable Federal, State and local rules and regulations before actually issuing HOME funds. (Lane Decl., Exh. E.) This does not change the fact that Defendants allocated these funds to the Project in the hope and expectation that the Development Team would rely on this commitment and take steps to advance the Project.

Defendants again misplace their reliance upon the decision in *Chem. Bank v. City of Jamestown*, 122 A.D.2d 530, 531 (1986), a case cited to this Court on their earlier failed motions to dismiss. There, the plaintiff alleged the municipality promised to provide Urban Development Action Grant (UDAG) funds, which the municipality ultimately did not receive due to a failure to comply with UDAG requirements. The plaintiff alleged that the municipality made a clear and unambiguous promise to provide these funds. *Id.* The court held that the municipality did not so promise when it "earmarked" the UDAG funds. *Id.*

The City promised to support the Project by providing $1,600,000 of its HOME funds in order to set the foundation for both sides to take the actions necessary to move forward with the Project. In *Chem. Bank*, there was no allegation that the municipality withdrew its award of UDAG or refused to continue to earmark funds and support the project. Here, Defendants breached their promise to earmark and allocate HOME funds to the Project by conditioning such support on Plaintiffs agreeing to their extortionate demands. Further, Mayor Brown specifically requested the release of HOME funds in support of the Project (after BURA approved the allocation), thus setting the stage for anticipated execution of a standard form HOME Agreement. (Lane Decl., Exh. O, March 12, 2009 email with March 12, 2009 HUD Request for Release of Funds).

## B.     Plaintiffs Reasonably Relied on these Promises

Defendants argue that the Second Amended Complaint "fails to allege" justified reliance on Defendants' promises. However, the Second Amended Complaint alleges that "NRP **reasonably and foreseeably relied upon** the municipal defendants' promises and has been damaged as a result of their negligent and wrongful failure to perform as promised." (Dkt. 44 at ¶ 126.) (emphasis added).

Defendants cannot deny that Plaintiffs relied on Defendants' promises, and devoted all necessary resources to the Project.   Thus, for example, Mayor Brown admits that the City expected the Development Team to respond to the Wanamaker Letter by taking action to move the Project forward.   (Lane Decl., Exh. C, Brown Deposition, pp. 134-35; 227-30.)   Mayor Brown admits that the Development Team could reasonably rely on the letter and "feel that they were receiving support from the city, that it made sense for them to continue to move toward a project, that it made sense for them to do everything that they were supposed to do to try to complete a project."   (*Id.* at 228-29)   Among these were applying for low-income housing tax credits, obtaining City approvals, planning board approvals, and environmental review.   (*Id.* at pp. 134-35) [7]

In this section of their Memorandum, Defendants repeat the argument that there was no reasonable reliance because they could not fulfil the promises without regulatory and Common Council approval, therefore Plaintiffs' reliance was unjustified.[8]   This argument mischaracterizes the nature of the promises alleged by Plaintiffs.   Plaintiffs have adequately pled that they reasonably relied on Defendants' promises to (1) extend the PILOT agreement; (2) allocate $1,600,000 in HOME funds; and (3) provide 51 buildable vacant lots.[9]   There was never any

---

[7] The City Defendants, in support of their prior motions to dismiss, argued that the Wanamaker Letter was intended "only to serve as evidence of the City's support of the Project" for use in connection with the Development Team's application to the DHCR for LIHC tax credits.  (Dkt. 34, pg. 3.)  This argument was accepted by the Court in its decision dismissing Plaintiffs' breach of contract claims.  (Dkt. 43, pg. 13.)  This argument is refuted by Mayor Brown's testimony, establishing that the Defendants expected Plaintiffs to rely on the promises set forth in the Wanamaker Letter and taking affirmative steps to move the Project forward.

[8] *C.f. Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385, 68 S. Ct. 1, 3, 92 L. Ed. 10 (1947) (holding that government could not be estopped from applying regulations providing that insurance could not be issued to reseeded wheat, where claimant argued that government agent represented that claimant's reseeded wheat was insurable).

