UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

NRP HOLDINGS LLC and
NRP PROPERTIES LLC,

                              Plaintiffs,

        v.                                                    **DECISION AND ORDER**
                                                              11-CV-472S
CITY OF BUFFALO, BYRON W. BROWN,
STEVEN M. CASEY, DEMONE A. SMITH,
CITY OF BUFFALO URBAN RENEWAL
AGENCY,

                              Defendants.


# I.   INTRODUCTION

On June 6, 2011, Plaintiffs NRP Holdings LLC and NRP Properties LLC commenced this action against Defendants the City of Buffalo (the "City"), Mayor Byron W. Brown, and Common Council Member Demone A. Smith (together, the "City Defendants"), Former Deputy Mayor Steven M. Casey, and the City of Buffalo Urban Renewal Agency ("BURA").   Currently pending before this Court are motions for summary judgment by the City Defendants and BURA seeking dismissal of the claims against them.   (Docket Nos. 152, 165.)   Also pending are motions by Plaintiffs seeking additional discovery and leave to file a sur-reply.   For the following reasons, the motions for summary judgment are granted and all pending claims are dismissed; Plaintiffs' motions are denied.

## II.  BACKGROUND

### A.  Factual Background[1]

East Side Housing II

Plaintiffs NRP Holdings LLC and NRP Properties LLC (collectively, "NRP") are affiliates of the NRP Group LLC, an Ohio limited liability company that develops, builds and manages apartments and housing across the United States.  In November 2007, NRP, together with developer Belmont Shelter Corporation ("Belmont"),[2] began working with the City of Buffalo and BURA[3] on a project to build and manage 50 affordable single-family homes in the Masten and Cold Springs neighborhoods on the East Side of the City of Buffalo ("East Side Housing II").  The City had previously worked on a similar project ("East Side Housing I") with Belmont in which NRP was not involved.  East Side Housing II was intended to revitalize the Masten Park and Cold Springs neighborhoods and bring revenue into the local community through the use of local subcontractors and locally sourced materials.

---

[1] The facts are taken from the City Defendant's Local Rule 56 statement and NRP's response, (see Docket Nos. 152-2, 177-4), as well as their supporting documents.  Although NRP "disputes" nearly every fact put forth by the City Defendants, those disputes rest primarily on the framing or wording of the statements (see, e.g., Docket No. 177-4 ¶ 1 (disputing statement because "[a]ny inference that NRP was not the developer is incorrect")) or the fact that they were not able to complete discovery in certain areas (see, e.g., id. ¶ 12 (disputing statement because it "depends largely on the [Scott] Billman affidavit" and "NRP objects that it has not had an adequate opportunity to respond to these allegations, as the current discovery stay has prevented NRP from conducting Fed. R. Civ. P. 30(b)(6) depositions of the City, BURA, and or Mr. Billman")).
The City Defendants have requested that the Court not consider NRP's response, and further requested that the Court reject NRP's Statement of Material Facts (filed together with its response to the City Defendants' Rule 56 Statement), arguing that the statement "is not in compliance with Local Rule 56, is irrelevant to the issues in the motion for summary judgment, largely consists of arguments, not facts, and because much of it is not supported by the cited or record evidence."  (Docket No. 192.)  Particularly in light of NRP's stance that discovery is incomplete, this Court has considered all statements submitted. Moreover, it draws all factual inferences and views the factual assertions in the light most favorable to NRP as the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202, 216 (1986).  However, this Court notes that a nonmovant benefits from such factual inferences "only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686, 694 (2007).
[2] Belmont assigned its claims to NRP.
[3] BURA is the City of Buffalo's designated delegate for urban renewal projects.

East Side Housing II was a complex real estate development project, which required, among other things:  (1) the transfer of 51 City-owned lots to the developers; (2) a payment in lieu of taxes ("PILOT") agreement between the developers, the City, and the County of Erie; (3) a release of federal HOME Investment Partnerships Program ("HOME") funds; (4) a Low-Income Housing Tax Credits Regulatory Agreement; and (5) a final HOME funds agreement.  These agreements and transfers required approvals from the federal Department of Housing and Urban Development ("HUD"), the City Planning Board, the County of Erie, the Buffalo Fiscal Stability Authority, BURA, and the Buffalo Common Council.

The project involved an investment by the City, as the cost to the City to build the 50 units would be an average of $32,000 per house in HOME funds.  (See Docket No. 177-1, Lane Decl. Exh. D.)  This cost, though not insignificant, was substantially less than similar projects, which had averaged over $220,000 per unit in HOME funds.  (Id.) Part of the City's investment came in the form of a tax forfeiture on the property involved in the development through the PILOT agreement.  The PILOT agreement was effectively a tax incentive program, to be negotiated between the City, the County, and the developers, to defer or limit taxes paid on the properties associated with the project. Typically, the City and County enter into an agreement to forfeit tax revenue so as to encourage development in their jurisdiction.  Here, it would have allowed NRP to receive a property tax exemption on the land to be developed and, in exchange, submit payments to the City and the County according to an agreed-upon schedule.[4]  Because the PILOT agreement was a municipal contract that impacted the City and County

---

[4] Because the property involved was City-owned, it was not tax-producing at the time of the relevant events.  Had the project been successfully completed, the property would have been returned to taxable lots, or the City could have otherwise sold the lots to return them to taxable status.

budgets, their legislative bodies were required to individually and separately approve the agreement before it came into effect.  The City was also required to approve any transfer of City-owned property.  Pursuant to the City Charter, the approval of any sale, lease, or transfer of City-owned real property must be made by formally adopted resolution by the Common Council.  (See City Charter, § 27-13 Sale or Lease of Property for Development or Redevelopment ("Real property or any interest therein and appurtenances thereto belonging to or in the control of the city, necessary for . . . development or redevelopment, . . . or for urban renewal, may be sold . . . to any person, firm or corporation . . . when authorized by resolution of the council . . . .").) Accordingly, the sale of the 51 City-owned lots also required Common Council approval.

Between November 2007 and February 2008, the City, BURA, and the developers had multiple meetings regarding East Side Housing II.  NRP alleges that, during these meetings, the City and BURA unconditionally and repeatedly promised to enter into a PILOT agreement, provide $1,600,000 of HOME funds to assist in construction, and transfer 51 buildable City-owned vacant lots, among other things that would be needed to complete the project.  On February 25, 2008, these promises were communicated by a letter from Timothy Wanamaker, the Executive Director of Buffalo's Office of Strategic Planning and Vice President of BURA, who wrote to Belmont:

> This letter is to confirm that the Buffalo Urban Renewal Agency has earmarked $1,600,000 of the City's HOME funds for the [ ] project that consists of construction of fifty (50) units of single-family homes in the Masten Park and Cold Springs neighborhoods of the City of Buffalo.