[9] Defendants' arguments in this regard are premised entirely on facts extrinsic to Plaintiffs' Second Amended Complaint, and may not form the basis for a motion to dismiss under 12(c).  *Hernandez v. Coffey*, 582 F.3d 303, 307 (2d Cir. 2009) (If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not

reason to doubt that the required regulatory and Common Council approvals would be obtained. The City followed through on its promises, devoting substantial resources in furthering the Project (entrenching the reliance even further), until Defendants decided to condition their continued support on the Development Team finding a role for Rev. Stenhouse.

### 1.    The PILOT Agreement and the Lots

Defendants argue that Plaintiffs could not have relied on promises to provide the PILOT Agreement transfer of the lots because Common Council approval was required.  Defendants do not provide any evidence suggesting that the Common Council would not have approved both. There was never any doubt that the Common Council would approve both.  The City took substantial steps to advance the Project, including preparing the PILOT agreement and transfer of 51 buildable lots for presentation to the Common Council.  (Lane Decl. Exh. B, Reilly April 28, 2009 email.)  Defendants wrongfully refused to submit these items to the Common Council because Reverend Stenhouse never called with his approval when Plaintiffs refused the demand for a payoff as a condition for submission of the already drafted resolution for Common Council approval.  (*Id.*)

On February 21, 2008 the City sent a letter to the Development Team identifying properties to be included in the Project.  (Lane Decl. Exh. J.)  These properties were all selected by the City.  (*Id.*)

---

excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion. Accordingly, a district court acts properly in converting a motion for judgment on the pleadings into a motion for summary judgment when the motion presents matters outside the pleadings, but the rule requires that the court give "sufficient notice to an opposing party and an opportunity for that party to respond.) (internal quotations omitted).  Given that there has been but a single deposition in this matter to date, summary judgment at this stage would be premature.

The City Planning Board approved as presented the Project site plan, design, and elevations. (Lane. Decl. Exh. K, April 2, 2009 letter from the City of Buffalo City Planning Board.)

The City of Buffalo Department of Economic Development, Permit & Inspection Services approved all necessary building permits, subject only to the payment of required fees. (Lane Decl. Exh. L, April 29, 2009 letter from The City of Buffalo Department of Economic Development, Permit & Inspection Services.)

The Project was formally approved by the Buffalo Fiscal Stability Authority. (Lane Decl, Exh. M, BFSA Approval letter.; Exh. C, Brown Deposition, pp. 211-18.) Mayor Brown was a director of the BFSA at the time the Project was submitted for approval. (*Id.*) Mayor Brown voiced no concerns regarding the Project when it was submitted to the BFSA board and implicitly endorsed its approval. (*Id.*; Lane Decl. Exh. N, March 19, 2009 email to BFSA board.) Indeed, when it was submitted to the BFSA board, Mayor Brown admitted that he viewed his role as an advocate for the Project. (Lane Decl., Exh. C, Brown Deposition, pg. 217.)

Common Council approval was never in doubt. Mayor Brown admits that he cannot recall a single instance where the administration asked the Common Council to approve the transfer of city-owned lots and the PILOT Agreement to an affordable housing project and the Common Council did not approve it. (Lane Decl. Exh. C, pg. 131.) Mayor Brown cannot recall a single affordable housing project that was presented to the Common Council during his administration for any form of approval that was rejected. (*Id.* at 309.)

Everything was in place for Common Council approval of the PILOT Agreement and transfer of lots. The City was prepared to introduce these items at a Common Council meeting on April 28, 2009. (Lane Decl. Exh. B, Reilly April 28, 2009 email.) Mr. Reilly indicated in an

email to Mayor Brown that he had been advised that the Development Team "knows what to do, will do it and Rev. Stenhouse will call Mayor should that contract be signed this AM.  IF that happens, presumably the file could be introduced for passage today at Council.  If not today, the tax credits will be lost by month's end.  I'll ensure Peter S has the legislation and other signature documents routed yesterday in case u want to move on this."  (*Id.*; Lane Decl. Exh. C, Brown Deposition, pp. 275-284.)   In fact, the Development Team did not agree to the Mayor's extortionate demands, no call came from Rev. Stenhouse, and the file was not presented to the Common Council.[10]

## 2.      The HOME Funds

Defendants argue that Plaintiffs' reliance on Defendants' promise to allocate HOME funds was unreasonable.  As shown above, however, the Wanamaker Letter was a valid award of HOME funds under applicable regulations.  Defendants issued this letter in an effort to induce reliance on the allocation of such funds as a means of financing the project.  (Lane Decl., Exh. C, Byron Brown Deposition, pp. 103-112).