(Docket No. 152-9, Battle Decl. Exh. 12 (the "Wanamaker Letter").)  After describing the details of the plan—including the "lease-to-own" component, the City's promise to offer its "usual Low-Income Housing Pilot Agreement," and the City's commitment to provide

51 City-owned vacant lots at a price of $2,000 per lot—Wanamaker noted, "This commitment letter is only valid if the developer is successful in securing a 2008 Low-Income Housing Tax Credit allocation to complete the project." (Id.) He concluded, "Of course, BURA is required to meet all applicable Federal, State, and local rules and regulations before issuance of HOME funds to eligible recipients." (Id.) On August 20, 2008, NRP obtained the requisite low-income-housing tax credits from the New York Division of Housing and Community Renewal ("NY DHCR"). This Court has previously found that, because issuance of HOME funds was explicitly conditional on meeting applicable rules and regulations, only the promises regarding the PILOT agreement and the transfer of City-owned property were unambiguous. (See Docket No. 132 at 11-12.)

On February 26, 2008, Mr. Wanamaker sent another letter to Belmont stating that the City had received Belmont's application and that the Project could be "eligible" for a PILOT Agreement. Mr. Wanamaker explained that a PILOT Agreement was contingent on certain future events, including Common Council approval:

> The PILOT will be granted to the project upon submittal of satisfactory evidence of funding and evidence that the project will proceed as proposed, and is contingent upon the approval of the County of Erie, the Buffalo Common Council and the Buffalo Fiscal Stability Authority.

(Docket No. 152-9, Battle Decl. Exh. 13.) The transfer of City-owned property was also subject to Common Council approval under the City Charter, as noted above. NRP alleges that, to the extent that any promises were made contingent on such approvals, it understood, from prior experience, that those approvals were *pro forma*.

During his deposition in this case, Mayor Brown testified that the Wanamaker Letter created affirmative obligations on the part of both NRP and the City. (See Docket No. 177-1, Lane Decl. Exh. B at 228-29 (stating that the developers "could definitely feel

5

that they were receiving support from the city, that it made sense for them to continue to move toward a project, that it made sense for them to do everything that they were supposed to do to try to complete a project").)   Mayor Brown further demonstrated support for the project in communications to Governor David Patterson's Office and to the Commissioner of the NY DHCR.

NRP alleges that, in reliance on the promises made by Defendants, it took numerous steps toward completion of the project.  In addition to obtaining low-income-housing tax credits from the NY DHCR, NRP also incurred costs for appraisals, flood zone determinations, title searches, pre-construction loans including interest, architecture designs, landscape architecture designs, surveys and other engineering activities, environmental reports, market studies, legal services, development consulting, building permits, site plans, Planning Board compliance, BURA compliance, the federal HOME funding process, the New York State funding process, SEQR, insurance retention, tax credit consultations, request for proposal for professional outreach, project financing, and personnel hours.  NRP estimates that its expenses and costs related to East Side Housing II exceed $489,000.

The City also took substantial preliminary steps.  It selected location sites for the planned homes and executed a HUD Request for Release of Funds and Certification. The Buffalo Planning Board approved NRP's site plan, design, and elevations for the project.  BURA passed a resolution authorizing allocation of the HOME funds on March 12, 2009.  The City of Buffalo Department of Economic Development, Permit & Inspection Services approved all necessary building permits, subject only to the

payment of required fees.  The project was also formally approved by the Buffalo Fiscal Stability Authority, which included Mayor Brown as its director.

The Alleged Conspiracy

The East Side Housing II project came to a halt in 2009 when Mayor Brown declined to submit resolutions on the PILOT agreement and the transfer of City-owned property to the Common Council.  The reasons behind Mayor Brown's actions are strongly disputed.  According to the City Defendants, Mayor Brown began to have doubts about the project, in part because the housing would be rent-to-own and the site would be scattered.  NRP argues that Mayor Brown was aware of these aspects previously and had never expressed reluctance before.  Instead, NRP contends that East Side Housing II was derailed because Mayor Brown, Deputy Mayor Casey, and Council Member Smith began conspiring with a political ally of Mayor Brown's, Reverend Richard Stenhouse, to demand a paid role for Reverend Stenhouse and his organization, the Jeremiah Partnership, in the project.[5]

Reverend Stenhouse stated in his deposition testimony that he wanted a role in the project for the Jeremiah Partnership to ensure that local subcontractors would be hired and that the minority hiring guidelines would be met.  Specifically, he was worried that women and "other people that met the guidelines that historically have been used to circumvent hiring minorities" would be hired rather than "African Americans."  (See Docket No. 177-1, Lane Decl. Exh. V at 272-75.)  On March 12, 2008, Carla Kosmerl, BURA's former director of administration and finance, sent an email to NRP and Belmont stating that she would be meeting with the mayor and wanted "to get

---

[5] NRP voluntarily dismissed Reverend Stenhouse and the Jeremiah Partnership from this case on January 13, 2012.  (Docket No. 25.)

something signed" wherein the developers agreed to six requests concerning minority-owned and women-owned business participation, a drug policy, local hiring, and to "[w]ork with the locally-based, not-for-profit Jeremiah Partnership" who "would like to assist in recruiting local minority sub-contractors" and "could shadow the NRP [general contractor] to learn some of the requirements for such a project." (See Docket No. 177-1, Lane Decl. Exh. X.)[6]

Shortly thereafter, on March 30, 2009, NRP was "put on the spot" during a call with the City when the City's representative stated that the developers needed to "make [S]tenhouse happy" and should inform the City in the "next 1.5 hours" whether they intended to hire the Jeremiah Partnership.  (Docket No. 177-2, Lane Decl. Exhs. AA, BB.)  Later that day, Reverend Stenhouse emailed Council Member Smith, Kosmerl, and Belmont, offering a contract whereby he would assist with "mwbe and section 3[sic][7] subcontractors for the fifty houses" at a cost of $30,000 as well as "an agreement with Belmont to do management training for a year for the Jeremiah Partnership." (Id., Lane Decl. Exh. BB.)  Reverend Stenhouse noted that the contract and agreement "would need to be formally signed before we will sign off." (Id.)  On April 15, 2009, Ken Peterson (who appears to be affiliated with Reverend Stenhouse, but is not otherwise identified) emailed a proposal to NRP for both the management program and the workforce and business diversity assistance, the cost of which had risen to $60,000. (Id., Lane Decl. Exh. CC.)  Peterson stated that "Stenhouse is ready to place his call to the Mayor . . . provided I can show him an executed agreement with [NRP]." (Id.)

---

[6] NRP agreed to all requests except working with the Jeremiah Partnership.
[7] "MWBE" likely refers to the minority-owned and women-owned business enterprises.  "Section 3" likely refers to a federal requirement designed to ensure that HUD funds invested in housing and community development provide employment opportunities for low-income individuals.