Plaintiffs' reliance on the City's allocation of HOME funds was reasonable, expected, and desired by Defendants.  In fact, the City continued to allocate these HOME funds, the BURA Board and BFSA approved the allocation, and Mayor Brown executed a U.S. Department of Housing and Urban Development Request for Release of Funds and Certification ("HUD Request for Release of Funds") concerning the Project.  (Lane Decl., Exh. O, March 12, 2009 email with March 12, 2009 HUD Request for Release of Funds).  In this document, Mayor Brown certified that the City had complied with applicable regulations, and requested that HUD release $1,600,000 in HOME funds to be used in support of the Project.  (*Id.*)  Mayor Brown

---

[10] In other words, Defendants took affirmative steps to improperly withhold the file from being presented to the Common Council for improper and illegal reasons.

admits that this document evidences the City's support for the Project: "the City had every intention of continuing to move this project forward...  I was in support of moving the project forward."  (Lane. Decl. Exh. C, pp. 199-203.)

BURA ultimately passed a resolution authorization the allocation of HOME funds.  (Lane Decl. Exh. P, BURA March 12, 2009 Meeting Minutes.)  Mayor Brown admits that he does not recall a single other instance when the BURA board passed such a resolution and a project did not ultimately move forward.  (Lane Decl. Exh. C, Brown Deposition, pp. 128-31; 198-199.)

Simply put, Plaintiffs' reliance upon Defendants' promises was reasonable.  The Project did not proceed based solely on Plaintiffs' refusal to submit to Defendants' extortionate demands.

### III.     The Assignability of Certain Loans, Commitments, or Agreements is Irrelevant to Plaintiffs' Claims

Defendants argue that Plaintiffs' remaining claims are dependent on certain governmental loans, commitments, or agreements.  This is incorrect.  The agreements and commitments attached to Plaintiffs' Second Amended Complaint were cited in connection with the dismissed tort claims asserted in Count III.  They are not required elements of the claims for promissory estoppel and RICO.

### A.     Plaintiffs' Promissory Estoppel and RICO Claims Are Not Premised on the Assignment of any Agreement

Plaintiffs' promissory estoppel and RICO claims do not rely on the assignment of any rights contained in the loans, commitments, or agreements cited by Defendants.

"Under New York law, a claim for promissory estoppel requires 'a clear and unambiguous promise, reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained in reliance on that promise.'"  *Kaye*, 202 F.3d at 615; *Ripple's of Clearview, Inc.*, 88 A.D.2d at 122.

"To establish a RICO claim, a plaintiff must show (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *DeFalco v. Bems*, 244 F.3d 286, 305 (2d Cir. 2001).  A plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

Plaintiffs' promissory estoppel claim is Count II of the Second Amended Complaint. (Dkt. 44.)  Plaintiffs alleged that the Defendants "made clear and unambiguous promises to participate in the Project by, among other things, extending to the Project its usual Low Income Housing PILOT agreement, providing $1,600,000.00 of its HOME funds to assist in the construction and, in addition, providing fifty-one (51) buildable vacant lots..."  (Dkt. 44, ¶ 125.) They also alleged that "NRP reasonably and foreseeably relied upon the municipal defendants' promises and has been damaged as a result of their negligent and wrongful failure to perform as promised."  (*Id.* at ¶ 126.)  Plaintiffs do not allege that any of the promises which are the subject of this claim were made to anyone other than to Plaintiffs (including Plaintiffs as members of the Development Team, including Belmont).  This claim is not based on any promises other than those made by the Defendants to Plaintiffs, and is not premised on promises contained in commitments to the Project made by the DHCR.