NRP did not execute the agreements.  It alleges that, after evaluating the possibility of hiring Reverend Stenhouse, it chose not to do so because it believed that Reverend Stenhouse would add little value to East Side Housing II and was seeking a no-show role.  Instead, NRP issued a "Request for Proposals for Professional Outreach Services to African-American, Minority, Local and Women-Owned Firms."  (Id., Lane Decl. Exh. GG.)  NRP received three proposals, one of which came from the Jeremiah Partnership.  The Jeremiah Partnership set out a total budget of $80,000, which included what NRP alleges to be "numerous and suspect budget items," such as a $3,600 allotment for refreshments at twelve planned meetings, a rental cost of $12,000 for those meetings (though they were to take place at locations owned by Jeremiah Partnership), and $35,000 in administrative fees for postage, telephone, and "Jeremiah involvement."  (Id., Lane Decl. Exh. HH.)  NRP rejected the proposal in favor of a bid prepared by the University at Buffalo, which proposed a $40,524 total budget— approximately half the amount sought by the Jeremiah Partnership.  (Id.)

NRP has submitted an affidavit from former Deputy Mayor Casey, stating that Mayor Brown told him Reverend Stenhouse "had to be involved as the face of the Project in the Black community" and that Mayor Brown "was tired with the out of town white developers handling all of these projects."  (Docket No. 177-5, Casey Aff. at ¶ 5.) Steven Weiss, who acted as NRP's outside legal counsel on the project, also submitted a declaration stating that when he explained to Mayor Brown that NRP regularly engaged local entities such as Reverend Stenhouse's to perform community outreach services, but intended to select such an entity by competitive bid, Mayor Brown indicated that he did not care as long as NRP "hired 'the right company,'" which Weiss

understood to be Reverend Stenhouse or his affiliates.  (Docket No. 184, Weiss Decl. at ¶ 6.)  Weiss stated that, in another conversation, "Mayor Brown made a statement to the effect that NRP needed to 'Make Stenhouse happy or the deal will not go through'" and that he was "'Sick of seeing those fucking white developers on the East Side with no black faces represented.'"  (Id. at ¶ 7.)  When Weiss informed Mayor Brown that NRP would not be retaining Reverend Stenhouse for community outreach, Mayor Brown stated "'I told you what you had to do and you hired the wrong company.'"  (Id. at ¶ 8.)  Aaron Pechota, Vice President of Development for NRP Investments Corporation, an affiliate of NRP, stated in a declaration that he believed "the Mayor was simply seeking a payoff of a political ally—a pay-to-play demand that required NRP . . . to retain Rev. Stenhouse."  (Docket No. 177-6, Pechota Decl. at ¶ 15.)

Indeed, NRP alleges that, but for their initial refusal to sign the agreements with Reverend Stenhouse, the resolutions for the PILOT agreement and transfer of the City lots would have been introduced at a Common Council meeting as early as April 28, 2009.  (See Docket No. 177-2, Lane Decl. Exh. EE (April 28, 2009 email stating that NRP "knows what to do, will do it and Rev. Stenhouse will call Mayor should that contract be signed this AM.  IF [sic] that happens, presumably the file could be introduced for passage today at Council.  If not today, the tax credits will be lost by month's end").

The Mayor generally has discretion as to which proposed resolutions are sent to the Common Council for a vote, and additional discretion to veto resolutions approved by the Council.  The Mayor never introduced the resolution for a PILOT agreement on East Side Housing II to the Common Council, and the Common Council therefore never

voted to approve or disapprove the agreement.  The Mayor also never introduced the resolution for sale of the 51 City-owned lots, and the Common Council therefore never voted to approve or disapprove the transfer.  Mayor Brown stated during his depositions that he was "not aware" of any instances where similar resolutions were not approved by the Common Council.  (Docket No. 177-1, Lane Decl. Exh. B at 131.)  NRP contends that, had the resolutions been introduced, Common Council approval was not in doubt.

**B.    Procedural Background**

Defendants have previously challenged the sufficiency of Plaintiffs' pleadings, and familiarity with this Court's prior orders is assumed.  In July of 2012, this Court dismissed several of NRP's claims but found that, based on the arguments raised, the claims under the doctrine of promissory estoppel and under the Racketeer Influenced and Corrupt Organizations Act (commonly known as "RICO") survived Defendants' motion to dismiss.  (See Docket No. 43.)  This Court also granted NRP leave to file its Second Amended Complaint, adding BURA as a defendant.  (Id.)  BURA moved to dismiss the claims against it and, in September 2013, this Court denied the motion with respect to NRP's promissory estoppel claim, but otherwise granted the motion with respect to Counts I, III, and V, which are the same claims that this Court previously dismissed as against the other defendants in July 2012.  (See Docket No. 68.) Defendants then filed motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  In December 2015, those motions were largely denied.  (See Docket No. 132.)

Following Defendants' earlier motions, two claims remained:  a RICO claim against Mayor Brown, Deputy Mayor Casey, and Council Member Smith, and a

promissory estoppel claim against all Defendants.  Per the Court's December 28, 2015

order, the promissory estoppel claim was limited to two "promises" in the Wanamaker

Letter, specifically that the City would enter into a PILOT agreement with NRP and that

it would transfer 51 city-owned lots to NRP.  (See id.)  The City Defendants and BURA

argue that they are entitled to summary judgment dismissing the remaining claims.  The

present motions raise new arguments, which focus on the City's special status as a

government entity and the other Defendants' status as agents and employees of a

governmental entity.  They contend that the RICO claims must be dismissed because

the individual defendants are immune from civil liability.  They further contend that the

promissory estoppel claim must be dismissed because estoppel is generally unavailable

against municipal defendants.  BURA's motion incorporates the City Defendants'

arguments.

### III. DISCUSSION

"A motion for summary judgment may properly be granted . . . only where there is

no genuine issue of material fact to be tried, and the facts as to which there is no such

issue warrant the entry of judgment for the moving party as a matter of law."  Kaytor v.

Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010).  A court's function on a summary

judgment motion "is not to resolve disputed questions of fact but only to determine

whether, as to any material issue, a genuine factual dispute exists."  Id. (citing Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

"A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party.'"  Weinstock v. Columbia Univ., 224

F.3d 33, 41 (2d Cir. 2003) *cert. denied*, 540 U.S. 811 (2003) (quoting Anderson, 477 U.S. at 248).