Defendants RICO violations are based upon their conspiracy to obstruct, delay, or affect commerce by extortion.  Defendants made clear that non-payment to Reverend Stenhouse would result in withdrawal of support for the Project.  The Court agreed with Plaintiffs, rejecting Defendants initial motions to dismiss Plaintiffs' RICO claims.  Plainly, none of these allegations arises out of any loans, commitments, or agreements referenced by Defendants.  Therefore their assignability is immaterial.

In their third cause of action, Plaintiffs alleged a series of tort claims including allegations that Defendants' actions tortuously interfered with the rights received pursuant to funding commitments made by New York State and the Federal government, including LIHTC and HOME funds.  This cause of action was dismissed by the Court.  As such, questions concerning whether the benefits under those commitments were to the Development Team - Belmont and NRP - or to Belmont alone, and NRP only by way of assignment, are no longer relevant.  Plaintiffs have not attempted to resurrect the dismissed third cause of action.  Thus, for example, Defendants cite to Plaintiffs' allegations concerning the New York State Housing Trust Fund Corporation low interest loan, which was approved by letter dated November 5, 2008. (Dkt. 44, ¶ 30.)  Plaintiffs have no remaining claim specifically arising out of this loan.

Defendants cite to the HOME Funds Commitment of $1.6 million, arguing that Plaintiffs never had any rights to these funds, nor were they assignable even if Belmont did.  The City promised to support the Project by providing $1,600,000 of its HOME funds in order to set the foundation for both sides to take the actions necessary to move forward with the Project.  The Defendants' promise to provide $1,600,000 of its HOME funds was made to NRP.  (Lane. Decl., Exh. P, BURA Meeting Minutes reflecting approval of allocation of HOME funds to "Belmont Shelter Corporation and/or NRP Group LLC or a to-be-formed corporation that will be 100% owned by Belmont Shelter Corporations."))  NRP relied on these promises.  In fact, the City followed through on its promise concerning HOME funds: submitting a Certification and Request for Release.  (Lane Decl. Exh. O.)  But for Mayor Brown killing the Project, there is no indication that the HOME funds would not have ultimately been released.  (Lane Decl. Exh. C, Brown Deposition, pp. 128-31; 198-99.)

Defendants cite to the commitment to provide fifty-one buildable lots and the PILOT Agreement as further examples of non-assignable commitments.   There are no written agreements concerning these commitments as they relate to this Project.  Instead, Defendants cite to the agreements concerning the East Side I project as evidence of what similar agreements concerning **this** Project **might** have provided.   This argument is without merit.   The commitments to provide fifty-one buildable lots and to extend the PILOT Agreement were to the Development Team, including Plaintiffs.  (Lane Decl., Exh. C, pg. 127) ("Q: The developer, that was NRP and Belmont Shelter? ... A: Yeah.  I would believe that in this context it was NRP and Belmont Shelter.")

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court deny Defendants' motions to dismiss in their entirety.

DATED:         September 9, 2015

                              **WEBSTER SZANYI LLP**
                              Attorneys for Plaintiffs


                              By:    *s/Thomas S. Lane*
                                         Thomas S. Lane
                                         Nelson Perel
                              1400 Liberty Building
                              Buffalo, New York 14202
                              (716) 842-2800
                              tlane@websterszanyi.com
                              nperel@websterszanyi.com

TO:    Richard T. Sullivan, Esq.
          Harris Beach PLLC
          Attorneys for Defendant Buffalo Urban Renewal Agency
          726 Exchange Street, Suite 1000
          Buffalo, New York 14210

          Terrence M. Connors
          Connors & Vilardo LLP
          Attorneys for Defendant City of Buffalo
          Mayor Byron M. Brown and Deputy Mayor Steven M. Casey
          1000 Liberty Building
          Buffalo, NY 14202
          tmc@connorsvilardo.com

          Timothy Ball
          Attorney for Defendant Demone A. Smith
          1102 City Hall
          65 Niagara Square
          Buffalo, NY 14202
          tball@ch.ci.buffalo.ny.us