## A.    RICO

NRP's RICO claim arises from allegedly corrupt conduct by Mayor Brown, Council Member Smith, and Deputy Mayor Casey[8] that "killed" East Side Housing II before it could be completed.   Mayor Brown and Council Member Smith contend that, because the conduct was part of their legislative duties, they are immune from civil liability and the RICO claims against them must be dismissed.[9]   NRP and the City Defendants identify two acts that this Court must examine to determine whether immunity is appropriate:  Mayor Brown's failure to introduce resolutions for a vote before the Common Council on (1) the PILOT agreement and (2) the sale of 51 city lots.[10]

It is well-established that federal, state, and local legislators are entitled to absolute immunity from civil liability for their legislative activities.  Bogan v. Scott–Harris, 523 U.S. 44, 118 S. Ct. 966, 140 L. Ed. 2d 79 (1998); see also Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206, 210 (2d Cir. 2003) ("Legislators are entitled to

---

[8] RICO claims may not be brought against the City, nor against a city employee in his or her official capacity.  See Naples v. Stefanelli, 972 F. Supp. 2d 373, 389 (E.D.N.Y. 2013).  NRP clarifies in its opposition that the RICO claim is directed at Mayor Brown, Council Member Smith, and Deputy Mayor Casey solely in their individual capacities.  (See Docket No. 179, Opp. to Motion for Summary Judgment, at 11.)

[9] Mayor Brown and Council Member Smith also claim qualified immunity as grounds for dismissal of the RICO claim.  Because this Court finds legislative immunity to be applicable, it need not address their other arguments.  See Mangiafico v. Blumenthal, 471 F.3d 391, 394 (2d Cir. 2006) (noting that legislative immunity "'defeats a suit at the outset'" (quoting Imbler v. Pachtman, 424 U.S. 409, 419 n. 13, 96 S. Ct. 984, 989, 47 L. Ed. 2d 128 (1976))).

[10] NRP restricts its argument to these two acts, but states in a footnote that it "alleges additional facts" in other filings, which "further show that legislative immunity is not proper here."  (See Docket No. 179, Opp. to Motion for Summary Judgment, at 4 n. 8.)  NRP does not specify which "additional facts" support its RICO claim, and instead cites generally to its Amended Complaint, Second Amended Complaint, and the statement of facts filed within its opposition papers.  (Id.)  Having reviewed these filings, this Court finds that, to the extent they provide additional allegations of conduct in violation of RICO, such allegations relate to Mayor Brown, Council Member Smith, and Deputy Mayor Casey's motive for "killing" the project.  As further discussed below, the alleged motive, even if such a motive is corrupt or otherwise criminal, is immaterial in determining the applicability of legislative immunity.  See infra.

absolute immunity from civil liability for their legislative activities."). This immunity attaches to all legislative actions, even if taken by members of an executive branch of government. Id. at 54-55 (internal quotation marks omitted). In this regard, the Supreme Court has held that officials outside of the legislative branch—like Mayor Brown and Deputy Mayor Casey—are entitled to legislative immunity when they perform legislative functions, such as introducing legislation or signing it into law. See id. at 55.

Officials are not immune from liability for administrative acts or for their conduct in the enforcement of existing laws, ordinances, or regulations. State Emps. Bargaining Agent Coal. v. Rowland, 494 F.3d 71, 83-84 (2d Cir. 2007) (legislative immunity does not apply to enforcement activities); Harhay, 323 F.3d at 211 (public officials not entitled to legislative immunity for acts that were "administrative, not legislative, in nature" in that they did not implicate "the kind of broad, prospective policymaking that is characteristic of legislative action"); Jessen v. Town of Eastchester, 114 F.3d 7, 8 (2d Cir. 1997) (challenged determination "was an administrative act that legislative immunity does not protect"). NRP contends that legislative immunity is not applicable in this case because the acts at issue—Mayor Brown's failure to introduce resolutions on the PILOT agreement and the sale of the City-owned lots to the Common Council—were administrative in nature.

"Under the Supreme Court's functional test of absolute legislative immunity, whether immunity attaches turns not on the official's identity, or even on the official's motive or intent, but on the nature of the act in question." See, e.g., Almonte v. City of Long Beach, 478 F.3d 100, 106 (2d Cir. 2007). More specifically, legislative immunity shields an official from liability if the act in question was undertaken "'in the sphere of

legitimate legislative activity,'" and is the sort of "broad, prospective policymaking that is characteristic of legislative action."   Harhay, 323 F.3d at 210-11 (quoting Bogan, 523 U.S. at 54).  In determining whether an act, or a course of conduct, is within the "sphere of legitimate legislative activity," two factors are relevant:

> First, it is relevant whether the defendants' actions were legislative "in form," *i.e.*, whether they were "integral steps in the legislative process." Second, it may also be relevant whether defendants' actions were legislative "in *substance*," *i.e.*, whether the actions "bore all the hallmarks of traditional legislation," including whether they "reflected . . . discretionary, policymaking decision[s] implicating the budgetary priorities of the [government] and the services the [government] provides to its constituents."

Rowland, 494 F.3d at 89 (alterations and emphasis in original) (citation omitted) (quoting Bogan, 523 U.S. at 55-56).

With respect to whether the acts were procedurally legislative, the introduction of a resolution for a vote, or the choice not to introduce such a resolution, is legislative "in form" because it is an "integral step[ ] in the legislative process."[11]  See Bogan, 523 U.S. at 55-56; Dorsett v. County of Nassau, No. 11-CV-5748, 2013 WL 272796 at *12 (E.D.N.Y. Jan. 24, 2013) (holding that decision of when to place a settlement agreement on legislative agenda was a "quintessentially legislative function" and an "integral step[ ] in the legislative process"); Ne. Land Dev., LLC v. City of Scranton, 561 F. App'x 135, 138 (3d Cir. 2014) (no dispute that city council's decision to table a resolution authorizing proposed development was legislative in form).  Even looking outside the resolutions, including the alleged communications with Reverend Stenhouse, "legislative immunity is not limited to the casting of a vote on a resolution or bill; it covers

---

[11] NRP argues that the conduct was not procedurally legislative because the resolutions on the PILOT agreement and the sale of City lots were not "legislation."  (See Docket No. 179, Opp. to Motion for Summary Judgment, at 8.)  This Court addresses that argument in its analysis as whether the acts were legislative in substance.

all aspects of the legislative process, including the discussions held and alliances struck regarding a legislative matter in anticipation of a formal vote." Almonte, 478 F.3d at 107; see also Baraka v. McGreevey, 481 F.3d 187, 196 (3d Cir. 2007) ("activities by legislators that directly affect drafting, introducing, debating, passing or rejecting legislation, are 'an integral part of the deliberative and communicative processes,' and are properly characterized as legislative, not political patronage") (quoting United States v. Brewster, 408 U.S. 501, 512, 92 S. Ct. 2531, 33 L. Ed. 2d 507 (1972)).  Accordingly, this Court finds that the conduct at issue is procedurally legislative as set forth by the Supreme Court in Bogan.

Under Bogan, it is also relevant that an act is substantively legislative, as not all procedurally legislative official actions fall under that category.  For example, the Second Circuit has found conduct that superficially appeared legislative (e.g., a vote on an employment decision) was in fact administrative where officials "did not engage in the kind of broad, prospective policymaking that is characteristic of legislative action," and their decision instead "was only directed to [a specific individual's] situation and did not implicate any [official] policy."  Harhay, 323 F.3d at 211.  Thus, the discretionary firing of an individual or group of employees, "even if undertaken by public officials who otherwise are entitled to immunity," would not be considered substantively legislative and therefore immune "because such decisionmaking is no different in substance from that which is enjoyed by other actors."  Id. at 210-11.  However, the "elimination of a class of jobs" would be deemed legislative, provided that the act was undertaken "for budgetary or policy reasons."  Id. at 211 ("To reiterate, it is the nature of the act that we examine to determine whether legislative immunity applies.").

16

Similarly, the enactment or amendment of a zoning law is ordinarily a legislative activity.  See Anderson Grp., LLC v. City of Saratoga Springs, 557 F. Supp. 2d 332, 344 (N.D.N.Y. 2008), aff'd in part, 336 F. App'x 21 (2d Cir. 2009).  But the execution of those laws, including the issuance of a permit under a law already in place, is generally not found to be immune.  Id. at 345 ("action taken on the special use permit by the Board was administrative in nature").  In Anderson, the court found legislative immunity for officials who had approved a "downzoning" ordinance that, although it impacted most significantly on a single property-owner, was consistent with a greater land use policy for the City and "necessarily impact[ed] on the public services the City must provide, the character of the City, tax revenues and expenditures, et cetera."  Id. at 344.  However, the Court denied immunity for official conduct with respect to the application for a permit, noting that although "the ultimate disposition of the plaintiffs' special use permit application had implications for the public at large[, . . . the] action taken on the application was not the sort of formal, quintessentially legislative activity that legislative immunity was intended to cover."  Id. at 345.

NRP contends that the resolutions for the PILOT agreement and the sale of City lots were analogous to the permit application in Anderson or the employment decision in Harhay:  administrative in nature and thus ineligible for legislative immunity.  This Court disagrees.  First, unlike the power to make a discretionary employment decision, which "is no different in substance from that which is enjoyed by other actors," see Harhay, 323 F.3d at 211, the ability to forego tax revenue or sell City property is a privilege held only by the City and its officials.  Second, both the implementation of a tax incentive scheme like the PILOT agreement and the sale of City-owned property are

"discretionary, policymaking decision[s] implicating the budgetary priorities of the [government] and the services the [government] provides to its constituents."  See Rowland, 494 F.3d at 89 (quoting Bogan, 523 U.S. at 55).  Documents cited by NRP state that East Side Housing II—though more cost-effective than similar prior developments—would nevertheless have required approximately $1.6 million in City-controlled HOME funds and involved a significant sale of City-owned, buildable lots. Third, the fact that these resolutions impacted City revenues, City property, and City policy demonstrates that this was not simply the implementation or enforcement of an already existing law, and distinguishes this case from others where a developer has successfully defeated a defense of legislative immunity.  See, e.g., Franklin Bldg. Corp. v. City of Ocean City, 946 F. Supp. 1161, 1171 (D.N.J. 1996) (finding no legislative immunity on failure to adopt resolution where the court was "convinced that the decision to adopt a resolution of need, the sole purpose of which is to allow a single developer to seek state-guaranteed financing for a single project, does not implicate the allocation of city resources or affect broad questions of public policy").

As the plaintiffs did in Anderson, NRP also argues that the impact of the actions is the salient issue, specifically, "whether the challenged action targeted a specific individual, as opposed to the community at large."  Anderson, 557 F. Supp. 2d at 342 (citing Orange Lake Assocs., Inc. v. Kirkpatrick, 21 F.3d 1214 (2d Cir. 1994)).  The Court in Anderson, citing Bogan, found that the impact analysis no longer "remained in untempered force," and relied instead on post-Bogan precedent, noting that "while the Supreme Court did not overrule the Orange Lake principle that legislative immunity is not available for acts which impact solely on individuals, it did take an extremely

18

restrictive view of what constitutes such individual impact when the challenged action is otherwise legislative and implicates larger policy concerns." Id.

This impact analysis is also addressed, under similar facts, in Northeast Land Development, LLC v. City of Scranton, No. 3:08CV290, 2008 WL 5051405 (M.D. Pa. Nov. 21, 2008) ("Northeast I") and Northeast Land Development, LLC v. City of Scranton, 946 F. Supp. 2d 376 (M.D. Pa. 2013) ("Northeast II"), aff'd, 561 F. App'x 135 (3d Cir. 2014).  In Northeast I, developers brought suit against the City of Scranton and several city council members after the city council tabled a vote on a development agreement.  That agreement, similar to the PILOT agreement, involved tax incentives for the developer, and would have affected the community with respect to business development and housing availability.  Northeast II, 946 F. Supp. 2d at 389 n. 2.  The individual council members were dismissed with legislative immunity after minimal discussion.  Northeast I, 2008 WL 5051405, at *5 ("Since voting on a development plan—or choosing not to vote on that plan—is the sort of act that the Supreme Court has found in form, quintessentially legislative, this court finds that the individual defendants are absolutely immune from all claims against them in this case." (internal quotation omitted)).  The court later examined the actions in greater depth when analyzing a challenge to plaintiff's procedural due process claim, concluding that the developer was not deprived of procedural due process because the city council's actions were legislative in nature and the protections of procedural due process do not extend to legislative actions.  Northeast II, 946 F. Supp. 2d at 386.

Similar to NRP, the developer in Northeast II contended that tabling a vote on the project was an act "targeted" at them and was "therefore too narrowly focused to

constitute legislative activity." Id. at 388.  The court noted that a legislative act is one that "produce[s] policies that at least approximate a fair and equitable distribution of social resources and obligations" and that the impact of a rule on more than a few people is a substantial factor, though not dispositive, weighing in favor of finding the rule or action to be legislative.  Id. at 386.  After reviewing the development agreement in total, and its impact on the community, the court found the Scranton city council's decision to table the development agreement to be legislative because the policy considerations related to the development affected the entire community with regard to taxes, standards of living, and business development, and the agreement implicated the property rights of individual neighbors surrounding the project. Id. at 390.  Thus, even if the decision to table approval of the development agreement was "engendered by concern over [the developer's] activities" and directed at the developer alone, "the City Council's decision affected the entire community." Id. at 391.

Accordingly, even under the "impact" analysis, the acts at issue must be considered legislative in nature.  East Side Housing II was a large-scale community initiative that impacted the entire community in Buffalo.  Although "killing" the project may have been felt keenly by NRP, its passage (or not) also impacted the community at large, including tax revenues, standards of living, and housing policy.   And, as discussed above, the resolutions would also have impacted the City itself, both with respect to the forfeit of tax revenue under the PILOT agreement as well as the strategic and budgetary policy underlying the disposition of city-owned property.

Finally, NRP argues that the alleged conduct at issue cannot be subject to legislative immunity because it was corrupt, and corrupt actions are not immune.  "It has

been well-settled since the Supreme Court's decision in <u>Bogan</u> that courts may not consider a defendant's motives when assessing the legislative nature *vel non* of his actions." <u>Rowland</u>, 494 F.3d at 90 (citing <u>Bogan</u>, 523 U.S. at 54).  The Supreme Court has concluded that the relevant question is "whether, stripped of all considerations of intent and motive, petitioner's actions were legislative." <u>Bogan</u>, 523 U.S. at 55; <u>see also</u> <u>Bernard v. County of Suffolk</u>, 356 F.3d 495 (2d Cir. 2004) ("unworthy purpose cannot defeat absolute legislative immunity as long as the challenged conduct is even arguably within delegated legislative powers and does not usurp the role of other branches of government" (internal quotation omitted); <u>S. Lyme Prop. Owners Assoc. v. Town of Old Lyme</u>, 539 F. Supp. 2d 547, 559 (D. Conn. 2008) ("The enforcement policies may have been flawed, and the Defendant [municipal legislators] may have acted in bad faith, as is alleged by Plaintiffs, but legislative immunity is absolute and does not depend on these considerations.").

Legislative immunity has been found to bar civil liability even where an official admitted to corrupt conduct.  In <u>Chappell v. Robbins</u>, the court considered a claim against a California state senator who admitted to taking bribes from the president of an insurance company in exchange for legislative activity aimed at helping that company. 73 F.3d 918, 920 (9th Cir. 1996).  The senator moved to dismiss the RICO claims, asserting that he was entitled to absolute legislative immunity, and the Ninth Circuit agreed, holding that his "efforts in sponsoring and pushing for passage of legislation concerning statewide insurance regulation fall squarely within the class of legislative acts. . . .  'The claim of an unworthy purpose does not destroy the privilege.'" <u>Id.</u> at 921 (quoting <u>Tenney v. Brandhove</u>, 341 U.S. 367, 377, 71 S. Ct. 783, 788, 95 L. Ed. 1019

(1951)); see also Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Illinois, Inc., 729 F.2d 1128, 1130 (7th Cir. 1984) (state legislators entitled to legislative immunity in spite of bribery allegations).

In Empress Casino Joliet Corporation v. Blagojevich, the Seventh Circuit dismissed claims against former Illinois governor Rod Blagojevich, finding that he was legislatively immune from civil RICO liability despite "some factual overlap with [his] federal prosecution . . . now awaiting retrial on various criminal counts."  638 F.3d 519, 522 (7th Cir.), reh'g en banc granted in part, opinion vacated in part sub nom. Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc., 649 F.3d 799 (7th Cir. 2011), and on reh'g sub nom. Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc., 651 F.3d 722 (7th Cir. 2011).  In his dissent from that opinion, Judge Posner noted:  "It is true that the federal common law of legislative immunity for state officials, since it is an immunity from civil suits, does not bar criminal actions, while barring civil actions even if based on charges of criminal misconduct."  Id. at 543 (dissent, emphasis omitted).  See also Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 30 (1st Cir. 1996) (noting that legislative immunity shields officials from civil liability for allegedly criminal conduct, but "does not necessarily immunize the legislator or his aide from federal criminal prosecution").  "Such is the nature of absolute immunity, which is—in a word—absolute."  Rangel v. Boehner, 785 F.3d 19, 24 (D.C. Cir. 2015), cert. denied, 136 S. Ct. 218, 193 L. Ed. 2d 131 (2015) (noting, in the context of the Speech or Debate Clause, that "legislative conduct" is immune even if alleged to be illegal) (citing Bogan, 523 U.S. at 54-55 ("The privilege of absolute immunity would be of little value if legislators could

be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader." (internal punctuation omitted)))).[12]

Determination of whether there existed a pay-for-play scheme, or whether the decision to "kill" East Side Housing II was the result of misconduct by Mayor Brown, would require this Court "to inquire into the motives of legislators," which the Supreme Court has found "is not consonant with our scheme of government." Bogan, 523 U.S. at 55 (quoting Tenney, 341 U.S. at 377); see also Blagojevich, 638 F.3d at 529 ("Even when the plaintiff's claim is directed primarily at illegal conduct by public officials, immunity attaches if the claim requires 'proof of a legislative act or the motives or purposes underlying such an act.'" (quoting Thillens, 729 F.2d at 1131)). Thus, assuming all of NRP's allegations of corruption to be true, indeed, assuming that Mayor Brown and Council Member Smith had admitted to "unworthy" or even criminal conduct, the actions at issue would nevertheless be immune from civil liability.

Because the decision not to bring the resolutions up for vote was procedurally legislative and substantively "reflected a discretionary, policymaking decision implicating the budgetary priorities" of the City and the services the City provides to its constituents, see Bogan, 523 U.S. at 55-56, the conduct at issue was legislative in nature. And, because legislative immunity is absolute, this Court has no discretion to evaluate the motives behind that conduct, when assessing civil liability for Mayor Brown and Council Member Smith's legislative acts. Deputy Mayor Casey has not moved to dismiss the RICO claim against him. However, having found that legislative immunity precludes the

_____

[12] NRP cites two cases where legislative immunity did not bar a criminal prosecution. (See Docket No. 179, Opp. to Motion for Summary Judgment, at 9-10 (citing Brewster, 408 U.S. 501 and United States v. Menendez, 831 F.3d 155, 166 (3d Cir. 2016)). As noted, legislative immunity is an absolute defense only with respect to civil, not criminal, liability.

RICO claims against Mayor Brown and Council Member Smith, and that Deputy Mayor Casey is alleged only to have participated in the same conduct attributed to the other defendants, this Court finds *sua sponte* that Deputy Mayor Casey is also immune. Accordingly, the RICO claim is dismissed.[13]

**B. Promissory Estoppel**

The City Defendants and BURA also contend that NRP's promissory estoppel claim must be dismissed. Promissory estoppel is established by showing "(1) a promise that is sufficiently clear and unambiguous; (2) reasonable reliance on the promise by a party; and (3) injury caused by the reliance." MatlinPatterson ATA Holdings LLC v. Fed. Express Corp., 87 A.D.3d 836, 841-42, 929 N.Y.S.2d 571 (1st Dep't 2011); see also New York City Health & Hosps. Corp. v. St. Barnabas Hosp., 10 A.D.3d 489, 491, 782 N.Y.S.2d 12 (1st Dep't 2004). This Court previously found, in its December 28, 2015 Decision and Order, two of the "promises" in the Wanamaker Letter to be unambiguous on their face: (1) the promise to extend a low-income PILOT agreement and (2) the promise to sell 51 City-owned buildable vacant lots.[14] (See Docket No. 132 at 12.) This Court also rejected the City Defendants' argument that any reliance on these statements was unreasonable because their fulfillment was contingent on the approval of the City's Common Council. (Id. at 12-13.)

The City Defendants now argue that, even if the promises were unambiguous, and even if NRP's reliance was reasonable, the claim must still be dismissed because a

[13] NRP argues that Mayor Brown and Council Member Smith waived immunity until the completion of discovery by failing to assert immunity earlier in this litigation. As discussed below, there is no basis for further fact discovery, as there are no material issues of disputed fact. Further, the City Defendants raised absolute immunity as an affirmative defense in their Answer. (See Docket Nos. 46 ¶ 177, 47 ¶ 177.)

[14] NRP states that these promises were also "made at various times" outside the Wanamaker Letter "without contingencies." (See Docket No. 179, Opp. to Motion for Summary Judgment, at 16.)

municipality cannot be bound by the promise of an official who lacked authority to make such a promise.   Although this argument appears similar to the reliance argument already rejected by this Court, it is critically different, because it relies on the City and BURA's special status as government entities and is grounded in the New York Court of Appeals rule that governmental agencies are rarely subject to estoppel:

> Generally, governmental agencies are not subject to the defense of estoppel for two reasons.   First, the doctrine is not applied against the government, as a matter of policy, because to do so could easily result in large scale public fraud.   As stated long ago by the United States Supreme Court, "It is better that an individual should now and then suffer by [governmental] mistakes, than to introduce a rule against an abuse, of which, by improper collusions, it would be very difficult for the public to protect itself."   The second, and more fundamental, reason why estoppel is not generally permitted against the government is that to do so may violate the doctrine of separation of powers.

E.F.S. Ventures Corp. v. Foster, 71 N.Y.2d 359, 370, 520 N.E.2d 1345 (N.Y. 1988) (alterations in original) (quoting Lee v. Munroe, 11 U.S. 366, 370, 3 L. Ed. 373 (1813)). Therefore, "[e]stoppel can be invoked against a municipality or municipal agency only in the rarest cases."  Casa Wales Hous. Dev. Fund Corp. v. City of New York, 129 A.D.3d 451, 451, 11 N.Y.S.3d 31 (1st Dep't 2015) (internal citations and quotation marks omitted); see also Nowinski v. City of New York, 189 A.D.2d 674, 675, 592 N.Y.S.2d 369 (1st Dep't 1993) (This exception "is to be invoked sparingly and only under exceptional circumstances.").

There is no genuine dispute that the promises at issue could be performed only after approval by the Common Council and the Mayor.   Although the promises in the Wanamaker Letter do not state this as a condition, the City Charter makes clear that Common Council approval was necessary for the sale of City-owned property.   There is also no dispute that the PILOT agreement, because it would have been a municipal

contract between the City, the County of Erie, and the developers, also required approval by both the Common Council and the County.  Therefore, because those promises were, by law, conditioned on legislative approval, neither BURA, nor any other Defendant or City agent, had authority to make them unconditionally.  "[W]here there is a lack of authority on the part of agents of a municipal corporation to create a liability, except by compliance with well-established regulations, no liability can result unless the prescribed procedure is complied with and followed."  Henry Modell & Co. v. City of N.Y., 159 A.D.2d 354, 355, 552 N.Y.S.2d 632 (1st Dep't 1990) (quotation omitted); see also Holdman v. Office of Court Admin., 38 Misc. 3d 1219(A), 967 N.Y.S.2d 867 (N.Y. Ct. Cl. 2012), aff'd, 118 A.D.3d 447, 987 N.Y.S.2d 363 (1st Dep't 2014) ("incorrect information dispensed by a governmental entity . . . , at variance with a given statutory/regulatory scheme" cannot "be converted into an enforceable promise" without "undermin[ing], if not eviscerate[ing], not only the Court of Appeals' holdings on governmental estoppel, but those on immunity as well").

Moreover, "New York, for policy reasons, choose[s] to place the risk of loss on parties dealing with municipal corporations.  Those dealing with officers or agents of municipal corporations must at their peril see to it that such officers or agents are acting within their authority."  City of Zanesville, Ohio v. Mohawk Data Scis. Corp., 97 A.D.2d 64, 66, 468 N.Y.S.2d 271 (4th Dep't 1983) (citations omitted); see also Casa Wales, 129 A.D.3d at 451 ("those dealing with municipal agents must ascertain the extent of the agents' authority, or else proceed at their own risk").  Even if NRP was not aware of the requirement that the alleged promises were conditional on resolutions approved by the Common Council, it was "chargeable with knowledge of the statutes which regulate

26

its contracting powers and is bound by them." Parsa v. State, 64 N.Y.2d 143, 147, 474 N.E.2d 235 (N.Y. 1984).  Thus, to the extent that NRP "presume[d] that the persons with whom [it was] dealing [were] acting within the scope of their authority," it did so "solely at [its own] peril . . . and, since the extent of that authority is a matter of public record, there is a conclusive presumption that [NRP was] aware of it."  Walentas v. New York City Dep't of Ports, 167 A.D.2d 211, 212, 561 N.Y.S.2d 718 (1st  Dep't 1990).

The City Defendants rely on a recent state court decision, Michael R. Gianatasio, PE, P.C. v. City of New York, 53 Misc. 3d 757, 37 N.Y.S.3d 828 (N.Y. Sup. Ct. 2016), in support of their arguments.  In Gianatasio, a city agency by-passed competitive bidding regulations and entered into illegal building contracts for construction of a youth center with the plaintiff contractor.  Id. at 760.  Although the plaintiff substantially completed construction of the youth center, and although there was no complaint about the quality of the work, the defendant city nevertheless refused to pay plaintiff on the grounds that the contracts were illegal and therefore unenforceable.  Id.  The court found in favor of the city, noting that "where there is a lack of authority on the part of agents of a municipal corporation to create a liability, except by compliance with well-established regulations, no liability can result unless the prescribed procedure is complied with and followed."  Id. at 769 (quoting Henry Modell & Co., 159 A.D.2d at 355); see also Casa Wales, 129 A.D.3d at 451 ("The courts of this state have long held that no implied contract to pay for benefits furnished by a person under an agreement which is invalid because it fails to comply with statutory restrictions and inhibitions can create an obligation or liability of the city." (internal quotation omitted)).

27

In Gianatasio, as here, plaintiffs unsuccessfully attempted to invoke an exception that allows estoppel "where a governmental subdivision acts or comports itself wrongfully or negligently, inducing reliance by a party who is entitled to rely and who changes his position to his detriment or prejudice." Id. at 769 (emphasis removed) (quoting Bender v. New York City Health & Hosps. Corp., 38 N.Y.2d 662, 668, 345 N.E.2d 561 (N.Y. 1976)).  But no matter how wrongful or negligent a government entity's conduct, it cannot be compelled to honor a contract that was entered without authority.  "It does not matter that the municipality or its agents violated the law." Id. at 771 (dismissing estoppel claim even though there was "no doubt that the City acted unlawfully and treated [plaintiff] unfairly" by begging plaintiff to continue work and then refusing to pay "more than $1.5 million for work done and money outlaid").  "In order to protect the public from corrupt or ill-considered actions of municipal officials, a municipality's power to contract is statutorily restricted." Henry Modell & Co., 159 A.D.2d at 355.

NRP was not entitled to rely on the alleged promises in the Wanamaker Letter because both the PILOT agreement and the sale of City-owned property required Common Council approval.  In other words, pursuant to the terms of the City Charter, NRP was not entitled to rely because BURA did not have the authority to make unconditional promises.  It is of little importance why the promise exceeded the agent's power—whether it was an illegal promise, as in Gianatasio, or required legislative approval, as here—the promise need only be outside the authority of the promisor. See Gianatasio, 53 Misc. 3d at 771.  Here, because Wanamaker, and through him BURA, had no legal authority to provide a PILOT agreement or transfer City-owned property

28

absent approval from the Common Council, it would be against New York law, and well-established public policy, to enforce those promises. See id. at 769; see also Parsa, 64 N.Y.2d at 147 (government entity's "acceptance of benefits furnished under a contract made without authority does not estop it from challenging the validity of the contract or from denying liability pursuant to it").[15]

As with the RICO claim, Deputy Mayor Casey did not move to dismiss the promissory estoppel claim against him. However, having found that the promises are unenforceable against the City and its agents because they were not in compliance with the City Charter, this Court finds *sua sponte* that they cannot bind Deputy Mayor Casey. Accordingly, the promissory estoppel claim is dismissed in its entirety.[16]

## C.    NRP's Motion for Additional Discovery

Rule 56(d) permits a party to oppose a motion for summary judgment on the grounds that it needs discovery where it "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). The affidavit must set forth: "'(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.'" Graves v. Corr. Med. Serv., No. 11-

---

[15] Nor is this Court persuaded by NRP's argument that the approvals were "*pro forma*" and that all prior resolutions on development projects had been approved after they were submitted to the Common Council. Approvals that are required by the City Charter to make a valid contract are not mere formalities or technicalities. See Henry Modell & Co., 159 A.D.2d 354. "To be valid, municipal contracts must comply with specific statutory requirements." H & R Project Assocs., Inc. v. City of Syracuse, 289 A.D.2d 967, 967, 737 N.Y.S.2d 712, 714 (4th Dep't 2001) (quotation omitted) (contract could not be enforced because it did not comply with the city charter).

[16] Mayor Brown and Council Member Smith also challenge this claim on the grounds that it cannot be brought against individuals; BURA argues that, because it was not a party to the two promises, it cannot be liable. Because this Court has found that the claim must be dismissed in its entirety because there was no authority to make the promises without legislative approval, it will not address Defendants' additional arguments.

CV-1005AM, 2015 WL 1823456, at *3 (W.D.N.Y. Apr. 22, 2015), aff'd, No. 15-1621, 2016 WL 3472602 (2d Cir. June 24, 2016) (quoting <u>Miller v. Wolpoff & Abramson, L.L.P.</u>, 321 F.3d 292, 303 (2d Cir. 2003)).   "A party seeking to delay resolution of a summary judgment motion on grounds that he has been deprived of certain discovery materials 'must show that the material sought is germane to the defense, and that it is neither cumulative nor speculative, and a bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient.'"   <u>Alphonse Hotel Corp. v. Tran</u>, 828 F.3d 146, 151 (2d Cir. 2016) (quoting <u>Paddington Partners v. Bouchard</u>, 34 F.3d 1132, 1138 (2d Cir. 1994)).

NRP contends that it needs additional discovery to establish facts in broadly three areas:  (1) the motives for killing the project, (2) evidence that the decision not to introduce the resolutions was administrative, not legislative; and (3) that BURA had authority to bind the City.  (<u>See</u> Docket No. 177, Lane Decl.)  However, any evidence that could be adduced in these areas would not create a genuine issue of material fact. Defendants' motives for killing the project are not relevant and cannot be taken into account in this Court's evaluation of legislative immunity.  And the sources of evidence identified, namely depositions of City officials and legislative materials, could not provide any evidence as to whether the acts were administrative, nor as to whether BURA had authority to bind the City, because these are questions of law for this Court to decide. <u>See generally</u> <u>Alphonse Hotel</u>, 828 F.3d at 151 (denying 56(d) motion because the documents identified "do not contain information that would change the outcome of the summary judgment motion").  Because NRP has not identified any genuine disputes of material fact, the motion for additional discovery must be denied.  <u>See</u> <u>Sousa v.</u>

Marquez, 702 F.3d 124, 129 (2d Cir. 2012) (no need for additional discovery where plaintiff "has not shown a genuine dispute of material fact with respect to his . . . claim because he has not even stated a claim upon which relief could be granted").

## D.    Consideration of NRP's Sur-Reply

NRP also moved to file a sur-reply to the City Defendants' motion for summary judgment on the grounds that the City Defendants' reply brief was improper.   NRP argues that the City Defendants, *inter alia*, misrepresent facts related to their compliance with discovery orders and improperly submitted objections to NRP's statement of facts.   As stated above, this Court finds there are no material issues of disputed fact, thus the discovery disputes need not be resolved.   And, although the City Defendants objected to numerous aspects of NRP's response to their statement of undisputed facts and filing of its own statement of facts, this Court gave consideration to NRP's submissions because, also as noted above, NRP argued that discovery was incomplete and because factual assertions must be viewed in the light most favorable to the nonmoving party.   See Anderson, 477 U.S. at 255.   Again, because there are no material issues of disputed fact, this Court need not consider NRP's proposed sur-reply to appropriately view those factual assertions.

Further, this Court disagrees with NRP's contention that the City Defendants made a new legal argument by citing to Gianatasio, 53 Misc. 3d 757, for the first time in their reply.   Gianatasio stands for the same legal propositions as the cases cited in the City Defendants' motion for summary judgment, and indeed cites many of the cases relied on by both parties in their papers.   Accordingly, NRP's motion is denied and the proposed sur-reply will not be considered.

## IV. CONCLUSION

The City Defendants and BURA's motions for summary judgment are granted and the claims against them are dismissed.  The claims against Deputy Mayor Casey are also dismissed, *sua sponte*.  NRP's motions for additional discovery and for leave to file a sur-reply are denied.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants the City of Buffalo, Byron W. Brown, and Demone A. Smith's motion for summary judgment (Docket No. 152) is GRANTED;

FURTHER, that the City of Buffalo Urban Renewal Agency's motion for summary judgment (Docket No. 165) is GRANTED.

FURTHER, that the claims against Steven M. Casey are dismissed.

FURTHER, that Plaintiffs NRP Holdings LLC and NRP Properties LLC's motion for additional discovery (Docket No. 177) is DENIED.

FURTHER, that Plaintiffs NRP Holdings LLC and NRP Properties LLC's motion for leave to file a sur-reply (Docket No. 194) is DENIED.

FURTHER, that the Clerk of Court is directed to close this case.

SO ORDERED.

Dated: February 27, 2017
Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge